## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CONNECTICUT GREEN BANK | : | |
| Plaintiff, | : | |
| | : | **CASE NO. _____** |
| v. | : | |
| | : | |
| POSIGEN, PBC f/k/a POSIGEN, INC., | : | |
| BID ADMINISTRATOR LLC, | : | October 30, 2025 |
| BID III POSIGEN AGGREGATOR LP, | : | |
| BII BID US HOLDINGS LLC. | : | |
| Defendants. | | |

## <u>VERIFIED COMPLAINT</u>

## <u>PRELIMINARY STATEMENT[1]</u>

1.      This Complaint stems from one lender's aggressive exercise of control over the financial and operational affairs of a now insolvent corporate enterprise: the PosiGen Group.  In doing so, the lender, Brookfield, has supplanted the business judgment of the PosiGen Group's management with its own regarding the company's restructuring efforts, and has caused the parent company of the PosiGen Group, PosiGen PBC, to breach its loan agreements with Plaintiff, Connecticut Green Bank or CGB, driving PosiGen PBC further into insolvency.  Significantly, Brookfield has (i) decided which of PosiGen Group's business segments will continue to exist and for how long, (ii) decided the funding to be allocated to those entities, (iii) directed the termination of substantially all of the PosiGen Group's employees at its Operating Companies—entities at which Brookfield had no material financial stake—and (iii) hand-selected a purportedly

---

[1] Capitalized terms used in this Preliminary Statement but not yet defined have the meanings given to such terms in the remainder of this Complaint.

"*independent*" manager to control and conduct the affairs of the company's Backleverage Entities—entities at which Brookfield has substantial interests. Absent from Brookfield's decision making is any plan for a comprehensive restructuring of the PosiGen Group that preserves the value of the PosiGen Group's parent entity, PosiGen PBC, or the group's other Operating Companies. Brookfield's clear decision to prioritize the outcome of certain segments of the PosiGen Group where Brookfield had invested at the expense of the upper level segments where Brookfield had not, created a dichotomy between the PosiGen Group's business segments—those that will survive and those that will be abandoned or liquidated. From Brookfield's perspective, the restructuring of PosiGen PBC or the other Operating Companies was of little consequence. Brookfield's strategy is clear, isolate as much liability as possible at PosiGen PBC and the other Operating Companies and then separate such entities from the remainder of the PosiGen Group, thereby minimizing the harm to Brookfield's secured position resulting from the PosiGen Group's insolvency.

2.      The wrinkle is that the segments of the PosiGen Group that Brookfield cares about (the Backleverage Entities and their subsidiaries) are currently dependent upon services provided by PosiGen PBC and the other Operating Companies. Implementing Brookfield's strategy therefore requires the temporary survival of PosiGen PBC and such other Operating Companies until Brookfield can establish replacement servicers. Those companies do not generate positive cash flow, and so in order to survive, they require funding, which Brookfield has provided on a week-by-week basis and has used to further exert control. When Brookfield could no longer provide such funding by releasing cash collateral under the Backleverage Entities' debt facilities, it determined that go-forward weekly advances would require a new secured bridge loan at PosiGen PBC, guaranteed by the other Operating Companies. However, such new loan was

expressly prohibited by the agreements governing existing debt obligations owed by PosiGen PBC to Plaintiff CGB, and therefore required CGB's prior waiver of such prohibitions. Brookfield requested such waiver from CGB, but became indignant when CGB desired to limit any waiver and protect CGB's interests at PosiGen PBC.

3. On a call on Friday, October 24, 2025, Brookfield explained its solution to sidestep CGB's rights: Brookfield would simply fund PosiGen PBC in breach of CGB's debt documents, and, in Brookfield's view, there was nothing CGB could do about it because CGB would never sue. On Tuesday, October 28, 2025, CGB was informed that Brookfield had followed through on that threat and forced PosiGen PBC to accept Brookfield's bridge loan in breach of CGB's debt documents. This litigation is the result.

4. As discussed in greater detail below, Brookfield's willful and wanton disregard of PosiGen PBC's dire financial situation and its objective to protect Brookfield and other members of the PosiGen Group at the expense of PosiGen PBC and its creditors and other stakeholders are clear violations of well-established legal principles. This Court should not allow Brookfield, both directly and indirectly via its control over the PosiGen Group, to engage in acts that have the effect of trampling the bargained-for contractual rights of smaller creditors like CGB in order to protect Brookfield's interests.

## PARTIES

5. Plaintiff Connecticut Green Bank ("**CGB**") is a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, having its mailing address at 75 Charter Oak Ave, Hartford, Connecticut, 06160.

6.      Defendant PosiGen, PBC, f/k/a/ PosiGen, Inc. ("**PosiGen PBC**"), is a Delaware public benefit corporation, having its principal place of business at 819 Central Ave, Ste. 210, New Orleans, Louisiana.

7.      Defendant BID Administrator LLC ("**Brookfield Agent**") is a Delaware limited liability company, having its principal place of business (care of Brookfield Asset Management Inc.) at Brookfield Place, 250 Vesey Street, New York, New York.

8.      Defendant BID III Posigen Aggregator LP ("**Brookfield Lender I**") is a Delaware limited partnership, having its principal place of business (care of Brookfield Asset Management Inc.) at Brookfield Place, 250 Vesey Street, New York, New York.

9.      Defendant BII BID US Holdings LLC ("**Brookfield Lender II**" and, together with Brookfield Agent and Brookfield Lender I, "**Brookfield**") is a Delaware limited liability company, having its principal place of business (care of Brookfield Asset Management Inc.) at Brookfield Place, 250 Vesey Street, New York, New York.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the action is between citizens of different States.

11.     Under Section 9.21 of the CGB PBC Credit Agreements (as defined below), CGB and PosiGen PBC expressly consented to the exclusive jurisdiction of the United States District Court for the District of Connecticut to resolve any claim or matter arising under or in connection with such agreements. This Court therefore has personal jurisdiction over PosiGen PBC because PosiGen PBC expressly consented to such exercise of personal jurisdiction.

12. This Court has personal jurisdiction over Brookfield pursuant to Conn. Gen. Stat. § 52-59b(a) because Brookfield has transacted business in the State of Connecticut and has committed acts within the state giving rise to the claims asserted herein.

13. On information and belief, Brookfield is a lender that regularly conducts business in Connecticut, extending credit facilities and enforcing security interests in the ordinary course of its lending operations. Brookfield purposefully availed itself of the privileges of conducting business within this State by (a) extending loans to a company that owned and operated substantial assets located in Connecticut, (b) taking and perfecting a security interest in collateral situated in Connecticut and (c) engaging in communications and transactions directed to Connecticut concerning negotiation, documentation and enforcement of the subject loan.

14. Brookfield's contacts with Connecticut are continuous and systematic and, in any event, are directly related to the transactions and occurrences giving rise to this action. By lending to an entity with Connecticut-based assets and perfecting liens on property located in this District, Brookfield purposely invoked the benefits and protections of Connecticut law and could reasonably foresee being forced to be appear in this court.

15. The exercise of personal jurisdiction over Brookfield therefore comports with due process, because Brookfield's contacts with Connecticut demonstrate purposeful availment and the claims in this action arise out of or relate to those contacts.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because the CGB and PosiGen PBC agreed that any disputes arising out of the CGB PBC Credit Agreements would be adjudicated exclusively in Connecticut courts. Moreover, a substantial part of the events or omissions giving rise to the claims occurred in this District and a substantial part of the property that is the subject of this action, including the collateral securing Plaintiff's loan, is located here.

# BACKGROUND

## A.     Background on CGB

17.     CGB was established by the Connecticut General Assembly in July 2011, and supports the energy strategy of the State's Governor and Legislature to achieve cleaner, less expensive and more reliable sources of energy while creating jobs and supporting local economic development.  In 2021, CGB's model was expanded to include the new area of environmental infrastructure, related to climate adaptation and resiliency, land conservation, parks and recreation, agriculture, water, waste and recycling, and environmental markets, including carbon offsets and ecosystem services.  CGB is funded by a mixture of private and public capital (including ratepayer and taxpayer dollars).

## B.     PosiGen and its Capital Structure

18.     PosiGen PBC, together with its direct and indirect subsidiaries (collectively, the "**PosiGen Group**"), was until recently a provider of solar technology and energy products offering residential solar and energy storage solutions to customers located primarily in Massachusetts, Connecticut, Rhode Island, New Jersey, Pennsylvania, Louisiana and Mississippi.  The PosiGen Group's customers include over 6,500 Connecticut residents, all of which may be impacted by the events and lender misconduct detailed below.

19.     The organizational structure of the PosiGen Group is essentially comprised of three groups of companies that each have their own largely distinct capital structure, namely (a) a top-level group of operating entities, (b) a mid-level group of entities used to raise "back leveraged" debt capital and (c) a final bottom level of project entities that owned and leased the majority of the PosiGen Group's solar and energy storage assets and received services from the operating entities, capital from the "back leveraged" entities and equity capital from certain additional tax equity investors.

20.    The first group of companies, consisting of (a) PosiGen PBC, (b) PosiGen, LLC, (c) PosiGen Operations, LLC, (d) PosiGen Developer, LLC, (e) PosiGen Provider, LLC, (f) PosiGen Holdings, LLC, (g) PosiGen Rampart Holdco, LLC and (h) PosiGen Rampart, LLC (collectively, the "**Operating Companies**"), were the primary operating entities within the PosiGen Group, employing substantially all of the PosiGen Group's employees, operating the PosiGen Group's office locations and selling to and servicing the PosiGen Group's customers.

21.    The organizational structure of the Operating Companies is as follows:



22.    Each of the Operating Companies is directly or indirectly 100% owned by PosiGen PBC.

23.    The debt capital structure of the Operating Companies primarily consisted, prior to the Defaults (as defined below) and certain subsequent events, of: (a) amounts borrowed from CGB pursuant to a Revolving Credit Agreement dated as of September 30, 2022 (as amended from time to time, the "**PBC Revolving Credit Agreement**") and a Term Loan Credit Agreement dated

as of October 7, 2022 (as amended from time to time, the "**PBC Term Loan Credit Agreement**" and, together with the PBC Revolving Credit Agreement, the "**CGB PBC Credit Agreements**" and, the related debt obligations, the "**CGB PBC Obligations**"),[2] with PosiGen PBC's obligation to repay such amounts secured by a first priority lien on, among other things, certain Generac battery storage systems and any funds generated from such systems by PosiGen PBC (the collateral securing the CGB PBC Credit Agreements, the "**CGB PBC Collateral**"); and (b) amounts borrowed under promissory notes issued to various lenders pursuant to a Note Purchase Agreement dated as of June 13, 2023 (as amended from time to time, the "**PBC Note Purchase Agreement**" and, the related debt obligations, the "**PBC Note Obligations**"), by and among PosiGen PBC and Wilmington Trust, National Association ("**Wilmington Trust**") as administrative agent and collateral agent, and such lenders. The PBC Note Obligations were secured by liens on substantially all of PosiGen PBC's assets, but were subordinated to the CGB PBC Obligations with respect to the CGB PBC Collateral pursuant to a Lien Subordination Agreement dated as July 17, 2023, by and among PosiGen PBC, CGB and Wilmington Trust.

24.     As of today's date, the CGB PBC Obligations include, without limitation, (a) approximately $2 million in outstanding principal amount, (b) accrued but unpaid interest and (c) material costs and expenses incurred by CGB following the Defaults.

25.     Importantly, the PBC Revolving Credit Agreement included a negative covenant pursuant to which, for so long as (among other things) any CGB PBC Obligations remain outstanding under the PBC Revolving Credit Agreement, PosiGen PBC covenanted and agreed that PosiGen PBC would not, and would not permit any of its subsidiaries (including the other

---

[2] A copy of the PBC Revolving Credit Agreements is attached hereto as **Exhibit A**. A copy of the PBC Term Loan Credit Agreement is attached hereto as **Exhibit B**.

Operating Companies) to, create, incur, assume or suffer to exist any indebtedness at any time, except for certain limited "Permitted Indebtedness" (such negative covenant, the "**Revolving Loan Debt Restriction**").  The PBC Term Loan Credit Agreement included substantially the same restriction (the "**Term Loan Debt Restriction**" and, together with the Revolving Loan Debt Restriction, the "**PBC Debt Restrictions**").  The "Permitted Indebtedness" permitted by the PBC Debt Restrictions was limited to:

- the CGB PBC Obligations;

- taxes, assessments and governmental charges that are not yet due and payable;

- certain subordinated indebtedness which was repaid in full in April 2024;

- the Backleverage Obligations (as defined below);

- unsecured trade accounts payable incurred in the ordinary course of business, provided that (a) such accounts payable are payable not later than ninety (90) days after the original invoice date and not overdue by more than thirty (30) days, and (b) the aggregate amount of such accounts payable does not, at any time, exceed $500,000 in the aggregate for PosiGen PBC and its subsidiaries; and

- the PBC Note Obligations.

26.     Equally important, prior to the events described herein, except for certain limited "cash diversion" guaranty obligations of PosiGen PBC associated with the Backleverage Obligations, PosiGen PBC and the other Operating Companies were not obligors on the Backleverage Obligations and Brookfield did not have a direct material stake in the Operating Companies' capital structure.

27.     The second group of companies, consisting of (a) PosiGen Backleverage Holdco, LLC ("**Backleverage Pledgor**"), (b) PosiGen Backleverage, LLC ("**Backleverage Borrower**"), (c) PosiGen Owner, LLC, (d) Rooftop Solar I Manager, LLC, (e) PosiGen Decatur Manager, LLC, (f) PosiGen Bienville Manager, LLC, (g) PosiGen Marengo Manager, LLC and (h) PosiGen Owner 2, LLC (collectively, the "**Backleverage Entities**"), were non-operating entities used to

raise debt capital for investment in the solar and battery project companies described below. Specifically, the Backleverage Entities were used to raise debt capital that was structurally subordinated, or "backleveraged," to equity investments made at the project companies.

28.     The organizational structure of the Backleverage Entities is as follows:



29.     Other than the Backleverage Entity PosiGen Owner 2, LLC, which is owned by the Operating Company PosiGen Rampart, LLC, each of the other Backleverage Entities is directly or indirectly 100% owned by the Operating Company PosiGen Holdings, LLC.

30.     The debt capital structure of the Backleverage Entities primarily consisted, prior to the Defaults, of: (a) approximately $600 million borrowed by the Backleverage Entities from Brookfield pursuant to a Credit Agreement dated April 21, 2023 (as amended from time to time, the "**Brookfield Credit Agreement**" and, the related debt obligations, the "**Brookfield Obligations**"), by and among Brookfield and various Backleverage Entities, among others, which amount was secured by, among other things, first priority liens on substantially all of the assets of the Backleverage Entities (the "**Backleverage Collateral**"); (b) approximately $30 million borrowed by the Backleverage Entities from CGB pursuant to a Second Lien Credit Agreement

dated December 18, 2019 (as amended from time to time, the "**CGB Backleverage Credit Agreement**" and, the related debt obligations, the "**CGB Backleverage Obligations**"), by and among CGB (in its capacity as administrative agent and collateral agent (in such capacity, the "**Second Lien Agent**")) and certain Backleverage Entities, among others, which amount as secured by a second priority lien on the Backleverage Collateral (although the CGB Backleverage Obligations were also secured by a first priority lien in certain limited battery collateral at the Backleverage entities); and (c) approximately $7 million borrowed by the Backleverage Entities from the Green Finance Authority, an independent instrumentality of the District of Columbia Government ("**DC Green Bank**"), pursuant to a Solar Loan Agreement dated May 18, 2022 (as amended from time to time, the "**DC Green Bank Credit Agreement**," the related debt obligations, the "**DC Green Bank Obligations**," the DC Green Bank Credit Agreement together with the Brookfield Credit Agreement and the CGB Backleverage Credit Agreement, the "**Backleverage Credit Agreements**" and, the DC Green Bank Obligations together with the Brookfield Obligations and the CGB Backleverage Obligations, the "**Backleverage Obligations**"), by and among various Backleverage Entities and DC Green Bank, which amount was secured by a third priority lien in the Backleverage Collateral.

31.     The final group of companies, consisting of (a) Rooftop Solar I, LLC, (b) Rooftop Solar II, LLC, (c) Rooftop Solar III, LLC, (d) Rooftop Solar IV, LLC, (e) Rooftop Solar V, LLC, (f) PosiGen Decatur Project Company, LLC, (g) PosiGen Decatur 2 Project Company, LLC, (h) PosiGen Bienville Project Company, LLC and (i) PosiGen Marengo Project Company, LLC (collectively, the "**Project Companies**"), are the "project companies" that were primarily intended to acquire and own interests in residential solar systems or energy storage systems and lease such systems to the PosiGen Group's customers.  As a result, outside of the necessary capital to form

and operate the Operating Companies, substantially all of the debt and equity capital raised by the Operating Companies and the Backleverage Entities was ultimately invested in the Project Companies.

32.    The organizational structure of the Project Companies, as they relate to the PosiGen Group, is as follows:



33.    As shown above, a Backleverage Entity holds an interest in each Project Company, however the Project Companies are not 100% owned by such Backleverage Entities.  Instead, the applicable Backleverage Entities hold, in each case, all of the "Class B" units in the corresponding Project Company(ies), providing such Backleverage Entities with the right to manage such Project Companies.  Additional capital, totaling approximately $100 million across all of the Project Companies, was also provided by certain tax equity investors (the "**Tax Equity Investors**" and, such invested capital, the "**Tax Equity Investments**"), who purchased "Class A" units in the Project Companies.  As noted above, the Tax Equity Investments were structurally senior to the "back-leveraged" investments from the Backleverage Entities, and are essentially the first in line for repayment from any value realized from the Project Companies.

34.    As a result of the PosiGen Group's organizational structure, the collective value of the PosiGen Group was ultimately dependent upon both (a) the operations of the Operating Companies, which both serviced and maintained the companies' existing customer relationships and drove marketing and sales to expand the companies' business, and (b) the assets acquired by the Project Companies using the capital generated by the Backleverage Obligations and the Tax Equity Investments.  In other words, absent the preservation of the services provided by the

Operating Companies, going concern value would be destroyed and only liquidation value would remain, although Brookfield's position within the capital structure limited its right to participate in any collective going concern value attributable to the Operating Companies.

### C.    PosiGen's Defaults and Insolvency

35.    On or around August 4, 2025, the Backleverage Entities failed to make certain scheduled interest payments with respect to the Backleverage Obligations.  Such failure constituted an event of default under the Backleverage Credit Agreements and, among other things, also triggered events of default under the CGB PBC Credit Agreements (such events of default, collectively, the "**Defaults**").  CGB (including in its capacity as the Second Lien Agent) delivered notices of default, with respect to events of default under the CGB PBC Credit Agreements and the CGB Backleverage Credit Agreement, to PosiGen PBC and Backleverage Borrower on August 16, 2025.  CGB understands that Brookfield delivered a notice of default with respect to the events of default under the Brookfield Credit Agreement around the same date.

36.    On August 25, 2025, CGB delivered additional notices of acceleration to PosiGen PBC with respect to the CGB PBC Credit Agreements, notifying PosiGen PBC that CGB was exercising the right to accelerate all obligations under the CGB PBC Credit Agreements and causing all such obligations to become immediately due in payable in full.  On September 5, 2025, CGB, in its capacity as the Second Lien Agent, delivered a similar notice of acceleration with respect to the CGB Backleverage Obligations.  Around the same time period, CGB understands that Brookfield delivered a similar notice of acceleration with respect to the Brookfield Obligations.

37.    CGB has only received only limited information concerning the cause of the PosiGen Group's Defaults.  Based on the limited information CGB has received, together with publicly available information, it appears that (a) rollbacks of federal tax credits for solar energy

substantially reduced the PosiGen Group's ability to attract needed capital and (b) the PosiGen Group may have engaged in extensive asset and cash commingling at odds with the segregation intended by the Project Companies that caused the PosiGen Group to become significantly over leveraged.

38.     Whatever the cause, by early September 2025, substantially all of the PosiGen Group's outstanding debt obligations had defaulted, such debt obligations had accelerated and become due and payable in full, the PosiGen Group lacked sufficient capital to satisfy its obligations in the ordinary course of its business, and the PosiGen Group was materially insolvent from a balance sheet perspective.

### D.     Brookfield Exercises Control

39.     After the occurrence of the Defaults, Brookfield took numerous actions to exercise control over the management of the Backleverage Entities, as well as the funding of PosiGen PBC and the Operating Companies.

40.     On or around August 18, 2025, Brookfield took control of the Backleverage Entities through its appointment of a purportedly "independent" manager at Backleverage Borrower—Neal P. Goldman (the "**Independent Manager**").  The Independent Manager, as Brookfield's designee, thereafter became Backleverage Borrower's sole manager and effectively conducted all business on behalf of the Backleverage Entities.

41.     Moreover, Brookfield assumed control over the funding of PosiGen PBC and the other Operating Companies by consenting to the release of approximately $15 million from certain "collateral accounts" under Brookfield's control (the "**Collateral Accounts**") to fund operations that Brookfield deemed critical.  Brookfield's control over the Operating Companies' budgets required the Operating Companies to terminate a substantial majority of their employees.  *See* PosiGen Developer LLC's notice to employees under the federal Worker Adjustment and

Retraining Notification Act dated August 25, 2025, attached hereto as **Exhibit C** (indicating that the company was permanently laying off employees in various facilities in Connecticut effective immediately, which would result in the permanent closure of one or more operating units at such facilities, after the company determined that it was "unable to secure sufficient capital to continue most of its operations and avoid the need for a significant headcount reduction" and given that its "limited near-term liquidity has been earmarked by the lender to preserve only a small portion of the Company's business[ and] [t]he Company must therefore cease all of its other business operations").

42.    During this period, Brookfield also made little effort to actively communicate with CGB and other creditors with respect to the restructuring process and options available to preserve value.

### E.    Brookfield Seeks CGB's Waiver of PBC Debt Restrictions

43.    Following the capital funded to PosiGen PBC on or around Friday, October 17, 2025 from the Collateral Accounts, which provided PosiGen PBC with the minimum amount needed to survive until Friday, October 24, 2025, the Collateral Accounts were depleted.  As a result, the additional capital that would be required to fund the Operating Companies on and after Friday, October 24th, would need to come from a new source.  Although Brookfield was willing to provide a secured "bridge" loan that would provide for periodic advances to PosiGen PBC, guaranteed by the other Operating Companies (such secured bridge loan, the "**Bridge Loan**"), Brookfield and PosiGen PBC recognized that any such additional financing at PosiGen PBC required CGB's waiver of the PBC Debt Restrictions.

44.    Brookfield's need for CGB to waive the PBC Debt Restrictions led to a sudden change in approach, which appeared driven primarily by Brookfield's need for CGB's consent rather than a genuine effort to collaborate on the restructuring.  Unfortunately, the limited

information that CGB possessed on the process and state of the PosiGen PBC's financial affairs meant that there was substantial work required before CGB would be able to make any informed decision regarding the PosiGen Group's restructuring efforts generally and any waiver of the PBC Debt Restrictions in connection with the Bridge Loan specifically.

45.    On Wednesday, October 22, 2025, after informing CGB that a waiver of the PBC Debt Restrictions would be required to proceed with the Bridge Loan, Brookfield's counsel prepared a proposed form of waiver and consent (to which only CGB and PosiGen PBC would be parties) and shared such proposed waiver with counsel for CGB and PosiGen PBC.  Brookfield's proposed waiver contemplated that CGB would expressly waive the PBC Debt Restrictions with respect to a to-be-determined amount of initial financing under the Bridge Loan, with the possibility of an unlimited amount of additional advances under the Bridge Loan over an unlimited period of time.  Later that day, counsel for PosiGen PBC provided limited comments to such proposed form of waiver.  At the time, it was believed that such waiver was being requested for an anticipated funding on or around Friday, October 31st.

46.    On Thursday, October 23, 2025, CGB's counsel spoke with Brookfield's counsel regarding the proposed waiver of the PBC Debt Restrictions.  CGB's counsel explained that CGB needed to receive adequate information to assess CGB's credit position at PosiGen PBC and PosiGen PBC's financial condition.  CGB also needed to understand how much capital was needed and by when, how much capital Brookfield was ultimately proposing to lend and over what time period, and what Brookfield was proposing to "bridge" to, both with respect to the Operating Companies and the Backleverage Entities.  In response, Brookfield's counsel insisted that the waiver would be required no later than early afternoon the following day, but could not clearly explain how much capital would be funded immediately, the total amount of capital Brookfield

was proposing to fund, over what specific time period Brookfield was proposing to lend such amounts, whether Brookfield was securing any assets that were currently unencumbered, or the ultimate goal of the bridge financing as it related to the Operating Companies (beyond vague references to the possibility of a restructuring or bankruptcy filing after the Backleverage Entities had separated from the Operating Companies), but committed to expediting information to help CGB make an informed decision.  In response, CGB's counsel explained (and reiterated by email shortly thereafter) that CGB would work diligently to assess any information that was provided, but was unlikely to provide any waiver beyond what was necessary for the immediate financing needs of the following week given the limited time to consider Brookfield's request.

47.    Within hours of such call, CGB was provided with limited information related to the condition of its collateral at PosiGen PBG and the amount of funding being requested by PosiGen PBC for the following week, the first time in months that such information had been shared in response to CGB's request.  After quickly reviewing such information, that evening, CGB provided its comments to the proposed waiver to counsel for Brookfield and PosiGen PBC, among other things: (a) limiting the permitted borrowings to the specific amount needed for the following week; (b) adding Brookfield as a party to the waiver that had been prepared by Brookfield's counsel, and including limited intercreditor provisions prohibiting additional borrowings under the Bridge Loan without CGB's express consent and expressly subordinating any borrowings provided under the Bridge Loan in violation of such consent requirement; and (c) in exchange for such waiver, requiring PosiGen PBC and its affiliates to (x) take all necessary steps to register installed or on site batteries or battery storage systems constituting CGB's collateral in order to qualify such assets for all applicable federal, state or local incentive programs and (y) commit to customary information and inspection rights.

48.     Early the following morning, on Friday, October 24, 2025, the expressed deadline to fund PosiGen PBC to avoid an immediate shutdown or bankruptcy filing, CGB's counsel discussed CGB's comments to the proposed waiver with PosiGen PBC's counsel and agreed, given the practical restraints resulting from Brookfield's exercise of control at the Backleverage Entities and the termination of the majority of the Operating Companies' personnel, to remove the battery registration requirement from the waiver and limit the information rights to PosiGen PBC and its controlled subsidiaries (effectively limiting such information rights to the Operating Companies).

49.     Unfortunately, disagreements with Brookfield regarding the terms of the waiver were more difficult to resolve, and a Zoom conference call was scheduled for 2:30 p.m. on Friday, October 24th, to discuss the terms of the potential waiver of the PBC Debt Restrictions.  The call ultimately included over fifteen representatives of Brookfield, PosiGen PBC and CGB, including Bert Hunter ("**Mr. Hunter**"), the Executive Vice President and Chief Investment Officer of CGB, and Michael Rudnick ("**Mr. Rudnick**"), Managing Director in Brookfield's Private Equity Group. During the call, after initial attempts to pressure Mr. Hunter failed, Mr. Rudnick quickly resorted to threats, including that, unless CGB provided the waiver in the form demanded by Brookfield, CGB would be "dead" to Brookfield and Brookfield would never again answer CGB's phone calls. When Brookfield's threat to cut-off unrelated business opportunities failed, Brookfield stated that it did not need the waiver because Brookfield would simply fund PosiGen PBC in breach of the PBC Debt Restrictions, and that there was nothing that CGB could do about it because CGB would never sue.

50.     Notwithstanding Mr. Rudnick's clear threats on Friday, on Saturday, October 25, 2025, Brookfield's counsel repeatedly asked that CGB provide a waiver that did not include Brookfield or any intercreditor arrangements of any kind.  CGB refused, but until late in the day

18

continued to express a willingness to provide the waiver it had offered late Thursday night. After CGB's counsel eventually asked how the proposed Bridge Loan would maximize the value of PosiGen PBC specifically, and noted that it appeared that Brookfield's proposed Bridge Loan would deepen the insolvency at PosiGen PBC with no apparent benefit to PosiGen PBC or its creditors, including CGB, to which Brookfield did not respond, communications with Brookfield ended.

**F.    Brookfield Forces PosiGen PBC to Breach the CGB PBC Credit Agreements**

51.    On Tuesday, October 28, 2025, PosiGen's financial advisor, FTI Consulting Ltd., confirmed to CGB's financial advisor, Riveron RTS, LLC, that Brookfield and PosiGen PBC intended to proceed with the Bridge Loan without a waiver from CGB, in breach of the PBC Debt Restrictions.

**COUNT I**
**BREACH OF CGB PBC CREDIT AGREEMENTS**
**(Against PosiGen PBC)**

52.    CGB repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

53.    CGB and PosiGen PBC are parties to the CGB PBC Credit Agreements, which are valid and enforceable.

54.    CGB has performed under the CGB PBC Credit Agreements by, among other things, extending funding thereunder.

55.    PosiGen has materially breached the CGB PBC Credit Agreements.

56.    The PBC Debt Restrictions set forth in the CGB PBC Credit Agreements prohibited the Operating Companies from incurring the Bridge Loan.

57.    PosiGen PBC and the other Operating Companies entered into the Bridge Loan and incurred debt obligations under such Bridge Loan without obtaining CGB's waiver of the PBC Debt Restrictions, which was a material breach of the CGB PBC Credit Agreements.

58.    CGB has and will continue to suffer damages as a result of PosiGen PBC's breach of the CGB PBC Credit Agreements.

59.    CGB seeks avoidance of the Bridge Loan and any liens issued in connection with such Bridge Loan.

60.    Alternatively, CGB seeks damages in an amount to be determined at trial.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
## (Against Brookfield)

61.    CGB repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

62.    At all relevant times, CGB and PosiGen PBC were parties to the CGB PBC Credit Agreements, both valid and enforceable, under which CGB extended substantial credit to PosiGen PBC.

63.    Brookfield was not a party to the CGB PBC Credit Agreements.

64.    The CGB PBC Credit Agreements contained, among other provisions, negative covenant clauses prohibiting PosiGen PBC from incurring additional indebtedness, granting liens, or otherwise pledging assets as security for any other lender.

65.    Brookfield was aware of the CGB PBC Credit Agreements and their material terms, including the PBC Debt Restrictions, prior to forcing PosiGen PBC to accept the Bridge Loan.  In fact, Brookfield drafted the proposed waiver of PBC Debt Restrictions on behalf of PosiGen PBC and requested CGB's waiver on various occasions.

66.     Brookfield's conduct was intentional, unjustified and motivated by its own self-interest.  Brookfield acted with the purpose and effect of inducing PosiGen PBC to breach its obligations to CGB, securing Brookfield's own financial advantage at CGB's (and PosiGen PBC's and the other Operating Companies') expense.

67.     As a direct and proximate result of Brookfield's intentional interference, PosiGen PBC breached the CGB PBC Credit Agreements, deepening the insolvency of PosiGen PBC and other Operating Companies.

68.     PosiGen PBC would not have breached the PBC Debt Restrictions absent the insistence and pressure exerted on it by Brookfield, as evidenced by PosiGen PBC's efforts to secure CGB's waiver.

69.     Brookfield further owed CGB duties arising under the implied covenant of good faith and fair dealing recognized under Connecticut law as applicable to lenders dealing with existing credit relationships and owed a duty to not knowingly impair an existing creditor's security interest through collusive or bad-faith lending conduct.

70.     Following the Defaults, Brookfield has exercised control over the PosiGen Group, including the Operating Companies, in connection with the PosiGen Group's restructuring efforts, in a malicious attempt to maximize the value recovered by Brookfield at the expense of other stakeholders.

71.     The Bridge Loan and its breach of the PBC Debt Restrictions is indicative of Brookfield's improper exercise of control over the PosiGen Group for its benefit—namely, the preservation of its interests at the Backleverage Entities.  Indeed, although Brookfield and PosiGen PBC will portray the Bridge Loan as critical life support to preserve the PosiGen Group, including the Operating Companies, until a restructuring solution can be determined, CGB believes that, as

it relates to the Operating Companies, this purported "bridge to possibility" is illusory if not, in the case of Brookfield, outright fraudulent.

72.    Brookfield has no intent to successfully restructure or otherwise "rescue" the Operating Companies, but is merely doing the bare minimum to preserve the Operating Companies until replacement servicing compaies for the Project Companies, for the benefit of the Backleverage Entities, can be identified or created, at which point the Operating Companies will intentionally be left without any capital or possibility of a restructuring or bankruptcy filing, allowing all going concern value to be captured by and preserved at the Backleverage Entities and Project Companies.  Such intentional movement of value from the existing Operating Companies to new businesses created or identified by Brookfield comes at the expense of stakeholders in the Operating Companies, which formed a material component of the PosiGen Group's business before Brookfield took control.

73.    Moreover, any suggestion that this intentional sacrificing of the Operating Companies and their stakeholders will ultimately benefit the Operating Companies by reducing the amount of claims that will be asserted against the Operating Companies by the Backleverage Entities and others is without merit, entirely speculative and ignores the substantial probability that Brookfield, as a result of the control it has exercised over the PosiGen Group and the restructuring effort to date, in bad faith for its own benefit, will ultimately be held responsible for such incremental harm.

74.    Brookfield's acts and omissions constitute lender misconduct within the meaning of Connecticut's lender-liability jurisprudence, including (a) knowing participation in the borrower's breach of loan covenants, and (b) inequitable interference with CGB's contract and security rights.

75.     As a result of Brookfield's tortious interference and lender misconduct, CGB has suffered damages in an amount to be determined at trial, including but not limited to (i) lost principal and interest payments, (ii) diminution in collateral value, (iii) enforcement and workout costs, and (iv) attorneys' fees.

76.     CGB is additionally entitled to compensatory, consequential, and punitive damages, together with prejudgment interest, because Brookfield's conduct was willful, wanton, and in reckless disregard of CGB's contractual rights.

**COUNT III**
**FRAUDULENT TRANSFER**
**(Against All Defendants)**

77.     CGB repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

78.     At all relevant times, CGB was a creditor of PosiGen PBC by virtue of loans made under the CGB PBC Credit Agreements.

79.     On or about October 28, 2025, and while insolvent, PosiGen PBC made one or more transfers of property, assets, or other value to or for the benefit of Brookfield in connection with entering into the Bridge Loan.

80.     The transfers were constructively fraudulent as to CGB because PosiGen PBC:

- Received less than reasonably equivalent value in exchange for its incurrence of debt under the Bridge Loan; and

- was engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the transaction; or

- intended to incur, or reasonably should have believed it would incur, debts beyond its ability to pay as they became due.[3]

---

[3] CGB reserves the right to amend this complaint to include an action for an actual fraudulent transfer and other causes of action following discovery.

81.    At the time of the transfers, PosiGen PBC was insolvent within the meaning of Conn. Gen. Stat. § 52-552c.

82.    Brookfield and PosiGen PBC knew that PosiGen PBC was insolvent at the time of the transfers.

83.    As a direct and proximate result of the transfers, Plaintiff has been injured and hindered in collecting amounts owed under the CGB PBC Credit Agreements.

## PRAYER FOR RELIEF

**WHEREFORE,** CGB respectfully requests that this Court enter judgment in its favor and against Brookfield and PosiGen PBC, and prays for the following relief:

(a) Injunctive relief by enjoining PosiGen PBC from utilizing any of the remaining cash borrowed under the Bridge Loan or otherwise receiving any other amounts under the Bridge Loan or any other financing obtained in violation of the PBC Debt Restrictions,

(b) Avoidance of the Bridge Loan and any liens issued in connection with such Bridge Loan,

(c) lost principal and interest payments,

(d) diminution in collateral value,

(e) enforcement and workout costs,

(f) attorneys' and other professionals' fees.

(g) compensatory, consequential, and punitive damages,

(h) prejudgment interest, and

(i) any other relief the Court deems just and proper.

## <u>JURY DEMAND</u>

CGB demands a trial by jury for all issues so triable as a matter of right.

/s/ Robert S. Hoff
Robert S. Hoff (ct27084)
WIGGIN & DANA LLP
Two Stamford Plaza
281 Tresser Boulevard, 14th Floor
Stamford, Connecticut 06901
Tel: 203.363.7600
Email: rhoff@wiggin.com

Kate E. Cassidy *(pro hac vice forthcoming)*
Scott A. Griffin *(pro hac vice forthcoming)*
Andrew C. Ritter *(pro hac vice forthcoming)*
WIGGIN & DANA LLP
437 Madison Ave, 35th Floor
New York, NY 10022
Tel: 212.551.2600
Email: kcassidy@wiggin.com
        sgriffin@wiggin.com
        aritter@wiggin.com

Tamara Van Heel *(pro hac vice forthcoming)*
WIGGIN AND DANA LLP
251 Royal Palm Way, Ste. 601
Palm Beach, Florida 33480
Tel: 561.701.8702
Email: tvanheel@wiggin.com

## VERIFICATION

I, Brian Farnen, am the General Counsel and Chief Legal Officer of Plaintiff Connecticut Green Bank.  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint are true and correct to the best of my knowledge, information and belief.

Dated this 30th day of October, 2025.


_____
Brian Farnen