# Exhibit B

# CGB PBC Term Credit Agreements

# PBC Term Loan Credit Agreement

# Dated October 7, 2022

*Execution Version*

## TERM LOAN CREDIT AGREEMENT

THIS TERM LOAN CREDIT AGREEMENT ("***Agreement***") dated October 7, 2022 (the "***Closing Date***"), is made and entered into by and between CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, having its mailing address at 75 Charter Oak Avenue, Hartford, Connecticut, 06106 (the "***Lender***") and POSIGEN, INC., a Delaware corporation, having its principal place of business at 819 Central Ave., Ste. 210, New Orleans, Louisiana, 70121 (the "***Borrower***"). The Lender, together with the Borrower, are each referred to herein as a "***Party***" and, collectively, the "***Parties***".

## RECITALS

A.    In accordance with the Decision dated July 28, 2021, Docket No. 17-12-03RE03, *PURA Investigation into Distribution System Planning of the Electric Distribution Companies – Electronic Storage*, the State of Connecticut Public Utilities Regulatory Authority ("***PURA***") established Energy Storage Solutions ("***ESS***"), a program designed to expand the development of battery storage systems across the State of Connecticut, with enhanced incentives for deployment of said devices to Low Income (as defined below) households and households located in Underserved Communities (as defined below).

B.    The Borrower and its subsidiaries plan to participate in the ESS and to provide eighteen kilowatt hour (18kWh) batteries to the Borrower's new and existing customers in the State of Connecticut, with a focus on installing Batteries (as defined below) for Low Income customers and customers in Underserved Communities, in accordance with the terms and subject to the conditions of ESS.

C.    The Borrower and Generac (as defined below) are parties to that certain Guaranteed Incentive Program Agreement, dated as of August 30, 2022, attached hereto as **Exhibit A** (as amended from time to time, and including, as applicable, all amendments, exhibits, schedules, quotes, change notes, appendices, statements of work, work orders, purchase orders and/ or other similar ordering documents, or other similar documents related thereto, collectively, the "***Generac Agreement***"), pursuant to which the Borrower will purchase *PWRcell®* battery storage systems as the initial product offering to the Borrower's customers for installation and connection to rooftop solar photovoltaic systems (each a "***Project***" and, collectively, the "***Projects***"), as more particularly set forth in the Generac Agreement.

D.    The Projects are to be constructed by the Borrower and the Affiliates of Borrower at ESS-qualifying residential real property located in State of Connecticut (the location of the Projects, as such locations may change from time to time, being the "***Premises***").

E.    The Borrower desires to finance certain development costs of the Projects, including the battery purchases from Generac.

F.    The Borrower has, subject to the terms and conditions set forth in this Agreement, requested that the Lender make loans and other financial accommodations to the Borrower in an aggregate amount not to exceed the Term Loan Commitment (as defined below) to finance the purchase of the Projects.

G.    The Lender is willing to make such loans upon the terms and subject to the conditions of this Agreement.

NOW THEREFORE, in consideration of the premises and the respective representations, warranties, covenants, agreements, and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1.    INCORPORATION OF PREAMBLE AND RECITALS; DEFINITIONS.

1.1    Incorporation of Preamble and Recitals.    The preamble and recitals set forth above are an integral part of this Agreement and set forth the intentions of the Parties and the premises on which the Parties have decided to enter into this Agreement.  Accordingly, the preamble and recitals set forth above, and all defined terms set forth in such preamble and in such recitals, are fully incorporated into this Agreement by this reference as if fully set forth herein.

1.2    Definitions.  Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement (including in the Recitals hereto):

"*Actual Loan Balance*" means, as of the time of calculation, the then-outstanding principal, accrued and unpaid interest, and other fees due hereunder.

"*Affiliate of Borrower*" means (a) any Person (i) in which Borrower holds any direct or indirect Equity Interest, (ii) who holds a direct or indirect Equity Interest in Borrower, (iii) Controls, is Controlled by, or is under common Control with Borrower.

"*Agreement*" has the meaning set forth in the Preamble to this Agreement.

"*Anti-Terrorism Law*" means the USA Patriot Act or any other law pertaining to the prevention of future acts of terrorism, in each case as such law may be amended from time to time.

"*Applicable Law*" means, as to any Person, all applicable constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules and regulations of any Governmental Authority binding upon such Person or to which such a Person is subject.

"*Authorized Officer*" means, with respect to any Person, any of the following officers:  the President, the Chief Executive Officer, the Chief Financial Officer, the Treasurer, the Assistant Treasurer, the Controller or the Assistant Controller, the Manager, or such other Person as is authorized in writing to act on behalf of such Person and is acceptable to the Lender.  Unless otherwise qualified, all references herein to an Authorized Officer shall refer to an Authorized Officer of Borrower.

"*Available Borrowing Base*" means, as of any date of determination, the net present value of the Generac Guaranteed Payments and any customer payments, relating to the installation of

the Pledged Collateral discounted by the weighted average of the Interest Rate of the Term Loan as of the date of determination.

"***Available Borrowing Base Certificate***" means a certificate from an authorized officer of the Borrower, in the form attached hereto as **Exhibit B**, containing the calculation of the Available Borrowing Base as of each Available Borrowing Base Determination Date determined in accordance with the Base Case Model updated as of such date.

"***Available Borrowing Base Determination Date***" means each date as of which the Available Borrowing Base is required to be calculated pursuant to Section 3.2.

"***Base Case Model***" means the comprehensive long-term financial model of the Term Loan as agreed between Borrower and Lender.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code, as amended from time to time, and all rules and regulations promulgated thereunder.

"***Battery***" means a Generac *PWRcell*® battery storage system connected or to be connected to a rooftop solar photovoltaic system.

"***Borrower***" has the meaning set forth in the Preamble to this Agreement.

"***Borrowing Request***" has the meaning set forth in Section 2.3(b).

"***Business Day***" means any day other than a Saturday, a Sunday or any other day on which commercial banks in the State of Connecticut or in the State of Louisiana are required or permitted by law to close.

"***Capitalized Lease Obligations***" means, with respect to any Person, all obligations under Capital Leases of such Person, without duplication, in each case taken at the amount thereof accounted for as liabilities identified as "capital lease obligations" (or any similar words) on a consolidated balance sheet of such Person prepared in accordance with GAAP.

"***Cash Available for Debt Service***" shall mean all cash available to Borrower for Debt Service including, but not limited to, the Customer Payments.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 *et seq*.

"***Change of Control***" means an event or series of events by which:

      (a)     a "person" or "group" within the meaning of Section 13(d) of the Exchange Act other than the Borrower, a direct or indirect Subsidiary of the Borrower, or any employee or executive benefit plan of the Borrower and/or its Subsidiaries, has become the "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Borrower's Common Stock representing more than fifty percent (50%) of the total

voting power of all Common Stock of the Borrower then outstanding and constituting Voting Stock;

(b)       the consummation of (i) any consolidation or merger of the Borrower pursuant to which the Borrower's Common Stock will be converted into the right to obtain cash, securities of a Person other than the Borrower, or other property or (ii) any sale, lease or other transfer in one transaction or a series of related transactions of all or substantially all of the consolidated assets of the Borrower and its Subsidiaries, taken as a whole, to any other Borrower other than a direct or indirect Subsidiary of the Borrower; *provided*, *however*, that a transaction described in clause (i) or (ii) in which the holders of the Borrower's Common Stock immediately prior to such transaction own or hold, directly or indirectly, more than fifty percent (50%) of the voting power of all Common Stock of the continuing or surviving corporation or the transferee, or the parent thereof, outstanding immediately after such transaction and constituting Voting Stock shall not constitute a Change of Control; or

(c)       during any period of twelve (12) consecutive months, a majority of the members of the board of directors (or other governing body) of the Borrower cease to be composed of individuals (i) who were members of the board of directors (or other governing body) of the Borrower on the first day of such period, (ii) whose election or nomination to the board of directors (or other governing body) of the Borrower was approved by individuals referred to in the immediately preceding clause (i) constituting at the time of such election or nomination at least a majority of the board of directors (or other governing body) of the Borrower, or (iii) whose election or nomination to the board of directors (or other governing body) of the Borrower was approved by individuals referred to in the immediately preceding clauses (i) and (ii) constituting at the time of such election or nomination at least a majority of the board of directors (or other governing body) of the Borrower.

"***Charged-Off Project***" shall mean a Project the subject of a continuing event described in clauses (a), (b), (c) or (d) of the definition of "Customer Prepayment Event".

"***Claims***" has the meaning set forth in the definition of "Environmental Claims".

"***Closing Date***" has the meaning set forth in the Preamble to this Agreement.

"***Collateral***" means any collateral (whether real property or personal property) covered by any Collateral Document or Loan Document.

"***Collateral Accounts***" shall mean collectively the Generac Guaranteed Payments Account and the Customer Payments Account.

"***Collateral Documents***" means the Security Agreement, the Control Agreements, the Lien Subordination Agreement, any other document or agreement pursuant to which any Lien is granted or perfected by the Borrower to the Lender as security for any of the Obligations, and all UCC or other financing statements, instruments or perfection and other filings, recordings and registrations required to be filed or made in respect of any of the foregoing.

"**Common Stock**" means the Borrower's common stock, par value $0.001 per share.

"**Control**" shall mean, with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise (the terms "**Controlling**" and "**Controlled**" shall have meanings correlative to the foregoing).

"**Control Agreement**" shall mean a deposit account, securities account or commodities account agreement by and among the Borrower, the Lender, and First Horizon Bank as Depositary Institution (or any other applicable Depositary Institution) thereunder, each in form and substance reasonably satisfactory to the Lender and in any event providing the Lender with full dominion and exclusive "control" of such deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"**Customer**" means a Connecticut homeowner who leases a Battery and Project Equipment from Borrower or an Affiliate of Borrower.

"**Customer Agreement**" means those certain lease agreements between a Customer and Borrower or an Affiliate of Borrower (together with all ancillary agreements and documents related thereto, including any assignment agreement to a replacement Customer), entered into from time to time, for the use of a Battery or the Project Equipment.

"**Customer Payment**" means a monthly payment paid by a Connecticut homeowner to Borrower or an Affiliate of Borrower pursuant to a Customer Agreement.

"**Customer Payments Account**" means the deposit, securities or commodities account in the name of the Borrower receiving the revenues from the Customer Payments from any Customer and subject to a Control Agreement.

"**Customer Prepayment Event**" shall mean the occurrence of any of the following:

(a)    any Project Equipment experiences an Event of Loss and is not repaired, restored, replaced or rebuilt to substantially the same condition as existed immediately prior to the Event of Loss within one hundred eighty (180) days of such Event of Loss;

(b)    the early termination of any Customer Agreement (including, but not limited to, as a result of the occurrence of a default thereunder or otherwise removed from the Customer's home and is in the process of being redeployed);

(c)    in respect of any Project Equipment, the applicable Customer is more than one hundred twenty (120) days past due on any amount due under the related Customer Agreement;

(d)     the sale or disposition of any Project Equipment attributable to court order, litigation or Debtor Relief Law;

(e)     the elective prepayment by the Customer of any future amounts due under a Customer Agreement;

(f)     the purchase of any Project Equipment by a Customer in accordance with the terms of the applicable Customer Agreement; or

(g)     the sale or disposition of any Project Equipment other than as identified above.

"**DC Green Finance Authority**" means the Green Finance Authority, an independent instrumentality of the District of Columbia Government.

"**Debt**" means, with respect to any Person, (i) Indebtedness of such Person for borrowed money, (ii) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments related to transactions that are classified as financings under GAAP, (iii) obligations of such Person to pay the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business that are unsecured and not overdue by more than six (6) months), (iv) obligations of such Person as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, (v) obligations secured by an adverse claim upon property or assets owned (under GAAP) by such Person, even though such Person may not have assumed or become liable for the payment of such obligations and (vi) obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor, against loss in respect of, Indebtedness or obligations of others of the kinds referred to in clauses (i) through (v) above.

"**Debt Service**" shall mean, for any period, the aggregate amount of all principal, interest, fees payable to lenders, agency fees, margin and payments in the nature of interest under this Agreement and, to the extent collateralized by the same Collateral as under the Collateral Documents, the Subordinating Lender Facilities.

"**Debt Service Coverage Ratio**" shall mean, for any calculation period, the ratio of: (i) the Cash Available for Debt Service for such period; to (ii) the Debt Service for such period.

"**Debtor Relief Laws**" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"**Default**" means any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"***Default Rate***" means, for any day, with respect to the Term Loan, a rate per annum equal to the lesser of: (i) eight percent (8.0%); or (ii) the maximum rate of interested which may be collected from Borrower under Applicable Law.

"***Delinquent Project***" shall mean a Project that is not a Charged-Off Project and (a) for which all or a portion of any Customer Payment is more than thirty (30) days delinquent or (b) with respect to which Lender shall have determined in good faith that the related Customer will not resume making Customer Payments.

"***Delinquency Ratio***" shall mean, as of the last day of each calendar month, the percentage equivalent of a fraction: (i) the numerator of which is the aggregate outstanding Customer Agreement balance of all Delinquent Projects included in the Collateral as of the last day of the immediately preceding calendar month; and (ii) the denominator of which is the aggregate outstanding Customer Agreement balance of all Projects which have achieved Project Completion and that are included in the Collateral as of the last day of the immediately preceding calendar month.

"***Depository Institution***" shall mean IberiaBank, and its successors and assigns in such capacity in accordance with the Depositary Agreement.

"***Designated Jurisdiction***" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"***Disclosure Schedule***" means the Disclosure Schedule attached hereto as **Schedule C**.

"***Dollars***", "***U.S. Dollars***", and the sign "$" each means lawful money of the United States.

"***Environmental Claims***" means any and all global, regulatory or judicial actions, suits, demands, demand letters, claims, Liens, notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law or any Permit issued under any such law (hereafter "***Claims***"), including, without limitation, (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the storage, treatment or Release (as defined in CERCLA) of any Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"***Environmental Laws***" means any federal, state, territorial, provincial or local law, common law doctrine, rule, order, decree, judgment, injunction, license, Permit or regulation relating to environmental matters, including those pertaining to land use, air, soil, service water, ground water, public or employee health or safety or any other environmental matter, together with any other laws relating to emissions, discharges, releases or threatened releases of any Hazardous Materials, toxic or hazardous substance, pollutant or contaminant, including, without limitation, medical, chemical, biological, biohazardous or radioactive waste and materials or otherwise

relating to the manufacture, processing, distribution, use, achievement, storage, disposal, transportation, discharge or handling of any Hazardous Materials, toxic or hazardous substance, pollutant or contaminant.

"***Environmental Liabilities and Costs***" means all liabilities, monetary obligations, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Claim which relate to any environmental condition or a release, use, handling, storage or treatment of Hazardous Materials by Borrower or a predecessor in interest from or onto the Borrower's Real Property.

"***Equity Interest***" means, with respect to a Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.  Section references to ERISA are to ERISA, as in effect at the Closing Date and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"***ERISA Affiliate***" means each Person (as defined in Section 3(9) of ERISA), which together with Borrower or a Subsidiary of Borrower, would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or 4001(b)(i) of ERISA or (ii) as a result of Borrower or a Subsidiary of Borrower being or having been a general partner of such Person.

"***ERISA Event***" means: (i) that a Reportable Event has occurred with respect to any Plan; (ii) the institution of any steps by Borrower or any Subsidiary, any ERISA Affiliate, the PBGC or any other Person to terminate any Plan or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan; (iii) the institution of any steps by Borrower or any Subsidiary or any ERISA Affiliate to withdraw from any Multi-Employer Plan or Multiple Employer Plan, if such withdrawal could result in withdrawal liability (as described in Part 1 of Subtitle E of Title IV of ERISA or in Section 4063 of ERISA) in excess of $2,000,000; (iv) a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA in connection with any Plan; (v) that a Plan has Unfunded Benefit Liabilities exceeding $2,000,000; (vi) the cessation of operations at a facility of Borrower or any Subsidiary or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (vii) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to a Plan; (viii) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 206(g) of ERISA; (ix) the insolvency of or commencement of reorganization proceedings with respect to a Multi-Employer Plan; (x) any material increase in the contingent liability of Borrower or any Subsidiary with

respect to any post-retirement welfare liability; or (xi) the taking of any action by, or the threatening of the taking of any action by, the Internal Revenue Service, the Department of Labor or the PBGC with respect to any of the foregoing.

"***ESS Active Dispatch Incentives***" means the payments administered under the ESS at a rate of: (i) Two Hundred AND No/100 Dollars ($200.00) per dispatched Battery kilowatt capacity for the period beginning June 1st and ending on September 30th during each year for the first five (5) years following Project Completion, and One Hundred Fifteen AND No/100 Dollars ($115.00) per dispatched Battery kilowatt capacity during each year for years six (6) through ten (10) following Project Completion; and (ii) Twenty-Five AND No/100 Dollars ($25.00) per dispatched Battery kilowatt capacity for the period beginning on November 1st and ending on March 1st during each year for the first five (5) years following Project Completion, and Fifteen AND No/100 Dollars ($15.00) per dispatched Battery kilowatt capacity during each year for years six (6) through ten (10) following Project Completion.

"***ESS Incentive Payments***" means, collectively, the ESS Active Dispatch Incentives and the ESS Passive Dispatch Incentives.

"***ESS Passive Dispatch Incentives***" means the payments administered under the ESS, through December 31, 2024, at a rate of: (i) Three Hundred AND No/100 Dollars ($300.00) per Battery kilowatt hour for Customers located in Underserved Communities, (ii) Four Hundred AND No/100 Dollars ($400.00) per Battery kilowatt hour for LMI Customers, and (iii) Two Hundred AND No/100 Dollars ($200.00) per Battery kilowatt hour for all other Customers.

"***Event of Default***" has the meaning set forth in Section 8.1 hereof.

"***Event of Loss***" shall mean (a) an event which causes all or a major portion of any Collateral be damaged, destroyed or rendered unfit for normal use for any reason whatsoever (including any covered loss under a casualty insurance policy) and (b) any compulsory transfer or taking, or transfer under threat of compulsory transfer, of any Collateral pursuant to the power of eminent domain, condemnation or otherwise.

"***Exchange Act***" means the U.S. Securities Exchange Act of 1934, as amended.

"***Favorable Pricing***" means the monthly charges to LI Customers and Customers residing in Underserved Communities, as provided in the applicable Customer Agreements, and as provided to Lender in each Borrowing Request, enabled by elevated tax incentives contained in the Inflation Reduction Act of 2022.

"***FERC***" shall mean the Federal Energy Regulatory Commission, and any successor authority.

"***First Lien Backleverage Lender***" means Forbright Bank, a Maryland chartered bank.

"***First Lien Credit Agreement***" means that certain Credit Agreement dated September 28, 2021 by and between PosiGen Backleverage, as borrower, and Forbright Bank, a Maryland

chartered bank, as lender, administrative agent, and collateral agent, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time.

"*Generac*" means Generac Grid Services LLC, a Delaware limited liability company and its affiliates, a U.S. manufacturer of backup power generation products for residential, light commercial and industrial markets.

"*Generac Guaranteed Payments*" means the "Payments" (as such term is defined in the Generac Agreement) made by Generac to Borrower pursuant to the Generac Agreement, which payments are, among other things, underwritten by Generac's receipt of the ESSP Incentive Payments.

"*Generac Guaranteed Payments Account*" means the deposit, securities or commodities account in the name of Borrower receiving the Generac Guaranteed Payments from Generac and subject to a Control Agreement.

"*Generac Agreement*" has the meaning set forth in the Preamble to this Agreement.

"*Governmental Authority*" means, with respect to any Person, any federal or state or local government or other political subdivision thereof or any entity, including any regulatory or administrative authority (including FERC) or court, exercising executive, legislative, judicial, regulatory or administrative or quasi-administrative functions of or pertaining to government and shall include any supra-national bodies (such as the European Union or the European Central Bank).

"*Hazardous Materials*" means (i) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; and (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous wastes," "restrictive hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar meaning and regulatory effect, under any applicable Environmental Law.

"*HMT*" has the meaning specified in the definition of "Sanctions".

"*Indebtedness*" of any Person means without duplication:

       (i)       all indebtedness of such Person for borrowed money;

      (ii)      all bonds, notes, debentures and similar debt securities of such Person;

(iii)     the deferred purchase price of capital assets or services that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person;

(iv)     the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder;

(v)     all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

(vi)     all indebtedness of a second Person secured by any Lien on any property owned by such first Person, whether or not such indebtedness has been assumed;

(vii)     all Capitalized Lease Obligations of such Person;

(viii)     the present value, determined on the basis of the implicit interest rate, of all Synthetic Lease Obligations of such Person;

(ix)     all obligations of such Person with respect to asset securitization financing;

(x)     all obligations of such Person to pay a specified purchase price for goods or services whether or not delivered or accepted, *i.e.*, take-or-pay and similar obligations, in each case that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person;

(xi)     the full outstanding balance of trade receivables, notes or other instruments sold with full recourse (and the portion thereof subject to potential recourse, if sold with limited recourse), other than in any such case any thereof sold solely for purposes of collection of delinquent accounts; and

(xii)     all guaranty obligations of such Person;

*provided*, *however*, that (x) neither trade payables, deferred revenue, taxes nor other similar accrued expenses, in each case arising in the ordinary course of business, shall constitute Indebtedness; and (y) the Indebtedness of any Person shall in any event include (without duplication) the Indebtedness of any other entity (including any general partnership in which such Person is a general partner) to the extent such Person is liable thereon as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide expressly that such Person is not liable thereon.

"***Inflation Reduction Act of 2022***" means the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022).

"***Insolvency Event***" means, with respect to any Person:

(i)    the commencement of a voluntary case by such Person under the Bankruptcy Code or the seeking of relief by such Person under any bankruptcy or insolvency or analogous law in any jurisdiction outside of the United States;

(ii)    the commencement of an involuntary case against such Person under the Bankruptcy Code or any bankruptcy or insolvency or analogous law in any jurisdiction outside of the United States and the petition or application is not controverted within thirty (30) days, or is not dismissed within sixty (60) days, after commencement of the case;

(iii)    a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of such Person;

(iv)    such Person commences (including by way of applying for or consenting to the appointment of, or the taking of possession by, a rehabilitator, receiver, custodian, trustee, conservator or liquidator (collectively, a "conservator") of such Person or all or any substantial portion of its property) any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation, rehabilitation, conservatorship or similar law of any jurisdiction whether now or hereafter in effect relating to such Person;

(v)    any such proceeding of the type set forth in clause (iv) above is commenced against such Person to the extent such proceeding is consented to by such Person or remains undismissed for a period of sixty (60) days;

(vi)    such Person is adjudicated insolvent or bankrupt;

(vii)    any order of relief or other order approving any such case or proceeding is entered;

(viii)    such Person suffers any appointment of any conservator or the like for it or any substantial part of its property that continues undischarged or unstayed for a period of sixty (60) days;

(ix)    such Person makes a general assignment for the benefit of creditors or generally does not pay its debts as such debts become due; or

(x)    any corporate (or similar organizational) action is taken by such Person for the purpose of effecting any of the foregoing.

"*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of September 28, 2021, by and between the Lender, First Lien Backleverage Lender, DC Green Finance Authority, PosiGen Backleverage, and PosiGen Backleverage Holdco, LLC, a Delaware limited liability company (as the same may be amended, restated, supplemented or otherwise modified from time to time).

"***Interest Rate***" has the meaning set forth in Section 2.6 hereof.

"***Internet***" means the collection of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the "transmission control protocol/internet protocol", or any predecessor or successor protocols to such protocol, and includes the world wide web.

"***Laws***" shall mean, collectively, all international, foreign, federal, state and local statutes, common law, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and Permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"***Leaseholds***" of any Person means all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"***Lender***" has the meaning set forth in the Preamble to this Agreement.

"***Lien***" means, with respect to any property or assets, any lien, hypothecation, encumbrance, assignment for security, charge, mortgage, pledge, security interest or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement) or similar lien.

"***LI***" means low-income, defined as households with annual income below sixty percent (60%) of Connecticut area median income.

"***LI Customer***" means a Customer: (i) whose Battery qualifies for enhanced ESS Incentive Payments for LI households; (ii) who has been qualified for a low to moderate income performance based incentive under Lender's Residential Solar Investment Program; or (iii) who resides in an Underserved Community.

"***LI Portion***" means the portion of the Term Facility Exposure used to provide Batteries to LI Customers.

"***Lien Subordination Agreement***" means that certain Lien Subordination Agreement, dated as of the date hereof, by and among Lender, Borrower, Mizzen Capital, LP, a Delaware limited partnership, and Stonehenge Community Impact Fund, LP, a Delaware limited partnership, substantially in the form attached hereto as **Exhibit C**.

"***Liquidity***" shall mean, as of any date of determination, an amount equal to unrestricted cash reserves on hand.

"*Loan Documents*" means this Agreement, the Term Note(s), the Collateral Documents, the Generac Agreement and such other documents, instruments and certificates delivered in connection with the Obligations.

"*Low Income*" means households with income below sixty percent (60%) of Connecticut area median income.

"*Margin Stock*" has the meaning provided in Regulation U.

"*Material Adverse Effect*" means any or all of the following: (i) any material adverse effect on the business, operations, property, assets, liabilities, or condition (financial or otherwise) of Borrower or its Subsidiaries, taken as a whole; (ii) any material adverse effect on the ability of Borrower to perform its obligations under any of the Loan Documents to which it is a party; (iii) any material adverse effect on the validity, effectiveness or enforceability, as against the Borrower, of any of the Loan Documents to which it is a party; (iv) any material adverse effect on the rights and remedies of the Lender under any Loan Document; or (v) any material adverse effect on the validity, perfection or priority of any Lien in favor of the Lender on any material portion of the Collateral.

"*Maturity Date*" means the earlier to occur of: (i) the date that is the ten (10) year anniversary of the Closing Date; and (ii) the date that the Term Loan is accelerated pursuant to Section 8.3 hereof.

"*Minimum Borrowing Amount*" means One Hundred Thousand AND No/100 Dollars ($100,000), with minimum increments thereafter of One Thousand AND No/100 Dollars ($100,000).

"*Multi-Employer Plan*" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding five (5) plan years made or accrued an obligation to make contributions.

"*Multiple Employer Plan*" means an employee benefit plan, other than a Multi-Employer Plan, to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate, and one or more employers other than Borrower or a Subsidiary of Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which Borrower or a Subsidiary of Borrower or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five (5) plan years preceding the date of termination of such plan.

"*Non-LI Portion*" has the meaning set forth in Section 2.6(a)(2) hereof.

"*Notice Office*" means the office of the Lender at 75 Charter Oak Ave., Hartford, Connecticut 06106 Attention: Bert Hunter (CIO), or such other office as the Lender may designate in writing to Borrower from time to time.

"**Obligations**" means any and all obligations, liabilities, covenants and agreements of Borrower under the Loan Documents, and any and all costs and expenses of, or incurred by, Lender in collecting any of the foregoing and in enforcing the provisions of this Agreement, including all court costs and/or reasonable attorneys' fees and expenses in any action between Lender and Borrower and/or Lender and any third party based on the Loan Documents, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest that would accrue on any of the foregoing during the pendency of any bankruptcy or related proceeding with respect to the Borrower, regardless of whether such interest and fees are allowed claims in such proceeding. .

"**OFAC**" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"**Organizational Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Party**" or "**Parties**" each has the meaning set forth in the Preamble to this Agreement.

"**Payment Due Date**" means, with respect to each advance under the Term Loan, the date that is the first day of each calendar Quarter beginning with the Principal Repayment Start Date and on the first day of each calendar quarter thereafter; *provided*, *however*, if any applicable day identified above is not a Business Day, the Payment Due Date shall be extended to the next succeeding Business Day.

"**Payment Office**" means the office of the Lender at 75 Charter Oak Ave., Hartford, Connecticut 06106 Attention: Head of Finance and Administration, or such other office as the Lender may designate in writing to Borrower from time to time.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"**Permits**" shall mean any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required to be obtained from a Governmental Authority under any Law, rule or regulation.

"**Permitted Encumbrances**" means: (a) Liens securing taxes, assessments and/or governmental charges and/or levies or the claims of materialmen, mechanics, carriers,

warehousemen, landlords and other similar Persons, the payment of which is not currently due and payable; (b) Liens in favor of Lender; (c) Liens in favor of other lenders existing prior to the Closing Date as disclosed to and approved by Lender, including liens in favor of Subordinating Lenders; and (d) Liens on the Pledged Collateral in favor of First Lien Backleverage Lender, but only to the extent that such First Lien Backleverage Lender's Liens on the Pledged Collateral are subordinate to the Lender's Liens on such Pledged Collateral.

"*Permitted Indebtedness*" shall have the meaning given to it in Section 7.1 hereof.

"*Person*" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, institution, entity, party, corporation, limited liability company, or government agency (whether national, federal, state, county, city, municipal, or otherwise), including any instrumentality, division, agency, body or department thereof.

"*Plan*" means any Multi-Employer Plan, Multiple Employer Plan or Single-Employer Plan.

"*Pledged Collateral*" has the meaning ascribed to such term in the Security Agreement.

"*PosiGen Backleverage*" means PosiGen Backleverage, LLC, a Delaware limited liability company.

"*Premises*" has the meaning set forth in the Recitals to this Agreement.

"*Principal Repayment Start Date*" means, with respect to each Term Loan Borrowing, the date that is the first day of the calendar Quarter immediately following the six (6) month anniversary of the Working Capital Loan Conversion Date.

"*Proceeds*" means any and all consideration received from the sale, exchange, collection or other disposition of any asset or property that constitutes Pledged Collateral, any value received as a consequence of the possession of any Pledged Collateral, any payment received from any insurer or other person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property which constitutes Pledged Collateral, and shall include all cash and negotiable instruments received or held on behalf of Lender relating to the payment of accounts and any and all property of whatever nature received and/or held by Borrower or on behalf of Lender.

"*Project*" or "*Projects*" each has the meaning set forth in the Recitals to this Agreement.

"*Project Completion*" means, with respect to any Project, the point at which a Battery and related Project Equipment: (i) is fully installed at the Premises; (ii) is connected to a rooftop solar photovoltaic system, (iii) is capable of storing measurable amounts of energy; and (iv) for which a PTO Letter has been received, if required.

"***Project Equipment***" means all of the Generac battery storage systems, component parts, wiring, replacement parts, and hardware necessary to construct the Projects, whether now owned or acquired after the date of this Agreement.

"***PTO Letter***" shall mean, with respect to a Project, a permission to operate letter or its functional equivalent as issued by the connecting utility authorizing the operation of such Project.

"***Real Property***" of any Person shall mean all of the right, title and interest of such Person in and to land, improvements and fixtures, including, but not limited to, any Leaseholds.

"***Regulation U***" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"***Reportable Event***" means an event described in Section 4043 of ERISA or the regulations thereunder with respect to a Plan, other than those events as to which the notice requirement is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, .35, .62, .63, .64, .65 or .67 of PBGC Regulation Section 4043.

"***Requirements of Law***" as to any Person, the articles or certificate of incorporation, declaration of trust, partnership agreement and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its material property or to which such Person or any of its material property is subject.

"***Quarter***" means a quarterly period measured based on a calendar year.

"***Sanction***" means any trade, economic or financial sanction, embargo or restrictive measures administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("***HMT***"), the Government of Canada (including Global Affairs Canada and Public Safety Canada) or other relevant sanctions authority.

"***Second Lien Credit Agreement***" means that certain Credit Agreement, dated December 12, 2018, by and between PosiGen Backleverage, as borrower, and Lender, as lender, administrative agent, and collateral agent, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

"***Secured Parties***" means the Lender and each other financial institution party hereto as a Lender from time to time, with each individually a "***Secured Party***".

"***Security Agreement***" means that certain Security and Pledge Agreement, dated as of the date hereof, by and among Borrower, as pledgor, and Lender, as pledgee, substantially in the form attached hereto as **Exhibit D**, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

"**Single Employer Plan**" means a single-employer plan, as defined in Section 4001(a)(15) of ERISA, to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five (5) plan years preceding the date of termination of such plan.

"**Subordinating Lender Documents**" means, collectively, the documents evidencing the Subordinating Lender Facilities.

"**Subordinating Lender Facilities**" means, collectively, the credit facilities provided by the Subordinating Lenders.

"**Subordinating Lender Indebtedness**" has the meaning set forth in Section 7.1(c) hereof.

"**Subordinating Lenders**" means, collectively, Mizzen Capital, LP, a Delaware limited partnership, Stonehenge Community Impact Fund, LP, a Delaware limited partnership, and Reinvestment Fund, Inc., a Pennsylvania not-for-profit corporation.

"**Subsidiary**" of a Person shall mean a corporation, partnership, limited liability company or other business entity of which the shares of the securities is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Synthetic Lease Obligations**" means, as to any person, an amount equal to the capitalized amount of the remaining lease payments under any synthetic lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Capitalized Lease Obligations.

"**Tangible Net Worth**" shall mean, for any Person, such Person's: (i) assets; minus (ii) liabilities; minus (iii) any intangible assets of such person, including goodwill, trademarks, tradenames, copyrights, patents, patent allocations, licenses and rights in any of the foregoing and other items treated as intangibles, in each case as determined in accordance with GAAP, minus (iv) amounts due to such Person from any of its Affiliates in each case as determined in accordance with GAAP.

"**Term Loan**" has the meaning set forth in Section 2.1 hereof.

"**Term Loan Borrowing**" means all Term Loan advances made on the same day.

"**Term Loan Commitment**" means the obligation of the Lender to make the Term Loan to the Borrower pursuant to Section 2.1, in an aggregate principal amount, as of the Closing Date, not to exceed Six Million AND No/100 Dollars ($6,000,000.00) at any one time outstanding, as such amount may be adjusted from time to time in accordance with this Agreement.

"***Term Facility Exposure***" means, for the Lender at any time, the aggregate principal amount of Term Loan made by the Lender and outstanding at such time.

"***Term Note***" has the meaning set forth in Section 2.5(b) hereof.

"***UCC***" shall mean the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"***Underserved Communities***" means (i) "distressed municipalities", as such term is defined in the State Commerce Act, Connecticut General Statutes §§ 32-1a, *et. seq*., as amended from time to time; and (ii) multifamily affordable housing.

"***Unfunded Benefit Liabilities***" of any Plan means the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"***USA Patriot Act***" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"***Voting Stock***" means securities entitled to vote generally in the election of directors (or similar governing bodies).

"***Withdrawn Collateral***" has the meaning set forth in Section 2.7(b) hereof.

"***Waiver and Consent Under Intercreditor Agreement***" means that certain Waiver and Consent Under Intercreditor Agreement, dated on or about the date hereof, by and between the Lender, First Lien Backleverage Lender, the Second Lien Agent (as defined therein), and DC Green Finance Authority.

"***Working Capital Loan***" means that certain revolving loan in an amount not to exceed Two Million AND No/100 Dollars ($2,000,000.00) advanced by Lender to Borrower pursuant to that certain Revolving Credit Agreement dated as of the date hereof.

"***Working Capital Assets***" means the Project Equipment securing Borrower's obligations to repay the Working Capital Loan.

"***Working Capital Loan Conversion Date***" means the date on which the Working Capital Assets become Pledged Collateral hereunder.

## 2.    TERM LOAN COMMITMENT; GENERAL TERMS.

2.1    Term Loan Commitment.  Subject to the terms and conditions hereof, the Lender agrees to make one or more advances of a term loan in the aggregate principal amount not to exceed the Term Loan Commitment of the Lender (the "***Term Loan***") by submitting a Borrowing Request to the Lender in accordance with Section 3.2 of this Agreement.

2.2     Repayment of Term Loan.  The Borrower shall repay to the Lender, the then-unpaid principal amount (together with accrued and unpaid interest and other amounts) of the Term Loan of the Lender on the Maturity Date.

2.3     Borrowing Request; Minimum Borrowing Amount.

(a)     *Time of Notice*.  Each Term Loan Borrowing of the Term Loan shall be made upon notice in the form provided for below which shall be provided by the Borrower to the Lender not later than 1:00 P.M. (Lender's local time) at least five (5) Business Days prior to the date of such Term Loan Borrowing, in each case, in accordance with the notice provisions set forth in Section 9.9 hereof.

(b)     *Borrowing Request*.  Each request for a Term Loan Borrowing shall be made by an Authorized Officer of the Borrower no more than once per calendar month by delivering written notice of such request, substantially in the form attached hereto as **Exhibit E** (each such request, a "***Borrowing Request***"), and each such request shall be irrevocable and shall specify, among other things, (i) the principal amount of the advance under the Term Loan to be made pursuant to such Term Loan Borrowing and (ii) the date of the Term Loan Borrowing (which shall be a Business Day).

(c)     *Minimum Borrowing Amount*.  The aggregate principal amount of each Term Loan Borrowing by the Borrower shall not be less than the Minimum Borrowing Amount.

2.4     Funding Obligations; Disbursement of Funds.  Subject to the terms and conditions set forth in this Agreement (including the prior satisfaction or waiver of the applicable conditions precedent under Section 3), no later than 4:00 P.M. (local time at the Payment Office) on the date specified in each Borrowing Request, the Lender will cause to be deposited to the Borrower's account specified in the Borrowing Request an amount equal to the amount of the Term Loan Borrowing requested to be made on such date, or such lesser amount as may be required by the terms and conditions hereof.

2.5     Evidence of Obligations.

(a)     *Loan Accounts of Lender*.  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Obligations of the Borrower to the Lender resulting from advance under the Term Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time under this Agreement.  The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of advances under the Term Loan made by the Lender to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

(b)     *Term Note*.  Upon request of the Lender, Borrower will execute and deliver to such Lender one or more Term Notes, substantially in the form attached hereto as **Exhibit F**, with blanks appropriately completed in conformity herewith to evidence Borrower's obligation to pay the principal of, and interest on, the advances under the Term Loan made to it by the Lender (each a "***Term Note***" and, collectively, the "***Term Notes***"); *provided*, *however*, that the decision of the Lender to not request a Term Note shall in no way detract from the Borrower's obligation to repay the Term Loan and other amounts owing by the Borrower to the Lender.

2.6          Interest Rates and Payment Dates; Default Rate.

(a)     *Interest on Term Loan*.  Subject to paragraph (b) of this Section 2.6, the Term Loan shall bear interest at a rate equal to (as applicable, the "***Interest Rate***"):

(1)  a fixed rate of two percent (2.0%) per annum for all portions of the Term Facility Exposure used to fund the LI Portion, such LI Portion not to exceed an amount equal to the difference of the (A) Term Facility Exposure, minus (B) the Non-LI Portion (as defined below), provided that Borrower provides Lender with proof of Favorable Pricing; and

(2)  a fixed rate of five percent (5.0%) per annum for all portions of the Term Facility Exposure used to fund Battery deployment to Customers who are not LI Customers (such portions, the "***Non-LI Portion***"), such Non-LI Portion not to exceed an amount equal to the difference of the (A) Term Facility Exposure, minus (B) the LI Portion.

(b)     *Default Interest*.  If: (i) any amount payable by the Borrower under any Loan Document is not paid when due, whether at stated maturity, by acceleration or otherwise; or (ii) an Event of Default occurs and so long as it is continuing, all outstanding Obligations shall thereafter bear interest (including post-petition interest in any proceeding under any Debtor Relief Law), payable on demand, at a interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Law.  Payment or acceptance of the increased rates of interest provided for in this Section 2.6(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lender.

(c)     *Payments of Principal and Interest*.

(1)          Interest on the outstanding principal amount of the Term Loan shall be payable on each applicable Payment Due Date (beginning on the Principal Repayment Start Date), and on the date on which all or any part of the Term Loan is repaid or prepaid, including, without limitation, at maturity (whether by acceleration or otherwise); *provided*, *however*, that

interest accrued pursuant to the preceding paragraph (b) of this Section 2.6 shall be payable from time to time on demand.

(2)    Additionally, the Borrower shall repay the outstanding principal amount of the Term Loan, due and payable, on each Payment Due Date, in an amount equal to outstanding principal under the Term Loan fully amortized over ten (10) years and adjusting such repayment of principal so as to evenly amortize such payments giving consideration to (a) any interest only option pursuant to Section 2.6(c)(3) hereof, (b) the expected cash receipts by Borrower of amounts due with respect to ESS Active Dispatch Incentives, ESS Incentive Payments, ESS Passive Dispatch Incentives, any amounts pursuant to the Generac Agreement and any and all other anticipated cash receipts of Borrower so that, together with any Interest due and payable results in a nearly level ratio of such expected cash receipts to expected payments of principal and interest and (ii) a final installment of the unpaid principal amount of the Term Loan, and all accrued and unpaid interest outstanding under the Term Loan, and other fees due to Lender under this Agreement which shall be due and payable on the Maturity Date.

(3)    *Interest Only Option*. At Lender's sole and absolute discretion, the Borrower may be afforded the option to pay interest only on the Actual Loan Balance for a period not to exceed twelve (12) months from the Closing Date, during which period the Term Loan shall re-amortize such that there is no balloon payment at the Maturity Date.

(4)    *Computations of Interest*. All computations of interest on the Term Loan and other amounts hereunder shall be made on the actual number of days elapsed over a year of 360 days.

(5)    *Payments*. All payments of principal and/or interest hereon shall be payable in lawful money of the United States and in immediately available fund. All payments received hereon shall be applied, at the Lender's option, first to late charges, if any, then to costs and expenses (including reasonable attorneys' fees) of collection and other sums due under the Loan Documents (as hereinafter defined), if any, then to accrued interest, if any, then to principal as billed, if any, then and then to outstanding principal. All payments hereunder shall be made without offset, demand, counterclaim, deduction, abatement, defense, or recoupment, each of which Borrower hereby waives. Acceptance by Lender of any payment in an amount less than the amount then due on any Indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect.

2.7     <u>Voluntary and Mandatory Prepayments of the Term Loan</u>.

(a)     *Voluntary Prepayments*.  The Borrower shall have the right to prepay any of the Term Loan owing by it in whole or in part, without premium or penalty. The Borrower shall give the Lender at the Notice Office written notice of its intent to prepay the Term Loan, which written notice shall be received by the Lender by 12:00 noon (local time at the Notice Office) on the date of such prepayment.

(b)     *Mandatory Prepayments*.

(1)     If on any date, after giving effect to any other payments on such date, the Term Facility Exposure of the Lender exceeds the Term Loan Commitment, then, in the case of the foregoing, the Borrower shall, on such day, prepay on such date the principal amount of the Term Loan in an aggregate amount sufficient to eliminate such excess.

(2)     If Pledged Collateral is withdrawn from either the Generac Agreement or any Customer Agreement (such collateral, "***Withdrawn Collateral***"), the Borrower shall, on the day such Pledged Collateral becomes Withdrawn Collateral, prepay on such date the principal amount of the Term Loan an amount equal to the difference of: (i) that portion of the Term Loan Borrowing of the Borrowing Request associated with such Withdrawn Collateral, in each case, as determined in the sole discretion of Lender; <u>minus</u> (ii) any payments by the Borrower to the Lender that have been made against such Term Loan Borrowing.

2.8     <u>No Reborrowing</u>.  Any principal amount of the Term Loan that is repaid or prepaid may not be reborrowed.

2.9     <u>Method and Place of Payment</u>.

(a)     *Generally*.  All payments made by the Borrower hereunder or under any Term Note or any other Loan Document shall be made without setoff, counterclaim or other defense.

(b)     *Payment of Obligations*.  Except as specifically set forth elsewhere in this Agreement, all payments under this Agreement with respect to any of the Obligations shall be made to the Lender on the date when due and shall be made at the Payment Office by wire transfer of immediately available funds and shall be made in Dollars.

(c)     *Timing of Payments*.   Any payments under this Agreement that are made later than 3:00 P.M.  (local time at the Payment Office) shall be deemed to have been made on the next succeeding Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with

respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

**3.**     **CONDITIONS PRECEDENT.**

3.1     Conditions Precedent at Closing Date. The obligation of the Lender to make a Term Loan on the Closing Date is subject to the satisfaction of each of the following conditions on or prior to the Closing Date:

(a)     *Term Loan Credit Agreement*. This Agreement shall have been executed by both the Borrower and the Lender.

(b)     *Term Note*. The Borrower shall have executed and delivered to the Lender a Term Note in favor of the Lender evidencing the Term Loan made by the Lender on the Closing Date.

(c)     *Loan Documents*. The Borrower shall have duly executed and delivered the Security Agreement, in form and substance satisfactory to the Lender, Borrower and any other party thereto shall deliver fully executed Collateral Documents by all parties thereto that are required by this Agreement and/or the Collateral Documents, and the Borrower shall have duly executed and delivered each other Loan Document to which it is a party; *provided*, *however*, that Borrower shall not be required to deliver any Control Agreement until the date that is forty-five (45) days after the Closing Date.

(d)     *Corporate Resolutions and Approvals*. The Lender shall have received certified copies of the resolutions of the board of directors (or similar governing body) of Borrower approving the Loan Documents to which Borrower is or may become a party, and of all documents evidencing other necessary corporate or other organizational action, as the case may be, and governmental and other material third party approvals, if any, with respect to the execution, delivery and performance by Borrower of the Loan Documents to which it is or may become a party and the continuing operations of the Borrower, all of which documents to be in form and substance satisfactory to the Lender.

(e)     *Incumbency Certificate*. The Lender shall have received a certificate of the Secretary or an Assistant Secretary or manager of Borrower certifying the names and true signatures of the officers of Borrower authorized to sign the Loan Documents to which Borrower is a party and any other documents to which Borrower is a party that may be executed and delivered in connection herewith.

(f)     *Opinion of General Counsel*. The Lender shall have received an opinion of counsel from the General Counsel to the Borrower, which opinion shall be addressed to the Lender and dated the Closing Date and in form and substance satisfactory to the Lender.

(g)     *Recordation of Collateral Documents, Delivery of Collateral, Taxes, Etc.* The Collateral Documents (and/or proper notices or UCC financing statements in respect thereof) shall have been duly recorded, published and filed in such manner and in such places as is required by law to establish, perfect, preserve and protect the rights, Liens and security interests of the parties thereto and their respective successors and assigns, all Collateral items required to be physically delivered to the Lender thereunder shall have been so delivered, accompanied by any appropriate instruments of transfer, and all taxes, fees and other charges then due and payable in connection with the execution, delivery, recording, publishing and filing of such instruments and the incurrence of the Obligations and the delivery of the Term Note shall have been paid in full.

(h)     *Evidence of Insurance.* The Lender shall have received, thirty (30) days of the Closing Date, (A) certificates of insurance and other evidence satisfactory to it of compliance with the insurance requirements of this Agreement and the Collateral Documents and (B) endorsements and/or declarations pages to insurance policies naming the Lender as an additional insured on the liability insurance policies of the Borrower and as a loss payee on the property insurance policies of the Borrower.

(i)     *Search Reports.* The Lender shall have received the results of UCC, financing statement, judgment, tax lien, and other search reports requested by Lender, from one or more commercial search firms acceptable to the Lender and in all jurisdictions (state and county) as Lender may deem appropriate, listing all of the effective financing statements, judgments, tax liens and other Liens on file with respect to Borrower in such jurisdictions, together with copies of such financing statements judgments, tax liens and other Liens. Such search results must show that no Person, other than Lender and any other holders of Permitted Encumbrances, has any Lien on any of the Pledged Collateral, except as provided in the Lien Subordination Agreement.

(j)     *Corporate Documents and Good Standing Certificates.* The Lender shall have received: (A) an original certified copy of the Articles of Incorporation, Bylaws or equivalent formation document of Borrower and any and all amendments and restatements thereof, certified as of a recent date by the relevant Secretary of State; (B) an original "long-form" good standing certificate or certificate of existence from the relevant Secretary of State of the state of organization, dated as of a recent date, listing all charter documents affecting Borrower and certifying as to the good standing (or equivalent) of Borrower; and (C) original certificates of good standing (or equivalent) or foreign qualification for Borrower from the Secretary of State of the State of Delaware and each jurisdiction in which the Borrower is authorized or qualified to do business and where the failure to maintain such good standing (or equivalent) or foreign qualification could reasonably be expected to have a Material Adverse Effect, such jurisdictions being set forth with respect to Borrower on **Schedule A** hereto.

(k)     *Proceedings and Documents*.  All corporate and other proceedings and all documents incidental to the transactions contemplated hereby shall be satisfactory in substance and form to the Lender and its counsel shall have received all such counterpart originals or certified or other copies of such documents as the Lender or its counsel may reasonably request.

(l)     *Litigation*.  There shall not exist any pending or threatened litigation that could reasonably be expected to cause a Material Adverse Effect, in the judgment of the Lender, in or affecting the business, operations, property or condition (financial or otherwise) of the Borrower or any Affiliate of Borrower.

(m)     *No Material Adverse Effect*.  No event shall have occurred that has had or would reasonably be expected to have any Material Adverse Effect on the Borrower or any Affiliate of Borrower.

(n)     *Waiver and Consent Under Intercreditor Agreement*.  The Lender shall have received a fully executed copy of the Waiver and Consent Under Intercreditor Agreement, in form and substance reasonably satisfactory to the Lender.

(o)     *Lien Subordination Agreement*.  The Lender shall have received a fully executed copy of the Lien Subordination Agreement, in form and substance reasonably satisfactory to the Lender.

(p)     *Generac Agreement*.  The Lender shall have received a fully executed copy of the Generac Agreement, in form and substance reasonably satisfactory to the Lender.

(q)     *Structure and Equity*.  The capital and organizational structure of Borrower shall be reasonably satisfactory to the Lender.

(r)     *Payment of Lender's Fees/Expenses*.  All of Lender's fees and expenses (including attorneys' fees and disbursements) incurred by Lender in connection with the transactions contemplated by the Loan Documents shall have been paid or shall be, contemporaneously with the Closing, paid.

(s)     *Miscellaneous*.  The Borrower shall have provided to the Lender such other items and shall have satisfied such other conditions as may be reasonably required by the Lender, including, without limitation, Lender's requests and conditions with respect to the Pledged Collateral

3.2     <u>Conditions Precedent to all Term Loan Borrowings</u>.  The obligations of the Lender to make any advance under the Term Loan, including the initial advance under the Term Loan is subject, at the time thereof, to the satisfaction of the following conditions:

(a)     *Borrowing Request and Available Borrowing Base Certificate*.  The Lender shall have received each of: (i) a Borrowing Request meeting the

requirements of Section 2.3(b), and (ii) an Available Borrowing Base Certificate, each in form and substance satisfactory to the Lender, with respect to any Term Loan Borrowing. Following receipt and approval of a Borrowing Request, Available Borrowing Base Certificate, and all supporting documentation and information, Lender will determine, in its sole discretion, the amount of the Term Loan that Lender will advance in accordance with this Agreement and the Loan Documents. Notwithstanding any other provision of this Agreement to the contrary, the proceeds of any Term Loan advance made after the initial Term Loan advance shall solely be used in accordance with the terms and conditions set forth in Section 4.7 hereof.

(b)     *Due Diligence; Formal Credit Approval*. At the time of each Term Loan Borrowing, Lender will have completed its due diligence and issued formal credit approval.

(c)     *No Default; Representations and Warranties*. At the time of each Term Loan Borrowing and also after giving effect thereto, (i) there shall exist no Default or Event of Default and (ii) all representations and warranties of the Borrower contained herein or in the other Loan Documents shall be true and correct in all material respects (or in the case of any representation and warranty already subject to a materiality qualifier, true and correct in all respects) with the same effect as though such representations and warranties had been made on and as of the date of such Term Loan Borrowing, except to the extent that such representations and warranties expressly relate to an earlier specified date, in which case such representations and warranties shall have been true and correct in all material respects as of the date when made.

(d)     *Term Loan Facility Exposure*. After giving effect to the Term Loan Borrowing, the aggregate outstanding Term Loan Facility Exposure shall not exceed the less of: (i) Term Loan Commitment or (ii) the Available Borrowing Base, as provided in the Available Borrowing Base Certificate applicable to such Term Loan Borrowing, after giving effect to such Term Loan Borrowing. If the balance of the aggregate outstanding Term Loan Exposure against the pledged assets per the Credit Agreement is greater than the Term Loan disbursement, then the Borrower shall pay the lender the difference upon disbursement. If the balance of the loan outstanding against the pledged assets per the Credit Agreement is less than the Term Loan disbursement, then the lender will disburse the net amount.

(e)     *Copies of Generac Purchase Orders*. The Lender has received copies of the purchase orders submitted to Generac or an Affiliate of Generac, which have been accepted by Generac.

(f)     *Compliance with the ESS*. The Lender has received any and all documentation related to Borrower's and its Subsidiaries' participation in and compliance with the ESS required by PURA, or the administrator of the ESS, as the case may be.

(g)     *Compliance with Loan Documents*.  Any and all other documents and legal matters in connection with the transactions contemplated by the Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Lender.

(h)     *Licenses and Approvals*.  Borrower and each of its Affiliates shall have received all licenses, approvals, or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Borrower and each of its Affiliates of the Loan Documents or with the consummation of the transactions contemplated thereby.

(i)     *Insurance*.  At the time of each Term Loan Borrowing, the Lender shall have received, certificates of insurance and other evidence satisfactory to it of compliance with the insurance requirements of this Agreement and the Collateral Documents.

(j)     *No Material Adverse Effect*.  At the time of each Term Loan Borrowing, no event shall have occurred that has had or would reasonably be expected to have any Material Adverse Effect on the Borrower or any Affiliate of Borrower.

(k)     *Bring-Down of Conditions Precedent*.  The acceptance of the benefits of: (i) the initial Term Loan Borrowing shall constitute a representation and warranty by the Borrower to the Lender that all of the applicable conditions specified in Section 3.1 of this Agreement have been satisfied as of the times referred to in such Section; and (ii) each Term Loan Borrowing thereafter shall constitute a representation and warranty by the Borrower to the Lender that all of the applicable conditions specified in Section 3.1 of this Agreement have been satisfied as of the times referred to in such Section.

## 4.     <u>REPRESENTATIONS AND WARRANTIES OF BORROWER</u>.

In order to induce the Lender to enter into this Agreement and to make the Term Loan provided for herein, the Borrower makes the following representations and warranties to, and agreements with, the Lender, all of which shall survive the execution and delivery of this Agreement and each Term Loan Borrowing:

4.1     <u>Organizational Status</u>. Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage.  Borrower is duly qualified and is authorized to do business in each and every jurisdiction where it is required to be so qualified or where the failure of Borrower to so qualify would have a Material Adverse Effect under this Agreement or any of the other Loan Documents.

4.2     <u>Corporate Power and Authority</u>.   Borrower has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now being conducted, and to execute, deliver and perform under this Agreement and any of the other Loan Documents and all writings relating hereto and thereto.    Borrower has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents to which it is party.

4.3     <u>Tax Returns and Payments</u>.   All of Borrower's federal, state, local and foreign income, profits, franchise, sales, use, occupation, property, excise and other tax returns and tax reports, if any, required to be filed with respect to the business and assets of Borrower have been filed, as of, at a minimum, the date hereof with the appropriate governmental agencies, and all taxes, governmental charges and assessments due and payable with respect to such returns and reports have been paid.  Borrower has established on its books such charges, accruals and reserves in respect of taxes, assessments, fees and other governmental charges for all fiscal periods as are required by GAAP.  Borrower does not know of any proposed assessment for additional federal, foreign or state taxes for any period, or of any basis therefor, which, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as Borrower and its Subsidiaries have made, could reasonably be expected to have a Material Adverse Effect.

4.4     <u>Authorization of Borrower</u>. The execution, delivery and performance by Borrower of this Agreement, all other Loan Documents to which it is a party, and all other writings relating hereto and thereto have been duly and validly authorized by Borrower. No consent or approval of or notification to any party, other than any consent or approval that has been obtained, is required in connection with the execution, delivery and performance by Borrower of this Agreement, the other Loan Documents, and/or any writing relating hereto and thereto or the consummation of the transactions contemplated hereby or thereby.  Borrower has duly executed and delivered each Loan Document to which it is party and each Loan Document to which it is party constitutes the legal, valid and binding agreement and obligation of Borrower, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

4.5     <u>Indebtedness</u>.   The Borrower and its Subsidiaries have no outstanding Indebtedness other than the Obligations and other Permitted Indebtedness.  As of the Closing Date, no other Indebtedness of the Borrower rank senior prior to the Obligations other than the Permitted Indebtedness.

4.6     <u>Litigation Claims and Proceedings</u>. No litigation, suits, claims, or judicial or administrative proceedings of any nature are pending or, to the best knowledge of Borrower, threatened against Borrower, Borrower's property or any Project, that: (i) have had, or could reasonably be expected to have, a Material Adverse Effect, or (ii) question the validity or enforceability of any of the Loan Documents, or of any action to be taken by Borrower pursuant to any of the Loan Documents.

4.7        <u>Use of Proceeds; Margin Regulations</u>.

(a)        The proceeds of the initial advance and all subsequent advances under the Term Loan shall solely be used to: (i) acquire from Generac the Project Equipment for the Projects; and (ii) pay down the amount due by Borrower to the Lender under the Working Capital Loan.

(b)        No part of the proceeds of the Term Loan will be used directly or indirectly to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, in violation of any of the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System.  The Borrower is not and will not be engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

4.8        <u>Title to Pledged Collateral; Liens or Encumbrances on Pledged Collateral</u>. Borrower has good and marketable title to the Pledged Collateral, free and clear of all Liens other than as provided in the Lien Subordination Agreement.

4.9        <u>Laws and Regulations</u>.

(a)        No order, consent, approval, license, Permit, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to authorize or is required as a condition to (i) the execution, delivery and performance by Borrower of any Loan Document to which it is a party or any of its obligations thereunder, or (ii) the legality, validity, binding effect or enforceability of any Loan Document to which the Borrower is a party, except the filing and recording of financing statements and other documents necessary in order to perfect the Liens created by the Collateral Documents.

(b)        The current or anticipated use of Project Equipment complies with applicable state ordinances, regulations and restrictive covenants affecting the Project Equipment and all use requirements of any governmental authority having jurisdiction have been satisfied.

4.10      <u>No Violation</u>. Neither the execution, delivery and performance by the Borrower of the Loan Documents to which it is party nor compliance with the terms and provisions thereof will:

(a)        contravene any provision of any law, statute, rule, regulation, order, writ, injunction or decree of any Governmental Authority applicable to Borrower or its properties and assets;

(b)        conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created pursuant to the Collateral Documents) upon any of the property or

assets of Borrower pursuant to the terms of (i) any material contractual obligation or (ii) any other promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement, or any other agreement or other instrument, to which Borrower is a party or by which it or any of its property or assets are bound or to which it may be subject; or

(c)        violate any provision of the Organizational Documents of Borrower.

4.11        <u>Environmental Matters</u>.

(a)        Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws, except to the extent noncompliance would not reasonably be expected to, in the aggregate, cause or result in a Material Adverse Effect.  All licenses, Permits, registrations or approvals required for the conduct of the business of Borrower and any of its Subsidiaries under any Environmental Law have been secured and Borrower and each of its Subsidiaries is in compliance therewith, except for licenses, Permits, registrations or approvals the failure to secure or to comply therewith is not material to Borrower or its business.  Neither Borrower nor any of its Subsidiaries has received written notice, or otherwise knows, that it is in any respect in noncompliance with, breach of or default under any applicable writ, order, judgment, injunction, or decree with respect to any Environmental Law to which Borrower or any of its Subsidiaries is a party or that would affect the ability of Borrower or any of its Subsidiaries to operate its business or any Real Property and no event has occurred and is continuing that, with the passage of time or the giving of notice or both, would constitute noncompliance, breach of or default thereunder, except in each such case, such noncompliance, breaches or defaults as would not reasonably be expected to, in the aggregate, be material to Borrower or its business.  There are no Environmental Claims pending or, to the best knowledge of Borrower, threatened wherein an unfavorable decision, ruling or finding would reasonably be expected to be material to Borrower or its business.  There are no facts, circumstances, conditions or occurrences on any Real Property now or at any time owned, leased or operated by Borrower or any of its Subsidiaries or, to Borrower's knowledge, on any property adjacent to any such Real Property, that are known by Borrower or as to which Borrower or any such Subsidiary has received written notice, that could reasonably be expected:  (i) to form the basis of an Environmental Claim against Borrower or any of its Subsidiaries or any Real Property of Borrower or any of its Subsidiaries; or (ii) to cause such Real Property to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Property under any Environmental Law, except in each such case, such Environmental Claims or restrictions that individually or in the aggregate could not reasonably be expected to cause or result in a Material Adverse Effect.

(b)        Except as disclosed to Lender, to the best of Borrower's knowledge, Hazardous Materials have not at any time been (i) generated, used, treated or stored on, or transported to or from, any Real Property of Borrower or any of its

Subsidiaries or (ii) released on or about any such Real Property, in each case where such occurrence or event is not in compliance with Environmental Laws and such noncompliance could reasonably be expected to, in the aggregate, cause or result in a Material Adverse Effect.

4.12    Compliance with ERISA.  Compliance by Borrower with the provisions of this Agreement or the other Loan Documents will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code.  Borrower, and each ERISA Affiliate: (i) has fulfilled all obligations under the minimum funding standards of ERISA and the Code with respect to each Plan that is not a Multi-Employer Plan or a Multiple Employer Plan, (ii) has satisfied all contribution obligations in respect of each Multi-Employer Plan and each Multiple Employer Plan, (iii) is in compliance in all material respects with all other applicable provisions of ERISA and the Code with respect to each Plan, each Multi-Employer Plan and each Multiple Employer Plan, and (iv) has not incurred any liability under Title IV of ERISA to the PBGC with respect to any Plan, any Multi-Employer Plan, any Multiple Employer Plan, or any trust established thereunder. No Plan or trust created thereunder has been terminated, and there have been no Reportable Events, with respect to any Plan or trust created thereunder or with respect to any Multi-Employer Plan or Multiple Employer Plan, which termination or Reportable Event will or could give rise to a material liability of Borrower or any ERISA Affiliate in respect thereof. Neither Borrower nor any Subsidiary of Borrower nor any ERISA Affiliate is at the date hereof, or has been at any time within the five (5) years preceding the date hereof, an employer required to contribute to any Multi-Employer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in Section 4001(a)(13) of ERISA) in any Multi-Employer Plan or Multiple Employer Plan.  Neither Borrower nor any Subsidiary of Borrower nor any ERISA Affiliate has any contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as has been disclosed to the Lender in writing.

4.13    Intellectual Property, etc.  Borrower and each of its Subsidiaries has obtained or has the right to use all patents, trademarks, service marks, trade names, copyrights, licenses and other rights with respect to the foregoing necessary for and material to the present and planned future conduct of its business, without any known conflict with the rights of others, except for such patents, trademarks, service marks, trade names, copyrights, licenses and rights, the loss of which, and such conflicts that, in any such case individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

4.14    Insurance.  Borrower and each of its Subsidiaries maintains insurance coverage by such insurers and in such forms and amounts and against such risks as are carried generally in accordance with sound business practices by companies in similar businesses similarly situated and located, and in each case in compliance with the terms of Section 6.16.

4.15    Contracts; Labor Relations.  Neither Borrower nor any Subsidiary of Borrower: (a) is subject to any contract, agreement, corporate restriction, judgment, decree or order, (b) is a party to any labor dispute affecting any bargaining unit or other group of employees generally, (c) is subject to any strike, slowdown, workout or other concerted interruptions of operations by employees of Borrower or any of its Subsidiaries, whether or not relating to any labor contracts, (d) is subject to any pending or, to the knowledge of Borrower, threatened, unfair

labor practice complaint, before the National Labor Relations Board, (e) is subject to any pending or, to the knowledge of Borrower, threatened grievance or arbitration proceeding arising out of or under any collective bargaining agreement, (f) is subject to any pending or, to the knowledge of Borrower, threatened significant strike, labor dispute, slowdown or stoppage, or (g) is, to the knowledge of Borrower, involved or subject to any union representation organizing or certification matter with respect to the employees of Borrower or any of its Subsidiaries, except (with respect to any matter specified in any of the above clauses) for such matters as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Neither Borrower nor any of its Subsidiaries has suffered any strikes, walkouts or work stoppages in the five (5) years preceding the Closing Date.

4.16    <u>Disclosures</u>.

(a)    The factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Borrower to the Lender for purposes of or in connection with this Agreement or any transaction contemplated herein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such Person in writing to the Lender is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided, except that all information consisting of financial projections prepared by Borrower is only represented herein as being based on good faith estimates and assumptions believed by such persons to be reasonable at the time made.

(b)    No representation or warranty by Borrower contained in this Agreement, and no statement contained in any certificate, schedule, exhibit, list or other writing furnished to Lender in connection with this transaction and/or in connection with the Project contains any material untrue statement of fact or omits to state any material fact necessary in order to make the statements contained herein or therein not materially misleading. All copies of all writings furnished to Lender in connection with this Agreement or the transactions contemplated in the Loan Documents, are true and complete in all material respects. All schedules and exhibits to this Agreement, if any, are true and complete in all material respects. Borrower has disclosed all material risk to all Projects of which Borrower has knowledge, including, without limitation, environmental risks.

4.17    <u>Security Interest</u>.    Once executed and delivered, each of the Collateral Documents creates, as security for the Obligations, a valid and enforceable, and upon making the required filings and recordings, perfected and continuing security interest in and Lien on all of the Pledged Collateral in favor of the Lender, superior to and prior to the rights of all third persons and subject to no other Liens, other than provided as set forth in the Lien Subordination Agreement. All recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable legal requirements or other laws applicable to the property encumbered

by the Collateral Documents in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement thereof have been paid.

4.18     Taxes.  Borrower has filed or has caused to have been filed all federal, state and local tax returns which, to the knowledge of Borrower, are required to be filed, and has paid or caused to have been paid all taxes as shown on such returns or on any assessment received by it, to the extent that such taxes have become due unless and to the extent only that such taxes, assessments and governmental charges are currently contested in good faith and by appropriate proceedings by Borrower and adequate reserves therefor have been established as required under generally accepted accounting principles. To the extent Borrower believes it advisable to do so, Borrower has set up reserves which are believed by Borrower to be adequate for the payment of additional taxes for years which have not been audited by the respective tax authorities.

4.19     Building Permits; Other Permits.  No work associated with any Project Equipment will be commenced unless and until all building, construction and other Permits necessary or required in connection with the commencement of the installation of the Project Equipment has been validly issued and all fees and bonds required in connection therewith have been paid or posted, as the circumstances may require.

4.20     Solvency.  Both before and after giving effect to the transactions contemplated by the Loan Documents, the sum of the "fair value" of the assets of Borrower and its Subsidiaries on a consolidated basis will, as of the date hereof, exceed the sum of all debts (including contingent, subordinated, absolute, fixed, matured or unmatured and liquidated or unliquidated liabilities) of Borrower and its Subsidiaries, taken as a whole, as of the date hereof. The present fair salable value of the assets of Borrower and its Subsidiaries, on a consolidated basis, is greater than the (i) total amount of present debts and liabilities (including subordinated and contingent liabilities) of Borrower and its Subsidiaries, on a consolidated basis, and (ii) amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities (including subordinated and contingent liabilities) as such debts and liabilities become absolute and matured.  Borrower and its Subsidiaries, on a consolidated basis, do not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the date hereof. Neither Borrower nor any of its Subsidiaries intends to incur, nor does Borrower or its Subsidiaries believe that they will incur, debts beyond their ability to pay such debts as they mature in the ordinary course of business.  Neither Borrower nor any of its Subsidiaries intends to hinder, delay or defraud either present or future creditors or any other person to which Borrower or any of its Subsidiaries is or, on or after the date hereof, will become indebted.

4.21     No Material Adverse Effect.  There has been no change in the business, operations, property, assets, liabilities, or condition (financial or otherwise) of Borrower or any of its Subsidiaries, taken as a whole since the date of formation, except for changes none of which, individually or in the aggregate, has had or could reasonably be expected to have, a Material Adverse Effect.

4.22    <u>No Defaults or Events of Default</u>.  No Default or Event of Default exists as of the Closing Date under this Agreement, nor will any Default or Event of Default begin to exist immediately after the execution and delivery of this Agreement.

4.23    <u>Capitalization</u>.  A true, complete and accurate description of the equity capital structure of Borrower, as of the Closing Date, is attached hereto as **<u>Schedule 4.23 of the Disclosure Schedules</u>**. The Equity Interests of Borrower described on **<u>Schedule 4.23 of the Disclosure Schedules</u>**: (i) are validly issued and fully paid and non-assessable (to the extent such concepts are applicable to the respective Equity Interests) and (ii) are owned of record and beneficially as set forth on **<u>Schedule 4.23 of the Disclosure Schedules</u>**, free and clear of all Liens (other than Liens created under the Collateral Documents or Permitted Liens).

4.24    <u>Sanctions Concerns; Anti-Terrorism Laws and Anti-Corruption Laws</u>.

(a)    *Sanctions Concerns*.  Neither Borrower, Borrower's Subsidiaries, nor, to the knowledge of the Borrower and Borrower's Subsidiaries, any respective director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

(b)    *Anti-Corruption Laws*.  The Borrower and Borrower's Subsidiaries have conducted their business in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.  No part of the proceeds of the Term Loan will be used, directly or indirectly, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-corruption laws.

(c)    *USA Patriot Act and Anti-Terrorism Laws*.  To the extent applicable, each of the Borrower and Borrower's Subsidiaries is in compliance with: (i) the Trading with the Enemy Act, as amended, the International Emergency Economic Powers Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA Patriot Act and any other applicable Anti-Terrorism Law or anti-money laundering law or statute.  Neither the making available of the Term Loan nor the use of any part of the proceeds thereof will violate the: (i) Trading with the Enemy Act, as amended, the International Emergency Economic Powers Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order

relating thereto or any other applicable economic sanctions law, or (ii) the USA Patriot Act and any other applicable anti-money laundering law or statute.

4.25     Fiscal Year.  Borrower's fiscal year is January 1st thru December 31st.

## 5.     REPRESENTATIONS AND WARRANTIES OF LENDER.

5.1     As of the date hereof, Lender represents and warrants that Lender is a public instrumentality and political subdivision of the State of Connecticut duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.

## 6.     AFFIRMATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter so long as this Agreement is in effect and until such time as the Term Loan Commitment has been terminated, no Term Note remains outstanding and the Term Loan, together with interest, Fees and all other Obligations incurred hereunder and under the other Loan Documents, have been indefeasibly paid in full, it shall, as applicable:

6.1     Corporate Existence and Maintenance of Properties.  Do or cause to be done all things necessary to preserve and keep in full force and effect its existence as a corporation and its rights and franchises and comply, in all material respects, with all laws applicable to it; at all times maintain, preserve and protect all franchises, approvals, trade names licenses, patents, trademarks and copyrights and preserve all material property used or useful in the conduct of its business and keep the same in good repair, working order and condition, reasonable wear and tear excluded, and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly conducted at all times.

6.2     Payment of Indebtedness, Taxes, etc.  (a) Pay all Indebtedness and obligations as and when due and payable and (b) pay and discharge or cause to be paid and discharged promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a Lien or charge upon such properties or any part thereof; *provided*, *however*, that Borrower shall not be required to pay and discharge or cause to be paid and discharged any such Indebtedness, tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings; and *provided further*, that subject to the foregoing proviso, Borrower will pay or cause to be paid all such Indebtedness, taxes, assessments, charges, levies or claims upon the commencement of proceedings to foreclose any Lien which has attached as security therefor.

6.3    <u>Notice of Adverse Change</u>.    Borrower shall furnish to the Lender, promptly after any manager or authorized representative of Borrower becomes aware or could reasonably be expected to become aware, written notice of:

(a)    immediately in writing of any proposed or actual change of Borrower's name, identity and/or corporate structure;

(b)    the occurrence of any event or circumstance that constitutes, or with the passage of time will come to constitute, a breach, Default, or Event of Default under any of the Loan Documents, or in any way impair the validity or enforcement of the Obligations, or tend to reduce the amount payable, under any of the Loan Documents;

(c)    the commencement of any action or proceeding involving or affecting Borrower or any of its Subsidiaries thereof or any properties or assets of Borrower or any of its Subsidiaries an adverse determination of which could reasonably be expected to have a Material Adverse Effect;

(d)    (i) any default or event of default under any material contractual obligation of Borrower or any of its Subsidiaries which could reasonably be expected to have a Material Adverse Effect, (ii) the termination or nonrenewal of a license issued by a Governmental Authority, or (iii) the termination or nonrenewal of any other licensing or other agreement of Borrower or any of its Subsidiaries, which could reasonably be expected to have a Material Adverse Effect;

(e)    any litigation, investigation or proceeding which may exist at any time between Borrower and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(f)    the occurrence of an event, occurrence or circumstance which would reasonably be expected to have a Material Adverse Effect on the Borrower or on any Project; and

(g)    (i) any release or discharge by Borrower or any of its Subsidiaries of any Hazardous Materials required to be reported under any Environmental Law to any Governmental Authority; (ii) any condition, circumstance, occurrence or event that could result in material Environmental Liabilities and Costs or could result in the imposition of any Lien or other restriction on the title, ownership or transferability of any of Borrower's Real Property; and (iii) any proposed action to be taken by Borrower or that could subject Borrower to any material additional or different requirements or liabilities under any Environmental Law.

6.4    <u>Financial Covenants</u>.

(a)     *Debt Service Covenant Ratio*.  The Debt Service Coverage Ratio shall not be less than 1.10x.

(b)     *Minimum Liquidity (Borrower)*.  As of any date of determination, the Liquidity of Borrower shall be equal to or greater than $5,000,000. For the avoidance of doubt, amounts on deposit in the Debt Service Reserve Account (as defined in the Credit Agreement) shall be considered as part of Borrower's Liquidity for purposes of this Section 6.4(b).

(c)     *Maximum Borrower Leverage*.  As of the end of each calendar month, the ratio of Borrower's Debt to Borrower's Tangible Net Worth shall not be greater than 1.00.

(d)     *Minimum Tangible Net Worth (Borrower)*.  As of the end of each calendar month, the Tangible Net Worth of Borrower shall not be less than $10,000,000.

(e)     *Delinquency Ratio*.  As of the end of each calendar month, the Delinquency Ratio shall not be greater than ten percent (10%).

6.5     <u>Notice of Default</u>.  Promptly, in the event Borrower knows of any default or Event of Default, or knows of an event of default under any other agreement, furnish to the Lender a written statement as to such occurrence, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto

6.6     <u>Litigation Notice</u>.  Give the Lender prompt written notice of any action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency against Borrower: (i) which, if adversely determined against Borrower on the basis of the allegations and information set forth in the complaint or other notice of such action, suit or proceedings would be reasonably likely to have a Material Adverse Effect, (ii) in which the amount involved is $50,000 or more and is not covered by insurance, (iii) in which injunctive or similar relief is sought in respect of the transactions contemplated hereby, or (iv) in which any material alterations in the nature of Borrower's business and/or any material change in the management of Borrower are sought.

6.7     <u>Access to Records</u>.  Maintain, and shall cause each of its Subsidiaries to maintain, proper books and records with respect to the operation of its business in accordance with GAAP consistently applied.  Borrower shall, permit, and shall cause each of its Subsidiaries to permit in accordance with all applicable laws relating to the confidentiality thereof, authorized representatives of the Lender to visit and inspect from time to time upon reasonable notice during business hours (or at any time after the occurrence and during the continuance of an Event of Default hereunder) any of the offices, inventory locations and other facilities of Borrower or any of its Subsidiaries, to examine the books and records of Borrower or any of its Subsidiaries and make copies or extracts therefrom, to examine the inventory of Borrower or any of its Subsidiaries, to conduct field examinations with respect to the assets of Borrower or any of its Subsidiaries, and to discuss the affairs, inventory and accounts of Borrower or any of its Subsidiaries with such Person's officers and accountants.  Borrower or any of its Subsidiaries

shall permit, and shall cause each of their Subsidiaries to permit, Lender to conduct field examinations and collateral audits as the Lender may reasonably require, at the sole cost and expense of Borrower; *provided*, *however*, that if no Event of Default exists, Borrower shall be responsible for only one field examination and collateral audit in any twelve (12) month period.

6.8     <u>Financial Statements, Reports, etc</u>.  Deliver or cause to be delivered to the Lender:

(a)     as soon as available, but in any event no later than one hundred eighty (180) days after the close of each fiscal year of Borrower, the consolidated and consolidating balance sheets of Borrower as of the close of such fiscal year, the related consolidated and consolidating profit and loss statements and consolidated and consolidating statements of cash flows for such fiscal year, and a summary operating report in form and substance reasonably satisfactory to the Lender with respect to the Borrower, and any other material items reasonably requested by the Lender, such financial statements to be reviewed by, and accompanied by a report of, a firm of independent certified public accountants reasonably acceptable to the Lender, to the effect that such financial statements have been prepared in conformity with GAAP.

(b)     as soon as available, but in any event no later than sixty (60) days after the close of each fiscal quarter of Borrower commencing with December 31, 2022, management-prepared or independently-prepared interim financial statements of Borrower for the most-recent fiscal quarter, all in reasonable detail satisfactory to the Lender and prepared in accordance with GAAP consistently applied for such interim period (subject to year-end audit adjustments), and a summary operating report in form and substance reasonably satisfactory to the Lender with respect to the Borrower, and any other material items reasonably requested by the Lender;

(c)     together with each delivery of financial statements of Borrower pursuant to clauses (a) and (b) above, Borrower shall deliver to Lender a Compliance Certificate, substantially in the form attached hereto as **<u>Exhibit G</u>** (the "***Compliance Certificate***"), demonstrating Borrower's compliance with, among other things, all of the financial covenants set forth herein.

(d)     promptly after the same become available, but in any event within ten (10) Business Days of filing or receipt thereof, copies of all licensure and state and federal inspection reports (including, if applicable, an attached plan of correction) and any other periodic reports, that may be required to be filed by or with respect to Borrower in order to maintain its licenses in good standing. Borrower shall correct any deficiency on any report delivered pursuant to this clause (e) or otherwise received by Borrower within the date required by the applicable Governmental Authority.

(e)      promptly upon receipt thereof, but in any event no later than three (3) Business Days after Borrower's receipt thereof, copies of:

    (1)    all notices given or received with respect to a default or any event of default under any term or condition of or related to any Permitted Indebtedness;

    (2)    all material notices, requests, correspondence and other communications relating to the Project Equipment;

    (3)    any and all notices of a material default, material breach or termination by any party under any Customer Agreement or the Generac Agreement;

    (4)    any notice of the occurrence of any event or circumstance that has, or could reasonably be expected to have, a Material Adverse Effect;

    (5)    all notices of any (i) fact, circumstance, condition or occurrence at, on, or arising from, any Project, that results or could reasonably be expected to result in material noncompliance with or a material liability or material obligation under any Environmental Law or Permit issued under Environmental Law, (ii) release of Hazardous Materials from or related to any Project that has resulted in or could reasonably be expected to result in personal injury, material property damage or material liability, or (iii) pending or, to the Borrower's knowledge, threatened action, charge, claim, demand, suit, proceeding, petition, governmental investigation or arbitration in respect of any Environmental Laws against it or arising in connection with occupying or conducting operations on or at any Project therefor;

    (6)    any notice that any insurance required to be maintained pursuant to the Loan Documents has been, or is threatened to be, cancelled;

    (7)    each recall notice issued in respect of, or any other material communications related to an actual or potential serial defect from any manufacturer of any Project Equipment included in a Project; and

    (8)    any amendment, modification or waiver to any Subordinating Lender Loan Documents.

(f)      promptly upon the occurrence thereof, but in any event no later than three (3) Business Days after the occurrence thereof, written notice of notice of any event which would require a mandatory prepayment under Section 2.7(b);

(g)     promptly upon the occurrence thereof, but in any event no later than ten (10) Business Days after the occurrence thereof, written notice of the occurrence of any Customer Prepayment Event;

(h)     as soon as available, but in any event within ten (10) days of Borrower's receipt of Lender's written request or as required as a condition of Loan approval, Borrower's most recent internally or independently prepared interim financial statements on a quarterly or semiannual basis, as Lender may require;

(i)     promptly, but in any event within five (5) Business Days after receipt by Borrower, copies of any material communications to or from any regulatory agency or Governmental Authority; and

(j)     with reasonable promptness, such other information regarding Borrower or any of their respective Subsidiaries as the Lender may reasonably request.

6.9     <u>Compliance with Contractual Obligations and Requirements of Law</u>. Comply, in all material respects, with all contractual obligations and Requirements of Law, the breach of which, or failure to comply with, would be reasonably likely to have a Material Adverse Effect.

6.10     <u>Licenses</u>.  Borrower shall (i) maintain, all licenses, certifications and material Permits necessary to continue its operations; and (ii) promptly provide the Lender with copies of any final third party audit reports, or other material regulatory communications. Borrower shall within thirty (30) days of receipt, deliver to Lender a copy of any required license, Permit, registration or evidence of any other requirement of any Governmental Authority having jurisdiction over Borrower or the conduct of its business.

6.11     <u>Conduct of Business and Maintenance of Existence</u>.  Borrower shall preserve in full force and effect its corporate existence and solvency, and materially comply with all laws applicable to it.  Borrower shall maintain and protect all Permits, licenses, franchises and trade names and preserve all of its assets used or usable in the conduct of its business and keep the same in good repair and working order and shall within thirty (30) days of receipt, deliver to Lender a copy of any required license, Permit, registration or evidence of any other requirement of any Governmental Authority having jurisdiction over Borrower or the conduct of its business.

6.12     <u>Organizational Documents</u>.  Borrower shall not permit or suffer (i) without the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed), a material amendment or modification of its Organizational Documents or (ii) any dissolution or termination of its existence.

6.13     <u>Maintenance of Security</u>.

(a)     Borrower shall, at its sole cost and expense: (i) take any and all actions necessary to defend its respective title, rights and interests in and to the Pledged

Collateral against all Persons and, further, to defend the security interest of the Lender in the Pledged Collateral and the priority thereof against any Lien other than as provided in the Lien Subordination Agreement; and (ii) advise Lender promptly, in reasonable detail, of any Lien made or asserted against any of the Pledged Collateral and of the occurrence of any event that may have a material, adverse effect on the aggregate value of the Pledged Collateral and/or on the security interest in the Pledged Collateral granted to Lender.

(b)     Notwithstanding the foregoing, the Lender, at its sole discretion and at the Borrower's expense, may take all necessary action to maintain and preserve the Liens and security interests created by the Loan Documents in accordance with the terms thereof.

6.14     <u>Furnishing Reports</u>.  Upon the Lender's request, Borrower shall provide the Lender with copies of all inspections, reports, test results and other information received by Borrower which in any material way relate to Borrower or such Person's property.

6.15     <u>Insurance</u>.  Borrower shall:

(a)     maintain to maintain the following minimum insurance coverages on itself, the Projects, and the Pledged Collateral:

(1)     Commercial General Liability insurance, for bodily injury and property damage, with limits of not less than: Two Million AND No/100 Dollars ($2,000,000.00) per occurrence and Two Million AND No/100 Dollars ($2,000,000.00) annual aggregate, and naming Lender as an additional insured under such policy;

(2)     All Risk property insurance covering the replacement cost of the Project and naming Lender as an additional insured and loss payee with respect thereto with a maximum deductible of $25,000;

(3)     Fidelity/Crime Insurance for limits of at least One Million and No/100 Dollars ($1,000,000.00) per claim; and

(4)     such other insurance in such coverage types and in such coverage amounts as Lender may reasonably require.

(b)     Each insurance policy required by this Agreement shall be issued by a nationally-known insurance underwriter having an A.M. Best's rating of "A-/VII" or better, or, for underwriters not rated by A.M. Best, a quality equivalent to that of an A.M. Best rating of "A-/VII" or better, as determined by Lender in its reasonable discretion.

(c)     Each insurance policy shall provide that each insurer will provide Lender with written notice at least thirty (30) days prior to any termination or material

modification thereof.  If Borrower fails to pay any insurance premium, Lender shall have the right (but shall be under no duty) to pay such premiums, and Borrower shall promptly reimburse Lender all costs and expenses reasonably incurred by Lender, together with interest thereon at the Interest Rate.  In the event of an insurable loss with respect to any Project, Borrower shall deliver to deliver the full replacement cost of the Equipment from the insurance Proceeds to Lender. Borrower hereby on behalf of it-self authorizes and directs Lender, and Lender shall have the sole discretion, to apply or pay all such Proceeds to: (i) the payment of the Obligations, (ii) the restoration or replacement of the property destroyed or damaged, or (iii) Borrower.

(d)     Each such insurance policy set forth above shall include: (i) provisions or endorsements naming Lender as an additional insured; (ii) provisions that such insurance is primary insurance with respect to the interest of Lender and that any insurance maintained by Lender is excess and not contributory insurance with the insurance required hereunder; (iii) a cross-liability or severability of insurance interest clause; and (iv) provisions by which the insurer waives all rights of subrogation against Lender.

(e)     Borrower shall provide Lender with Certificates of Insurance, in form and substance acceptable to Lender, evidencing the policies, provisions and endorsements listed above as a condition of closing of each advance under the Term Loan and, during the term of the Term Loan, promptly upon the request of Lender.

6.16     Inspections.  Upon written notice to Borrower, Borrower shall allow Lender (or its designee) to inspect the Projects to confirm that Borrower is constructing, operating and maintaining the Projects in accordance with this Agreement, and Borrower shall use best efforts to facilitate such inspections.  Borrower shall not rely on Lender's inspection for any purpose and shall be solely responsible for ensuring that the Projects are installed, constructed, operated and maintained in accordance with prudent industry standard. Lender's inspection of the Projects or the disbursement of an advance under the Term Loan shall not be deemed to constitute Lender's approval or warranty of the Projects, the Project Equipment, or any contractor or vendor and/or its continued operation.

6.17     Material Agreements.  Borrower shall comply in all respects with all material existing and future agreements, indentures, mortgages, or documents which are binding on it or affecting any of its properties or business.

6.18     Taxes.  Borrower shall file and caused to be filed when and as due all federal, state, local and foreign income, profits, franchise, sales, use, occupation, property, excise and other tax returns and tax reports required to be filed with respect to the business and assets of Borrower, including without limitation the Pledged Collateral, with the appropriate Governmental Authority, and pay, when and as due, all such taxes to all such appropriate Governmental Authority.

6.19    Payment of Lender's Fees, Costs and Expenses.  Borrower shall pay to Lender, or as Lender directs, all reasonable fees, charges, costs and expenses of the Lender including any third-party fees, legal fees, accounting fees, inspection fees and other fees related to the Term Loan and required to satisfy the conditions of the Loan Documents.  Borrower will hold Lender harmless and indemnify Lender from all claims of brokers and "finders" arising by reason of the execution and delivery hereof or the consummation of the transaction contemplated hereby that claim to have been introduced to the transaction by Borrower.

6.20    Correction of Project Defects.  Borrower will correct or cause the correction of any defects in any Project and any material departures or deviations from any Project not approved in advance and in writing by Lender.

6.21    Management of Project Equipment.  Borrower shall cause the Project Equipment to be managed, operated and maintained in compliance with the ESS, manufacturer's specifications, the Generac Agreement, and with all applicable federal, state and local laws, ordinances and regulations.  Additionally, at all times applicable hereto, Borrower shall cause any and all Project Equipment to be connected to the Internet and shall afford Generac at least such Internet and other access to the Project Equipment as required by the terms of the Generac Agreement.

6.22    Maintenance of Project Equipment.  Borrower shall cause the Project Equipment to be maintained in good operating condition, reasonable wear and tear excepted.

6.23    Maintenance of Pledged Collateral. Borrower will properly protect and maintain the Pledged Collateral and defend the Pledged Collateral against any claims and/or demands against it.   Borrower shall use reasonable means to use reasonable means to ensure that the Project Equipment is not affixed to real estate in a manner so as to be deemed a "fixture" as defined under the Uniform Commercial Code.

6.24    Change of Place of Business.  Borrower shall notify Lender in writing at least thirty (30) days prior to any change in Borrower's place of business, or, if Borrower has or acquires more than one place of business, at least thirty (30) days prior to any change in either Borrower's chief executive office and/or the office or offices where Borrower's books and records are kept.

6.25    Further Assurances. Borrower shall, upon Lender's request at any time, take all actions reasonably required to assure to the Lender a perfected security interest in the Pledged Collateral.

6.26    Cooperation. Borrower shall cooperate and use all reasonable efforts to cooperate and use all reasonable efforts, in good faith, to make all registrations, filings and applications and to give all notices and obtain all governmental and regulatory consents, authorizations, approvals, licenses, Permits, orders, qualifications and waivers necessary or desirable for the consummation of the transactions contemplated in this Agreement.

6.27    Collateral Accounts; Collections.

(a)     The Borrower shall maintain, and shall cause its Affiliates to maintain, in full force and effect each of the Collateral Accounts in accordance with the terms of the Loan Documents.

(b)     The Borrower shall, and shall cause each of its Affiliates to, remit all Generac Guaranteed Payments received from Generac to the Generac Guaranteed Payments Account for deposit in accordance with the terms of the Loan Agreements.

(c)     The Borrower shall, and shall cause each of its Affiliates to, remit all Customer Payments received from Customers to the Customer Payments Account for deposit in accordance with the terms of the Loan Agreements.

(d)     The Borrower shall, and shall cause each of its Affiliates to, direct any proceeds of any Generac Guaranteed Payments received from Generac to the Generac Guaranteed Payments Account.

6.28    Non-Discrimination.  The Borrower shall comply with all federal and state laws regarding non-discrimination. The Borrower shall provide, and shall include in all contracts and subcontracts entered into in connection with the Project Equipment after the date hereof, a requirement that all contractors and subcontractors engaged in the installation of the Project Equipment shall provide equal opportunity for housing or employment without discrimination in accordance with applicable state and federal laws. The Borrower shall use its best efforts to assure compliance with this requirement, including prosecution of an action to enforce contract compliance, if necessary.

6.29    State Contracting Terms. Lender is a quasi-public agency of the state of Connecticut and the state of Connecticut requires certain certifications for certain parties contracting with quasi-public agencies.  Attached hereto as **Schedule B** are the State Contracting Standard Terms and Conditions applicable to the execution and performance of this Agreement (the "***State Contracting Standard Terms and Conditions***").  References to the "Contract" or "contract" shall mean this Agreement and references to "Contractor" or "contractor" shall mean the Borrower.

## 7.    **NEGATIVE COVENANTS.**

The Borrower hereby covenants and agrees that on the Closing Date and thereafter so long as this Agreement is in effect and until such time as the Term Loan Commitment has been terminated, no Term Note remains outstanding and the Term Loan, together with interest, Fees and all other Obligations incurred hereunder and under the other Loan Documents, have been indefeasibly paid in full, it shall not, as applicable:

7.1     Additional Indebtedness.  The Borrower shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness at any time, except the following (collectively, the "***Permitted Indebtedness***"):

(a)       the Obligations and all other Indebtedness owing to Lender under the Loan Documents and as set forth in the Lien Subordination Agreement;

(b)       taxes, assessments and governmental charges that are not yet due and payable;

(c)       Indebtedness owing to the Subordinating Lenders as of the date hereof that is: (i) specified in the financial statements referred to in the Disclosure Schedule; (ii) set forth in, and subject to, the Lien Subordination Agreement; and (iii) is set forth in **Schedule 7.1(c) of the Disclosure Schedules**, and any extensions, renewals and refinancings thereof, so long as such extensions, renewals or refinancings do not increase the amount of the original Indebtedness (the "***Subordinating Lender Indebtedness***"); and

(d)       unsecured trade accounts payable incurred in the ordinary course of business; *provided*, *however*, (1) such trade payables are payable not later than ninety (90) days after the original invoice date and are not overdue by more than thirty (30) days, and (2) the aggregate amount of such trade payables outstanding does not, at any time, exceed Five Hundred Thousand AND No/100 Dollars ($500,000.00) in the aggregate for the Borrower and the Subsidiaries.

In no event shall any Indebtedness, other than the Obligations, be secured, in whole or in part, by the Pledged Collateral or any portion thereof or interest therein and any proceeds of any of the foregoing unless such security was created without the consent of the Borrower, in which case Borrower shall have not less than thirty (30) days to fully bond over, or reserve against, any such involuntary interest.

7.2       <u>Accounting Policies and Procedures</u>.  The Borrower shall not change its fiscal year or any of its fiscal quarters from those in effect on the date hereof, change any of its accounting or auditing policies, practices or procedures in effect on the date hereof, unless it has given the Lender not less than ninety (90) days' prior written notice of its intention to do so and has amended the financial covenants set forth herein to the extent necessary, in the opinion of the Lender, to preserve the usefulness to the Lender of such financial covenants as a means of ascertaining the financial condition of Borrower.

7.3       <u>Liens</u>.  The Borrower shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien of any kind upon, or any security interest in, any of the Project Equipment or the Pledged Collateral, whether now owned or hereafter acquired.

7.4       <u>Merger, Consolidation, Dissolution or Liquidation</u>.  The Borrower shall not enter into any merger, consolidation, liquidation, or voluntary dissolution, or lease or acquire all or substantially all of the assets of any Person or of any division or business unit of any Person, or sell, lease, license or otherwise dispose of all or a significant portion of its assets.

7.5     Change of Name.  The Borrower shall not change the name or the legal form of Borrower's business.

7.6     Change of Address.  The Borrower shall not change the address of its principal offices without first giving Lender thirty (30) days' prior written notice.

7.7     Change of Control.  The Borrower shall not enter into, allow, or suffer to exist a Change of Control to which Lender has not provided its prior written consent, which consent may be withheld, delayed or conditioned in Lender's sole and absolute discretion.

7.8     Insurance Policies.  The Borrower shall not cancel or change any material existing insurance policy required under this Agreement, unless replaced by an insurance policy providing substantially the same coverage, and such replacement insurance policy or policies are in compliance with the terms hereof.

7.9     Sale or Relocation of Project Equipment.  The Borrower shall not sell or relocate the Project Equipment outside of the State of Connecticut.

7.10     Use of Proceeds of the Term Loan.  The Borrower shall not allow the proceeds of the Term Loan to be used for any purpose, except (i) as set forth in Section 4.7 of this Agreement; or (ii) a purpose for which the Borrower receives the Lender's prior written consent.

7.11     Pledged Collateral.   The Borrower shall not take any action that will, or is reasonably likely to, impair: (i) the value of the Pledged Collateral in any manner; or (ii) (A) the legality, validity, or enforceability of the Security Agreement, or (B) the legality, validity, enforceability, or priority of the Lender's security interest in the Collateral identified and described in such Security Agreement.

7.12     No Assignments.  Borrower shall not to transfer, assign, pledge or hypothecate any right or interest in any payment or advance due pursuant to this Agreement, or any of the other benefits of this Agreement, without the prior written consent of Lender.  Any assignment made or attempted by Borrower without the prior written consent of Lender shall be void.  No consent by Lender to an assignment by Borrower shall release Borrower as the party primarily obligated and liable under the terms of this Agreement unless Borrower shall be released specifically by Lender in writing.  No consent by Lender to an assignment shall be deemed to be a waiver of the requirement of prior written consent by Lender with respect to each and every further assignment and as a condition precedent to the effectiveness of such assignment.

## 8.     **EVENTS OF DEFAULT.**

8.1     Events of Default.  Any of the following specified events which are continuing after expiration of all applicable cure periods shall constitute an Event of Default (each an "***Event of Default***"):

(a)     *Payments*.  Borrower shall fail to make a payment when due under the Term Loan, this Agreement, or any other Loan Document, or if Borrower shall fail to timely fund a reserve or escrow under the Loan Documents; or

(b)     *Representations, etc*.  any representation, warranty or statement made by Borrower herein or in any other Loan Document or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect (without duplication as to any materiality modifiers, qualifications, or limitations applicable thereto) on the date as of which made, deemed made, or confirmed; or

(c)     *Certain Covenants*.  Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in Sections 6.1, 6.3, 6.7, 6.11, 6.12, 6.14, 6.25, 6.26 or 6.27 or Section 7 of this Agreement; or

(d)     *Other Covenants*.  Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in this Agreement or any other Loan Document (other than those referred to in Section 8.1(a) or (b) or (c) above); or

(e)     *Cross-Default Under Other Agreements*.  Borrower shall (i) default in any payment with respect to any Indebtedness and such default shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness; or (ii) default in the observance or performance of any agreement, covenant or condition relating to any Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto (and all grace periods applicable to such observance or performance shall have expired), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause any such Indebtedness to become due prior to its stated maturity; or (iii) any such Indebtedness of Borrower shall be declared to be due and payable, or shall be required to be prepaid (other than by a regularly scheduled required prepayment or redemption, prior to the stated maturity thereof; or

(f)     *Invalidity of Loan Documents*.  any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or under such Loan Document or satisfaction in full of all the Obligations, ceases to be in full force and effect, and the Borrower shall fail to provide a replacement for such Loan Document(s) that is acceptable to Lender, in its reasonable discretion, within thirty (30) days from written request from Lender; or Borrower or any of its Subsidiaries contests in any manner the validity or enforceability of any provision of any Loan Document; or the Borrower or any of its Subsidiaries denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(g)     *Invalidity of Liens*.  any security interest and Lien purported to be created by any Collateral Document shall cease to be in full force and effect with respect to any portion of the Collateral (other than in accordance with the terms hereof and thereof), or shall cease to give the Lender, the Liens, rights, powers and privileges purported to be created and granted under such Collateral Documents (including a perfected first priority security interest in and Lien on, the Collateral thereunder (except as otherwise expressly provided in such Collateral Document)) or shall be asserted by Borrower or any of its Subsidiaries not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on a material portion of the Collateral covered thereby, and the Borrower or any of its Subsidiaries shall fail to provide a replacement for such Collateral Document, Lien and/or Collateral that is acceptable to Lender, in its reasonable discretion; or

(h)     *Judgments*.  (i) one or more judgments, orders or decrees shall be entered against Borrower involving a liability (other than a liability covered by insurance as to which the carrier has not effectively disclaimed coverage) that is likely to constitute a Material Adverse Effect for Borrower or to impair the Pledged Collateral, and any such judgments, orders or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within twenty (20) days (or such longer period, not in excess of sixty (60) days, during which enforcement thereof, and the filing of any judgment Lien, is effectively stayed or prohibited) from the entry thereof; or (ii) one or more judgments, orders or decrees shall be entered against Borrower and/or any of its Subsidiaries involving a required divestiture of any material properties, assets or business that is likely to constitute a Material Adverse Effect for Borrower or to impair the Pledged Collateral, and any such judgments, orders or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within twenty (20) days (or such longer period, not in excess of sixty (60) days, during which enforcement thereof, and the filing of any judgment Lien, is effectively stayed or prohibited) from the entry thereof; or

(i)     *Insolvency Event*.  any Insolvency Event shall occur with respect to Borrower; or

(j)     *Illegal Activity*.  Borrower shall participate in any illegal activity, whether or not related to the business of Borrower, that may subject the assets in excess of $100,000 of Borrower to: (i) a restraining order or any form of injunction issued by any federal or state court, or (ii) seizure, forfeiture or confiscation by any federal or state governmental instrumentality; or

(k)     *ERISA*.  any ERISA Event shall have occurred and either (i) such event or events could reasonably be expected to have a Material Adverse Effect or (ii) there shall result from any such event or events the imposition of a Lien; or

(l)    *Cessation of Business*.  any cessation of a substantial part of the business of Borrower for a period that could reasonably be expected to have a Material Adverse Effect, such period being a minimum of sixty (60) days; or

(m)    *Environmental*.  Borrower or any of its Subsidiaries shall have any Environmental Liabilities and Costs (other than Environmental Liabilities and Costs covered by insurance, as to which the carrier has not effectively disclaimed coverage), the payment of which is reasonably probable and which could reasonably be expected to have a Material Adverse Effect (after taking into consideration available claims or rights of recovery that Borrower or any of its Subsidiaries may have against any third- party, to the extent reasonably expected to be realized); or

(n)    *Material Adverse Effect*.  any other event shall occur, which could reasonably be expected to have a Material Adverse Effect; or

(o)    *Change of Control*.  the occurrence of a Change of Control, without the Lender's prior written consent; or

(p)    *Security Agreement*.  Borrower commits an Event of Default under the Security Agreement or any of the other Loan Documents; or

(q)    *First Lien Credit Agreement; Second Lien Credit Agreement*.  an Event of Default, as such term is defined in the First Lien Credit Agreement or the Second Lien Credit Agreement, has occurred; or

(r)    *Breach of Agreement Between Borrower and Lender*.  Borrower breaches and/or defaults under any agreement between Borrower and Lender; or

(s)    *Subordinating Lenders*.  Borrower defaults under any of its obligations to Subordinating Lenders with respect to the Pledged Collateral; or

(t)    *Liens on Pledged Collateral*.  any lien or encumbrance of any kind or character, other than any Permitted Encumbrances, shall attach to the Pledged Collateral, or any portion thereof, or any levy, seizure or attachment thereof or thereon; or

(u)    *Lender's Lien on Pledged Collateral*.  Lender's Lien on or security interest in any of the Pledged Collateral becomes unenforceable.

8.2    Cure Rights.  If any default, other than a default under Sections 8.1(a), 8.1(b), 8.1(c), 8.1(f), 8.1(h), 8.1(i), 8.1(k), 8.1(l), 8.1(o) or 8.1(t), is curable and if Borrower has not been given a notice of a similar default within the preceding three (3) months, it may be cured (and no Event of Default will have occurred) if Borrower, after receiving written notice from Lender demanding cure of such default:

(a)      cures the default, if such default requires the payment of money to Lender, within ten (10) days, or thirty (30) days, if such default does not require the payment of money to Lender, or

(b)      if the cure requires more than thirty (30) days, promptly initiates steps to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

Nothing in this Section 8.2 shall require Lender to provide Borrower with an additional ten (10) days to cure any event of default occurring under any of the other Loan Documents, which event of default was not cured within any applicable grace period provided therein.  Any notice and cure period shall not be made available to Borrower if Lender determines, in its sole discretion, that Lender's rights with respect to Borrower and/or the Pledged Collateral could be materially adversely affected.

8.3      Remedies.

(a)      Subject to any applicable notice and cure periods, upon the occurrence of any Event of Default, and at any time thereafter, if any Event of Default shall then be continuing, the Lender may, as the true and lawful agent of Borrower, with power of substitution for Borrower and in either Borrower's name, Lender's name or otherwise, for the use and benefit of Lender, take any or all of the following actions, without prejudice to the rights of the Lender to enforce its claims against the Borrower in any manner permitted under Applicable Law:

i.   declare the Term Loan Commitment terminated, whereupon the Term Loan Commitment of Lender shall forthwith terminate immediately without any other notice of any kind;

ii.  declare the principal of and any accrued interest in respect of the Term Loan and all other Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;

iii. to offset any amounts owed by Borrower to Lender, which are not paid when due, against any amounts due and owing by Lender to Borrower from any source whatsoever;

iv.  to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Pledged Collateral or any part of it;

v.   to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any part of the Pledged Collateral;

vi.  to commence and prosecute any and all suits, actions or proceedings at law or in equity or otherwise in any court of competent jurisdiction to collect on any of the Pledged Collateral or to enforce any rights in respect of any Pledged Collateral;

vii.  to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating or pertaining to all or any portion of the Pledged Collateral;

viii.  to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Pledged Collateral and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though Lender were the absolute owner of the Pledged Collateral for all purposes; and/or

ix.  exercise any other right or remedy available under any of the Loan Documents or Applicable Law.

(b)    *Lender's Costs and Expenses*.  Lender shall be entitled to recover its costs and expenses including reasonable attorneys' fees in any legal or equitable action resulting from an Event of Default hereunder.  Borrower shall promptly reimburse Lender promptly for all reasonable attorneys' fees, costs and expenses Lender incurs in exercising any and all of its remedies, including the costs and expenses incurred by Lender in inspecting Borrower's books and records, plus interest on the amount of such costs and expenses from the date incurred by Lender to the date reimbursed by Borrower, calculated in accordance with Section 2.6, and Lender shall be entitled to offset such amounts against payment of any amounts owed to Borrower from any source whatsoever.

(c)    *No Requirement to First Foreclose on or Liquidate Pledged Collateral*. Upon the occurrence of an Event of Default, Lender may institute a suit directly against Borrower without first foreclosing on or liquidating the Pledged Collateral, and Borrower waives any requirement that Lender first foreclose on or liquidate the Pledged Collateral.

(d)    *Default Rate*.  Upon the occurrence of an Event of Default, Lender, in its sole discretion may increase the rate of interest accruing and payable on the Term Loan to a rate equal to the Default Rate, for as long as any portion of the Term Loan remains outstanding.

(e)    *Execution of Additional Documents*.  Upon the written demand of the Lender, the Borrower shall execute and deliver to the Lender an assignment or assignments of any or all of the Pledged Collateral and such other documents and take such other actions as are necessary or appropriate to carry out the intent and purposes hereof.

(f)    *Possession of Pledged Collateral*. After the occurrence of an Event of Default and in the event of a failure of the foregoing remedies, Lender may, after reasonable notice to Borrower, with ten (10) days constituting reasonable notice, and in accordance with Applicable Law, enter onto the Premises, and take possession of the Pledged Collateral.

(g)    *Lender's Right to Dispose of Pledged Collateral*. Consistent with Applicable Law, Borrower agrees that Lender shall have the right to sell or otherwise dispose of all or any part of the Pledged Collateral, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as Lender shall deem appropriate. Lender shall be authorized at any such sale, if it deems it advisable to do so, to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment and not with a view to the distribution or sale of it, and upon consummation of any such sale Lender shall have the right to assign, transfer and deliver to the purchaser or purchasers the Pledged Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Borrower, and Borrower hereby waives to the fullest extent permitted by law, all rights of redemption, stay and appraisal which Borrower now has, or may have at any time in the future, under any rule of law or statute now existing or hereafter enacted.

(h)    *Lender Appointed Attorney-in-Fact*. Upon Borrower's receipt of written notice of an Event of Default pursuant to Section 8, Lender is automatically appointed without any further action by Borrower to act as attorney-in-fact on behalf of Borrower for the purposes of carrying out the provisions of this Agreement and taking any action and executing any instrument or other writing which Lender may deem reasonably necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest.

8.4    <u>Application of Certain Payments and Proceeds</u>. All payments and other amounts received by the Lender through the exercise of remedies hereunder or under the other Loan Documents shall, unless otherwise required by the terms of the other Loan Documents or by applicable law, be applied as follows:

(a)    FIRST, to the payment of that portion of the Obligations constituting fees, costs, indemnities, and expenses payable Lender in connection with such collection or sale, or otherwise in connection with this Agreement or any other agreement in connection with the Term Loan, including, without limitation, all court costs and reasonable attorneys' fees, costs, disbursements and other charges of its agents and legal counsel, whether incurred in any action or proceeding either between the Parties or between Lender and any third party;

(b)      SECOND, to the payment of that portion of the Obligations constituting any and all accrued and unpaid interest on the Term Loan;

(c)      THIRD, to the payment of that portion of the Obligations constituting unpaid principal of the Term Loan;

(d)      FOURTH, to the payment of all other Obligations of the Borrower owing under or in respect of the Loan Documents that are then due and payable to the Lender; and

(e)      FINALLY, any remaining surplus after all of the Obligations have been paid in full, to the Borrower or to whomsoever shall be lawfully entitled thereto.

Lender shall have absolute discretion as to the time of application of any such Proceeds, moneys or balances in accordance with this Agreement. Upon any sale of the Pledged Collateral by Lender, including pursuant to a power of sale granted by statute or under a judicial proceeding, the receipt of the consideration by Lender or of the officer making the sale shall be a sufficient discharge to the purchaser of the Pledged Collateral so sold and such purchaser shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication thereof.

## 9.      **MISCELLANEOUS.**

9.1      Amendments; Waivers.

(a)      *No Deemed Waivers; Remedies Cumulative*.  No failure or delay by the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of an advance under the Term Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)      *Amendments*.  Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, changed, waived or otherwise modified unless such amendment, change, waiver or other modification is in writing and signed by Borrower and the Lender. The representations, warranties, covenants and conditions set forth in this Agreement may be waived only by a written instrument executed by the Party so waiving.  The failure of any Party at

any time or times to require performance of any provision of this Agreement shall in no manner affect the right of such Party at a later time to enforce the same. No waiver by any Party of any condition, or breach of any term, covenant, agreement, representation or warranty contained in this Agreement shall be deemed to be or construed as a waiver of any other condition or of the breach of any other term, covenant, agreement, representation or warranty contained in this Agreement.

9.2    <u>Survival of Representations, Warranties and Covenants</u>. All representations, warranties and covenants of the Parties contained in or made pursuant to this Agreement, and in any document, certificate or statement delivered pursuant hereto or in connection herewith, shall survive until this Agreement expires or is sooner terminated or, in the case of a third-party claim against Lender with respect to the Loan Documents, the indemnity obligations set forth in the Loan Documents.

9.3    <u>Payment of Expenses</u>. Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Lender and its affiliates (including the reasonable fees, charges and disbursements of outside counsel for the Lender), in connection with the preparation, negotiation, execution, and delivery of this Agreement and the other Loan Documents and the Closing; and (ii) all out-of-pocket expenses incurred by the Lender (including the fees, charges and disbursements of any outside counsel for the Lender), in connection with (x) any amendments, modifications or waivers of the provisions hereof or thereof, and (y) the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of this Agreement and the Loan Documents.

9.4    <u>Indemnification</u>.    In consideration of the Lender's execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder and in addition to all of the Borrower's other obligations under this Agreement and the Loan Documents, Borrower shall defend, protect, indemnify and hold harmless the Lender and all of its affiliates, officers, directors, managers, members, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "***Indemnitees***") from and against each of the following (the "***Indemnified Liabilities***"):

(a)    subject to the limitations in clause (i) of Section 9.3 governing the costs and expenses arising in connection with the preparation, negotiation, execution, and delivery of this Agreement and the other Loan Documents and the Closing, any and all expenses, costs, actions, causes of action, liabilities, suits, claims, losses, penalties, fees, liabilities, and damages (including among others reasonable attorney's fees and disbursements) arising out of or incurred in connection with this Agreement, the Loan Documents and/or the transactions contemplated herein or therein (including without limitation costs related to the Closing, costs of collection, and costs related to waivers, consents, and enforcement of rights) except for any such liabilities arising on account of the particular Indemnitee's gross negligence or willful misconduct; and

(b)      any and all actions, causes of action, liabilities, suits, claims, losses, costs, penalties, fees, liabilities, damages, and expenses including, but not limited to, all costs of investigation, monitoring, legal representation, remedial response, removal, restoration or Permit acquisition of any kind whatsoever, which may now or in the future be undertaken, suffered, paid, awarded, assessed, or otherwise incurred by the Indemnitees (or any other Person with a claim on the Lender or to whom the Lender has or have liability or responsibility of any sort) related to, resulting from or arising out of (i) the presence of any hazardous substance or a release or the threat of a release of any hazardous substance on, at or from Borrower's or any of its Subsidiary's Real Property, (ii) the failure to promptly undertake and diligently pursue to completion all necessary, appropriate and legally authorized investigative, containment, removal, cleanup and other remedial actions with respect to any release or the threat of a release of any hazardous substance on, at or from Borrower's or any of its Subsidiary's Real Property, (iii) human exposure to any hazardous substance, noises, vibrations or nuisances of whatever kind to the extent the same arise from the condition of any Borrower's or any of its Subsidiary's Real Property or the ownership, use, operation, sale, transfer or conveyance thereof, (iv) a violation of any Environmental Law or any other Applicable Law related to the environment, and (v) non-compliance with any environmental Permit, incurred by the Indemnitees or any of them as a result of, or arising out of, or relating to the transactions contemplated by this Agreement and the Loan Documents. To the extent that the foregoing undertaking by Borrower may be unenforceable for any reason, Borrower shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. Notwithstanding anything to the contrary contained herein, Borrower's liability and obligations under this Section 9.4 shall survive the discharge, satisfaction or assignment of this Agreement by the Lender and the payment in full of all of the Obligations.

(c)      The Indemnified Liabilities shall be deemed to include, without limitation, any sums which the Lender reasonably deems it necessary or desirable to expend to protect its security interests and liens under this Agreement and/or any Loan Document.

9.5      <u>Usury</u>.  This Agreement and the Loan Documents are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or maturity of the Indebtedness evidenced hereby or thereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the Indebtedness evidenced hereby or thereby exceed the maximum permissible under applicable law.  As used herein, the term "applicable law" shall mean the law in effect as of the date hereof, *provided*, *however* that in the event there is a change in the law which results in a higher permissible rate of interest, then the Loan Documents shall be governed by such new law as of its effective date.  If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time performance of such provision shall be due, shall involve transcending

the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from any circumstances whatsoever the Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest.  This provision shall control every other provision of this Agreement and all Loan Documents.

        9.6        <u>Payment Set Aside</u>.  To the extent that Borrower makes a payment or payments to the Lender hereunder or under the Loan Documents or the Lender enforces or exercises its rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, or are required to be refunded, repaid or otherwise restored to Borrower, a trustee, receiver or any other Person under any law, then to the extent of any such set off, recovery, refund, repayment or restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or such set off, recovery, refund, repayment or restoration had not occurred.

        9.7        <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, the Lender and each of its affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or its affiliates, irrespective of whether or not such Lender or affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch, office or affiliate of such Lender different from the branch, office or affiliate holding such deposit or obligated on such Indebtedness.  The rights of the Lender and its affiliates under this Section 9.7 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its affiliates may have.  The Lender agrees to notify the Borrower promptly after any such setoff and application; *provided*, *however*, that the failure to give such notice shall not affect the validity of such setoff and application.

        9.8        <u>Successors and Assigns</u>.  Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the Parties hereto shall bind and inure to the benefit of the respective successors and assigns of the Parties hereto.  In addition, and whether or not any express assignment has been made, the provisions of this Agreement which are for the Lender's benefit holder of the Term Note(s) are also for the benefit of, and enforceable by, any subsequent holder of the same.  The Borrower may not assign any of its obligations, duties or rights under this Agreement, or under the Term Note(s) issued hereunder, except with the Lender's consent.

        9.9        <u>Notices</u>. Any and all notices or other communications required or permitted under this Agreement shall be in written communication given: (i) by delivery to a

commercially recognized ground or air courier service which provides a receipt for delivery, (ii) by certified mail, postage prepaid, return receipt requested, or (iii) by hand delivery with delivery receipt, addressed to the person to whom such communication is to be given, at the following addresses, addressed as follows:

> If to Lender:  Connecticut Green Bank
> 75 Charter Oak Ave.
> Hartford, Connecticut 06106
> Attn: General Counsel
>
> With a copies to (which shall not constitute notice):
>
> Wiggin and Dana LLP
> One Century Tower
> 265 Church Street, 17th Floor
> New Haven, Connecticut 06510
> Attn: Paul A. Hughes, Esq.
>
> and
>
> Wiggin and Dana LLP
> One Century Tower
> 265 Church Street, 17th Floor
> New Haven, Connecticut 06510
> Attn: Jonathan F. Tross, Esq.

> If to Borrower:
>
> PosiGen, Inc.
> 819 Central Ave., Ste. 210,
> New Orleans, Louisiana 70121
> Attn: Benjamin Healey

Any Party may change the address to which notices or other communications are to be sent to it by giving written notice of such change in the manner provided above for all notices.

A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or two (2) Business Days after mailing; or (c) in the case of overnight courier service, on the Business Day after the same was sent. A Party receiving a notice which does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given.

9.10    Liability of Lender.  Lender shall in no event be responsible or liable to any Person other than Borrower for the disbursement of or failure to disburse the proceeds of

the Term Loan or any part thereof and no subcontractor, laborer or material supplier shall have any right or claim against Lender under this Agreement or the administration thereof.

9.11    <u>Assignment</u>. This Agreement may not be assigned by the Borrower without the prior written consent of the Lender. Borrower shall not transfer, assign, pledge or hypothecate any of its rights to Loan advances, or any of its rights or obligations under this Agreement, without the prior written consent of Lender.  Any assignment made or attempted by Borrower without the prior written consent of Lender shall be void.  No consent by Lender to an assignment by Borrower shall either (a) release Borrower as the party primarily obligated and liable under the terms of this Agreement unless Borrower shall be released specifically by Lender in writing, or (b) be deemed to be a waiver of the requirement of prior written consent by Lender with respect to each and every further assignment. The Lender shall be entitled to recover its reasonable costs and expenses including administration and attorneys' fees in connection with any such assignment.  Lender may assign its rights and delegate its obligations under this Agreement to one or more Subsidiaries or affiliates of Lender.

9.12    <u>Entire Agreement</u>. This Agreement, together with the Term Note(s) and the Loan Documents, sets forth the entire agreement and understanding of the Parties in respect of the transactions contemplated by this Agreement, and supersedes all prior agreement, arrangements and understandings relating to the subject matter of this Agreement.

9.13    <u>No Third Party Beneficiary</u>. Nothing in this Agreement is intended or shall be construed to give any Person any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein, other than the Parties.

9.14    <u>Incorporation of Preamble and Recitals</u>. The preamble and recitals set forth above are an integral part of this Agreement and set forth the intentions of the Parties and the premises on which the Parties have decided to enter into this Agreement. Accordingly, the preamble and recitals set forth above, and all defined terms set forth in such preamble and in such recitals, are fully incorporated into this Agreement by this reference as if fully set forth herein.

9.15    <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") shall be effective as delivery of a manually executed counterpart thereof.   Unless otherwise provided in this Agreement, the words "execute", "execution", "signed", and "signature" and words of similar import used in or related to this Agreement, or in any amendment or modification hereof (including waivers and consents), shall be deemed to include electronic signatures (including, without limitation, DocuSign and AdobeSign) and the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any applicable law, including the Federal Electronic Signatures in

Global and National Commerce Act, the Connecticut Uniform Electronic Transactions Act, and other similar state laws based on the Uniform Electronic Transactions Act.

9.16    <u>Titles, Headings, and Captions</u>. The titles, headings, and captions used in this Agreement are inserted only as a matter of convenience and in no way affect the terms or intent of any provisions of this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.17    <u>Interpretation</u>.  Each of the Parties expressly acknowledges and agrees that the Parties have participated jointly in the negotiation and drafting of this Agreement.   In recognition of the fact that each of the Parties had an equal opportunity to negotiate the language of, and draft, this Agreement, the Parties acknowledge and agree that there is no single drafter of this Agreement and, therefore, the general rule that ambiguities are to be construed against the drafter is, and shall be, inapplicable to this Agreement.  If any language in this Agreement is found or claimed to be ambiguous, each Party shall have the same opportunity to present evidence as to the actual intent of the Parties with respect to any such ambiguous language without any inference or presumption being drawn against any Party hereto.

9.18    <u>Construction</u>. In this Agreement the singular includes the plural and the plural the singular; words importing any gender include the other genders; the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications, without prejudice to any provisions of this Agreement prohibiting such amendments and other modifications; and references to persons include their respective permitted successors and assigns.

9.19    <u>Severability</u>. If any provision of this Agreement is determined by any court or other tribunal of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the Parties hereto.  If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.  Notwithstanding the foregoing, upon such determination that any term or other provision is invalid, illegal, or unenforceable, the court or other tribunal of competent jurisdiction making such determination is authorized and instructed to modify this Agreement so as to effect the original intent of the Parties as closely as possible so that the transactions and agreements contemplated herein are consummated as originally contemplated to the maximum extent permitted under Applicable Law.

9.20    <u>Governing Law</u>. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO**

CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

9.21    Jurisdiction; Venue.

(a)    *Consent to Jurisdiction*.  **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT AND OF ANY CONNECTICUT STATE COURT SITTING IN NEW HAVEN, CONNECTICUT AND ANY APPELLATE COURT FROM ANY THEREOF FOR THE PURPOSES OF ALL ACTIONS, LITIGATIONS OR LEGAL PROCEEDINGS, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF CONNECTICUT SITTING IN NEW HAVEN, CONNECTICUT, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT, AND ANY APPELLATE COURT FROM ANY THEREOF.  EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

(b)    *Waiver of Venue*.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN

CLAUSE (a) OF THIS SECTION.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

9.22    Waiver of Jury Trial.   EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).   EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.23    Prejudgment Remedy Waiver.   BORROWER ACKNOWLEDGES THAT THE TERM LOAN EVIDENCED BY THE TERM NOTE(S) IS A COMMERCIAL TRANSACTION AS DEFINED IN CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED, AND WAIVES ITS RIGHTS TO NOTICE AND HEARING UNDER SAID CHAPTER 903a, OR AS OTHERWISE REQUIRED BY ANY STATE OR FEDERAL LAW, WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH THE LENDER MAY SEEK AND WAIVES ITS RIGHTS TO REQUEST THAT THE LENDER POST A BOND IN CONNECTION WITH ANY SUCH PREJUDGMENT REMEDY.

9.24    Limitation of Damages.   EXCEPT AS PROHIBITED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS.   THESE WAIVERS CONSTITUTE A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.   BORROWER REPRESENTS AND ACKNOWLEDGES THAT THESE WAIVERS ARE MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AFTER CONSULTATION WITH LEGAL COUNSEL.

9.25    Miscellaneous. Nothing in this Agreement shall be construed to create any duty to, any standard of care with reference to, or any liability to any Person not a party to

this Agreement. No undertaking by one Party to the other under any provision of this Agreement shall constitute the dedication of Lender's system or any portion thereof to Borrower or to the public, nor affect the status of Lender as an independent instrumentality of the State of Connecticut, or Borrower as an independent entity. Lender's review or acceptance of the Project and its operation shall not be construed as confirming or endorsing the design or as any warranty of safety, durability, reliability and/or performance. Lender shall not by reason of such review or failure to review be responsible for the strength, safety, details of design, adequacy, capacity, reliability and/or operation of any Project, nor shall Lender's extension of the Term Loan to Borrower be deemed to be an endorsement of the Project, in whole or in part.

9.26    <u>Relationship of the Parties</u>. For purposes of this Agreement, Lender and Borrower expressly agree that the relationship of Lender to Borrower is that of a lender only. The intent of this provision is to clarify and stipulate that Lender is not a partner, fiduciary and/or coventurer of Borrower and that Lender's sole interest in the Pledged Collateral is for the purpose of security for repayment of the obligations of Borrower to Lender and of Grantor to Lender under the Security Agreement.

9.27    <u>Participation and Loan Servicing</u>. In its sole discretion, at any time Lender shall have the right to participate out all or a portion of any Term Loan or to engage a loan servicer for any Term Loan. Borrower shall execute such documents any take such actions as may be required in connection with such participation or servicing provided that such documents or actions shall not increase the monetary liability of Borrower under the Loan Documents.

9.28    <u>Time is of the Essence</u>. Time is of the essence for the Loan Documents.

9.29    <u>Freedom of Information Act</u>.    The Lender is a "public agency" for purposes of the Connecticut Freedom of Information Act ("***FOIA***"). This Agreement and information received pursuant to this Agreement will be considered public records and will be subject to disclosure under the FOIA, except for information falling within one of the exemptions in Conn. Gen. Stat. Sections § 1-210(b) and § 16-245n(d). Because only the particular information falling within one of these exemptions can be withheld by the Lender pursuant to an FOIA request, Borrower should specifically and in writing identify to Lender the information that Borrower claims to be exempt. Borrower should further provide a statement stating the basis for each claim of exemption. It will not be sufficient to state generally that the information is proprietary or confidential in nature and not, therefore, subject to release to third parties. A convincing explanation and rationale sufficient to justify each exemption consistent with General Statutes §1-210(b) and § 16-245n(d) must be provided. Borrower acknowledges that (1) Lender has no obligation to notify Borrower of any FOIA request it receives, (2) Lender may disclose materials claimed by Borrower to be exempt if in its judgment such materials do not appear to fall within a statutory exemption, (3) Lender may in its discretion notify Borrower of FOIA requests and/or of complaints made to the Freedom of Information Commission concerning items for which an exemption has been claimed, but Lender has no obligation to initiate, prosecute, or defend any legal proceeding, or to seek to secure any protective order or other relief to prevent disclosure of any information pursuant to an FOIA request, (4) Borrower will have the burden of establishing the availability of any FOIA exemption in any such legal

proceeding, and (5) in no event shall Lender or any of its officers, directors, or employees have any liability for the disclosure of documents or information in Lender's possession where Lender, or such officer, director, or employee, in good faith believes the disclosure to be required under the FOIA or other law.

(Signatures appear on the following pages)

IN WITNESS WHEREOF, each Party has caused its duly authorized representative to sign and deliver this Agreement as of the date first above written.

**BORROWER**:

**POSIGEN, INC.**

By: _____
Name:  Thomas A. Neyhart
Title:    CEO

*[Lender's signature appears on the following page]*)

**LENDER**:

**CONNECTICUT GREEN BANK**

By: _____
Name: Bryan T. Garcia
Title: President & CEO

**EXHIBIT A**

**Generac Agreement**
(*attached*)

## <u>GUARANTEED INCENTIVE PROGRAM AGREEMENT</u>

This GUARANTEED INCENTIVE PROGRAM AGREEMENT (the "***Agreement***") is entered into as of August 30, 2022, by and between GENERAC GRID SERVICES LLC ("***Generac***") and POSIGEN, INC. ("***PosiGen***", "***you***", and "***your***").

1.    <u>**Introduction**</u>.

PosiGen will participate in the Guaranteed Incentive Program (the "***Program***") as 1) a collaborator of residential account holders with the local power Utility ("***Utility***" or "***Program Administrator***"), and 2) owner of one or more Generac PWRcell™ Solar or Solar + Battery Storage Systems (each system, a "***PWRcell***") that are connected to the electrical system of the Utility account holders' homes (each host customer, a "***Customer***"). PosiGen's participation in the Program is governed by this Agreement.

PosiGen will install and enroll multiple PWRcell systems in Connecticut's Energy Storage Solutions demand response program ("***ESS***"). The terms and conditions described in this Agreement will apply to each individual PWRcell system that PosiGen enrolls in the Program (each such system, an "***Eligible System***"). PosiGen will not need to accept separate terms and conditions for each system, but it will need to enroll each PWRcell system in the ESS and the Program for each system to become eligible for the Payment (as defined below) offered by Generac. Failure to properly enroll the system means that Generac will have no obligation to pay PosiGen a Payment as described in this Agreement.

2.    <u>**How the Program Works.**</u>

The ESS is a new energy storage program designed to help Utility customers install energy storage at their home or business. Via this Program, uncertainty is taken out of the estimated ESS incentive payments by letting Generac guarantee PosiGen's incentive. Generac will manage PosiGen's PWRcell in preparation for and during each ESS Program demand response event.

For participating in the Program in accordance with this Agreement, Generac will pay, in respect of energy storage equipment enrolled and accepted into ESS for PosiGen Customers, a guaranteed incentive payment on an annual basis as reflected on the attached <u>Schedule A</u> ("***Payment***"). The calculation of Payment for each PWRcell reflects the model of your PWRcell and your Utility and is based on projected output of your PWRcell's participation in ESS.

The length of the term of the Program will be ten (10) years for each Eligible System, measured from the date the Eligible System is enrolled in the Program (the "***Term***"). This Agreement shall be in effect for the time that you participate in both ESS and the Program. The Program will continue throughout the Term unless the ESS program is materially altered by the Program Administrator or is otherwise terminated earlier in accordance with this Agreement. To continue to receive the Payment for an Eligible System, PosiGen must continue to participate in the Program and ESS for the Term of each Eligible System. During the Term or at the end of the Term, Generac and PosiGen may agree to additional and/or future incentive programs for which the PosiGen Eligible Systems may be eligible at that time. Generac will secure PosiGen's written approval before enrolling such Eligible Systems in any additional and/or future incentive programs. You are also free to withdraw one or more Eligible Systems from the Program at any time by submitting your request to your primary Generac contact. If an Eligible System is withdrawn from the Program prior to the completion of the demand response summer season (June-September), you will forfeit your right to receive Payment for the current season and for future Payments under the Program with respect to such Eligible Systems, although you may still be entitled to receive performance-based incentive payments from your Utility directly under the ESS terms and conditions if you continue to participate in ESS after withdrawal from the Program.

During the Program, the Program Administrator will initiate a number of demand response events ("**Events**") in accordance with the terms and conditions of ESS, which are available at https://energystoragect.com/contractor-resources/. In response, Generac will remotely manage your Eligible Systems to charge from the PV system up to twenty-four (24) hours in advance of an Event, and discharge up to 80% of the usable capacity during an Event. The participation of your Eligible Systems in these Events is an essential component of the Program and ESS, and you agree to use your best efforts to participate in the maximum number of your Program Administrator's applicable Events during the term of the Program. The number and nature of the Events will be decided by the Program Administrator. Except as otherwise provided in this paragraph, Generac will send you the Payment on an annual basis within thirty (30) days from the time that Generac receives corresponding payment from the Program Administrator for your participation in summer season Events for the calendar year. In the event that an Eligible System is not functional and the Eligible System is unable to perform in any Events for any reason other than PosiGen's acts or omissions, Generac will send you the Payment amount within thirty (30) days from the time that Generac would have received corresponding payment from the Program Administrator, regardless of whether Generac receives such initial payment from the Program Administrator. During time periods without an Event, your Eligible System will default to the operating mode that you had previously utilized.

Participation in the Program will not affect your PWRcell warranty, which will remain in full force and effect in accordance with its terms.

3.    **Program Requirements.**

The following describes your additional requirements for participation in the Program. If you or any Customer fails to comply with any material obligation with respect to any Eligible System, then Generac agrees to provide at least thirty (30) days' prior written notice to PosiGen. If PosiGen fails to cure such non-compliance during such thirty (30)-day period, then PosiGen understands and agrees that such failure may result in: (a) reduction or elimination of your Payments for the affected Eligible Systems; (b) proration of your Payment for failure to participate in all Events for the affected Eligible Systems; or (c) suspension or disqualification and unenrollment from the Program for the affected Eligible Systems. Further, failure to comply with ESS may result in your Utility modifying your participation in, suspending, or disqualifying and unenrolling you from ESS.

(a)    You must apply, be accepted into, and continue to participate in ESS through your Utility, select Generac as your battery partner, and select for your performance-based incentive to be sent to Generac.

(b)    You must maintain an internet connection ("**Connectivity**") to your Eligible System that is sufficient to enable Generac to remotely manage and control your Eligible System.

(c)    You will instruct the Customer to not cause or permit any third party to cause any persistent or lasting interference with your Eligible System, its Connectivity, or any connected component or material system, including, maintaining the insolation of any connected solar system (as applicable), that would negatively impact your Eligible System's performance under the Program or ESS, including, any disruption or interference with the ability of Generac to remotely manage your Eligible System's mode and operations, including, setpoint, minimum state of charge reservation, operating status, and charging or discharging your Eligible System before, during, and after an Event ("**Interference**"). In the event of Interference, Generac reserves the right to reduce the amount of your Payment in accordance with any corresponding reduction of payment received from ESS.

(d) You must reasonably assist Generac's technicians and support staff in diagnosing, troubleshooting, or remedying any problems with your Eligible System, its Connectivity, or any connected component or material system.

(e) You must not enroll or participate—or have your Eligible System or any connected component or material system enroll or participate—in any other distributed energy resource or demand response program that would interfere with the ability for Generac to participate in ESS or the Program.

(f) You agree to comply with this Agreement and any applicable terms and conditions of your Utility, as well as Generac's policies attached hereto as Exhibit A. You also agree to comply with all applicable local, state, national, and international laws, rules and regulations.

(g) You will notify each Customer that the Customer should not rely on the Eligible System for critical or essential medical life support equipment.

## 4. __General Provisions__

(a) __Force Majeure__. "***Force Majeure***" means an event or circumstance that prevents Generac or PosiGen from performing any obligation under this Agreement and that was not previously anticipated or, if anticipated, was unavoidable, is not within a party's reasonable control, and not the result of a party's negligence or willful misconduct, and which, by the exercise of due diligence, is unable to be overcome or avoided. Events or circumstances on which a claim of Force Majeure may be based include acts of God (such as tornadoes, fires, earthquakes and floods), explosions, war, hostilities, riots and acts or threats of terrorism, pandemics, epidemics, vandalism, civil disturbances, protests or embargoes, or any such event or similar event not within the reasonable control of a party. A party shall not be considered in breach of this Agreement or liable for any delay or failure to comply with this Agreement to the extent that such breach, delay, or failure is attributable to the occurrence of a Force Majeure; provided that such party shall use reasonable efforts to minimize the delay cause by such Force Majeure and resume performance of its obligations hereunder. If any Force Majeure event or circumstance disrupts, the ability of your Eligible System to properly discharge and fully perform during an Event, then Generac reserves the right to reduce the amount of your Payment in accordance with any corresponding reduction of payment received from ESS.

(b) __Release and Indemnity__. To the maximum extent permitted by law, each party (the "***Indemnifying Party***") agrees to indemnify, release, and hold harmless the other party and its directors, trustees, officers, shareholders, partners, members, agents and employees, and the respective affiliates of thereof (the "***Indemnified Parties***"), from and against all loss, damage, expense, liability and other claims, including court costs and reasonable attorneys' fees (the "***Liabilities***") resulting from any third party actions relating to the Indemnifying Party's breach of this Agreement and from injury to or death of persons, and damage to or loss of property arising out of the Indemnifying Party's acts or omissions (or such acts or omissions of the Indemnifying Party's Customers, contractors, subcontractors, affiliates, agents or employees) in connection with this Agreement or related subject matter, including, any such Liabilities resulting from the Indemnifying Party's or its Customer's participation in the Program and ESS; provided, however, that nothing herein shall require the Indemnifying Party to indemnify the Indemnified Parties for any Liabilities to the extent, and only to the extent, caused by or arising out of the negligent acts or omissions, or the willful misconduct, of the Indemnified Parties.

(c) __Limitation of Liability__. To the maximum extent permitted by law, your and Generac's liability in connection with this Agreement will be limited by this Agreement, and all other damages or remedies are hereby waived. With the exception of your indemnification obligations hereunder, your and Generac's liability under this Agreement will be limited to direct, actual damages or costs only. Notwithstanding anything to the contrary, IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY INCIDENTAL, PUNITIVE, SPECIAL, INDIRECT, EXEMPLARY OR CONSEQUENTIAL

DAMAGES, INCLUDING LOST PROFITS AND BUSINESS INTERRUPTION DAMAGES, ARISING UNDER This Agreement OR THE SERVICES CONTEMPLATED HEREBY. NOTWITHSTANDING ANYTHING TO THE CONTRARY, EACH PARTY'S AGGREGATE AND CUMULATIVE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT FROM ANY AND ALL CAUSES, WHETHER AS A RESULT OF BREACH OF CONTRACT, BREACH OF WARRANTY, TORT LIABILITY (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE, SHALL IN NO EVENT EXCEED THE TOTAL AGGREGATE PAYMENTS PAID TO YOU BY GENERAC IN THE PREVIOUS YEAR.

(d)  <u>Notices</u>. All notices to you under this Agreement shall be in writing at the addresses set forth below.

If to Generac:

| Address: | 1515 Wynkoop Street, Suite 710 |
| | Denver, CO 80202 |
| Attention: | |
| E-Mail: | enroll@generacgs.com |

WITH COPY TO:

| Address: | Generac Power Systems |
| | S45W29290 Highway 59 |
| | Waukesha, WI 53189 |
| Attention: | Generac Legal Department |
| E-Mail: | legal@generac.com |

If to PosiGen:

| Address: | 819 Central Avenue, Suite 210 |
| | New Orleans, LA 70121 |
| Attention: | PosiGen Legal Department |
| E-Mail: | legal@posigen.com |

(e)  <u>Choice of Law</u>. This Program is governed by the laws of the State of Connecticut without giving effect to conflict of laws principles.

(f)  <u>Non-Waiver</u>. Failure to enforce any provision of this Agreement shall not constitute a waiver of that or any other provision of this Agreement.

(g)  <u>Survival</u>. The following sections will survive any termination of this Agreement: 4(b), 4(c), 4(d), 4(e), 4(f), 4(h), 4(j), 4(m), 4(n), 4(o), 4(p), 4(q), 4(r) and 4(s). In addition, those provisions that by their nature are intended to survive termination of this Agreement shall so survive.

(h)  <u>Severability</u>. If any provision or portion of this Agreement are found to be unenforceable, the remainder shall be enforced as fully as possible, and the unenforceable provision shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the parties as expressed herein.

(i)     Assignment. This Agreement shall be binding on you and Generac and their respective successors and assigns. Neither party may assign this Agreement to any person without the prior written consent of the other party; provided, however, PosiGen may assign its rights to the Payment to its financing parties without the consent of Generac. Any assignment in violation of this section shall be void.

(j)     Entire Agreement. This Agreement constitute the entire agreement between you and Generac regarding the subject matter hereof and supersedes all other such prior or contemporaneous oral and written agreements and understandings.

(k)     Amendments. This Agreement may be amended or modified only by a written instrument signed by both parties.

(l)     Withdrawal. You may withdraw an Eligible System from the Program at any time by submitting reasonable notice to your primary Generac contact of your intent to withdraw. Upon your withdrawal, this Agreement will terminate with respect to such withdrawn Eligible System without any liability on the part of you or Generac to the other, except for any rights that accrued before the date of withdrawal. Furthermore, withdrawal may result in forfeiture of your right to receive some or all of the Payment for the then-current season with respect to such withdrawn Eligible System.

(m)     Information. PosiGen agrees to include a consent to sharing data to Generac in its customer agreement in form and substance acceptable to Generac. PosiGen will not allow an Eligible System to enroll in the Program unless the Customer associated with such Eligible System agrees to PosiGen's customer agreement.

(n)     No Class Action Procedure. Notwithstanding anything to the contrary, class arbitration is not permitted under any circumstance. You and Generac agree that, by entering into this Agreement, THE PARTIES MAY BRING CLAIMS AGAINST THE OTHER ONLY IN THEIR RESPECTIVE INDIVIDUAL CAPACITY, and not as a plaintiff or class member in any purported class or representative proceeding. Further, the parties agree that the arbitrator may not consolidate proceedings or more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. Although the non-availability of any form of representative or class proceeding is clear from this Agreement, should any dispute arise regarding or relating to the existence, validity, enforceability, or interpretation of the Dispute Resolution and No Class Action procedures provisions above, the arbitrator shall have the sole and exclusive jurisdiction to hear and determine the issue.

(o)     Assumption of Risk. You assume all risk of participation in the Program or ESS. Generac is not responsible for any changes in the Customer's electricity costs or other costs before, during, or after the Program.

(p)     Dispute Resolution. In the event of a dispute between you and Generac in connection with ESS, the Program, or this Agreement, you and Generac will first attempt to resolve the dispute informally for at least forty-five (45) days from when you or Generac notifies the other in writing of any such dispute. Notwithstanding anything to the contrary, any dispute that cannot be resolved informally within the forty-five (45) day period shall be settled by arbitration administered by the American Arbitration Association in accordance with its commercial arbitration rules and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. SUCH AGREEMENT TO ARBITRATE MEANS THAT BOTH PARTIES HEREBY WAIVE THEIR RIGHT TO A JURY TRIAL. The Parties may, in arbitration, seek all remedies available to such Party under this Agreement as interpreted under the laws of the State of Connecticut. The arbitrator(s) may award costs of the arbitration and fees, including reasonable attorney's fees and expenses of travel to the arbitration to the prevailing Party subject to Generac's absolute aggregate limitation of liability below. The arbitration will be held in Hartford, Connecticut unless you and Generac agree to another location in writing.

(q)     Intellectual Property. Each party agrees and acknowledge that participation in the Program or this Agreement does not provide any party with any right to or ownership interest in the other party's confidential or proprietary information, including, any intellectual property, business plans, strategies, financial information, proprietary, patented, licensed, copyrighted or trademarked information, or technical information regarding the financing, design, operation and maintenance of the Program or of such other party's services, business, or accounts. Each party agrees to keep and safeguard all confidential information of the other party, and to not disclose such confidential information without such other party's consent unless disclosure is required by court order.

(r)     Warranty Disclaimer. EXCEPT FOR THE GUARANTEED PAYMENT REQUIRED TO BE PAID BY GENERAC PURSUANT TO SECTION 2 ABOVE, YOU AGREE AND ACKNOWLEDGE THAT THE PROGRAM AND ANY SERVICES OR PERFORMANCE PROVIDED TO YOU BY GENERAC PURSUANT TO THIS AGREEMENT SHALL BE "AS-IS WHERE-IS" AND THAT GENERAC IS NOT OFFERING AND EXPRESSLY DISCLAIMS ANY WARRANTY TO YOU OR ANY OTHER PERSON, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IN CONNECTION WITH THE PROGRAM OR ANY SERVICE OR PERFORMANCE PROVIDED HEREUNDER OR DESCRIBED HEREIN, AND YOU HEREBY EXPRESSLY RECOGNIZE SUCH DISCLAIMER.

(s)     Interpretation. Unless otherwise specifically defined or required by the context in which the term appears, in this Agreement: (a) the singular includes the plural and vice versa; (b) the words "this Agreement," "herein," "hereto" "hereof" and "hereunder" refer to this Agreement as a whole, including all schedules or exhibits, and not to any particular section or subsection of this Agreement; (c) unless qualified by "either," "greater of," "lesser of," "later of," "earlier of," or other express language indicating that clauses are mutually exclusive, when "or" is used in this Agreement it also contains "and" (i.e. and/or); (d) references to any agreement, document or instrument mean such agreement, document or instrument as amended, modified, supplemented, restated or replaced from time to time; (e) the words "include," "includes" and "including" mean include, includes and including "without limitation."; (f) the captions or headings in this Agreement are strictly for convenience and shall not be considered in interpreting this Agreement; (g) references to persons, parties, or entities include their permitted successors and assigns; (h) references to exhibits, schedules, or sections mean the exhibits to, schedules to, and sections of, this Agreement; (i) references to approvals, consents or permissions shall refer to written approvals, consents, or permissions; (j) references to "unreasonable", "reasonable", "unreasonably", and "reasonably" shall be deemed respectively to mean "commercially unreasonable", "commercially reasonable" and "commercially unreasonably" and "commercially reasonably"; (k) any time period set forth herein that concludes on a non-business day shall be automatically extended to conclude on the next business day; and (l) any references to "annual", "annually", "year", or "yearly" hereunder shall refer to the twelve (12) month period starting on the date that this Agreement first go into effect and be distinct from calendar years, unless the context expressly indicates otherwise.

(t)     Counterparts. This Agreement may be executed by the Parties by facsimile, email, or digital signature, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A facsimile, digital signature, or portable document format ("pdf") signature page shall constitute an original for purposes hereof.

**IN WITNESS WHEREOF**, the parties enter into this Agreement as of the last date set forth below.

POSIGEN, INC.

By: _Benjamin Healey_____

Name: ___Benjamin Healey_____

Title: ___Chief Commercial Officer_____

GENERAC GRID SERVICES, LLC

By: _____

Name: ___James Carr_____

Title: ___President_____

SCHEDULE A
Payment

Annual incentive payments vary depending on your PWRcell battery capacity, location of PWRcell, and utility provider, in accordance with the charts below.

### PWRcell AC-Coupled or Standalone Systems
#### (PV production from third-party PV system)

|  | Years 1-5 | | Years 6-10 | |
|---|---|---|---|---|
|  | Eversource | United Illuminating | Eversource | United Illuminating |
| M3 | $ 413 | $ 413 | $ 200 | $ 200 |
| M4 | $ 572 | $ 572 | $ 280 | $ 280 |
| M5 | $ 731 | $ 731 | $ 350 | $ 350 |
| M6 | $ 890 | $ 890 | $ 430 | $ 430 |
| M7 | $ 1,017 | $ 1,017 | $ 500 | $ 500 |
| M8 | $ 1,144 | $ 1,144 | $ 560 | $ 560 |
| M9 | $ 1,271 | $ 1,271 | $ 620 | $ 620 |
| M10 | $ 1,398 | $ 1,398 | $ 675 | $ 675 |
| M11 | $ 1,398 | $ 1,398 | $ 675 | $ 675 |
| M12 | $ 1,398 | $ 1,398 | $ 675 | $ 675 |

### PWRcell Solar-Plus-Storage Systems
#### (Includes DC-coupled PWRcell PV Links and SnapRS)

|  | Years 1-5 | | Years 6-10 | |
|---|---|---|---|---|
|  | Eversource | United Illuminating | Eversource | United Illuminating |
| M3 | $ 325 | $ 325 | $ 160 | $ 160 |
| M4 | $ 450 | $ 450 | $ 220 | $ 220 |
| M5 | $ 575 | $ 575 | $ 280 | $ 280 |
| M6 | $ 700 | $ 700 | $ 350 | $ 350 |
| M7 | $ 800 | $ 800 | $ 390 | $ 390 |
| M8 | $ 900 | $ 900 | $ 440 | $ 440 |
| M9 | $ 1,000 | $ 1,000 | $ 490 | $ 490 |
| M10 | $ 1,100 | $ 1,100 | $ 540 | $ 540 |
| M11 | $ 1,100 | $ 1,100 | $ 540 | $ 540 |
| M12 | $ 1,100 | $ 1,100 | $ 540 | $ 540 |

**EXHIBIT B**

**Available Borrowing Base Certificate**

AVAILABLE BORROWING BASE CERTIFICATE

Dated as of: _____

Connecticut Green Bank
75 Charter Oak Ave.
Hartford, Connecticut 06106
Attention: Bert Hunter, CIO

RE: Connecticut Green Bank/PosiGen, Inc.

Ladies and Gentlemen:

This certificate (this "***Certificate***") is delivered to you pursuant to Section 3.2 of that certain Term Loan Credit Agreement, dated as of October 7, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Term Loan Credit Agreement***"), by and between  CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut (the "***Lender***") and POSIGEN, INC., a Delaware corporation (the "***Borrower***").  Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Term Loan Credit Agreement.

The Borrower hereby certifies to the Lender that, as of the date hereof:

Attached hereto as Appendix A are calculations showing the Available Borrowing Base, as of the Available Borrowing Base Determination Date, which were calculated in good faith and a manner consistent in all material respects with and supported by the Base Case Model.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be duly executed and delivered as of the date first written above.

POSIGEN, INC.,
a Delaware corporation

By: _____
Name: Benjamin Healey
Title:   Chief Commercial Officer

**APPENDIX A TO AVAILABLE BORROWING BASE CERTIFICATE**

**Available Borrowing Base Calculations**
(*attached*)

**EXHIBIT C**

**Lien Subordination Agreement**
(*attached*)

*Final Attachment Copy*

## <u>LIEN SUBORDINATION AGREEMENT</u>

THIS LIEN SUBORDINATION AGREEMENT (this "***Agreement***") is made as of September 30, 2022 by and among POSIGEN, INC., a Delaware corporation (the "***Borrower***"), MIZZEN CAPITAL, LP, a Delaware limited partnership, ("***Mizzen***"), STONEHENGE COMMUNITY IMPACT FUND, LP, a Delaware limited partnership ("***Stonehenge***", and, with Mizzen, collectively, the "***Subordinating Lienholder***"), and CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, (the "***First Lien Claimholder***" and, together with Subordinating Lienholder, each a "***Secured Creditor***" and, collectively, the "***Secured Creditors***").  Borrower, together with Mizzen and Stonehenge, are each sometimes referred to herein as a "***Party***" and, collectively, the "***Parties***".

## <u>RECITALS</u>

The following are the basis for and are a part of this Agreement.

A.    Borrower and Subordinating Lienholder are parties to the certain Credit Agreement dated as of April 29, 2022 (as amended, restated, modified and assigned, the "***Mizzen Credit Agreement***") and that certain Security Agreement dated April 29, 2022 (the "***Mizzen Security Agreement***", and collectively with the Mizzen Credit Agreement and this Agreement, the "***Mizzen Loan Documents***") both in connection with a term loan from Subordinating Lienholder to Borrower (the "***Mizzen Debt***"). Borrower has pledged certain collateral to Subordinating Lienholder pursuant to the Mizzen Loan Documents (referred to herein as the "***Mizzen Collateral***").   As used in this Agreement, the term "***Mizzen Obligations***" means, collectively, the Borrower's "Obligations" under each of the Mizzen Loan Documents.

B.    Borrower and First Lien Claimholder are party to: (i) that certain Revolving Credit Agreement dated as of September 30, 2022 (as the same may be amended, restated, modified and assigned from time to time, the "***CGB Revolving Credit Agreement***"); (ii) that certain Term Loan Credit Agreement dated on or about September 30, 2022 (as the same may be amended, restated, modified and assigned from time to time, the "***CGB Term Credit Agreement***" and, together with the CGB Revolving Credit Agreement, collectively, the "***CGB Credit Agreements***"); (iii) that certain Security and Pledge Agreement (2022 Revolving Loan Facility) dated as of September 30, 2022 (as the same may be amended, restated, modified and assigned from time to time, the "***CGB Revolving Security Agreement***"); and (iv) that certain Security and Pledge Agreement (2022 Term Loan Facility) dated on or about September 30, 2022 (as the same may be amended, restated, modified and assigned from time to time, the "***CGB Term Security Agreement***" and, together with the CGB Credit Agreements and this Agreement, collectively, the "***CGB Loan Documents***"), in connection with that certain term loan First Lien Claimholder to Borrower and that certain from First Lien Claimholder to Borrower (the "***Green Bank Debt***"). Borrower has agreed to pledge: (a) the "Pledged Collateral" (as defined in the CGB Revolving Security Agreement) (the "***Revolving Pledged Collateral***"); and (b) the "Pledged Collateral" (as defined in the CGB Term Security Agreement) (the "***Term Pledged***

Collateral" and, together with the Revolving Pledged Collateral, collectively, the "**Green Bank Collateral**"), to First Lien Claimholder pursuant to the CGB Loan Documents.  As used in this Agreement, the term "**CGB Obligations**" means, collectively, the Borrower's "Obligations" under each of the CGB Loan Documents.

C.    To induce the First Lien Claimholder to enter into or maintain the CGB Loan Documents, the Subordinating Lienholder, along with Obligor, has agreed to enter into this Agreement so as to provide the First Lien Claimholder a first-priority Lien against and security interest in the Green Bank Collateral.  The Revolving Pledged Collateral portion of the Green Bank Collateral includes only the following collateral and is defined in the CGB Loan Documents as:

(i)    all right, title, and interest of any Obligor in the Project Equipment, at all times after such Obligor obtains title to the Project Equipment from Generac, but prior to its installation at ESS-qualifying residential real property located in State of Connecticut;

(ii)    all of each Obligor's rights under and to the insurance policies maintained or required to be maintained by an Obligor related to the collateral described in the foregoing clause (i) under the CGB Loan Documents, and all proceeds and other amounts payable to Borrower thereunder; and

(iii)    all Accessions, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letters of Credit, Letter-of-Credit Rights, Payment Intangibles, Proceeds, Promissory Notes, Software and Supporting Obligations related to the collateral described in the foregoing clauses (i) – (ii) and additions thereto and all substitutions and replacements therefor and products of any and all of the foregoing, all wherever located, whether now existing or hereafter from time to time arising or coming into existence, and whether now owned or hereafter from time to time acquired by any Obligor.

The Term Pledged Collateral portion of the Green Bank Collateral includes only the following collateral and is defined in the CGB Loan Documents as:

(i)    all rights and interests of any Obligor with respect to each "Payment" (as defined in the Generac Agreement), including the right to receive monies due and to become due with respect thereto;

(ii)    the Generac Guaranteed Payments Account, including any subaccounts within such Generac Guaranteed Payments Account, and all interest or dividends thereon;

(iii)    all rights and interests of any Obligor with respect to each Customer Payment, including the right to receive monies due and to become due with respect thereto;

2

(iv)    the Customer Payments Account, including any subaccounts within such Customer Payments Account, and all interest or dividends thereon;

(v)    all of each Obligor's rights under and to the insurance policies maintained or required to be maintained by such Obligor related to the collateral described in the foregoing clauses (i) – (iv) under the CGB Loan Documents, and all proceeds and other amounts payable to Borrower thereunder; and

(vi)    all Accessions, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letters of Credit, Letter-of-Credit Rights, Payment Intangibles, Proceeds, Promissory Notes, Software and Supporting Obligations related to the collateral described in the foregoing clauses (i) – (v) and additions thereto and all substitutions and replacements therefor and products of any and all of the foregoing, all wherever located, whether now existing or hereafter from time to time arising or coming into existence, and whether now owned or hereafter from time to time acquired by any Obligor.

D.    The Parties acknowledge that the Mizzen Collateral includes the Green Bank Collateral and the Parties desire to set forth the priority for the Green Bank Collateral.

NOW, THEREFORE, in consideration of the recitals specified above, which recitals shall be deemed to be a substantive part of this Agreement, and the mutual covenants, promises, undertakings, agreements, representations and warranties specified in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, with the intent to be obligated legally and equitably, the parties do hereby covenant, promise, agree, represent and warrant as follows:

<u>AGREEMENT</u>

1.    <u>Incorporation of Preamble and Recitals</u>.  The preamble and recitals set forth above are an integral part of this Agreement and set forth the intentions of the Parties and the premises on which the Parties have decided to enter into this Agreement. Accordingly, the preamble and recitals set forth above, and all defined terms set forth in such preamble and in such recitals, are fully incorporated into this Agreement by this reference as if fully set forth herein

2.    <u>Definitions</u>.

(a)    *General Terms*.  As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and the plural forms of the terms defined:

3

(i)     "**Borrower**" shall have the meaning set forth in the preamble hereof, together with such Person's successors and assigns, including a receiver, trustee, or debtor-in-possession on behalf of such Person.

(ii)    "**CGB Default Notice**" has the meaning set forth in Section 3(c) hereof.

(iii)   "**Collateral**" shall mean, collectively, the Mizzen Collateral and the Green Bank Collateral.

(iv)    "**Distribution**" means, with respect to any indebtedness or obligation, (a) any payment or distribution by any Person of cash, securities, or other property, by setoff or otherwise, on account of such indebtedness or obligation or (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person.

(v)     "**Enforcement Action**" shall mean (1) the taking of any action or commencing any proceeding by the First Lien Claimholder to declare the CGB Obligations were immediately due and payable in full as a result of acceleration or otherwise; (2) the taking of any action by the First Lien Claimholder to enforce or realize upon any Lien on any portion of the Green Bank Collateral, including the institution of any foreclosure proceedings or the noticing of any public or private sale or other disposition pursuant to Article 8 or Article 9 of the Uniform Commercial Code in effect in the State of Connecticut or other applicable law; (3) the exercise of any right or remedy provided to a secured creditor or otherwise by the First Lien Claimholder  on account of a Lien on the Green Bank Collateral under the CGB Loan Documents, or applicable law, in a proceeding or otherwise, including the election to retain any Green Bank Collateral in satisfaction of a Lien and the notification of account debtors; (4) the taking of any action or the exercise of any right or remedy in respect of the collection on, set off against, marshaling of, or foreclosure on the Green Bank Collateral or the proceeds of the Green Bank Collateral by the First Lien Claimholder; (5) the sale, lease, license or other disposition of all or any portion of the Green Bank Collateral by the First Lien Claimholder at a private or public sale, other disposition or any other means permissible under applicable law; (6) the exercise of cash dominion or a cash sweep by the First Lien Claimholder under any deposit account control agreement or securities account control agreement covering any Green Bank Collateral; and (7) the exercise of any other right of liquidation by the First Lien Claimholder against any Green Bank Collateral (including the exercise of any right of recoupment or set-off or any rights against Green Bank Collateral obtained pursuant to or by foreclosure of a judgment lien obtained against any Obligor) whether under any of the CGB Loan Documents or applicable law, in a proceeding or otherwise.

(vi)    "**Exigent Circumstances**" shall mean (1) an exercise by another creditor of enforcement rights or remedies with respect to all or a material portion

4

of the Green Bank Collateral; or (2) an event or circumstance that, in the reasonable judgment of the First Lien Claimholder: (x) materially and imminently threatens the ability of such First Lien Claimholder to realize upon all or a material portion of the Green Bank Collateral, such as, without limitation, fraud, fraudulent removal, concealment, or abscondment thereof, destruction (other than to the extent covered by insurance) or material waste thereof or (y) is likely to lead to the diminution of value of all or a material portion of the Green Bank Collateral or reasonably likely to impact the timely payment of the Green Bank Debt or any CGB Obligations.

(vii)    "*Insolvency Proceeding*" shall mean any voluntary or involuntary insolvency, bankruptcy, receivership, custodianship, liquidation, dissolution, arrangement, reorganization, assignment for the benefit of creditors, appointment of a custodian, receiver, trustee or other officer with similar powers or any other proceeding for the liquidation, dissolution, or other winding up of any Person.

(viii)    "*Obligations*" shall mean the Mizzen Obligations and the CGB Obligations, or any of them.

(ix)    "*Obligor*" or "*Obligors*" shall mean the Borrower and each other Person liable on or in respect of the Obligations or that has granted a Lien on any property or assets as either Mizzen Collateral to Green Bank Collateral, together with such Person's successors and assigns, including a receiver, trustee, or debtor-in-possession on behalf of such Person.

(x)    "*Paid in Full*" or "*Payment in Full*" shall mean, with respect to any Obligations, that:    (a) all of such Obligations (other than contingent indemnification obligations for which no underlying claim has been asserted) have been indefeasibly paid, performed or discharged in full (with all such Obligations consisting of monetary or payment obligations having been paid in full in cash), (b) no Person has any further right to obtain any loans, letters of credit, bankers' acceptances, or other extensions of credit under the documents relating to such Obligations, (c) any and all letters of credit, bankers' acceptances or similar instruments issued under such documents have been cancelled and returned (or backed by stand-by guarantees or cash collateralized) in accordance with the terms of such documents (not to exceed 105% of the face amount thereof), and (d) any and all cash management obligations and hedging obligations owed by Obligor under either the Mizzen Loan Documents or the CGB Loan Documents have been satisfied in full and terminated (or fully cash collateralized).

(xi)    "*Person*" means any individual, corporation, estate, partnership, joint venture, association, joint stock company, limited liability company, trust (including any beneficiary thereof), unincorporated organization, or government or any agency or political subdivision thereof.

5

(xii)    "***Standstill Period***" shall mean the period commencing on the date of the Subordinating Lienholder's receipt of the CGB Default Notice (the "***Default Notice Date***") and ending upon the date which is the earlier of: (1) ninety (90) days after the Default Notice Date; (2) the date on which the Mizzen Debt has been Paid In Full and all obligations related thereto have been fully satisfied as confirmed in writing by the Subordinating Lienholder; or (3) the date on which the First Lien Claimholder shall have received express written consent from the Subordinating Lienholder of any action First Lien Claimholder desires to take, which consent shall be granted in the sole discretion of the Subordinating Lienholder.

(b)    *Additional Terms*.  All capitalized terms not defined herein shall bear the meaning assigned to them in the CGB Loan Documents.

3.    <u>Subordination</u>.

(a)    The Subordinating Lienholder hereby covenants and agrees that the First Lien Claimholder shall have a first-priority Lien against and security interest in the Green Bank Collateral, and the Subordinating Lienholder shall maintain a Lien on the Green Bank Collateral in a junior position. First Lien Claimholder acknowledges and agrees that as between First Lien Claimholder and Subordinating Lienholder, Subordinating Lienholder shall continue to have a first-priority security interest in the Mizzen Collateral other than the Green Bank Collateral.

(b)    Notwithstanding the respective orders of priorities of the filing or non-filing, recording or non-recording, perfection or non-perfection or voidability for any reasons of liens and security interests held by First Lien Claimholder and Subordinating Lienholders, as collateral for any Obligor's respective obligations to them, the liens, security interest, mortgages and rights of First Lien Claimholder in the Green Bank Collateral, including, but not limited to, the pledge of Collateral pursuant to the CGB Security Agreements, shall be, at all times, superior and prior to any liens, security interest, mortgages and rights that Subordinating Lienholder have or may acquire in the Green Bank Collateral. Subordinating Lienholder and First Lien Claimholder intend and desire that First Lien Claimholder shall obtain, retain, and maintain a position in the Green Bank Collateral superior and prior to any interest of Subordinating Lienholder.

(c)    Notwithstanding any other provision of this Agreement, First Lien Claimholder hereby agrees that upon the occurrence of an Event of Default (as such term is defined in the CGB Loan Documents) with respect to any CGB Obligations, First Lien Claimholder shall provide to Subordinating Lienholder written notice of such Event of Default (a "***CGB Default Notice***") and such Event of Default shall constitute an Event of Default (as such term is defined in the Mizzen Loan Documents) under the Mizzen Loan Documents. First Lien Claimholder shall not take or continue any Enforcement Action (as defined below), other than in Exigent Circumstances (as defined below) or upon an Obligor becoming subject to an Insolvency Proceeding (as defined below), with regard to the CGB Obligations, the CGB Loan Documents, or the Green Bank Collateral until the

6

passage of the Standstill Period.  Other than Enforcement Actions (except in compliance with the terms of this Agreement), First Lien Claimholder may exercise any other right or take any other action permitted by the CGB Loan Documents or by applicable law prior to and during an Event of Default (as such term is defined in the CGB Loan Documents). For the avoidance of doubt, Subordinating Lienholder and First Lien Claimholder agree and acknowledge that First Lien Claimholder may take, assume, or continue any Enforcement Action or other action with regard to the CGB Obligations, the CGB Loan Documents, or the Green Bank Collateral following the passage of the Standstill Period.

(d)     All CGB Obligations shall be Paid in Full before any Distribution from the Green Bank Collateral, whether in cash, securities, or other property, shall be made to the Subordinating Lienholder on account of any Mizzen Obligations.

(e)     Any Distributions or other proceeds of Green Bank Collateral obtained by Subordinating Lender from any Enforcement Action shall in any event be held in trust by it for the benefit of First Lien Claimholder and promptly be paid or delivered to First Lien Claimholder in the form received until all CGB Obligations are Paid in Full.

(f)     *Other Permitted Actions*.  Section 3 shall not be construed to limit or impair in any way the right of:

(i)     any Secured Creditor to bid for or purchase Collateral at any private or judicial foreclosure upon such Collateral initiated by any Secured Creditor; *provided*, *however*, that no bid may include any "credit bid" in respect of the CGB Obligations unless the net cash proceeds therefrom are sufficient to cause the CGB Obligations to be Paid in Full and are so applied;

(ii)     the First Lien Claimholder to join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Collateral initiated by Subordinating Lienholder for the sole purpose of protecting such First Lien Claimholders' Lien on the Green Bank Collateral, so long as it does not delay or interfere with the exercise by such other Subordinating Lienholder of its rights under this Agreement, the Mizzen Loan Documents, the CGB Loan Documents, and under applicable law; and

(iii)     the First Lien Claimholder to receive any remaining proceeds of any Mizzen Collateral after the Mizzen Obligations have been Paid in Full in accordance with applicable law.

4.     Duration and Termination.    This Agreement shall constitute a continuing agreement of and shall terminate only upon the first to occur of (i) Payment in Full of the CGB Obligations and termination of any obligation of First Lien Claimholder to extend any further credit to Borrower, or (ii) Payment in Full of the Mizzen Obligations and termination of any obligation of Subordinating Lienholder to extend any further credit to Borrower.

12426485v1

23090\7\4884-0586-0133.v6

5.    <u>Notices</u>.  All notices, requests, demands and other communications required or permitted under this Agreement or by law shall be in writing and shall be deemed to have been duly given, made and received only when delivered against receipt or when deposited in the United States mails, certified mail, return receipt requested, postage prepaid, or when delivered by next day express delivery service, to the addresses set forth below, or to a different address provided by notice in accordance with this section.

6.    <u>First Lien Claimholder's Duties Limited</u>.  The rights granted to First Lien Claimholder in this Agreement are solely for its protection and nothing herein contained imposes on First Lien Claimholder any duties with respect to any property either of any Obligor or of Subordinating Lienholder heretofore or hereafter received by First Lien Claimholder.  First Lien Claimholder has no duty to preserve rights against prior parties on any instrument or chattel paper received from an Obligor as collateral security for the loans provided under the CGB Loan Documents.

7.    <u>Effect on Borrower and Other Obligors</u>.  The subordination provisions and other limitations and restrictions on the obligations of First Lien Claimholder, Borrower, any other Obligor, and the rights and remedies of First Lien Claimholder and the Subordinating Lienholder are only applicable to the Green Bank Collateral.  Nothing in this Agreement shall be construed to subordinate or otherwise modify or affect any of the obligations of any Person under any of the Mizzen Loan Documents (or any documentation executed or contemplated in connection therewith) or to the limit any rights or remedies of any Subordinating Lienholder with respect to any such obligations except in connection with the Green Bank Collateral.

8.    <u>Authority</u>.  Subordinating Lienholder and First Lien Claimholder represent and warrant that, assuming the execution of delivery by the other signatories hereto, they have obtained all necessary consents and approvals to enter into this Agreement, have the legal power and authority to enter into this Agreement and that the person signing for such Party is authorized and directed to do so.  Each Obligor, by its execution hereof, hereby agrees that this Agreement shall be deemed to be a collateral document under the Mizzen Loan Documents and the CGB Loan Documents.

9.    <u>Entire Agreement, Amendment</u>.  This Agreement constitutes and expresses the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, whether express or implied, oral, or written.  Neither this Agreement nor any portion or provision hereof may be amended orally or in any manner other than by an agreement in writing signed by the Parties hereto. Further, and for the avoidance of doubt, Borrower and First Lien Claimholder agree that (i) no amendment to any of the Defined Terms used in the CGB Loan Documents (specifically, but not limited to, "Pledged Collateral", "Project Equipment", "Payments" (as defined in the Generac Agreement), and "Generac") shall be effective without the written consent of Subordinating Lienholder.

10.    <u>Additional Documentation</u>.  So long as the loans made to Borrower pursuant to the CGB Loan Documents shall remain unpaid or any part thereof, Subordinating Lienholder shall, within ten (10) days following request by First Lien Claimholder, execute, acknowledge

and deliver to First Lien Claimholder such further instruments and shall take such further action as First Lien Claimholder may reasonably request in order to carry out the provisions and intent of this Agreement, including, but not limited to subordinations, agreements or other instruments in recordable form as First Lien Claimholder may reasonably require for carrying out the purpose and intent of the covenants contained herein; provided, however, that no such subordinations, agreements or other instruments shall increase the Subordinating Lienholder's obligations or decrease Subordinating Lienholder's rights under this Agreement or Mizzen Loan Documents.

11.    <u>Prejudgment Remedy Waiver, Etc</u>.  SUBORDINATING LIENHOLDER ACKNOWLEDGES THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION AND WAIVES ITS RIGHTS TO NOTICE AND HEARING AS ALLOWED BY ANY STATE OR FEDERAL LAW WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH FIRST LIEN CLAIMHOLDER  MAY DESIRE TO USE, AND FURTHER WAIVES ALL RIGHTS TO REQUEST THAT FIRST LIEN CLAIMHOLDER POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SUBORDINATING LIENHOLDER, BORROWER, OR ANY OTHER OBLIGOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY WHICH FIRST LIEN CLAIMHOLDER  MAY DESIRE TO USE.  SUBORDINATING LIENHOLDER ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, VOLUNTARILY AND ONLY AFTER CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEY.

12.    <u>Jury Waiver</u>.  EACH PARTY HERETO HEREBY WAIVES TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE FINANCING TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART AND/OR THE DEFENSE OR ENFORCEMENT OF ANY OF FIRST LIEN CLAIMHOLDER 'S RIGHTS AND REMEDIES, INCLUDING WITHOUT LIMITATION, TORT CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT IT MAKES THIS WAIVER KNOWINGLY, VOLUNTARILY AND ONLY AFTER CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH ITS ATTORNEY.

13.    <u>Expenses</u>.  Each Party to this Agreement agrees that it is solely responsible for any expenses it incurs in enforcing any of its rights under this Agreement (subject to its rights to reimbursement under the respective loan documents to which it is a party).

14.    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of First Lien Claimholder, its successors, and assigns, and shall be binding upon Subordinating Lienholder, Borrower, and any other Obligor and their respective successors and assigns. Any assignee of the Subordinating Lienholder's rights shall be deemed by acceptance thereof to have assumed the obligations of Subordinating Lienholder hereunder.  Subordinating Lienholder hereby agrees to have such assignee execute a formal assumption agreement upon such assignment but no failure of an assignee to execute an assumption agreement shall affect such assignee's assumption of the obligations of the Subordinating Lienholder.

12426485v1

23090\7\4884-0586-0133.v6

15.    <u>Governing Law</u>.  The validity, construction and enforcement of this Agreement shall be governed by the internal laws of the State of New York.  EACH PARTY TO THIS AGREEMENT HEREBY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

16.    <u>Severability</u>.  The provisions of this Agreement are independent of and separable from each other.  If any provision hereof shall for any reason be held invalid or unenforceable, it is the intent of the Parties that such invalidity or unenforceability shall not affect the validity or enforceability of any other provision hereof, and that this Agreement shall be construed as if such invalid or unenforceable provision had never been contained herein.

17.    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts and by each Party on a separate counterpart, each of which, when executed and delivered, shall be deemed to be an original.  Such counterparts shall together constitute one and the same instrument.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (*e.g.*, "pdf", "tif", "jpg" or "jpeg") shall be effective as delivery of a manually executed counterpart of this Agreement.

18.    <u>Subordinating Lienholder Not Liable to Borrower</u>.  Subordinating Lienholder shall not be liable to Borrower for any acts or omissions of Subordinating Lienholder pursuant to this Agreement that are detrimental to, or adversely impact, Borrower.

**Remainder of Page Intentionally Left Blank**

**Signature Pages Follow**

12426485v1

23090\7\4884-0586-0133.v6

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be signed, sealed and delivered as of the date first written above

<u>FIRST LIEN CLAIMHOLDER</u>:

**CONNECTICUT GREEN BANK**

By: _____
Name:
Title:

**Address for notices:**
Connecticut Green Bank
75 Charter Oak Ave.,
Hartford, Connecticut, 06106
Attention:  General Counsel
Email:  brian.farnen@ctgreenbank.com

<u>SUBORDINATING LIEN HOLDER</u>:

**MIZZEN CAPITAL, LP**


By: _____
Name: Elizabeth H. Karter
Title:  Managing Director

**Address for notices:**
Mizzen Capital, LP
488 Madison Ave., 18th Floor
New York, New York
Attention:  Elizabeth H. Karter
Email:  lkarter@mizzencapital.com


**STONEHENGE COMMUNITY IMPACT FUND, LP**

       By: Stonehenge Community Impact Fund
           GP, LLC
       Its General Partner


By: _____
Name: L'Quentus Thomas
Title:  Managing Director

**Address for notices:**
Stonehenge Community Impact Fund, LP
191 W. Nationwide Blvd Suite 600
Columbus, OH 43215
Attention: L'Quentus Thomas
Email: LThomas@stonehengecapital.com

BORROWER:

**POSIGEN, INC.**


By: _____
Name: Thomas A. Neyhart
Title:  CEO

**Address for notices:**
819 Central Ave., Ste. 210
New Orleans, LA 70121
Attention: Benjamin Healey
Email: bhealey@posigen.com

**EXHIBIT D**

**Form of Security Agreement**
(*attached*)

*Final Attachment Copy*

## SECURITY AND PLEDGE AGREEMENT

*(2022 Term Loan Facility)*

THIS SECURITY AND PLEDGE AGREEMENT (this "***Agreement***") is dated as of October 7, 2022 by and between POSIGEN, INC., a Delaware corporation ("***Borrower***"), and CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut ("***Secured Party***").

WITNESSETH:

**WHEREAS**, Borrower and Secured Party have entered into that certain Term Loan Credit Agreement dated as of the date hereof (as amended, modified, restated or otherwise supplemented from time to time, the "***Credit Agreement***"), pursuant to which Secured Party has agreed to make a Term Loan (as defined in the Credit Agreement) to Borrower not to exceed Six Million AND 00/100 Dollars ($6,000,000) upon the terms and subject to the conditions set forth therein;

**WHEREAS**, Borrower has entered into that certain Guaranteed Incentive Program Agreement, dated as of August 30, 2022, with Generac Grid Services LLC, a Delaware limited liability company and its affiliates ("***Generac***") for the purchase of the Project Equipment from Generac, pursuant to which Generac has agreed to pay to Borrower substantially all Active Dispatch Incentives earned from the ESS Program administered by PURA;

**WHEREAS**, Borrower will receive substantial direct and indirect benefits from the execution, delivery, and performance of the obligations under the Credit Agreement and is, therefore, willing to enter into this Agreement; and

**WHEREAS**, it is a condition precedent to the obligation of Secured Party to make the Term Loan to Borrower under the Credit Agreement that Borrower shall have executed and delivered this Agreement.

**NOW, THEREFORE**, in consideration of the promises contained herein, and to induce the Secured Party to enter into the Credit Agreement and to make the advances of credit and other financial accommodations contemplated thereby, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrower and the Secured Party hereby agree as follows:

1.    <u>Defined Terms</u>.

    (a)    Except as otherwise expressly defined herein, all capitalized terms shall have the meanings ascribed to them in the Credit Agreement and all such defined terms in the Credit Agreement are incorporated herein by reference.

    (b)    As used in this Agreement, and unless otherwise defined in this Agreement, the singular and plural forms of the terms: Accessions, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letters of Credit,

Letter-of-Credit Rights, Payment Intangibles, Proceeds, Promissory Notes, Software and Supporting Obligations, have the respective meanings assigned to those terms in the UCC; *provided*, *however*, that any such term shall have the meaning assigned to such term under Article 9 if such term also is defined differently in another Article of the UCC.

(c)    The following terms shall have the following meanings:

"***Article 9***" means Article 9 of the UCC as in effect from time to time.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code, as amended from time to time, and all rules and regulations promulgated thereunder.

"***Bankruptcy Law***" means the Bankruptcy Code and all other liquidation, receivership, moratorium, conservatorship, assignment for the benefit of creditors, insolvency or similar federal, state, or foreign law for the relief of debtors.

"***FERC***" shall mean the Federal Energy Regulatory Commission, and any successor authority.

"***Governmental Authority***" means, with respect to any Person, any federal or state or local government or other political subdivision thereof or any entity, including any regulatory or administrative authority (including FERC) or court, exercising executive, legislative, judicial, regulatory, or administrative or quasi-administrative functions of or pertaining to government and shall include any supra-national bodies (such as the European Union or the European Central Bank).

"***Organizational Documents***" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"***Person***" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, institution, entity, party, corporation, limited liability company, or government agency (whether national, federal, state, county, city, municipal, or otherwise), including any instrumentality, division, agency, body, or department thereof.

"***Pledged Collateral***" means, (i) all rights and interests of Borrower with respect to each "Payment" (as defined in the Generac Agreement), including the right to receive monies due and to become due with respect thereto; (ii) the Generac Guaranteed Payments Account, including any subaccounts within such Generac Guaranteed

Payments Account, and all interest or dividends thereon; (iii) all rights and interests of Borrower with respect to each Customer Payment, including the right to receive monies due and to become due with respect thereto; (iv) the Customer Payments Account, including any subaccounts within such Customer Payments Account, and all interest or dividends thereon; (v) all of Borrower's rights under and to the insurance policies maintained or required to be maintained by Borrower related to the collateral described in the foregoing clauses (i) – (iv) under the Loan Documents, and all proceeds and other amounts payable to Borrower thereunder; and (vi) all Accessions, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letters of Credit, Letter-of-Credit Rights, Payment Intangibles, Proceeds, Promissory Notes, Software and Supporting Obligations related to the collateral described in the foregoing clauses (i) – (v) and additions thereto and all substitutions and replacements therefor and products of any and all of the foregoing, all wherever located, whether now existing or hereafter from time to time arising or coming into existence, and whether now owned or hereafter from time to time acquired by Borrower.

"*UCC*" shall mean the Uniform Commercial Code as in effect from time to time in the State of Connecticut; *provided*, *however*, in the event that, by reason of mandatory provisions of law, any or all of the perfection or effect of perfection or non-perfection or priority of the security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Connecticut, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority and for purposes of definitions related to such provisions.

2.      Security Interest.  Borrower, as security for the prompt and complete payment and performance when due of the Obligations, does hereby grant, collaterally assign, and pledge to Secured Party a continuing security interest of first priority in all the rights, title, and interest of Borrower in, to and under all of the Pledged Collateral.

3.      Secured Obligations; Destruction of Pledged Collateral.  The security interest hereby granted shall secure the due and punctual payment and performance in full of all the Obligations, including, without limitation, the Obligations arising under the Credit Agreement and the other Loan Documents.  No injury to, or loss or destruction of, the Pledged Collateral or any part thereof shall relieve Borrower of any of its obligations hereunder or under any of the Obligations under the Loan Documents.

4.      Special Warranties and Covenants of Borrower.  Borrower hereby represents and warrants to Secured Party as of the date hereof and covenants to Secured Party with respect to the Pledged Collateral that:

(a)      Borrower has full power, authority and legal right to execute, deliver and perform its obligations under this Agreement and to pledge and grant a security interest in all of the Pledged Collateral pursuant to this Agreement, and the execution, delivery and performance hereof and the pledge of and granting of a security interest in the Pledged Collateral hereunder have been duly authorized by all necessary corporate or other action

- 3 -

and do not contravene any law, rule or regulation of the United States or any state thereof or any provision of Borrower's Organizational Documents or of any judgment, decree or order of any tribunal or of any agreement or instrument to which Borrower is a party or by which it or any of its property is bound or affected or constitute a default thereunder.

(b)     Secured Party has a first priority security interest in the Pledged Collateral.

(c)     Borrower has good and marketable title to, and is the sole, direct, legal, record and beneficial owner of, the Pledged Collateral, free and clear of all Liens, except as expressly set forth in or permitted under the Credit Agreement; and Borrower warrants and will defend Secured Party's right, title, and security interest in and to the Pledged Collateral against the claims and demands of all Persons whomsoever.

(d)     Borrower covenants that it will have the like title to and right to pledge and grant a security interest in the Pledged Collateral hereafter pledged or in which a security interest is granted to Secured Party hereunder and will likewise defend the rights, pledge, and security interest thereof and therein of Secured Party.

(e)     Except as permitted under the Credit Agreement, Borrower will not sell, assign, transfer, convey or otherwise dispose of, grant any option with respect to, any of the Pledged Collateral, nor will Borrower create, incur, or permit to exist any Lien with respect to any of the Pledged Collateral or the proceeds thereof, other than Liens with respect to the Pledged Collateral created hereby and Liens permitted under the Credit Agreement.

(f)     Borrower has not executed or filed, or authorized any third party to file, any financing statement or other instrument similar in effect covering all or any part of the Pledged Collateral or listing Borrower as debtor in any recording office, except those that have been filed in favor of Secured Party pursuant to this Agreement or as otherwise permitted under the Credit Agreement.  Borrower shall not execute, authorize, or permit to be filed in any recording office any financing statement or other similar instrument covering all or any part of the Pledged Collateral or listing Borrower as debtor with respect to all or any part of the Pledged Collateral, except financing statements and other instruments filed in respect of Liens permitted under the Credit Agreement.

(g)     All certificates, agreements, or instruments representing or evidencing the Pledged Collateral in existence on the date hereof have been delivered to Secured Party in suitable form for transfer by delivery or accompanied by duly executed instruments of transfer or assignment in blank.

(h)     No Pledged Collateral pledged by Borrower is subject to any defense, offset or counterclaim, nor have any of the foregoing been asserted or alleged against Borrower by any Person with respect thereto.

(i)     None of the Pledged Collateral are now or will hereafter be held or maintained in the form of a securities entitlement or credited to any securities account.

(j)    Borrower shall, at its sole cost and expense, maintain the security interest created by this Agreement in the Pledged Collateral as a perfected first priority security interest.

(k)    Borrower shall not sell, offer to sell, dispose of, convey, assign, or otherwise transfer, grant any option with respect to, or restrict any of the Pledged Collateral pledged by it hereunder or any interest therein.

(l)    Borrower shall not permit or agree to any amendment or modification of the Organizational Documents of any Listed Company in any manner that could reasonably be expected to be adverse to Secured Party's rights hereunder.

5.    <u>Events of Default</u>.  Borrower shall be in default under this Agreement upon the happening of any Event of Default.

6.    <u>Rights and Remedies of Secured Party</u>.  Upon the occurrence and after the continuance of an Event of Default for thirty (30) consecutive days (the first day immediately following such thirty (30) day time period, the "***Enforcement Date***"; the time period from and including the Enforcement Date to and excluding the date on which such Event of Default is no longer continuing, the "***Enforcement Period***"), Secured Party shall have the following rights and remedies (to the extent permitted by applicable law), all such rights and remedies being cumulative, not exclusive, and enforceable alternatively, successively or concurrently, at such time or times as Secured Party deems expedient:

(a)    by notice to Borrower, declare any amounts payable by Borrower under the Credit Agreement to be due and payable immediately and thereupon the same shall become immediately due and payable upon such notice to Borrower but without presentment, demand, notice of dishonor, protest, or further notice of any kind, all of which are expressly waived by Borrower, anything contained herein to the contrary notwithstanding.

(b)    proceed to protect and enforce the rights vested in it by this Agreement and to enforce its rights hereunder by such appropriate judicial proceedings as it shall deem most effective to protect and enforce any of such rights, either at law or in equity or otherwise, whether for specific enforcement of any covenant or agreement contained in this Agreement and any of the Loan Documents, or in aid of the exercise of any power therein or herein granted, or for any foreclosure hereunder and sale under a judgment or decree in any judicial proceeding, or to enforce any other legal or equitable right vested in it by this Agreement or by law and under the UCC;

(c)    cause all revenues hereby pledged as security and all other moneys and other property pledged hereunder to be paid or delivered directly to it, and demand, sue for, collect, and receive any such moneys and property;

(d)    cause any action at law or suit in equity or other proceeding to be instituted and prosecuted to collect or enforce any obligation or right hereunder or included in the Pledged Collateral, including specific enforcement of any covenant or agreement contained herein or in any of the Loan Documents, or to foreclose or enforce

- 5 -

the security interest in all or any part of the Pledged Collateral granted herein, or to enforce any other legal or equitable right vested in it by this Agreement or by applicable Law;

(e)    foreclose or enforce any other agreement or other instrument by or under or pursuant to which the Obligations are issued or secured;

(f)    incur expenses, including attorneys' fees, consultants' fees, and other costs, appropriate to the exercise of any right or power of the Secured Party under this Agreement;

(g)    perform any obligation of Borrower hereunder or under any other Loan Document, make payments, submit drawing certificates under any letter of credit included in the Pledged Collateral, purchase, contest or compromise any encumbrance, charge or other Lien on any of the Pledged Collateral, pay taxes and expenses relating to the Pledged Collateral, and insure, process and preserve the Pledged Collateral, without, in each case, any obligation to do so, but also, in each case, only to the extent Borrower is entitled to take any such action;

(h)    in connection with any acceleration or foreclosure under the Loan Documents, take possession of the Pledged Collateral and of any and all books of account and records of Borrower relating to any of the Pledged Collateral and render it usable and repair and renovate the same without, however, any obligation to do so, and enter upon, or authorize its designated agent to enter upon, or any other location where any of the Pledged Collateral may be located for that purpose (including the right of the Secured Party to exclude Borrower and all Persons claiming access through Borrower from any access to the Pledged Collateral or to any part thereof), and the Secured Party and its representatives are hereby granted an irrevocable license to enter upon such premises for such purpose, control, manage, operate, rent and lease the Pledged Collateral, collect all rents and income from the Pledged Collateral and apply the same to reimburse the Secured Party for any cost or expenses reasonably incurred hereunder or under any of the other Loan Documents and to the payment or performance of Borrower's Obligations, including applying the balance to the Term Loan and other Obligations of Borrower and any remaining excess balance to whomsoever is legally entitled thereto;

(i)    make any reasonable compromise or settlement deemed desirable with respect to any of the Pledged Collateral and extend the time of payment, arrange for payment installments, or otherwise modify the terms, of any Pledged Collateral;

(j)    secure the appointment of a receiver of the Pledged Collateral or any part thereof, whether incidental to a proposed sale of the Pledged Collateral or otherwise, and all disbursements made by such receiver and the expenses of such receivership shall be added to and be made a part of the Obligations, and, whether or not the sum of such disbursements and expenses plus the other Obligations exceeds the indebtedness originally intended to be secured hereby, the entire amount of said sum, including such disbursements and expenses, shall be secured by this Agreement, and reimbursement by Borrower of such disbursements and expenses shall be due and payable upon demand

- 6 -

therefor and thereafter shall bear interest, until paid, at the Default Rate or the maximum rate permitted by applicable Law, whichever is less;

(k)     enter into any extension, reorganization, deposit, merger, consolidation, or other agreement pertaining to, or deposit, surrender, accept, hold, or apply other property in exchange for, the Pledged Collateral or any part thereof;

(l)     transfer the Pledged Collateral or any part thereof to the name of a Secured Party or to the name of the Secured Party's nominee;

(m)     take possession of and endorse in the name of Borrower or in the name of the Secured Party, for the account of Borrower, any bills of exchange, checks, drafts, money orders, notes or any other chattel paper, documents or instruments constituting all or any part of the Pledged Collateral or received as interest, rent or other payment on or on account of the Pledged Collateral or any part thereof or on account of its sale or lease;

(n)     appoint another Person (who may be an employee, officer, or other representative of the Secured Party) to do any of the foregoing, or take any other action permitted hereunder, as agent for or representative of, and on behalf of, the Secured Party;

(o)     execute (in the name, place, and stead of Borrower) endorsements, assignments and other instruments of conveyance or transfer with respect to all or any of the Pledged Collateral;

(p)     require Borrower to assemble the Pledged Collateral or any part thereof and to make the same (to the extent the same is moveable) available to the Secured Party at a place to be designated by the Secured Party which is reasonably convenient to the Secured Party;

(q)     make formal application for the transfer of all of Borrower's Permits included in the Pledged Collateral and relating to Borrower's business to the Secured Party, to any assignee of the Secured Party or to any purchaser of any of the Pledged Collateral to the extent the same are assignable in accordance with their terms and applicable Law;

(r)     sell or otherwise dispose of any or all of the Pledged Collateral in accordance with the terms of this Agreement;

(s)     all rights to set off or otherwise apply or credit against the Obligations any and all sums deposited with Secured Party or held by Secured Party;

(t)     require Borrower to take any reasonable actions that are necessary or appropriate to preserve the value of the Pledged Collateral and the validity, perfection or priority of the Liens granted by this Agreement in any portion of the Pledged Collateral, or to take any other reasonable action which the Secured Party deems necessary or desirable to protect or realize upon its security interest in the Pledged Collateral or any part thereof, and Borrower hereby irrevocably appoints the Secured Agent as Borrower's

attorney-in-fact (as set forth in Section 22) to take any such action, including the execution and delivery of any and all documents or instruments related to the Pledged Collateral or any part thereof in Borrower's name, and said appointment shall create in the Secured Party a power coupled with an interest which shall be irrevocable; and

(u)     exercise any other or additional rights or remedies granted to the Secured Party under any other provision of this Agreement or any other Loan Document, or exercisable by the Secured Party under the UCC or under any other applicable Law.

7.     <u>Right to Transfer into Name of Secured Party, etc</u>.  During any Enforcement Period, Secured Party may cause all or any of the Pledged Collateral to be transferred into its name or into the name of its nominee or nominees.

8.     <u>Right of Secured Party to Dispose of Collateral, etc</u>.  During any Enforcement Period, to the extent permitted by applicable law, including the UCC, and the terms of this Agreement, Secured Party shall have the right at any time or times thereafter to sell, resell, assign and deliver or grant a license to use or otherwise dispose of all or any of the Pledged Collateral in one or more parcels at any exchange or broker's board or at public or private sale for cash or on credit or for future delivery (without assuming any responsibility for credit risk). Unless the Pledged Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party will give Borrower at least ten (10) days' prior written notice in accordance with Section 20 hereof of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition of any of the Pledged Collateral is to be made.  Any such notice shall be deemed to meet any requirement hereunder or under any applicable law (including the UCC) that reasonable notification be given of the time and place of such sale or other disposition.  Such notice may be given without any demand of performance or other demand or any other notice and without compliance with any other condition precedent now or hereunder imposed by statute, rule of law or otherwise, all of which are hereby expressly waived by Borrower, to the fullest extent permitted by law.  All such sales shall be at such commercially reasonable price or prices and such other terms as Secured Party shall reasonably deem best and either for cash or on credit or for future delivery (without assuming any responsibility for credit risk).  At any such sale or sales, Secured Party may purchase or otherwise acquire any or all of the Pledged Collateral to be sold upon such terms as Secured Party may reasonably deem best and may make payments thereof by any means. For the avoidance of doubt, at any such sale or sales, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Pledged Collateral, Secured Party may use and apply any of the Obligations as a credit on account of the purchase price of the Pledged Collateral or any part thereof payable at such sale or sales. Upon any such sale or sales, the Pledged Collateral so purchased shall be held by the purchaser absolutely free from any claims or rights of whatsoever kind or nature, including any equity of redemption and any similar rights, all such equity of redemption and any similar rights being hereby expressly waived and released by Borrower.  In the event any consent, approval or authorization of any Governmental Authority will be necessary to effectuate any such sale or sales, Borrower shall execute, and hereby agrees to cause each of its affiliates to execute, all such applications or other instruments as may be required. Secured Party shall not be liable for failure to collect or realize upon any or all of the Pledged Collateral or for any delay in so doing nor shall it be under any obligation to take any action with regard thereto.

- 8 -

Borrower recognizes that Secured Party may be unable to effect a public sale or other disposition of all or a part of the Pledged Collateral by reason of the lack of a ready market for the Pledged Collateral, a limited number of potential buyers of the Pledged Collateral, or certain prohibitions contained in the Securities Act of 1933, as amended (the "*Securities Act*"), federal banking law, or other applicable laws, and may be compelled to resort to one or more private sales or other dispositions thereof to a restricted group of purchasers, each of whom will be obligated to agree, among other things, to acquire such Pledged Collateral for its own account, for investment and not with a view to the distribution or resale thereof. Borrower acknowledges that private sales or other dispositions thereof so made may be at prices and upon other terms less favorable to the seller than if such Pledged Collateral were sold at public sales or other dispositions thereof without such restrictions, and that Secured Party has no obligation to delay sale or other disposition of any such Pledged Collateral for the period of time necessary to permit such Pledged Collateral to be registered for public sale or other public disposition under the Securities Act and applicable state securities laws. Borrower agrees that any such private sales or other dispositions thereof shall not be deemed to have been made in a commercially unreasonable manner solely because they shall have been made under the foregoing circumstances.

If Secured Party shall determine to exercise its right to sell or otherwise dispose of any or all of the Pledged Collateral pursuant to this Section 8, and if in the opinion of Secured Party it is necessary or advisable to have the Pledged Collateral, or that portion thereof to be sold, registered under the provisions of the Securities Act, Borrower shall use its best efforts to execute and deliver, or cause the issuer or issuers of the Pledged Collateral contemplated to be sold to execute and deliver, or cause the directors and officers of such issuer to execute and deliver, all at Borrower's expense, all such instruments and documents, and to do or cause to be done all such other acts and things as may be necessary or, in the opinion of Secured Party, advisable (i) to register and sell such Pledged Collateral under and in compliance with the provisions of the Securities Act, and to cause the registration statement relating thereto to become effective and to remain effective for a period of nine (9) months from the date such registration statement became effective, and to make all amendments thereto or to the related prospectus or both, which, in the opinion of Secured Party, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto or in the opinion of any underwriters selected by Secured Party to effectuate such sale or (ii) to exempt such Pledged Collateral from registration under the provisions of the Securities Act, and to make all amendments to such instruments and documents which, in the opinion of Secured Party, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the Securities and Exchange Commission applicable thereto or in the opinion of any underwriters selected by Secured Party to effectuate such sale. Borrower further agrees to indemnify, defend and hold harmless Secured Party, any underwriter and their respective directors, officers, affiliates and controlling Persons from and against all loss, liability, expenses, costs of counsel (including reasonable fees and expenses of legal counsel to Secured Party), and claims (including the costs of investigation) that they may incur insofar as such loss, liability, expense or claim arises out of or is based upon any alleged untrue statement of a material fact contained in any prospectus (or any amendment or supplement thereto) or in any notification or offering circular, or arises out of or is based upon any alleged omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, except insofar as the same

- 9 -

may have been caused by any untrue statement or omission based upon information furnished in writing to Borrower or the issuer of such Pledged Collateral by Secured Party expressly for use therein.

Borrower shall use its best efforts to qualify, file or register, or cause the issuer of such Pledged Collateral to (i) qualify, file or register, any of the Pledged Collateral under the "Blue Sky" or other securities laws of such states as may be requested by Secured Party and keep effective all such qualifications, filings or registrations and (ii) to promptly make available to its security holders an earnings statement which will satisfy the provisions of section 11(a) of the Securities Act.

Borrower shall do or cause to be done all such other acts and things as may be necessary or advisable in the opinion of Secured Party to make any sales of any portion or all of the Pledged Collateral pursuant to this Section 8 valid and binding and in compliance with any and all applicable laws (including, without limitation, the Securities Act, the Securities Exchange Act of 1934, as amended, the rules and regulations of the Securities and Exchange Commission applicable thereto and all applicable state securities or "Blue Sky" laws), regulations, orders, writs, injunctions, decrees or awards of any and all courts, arbitrators or governmental instrumentalities, domestic or foreign, having jurisdiction over any such sale or sales, all at Borrower's expense. Borrower further agrees that a breach of any of the covenants contained in this Section 8 will cause irreparable injury to Secured Party, that Secured Party has no adequate remedy at law in respect of such breach and, as a consequence, agrees that each and every covenant contained in this Section 8 shall be specifically enforceable against Borrower by Secured Party and Borrower hereby waives and agrees not to assert any defenses against an action for specific performance of such covenants.

9.    <u>Care of Pledged Collateral in Secured Party's Possession</u>. Beyond the exercise of reasonable care to assure the safe custody of the Pledged Collateral while held hereunder, Secured Party shall have no duty or liability to take any action of any kind to collect any sums due in respect thereof or to protect or preserve its or Borrower's rights in the Pledged Collateral or against other parties thereto, and shall be relieved of all responsibility for the Pledged Collateral upon surrendering the same to Borrower.

10.    <u>Proceeds of Collateral</u>. The proceeds of any sale or sales of the Pledged Collateral, together with any other additional collateral security at the time received and held hereunder, shall be received and applied: first, to the payment of all costs and expenses of such sale, including reasonable attorneys' fees; second, to the payment of the Obligations by Secured Party in accordance with the terms of the Credit Agreement; and third, any surplus thereafter remaining shall be turned over to Borrower. In the event the proceeds of any sale or other disposition of the Pledged Collateral hereunder are insufficient to pay all of the Obligations in full, Borrowers will be liable for the deficiency, together with interest thereon at the maximum rate provided in the Credit Agreement, and the cost and expenses of collection of such deficiency, including (to the extent permitted by law), without limitation, reasonable attorneys' fees, expenses, and disbursements.

11.    <u>No Waiver and Cumulative Remedies</u>. No failure on the part of Secured Party to exercise, no course of dealing with respect to, and no delay on the part of Secured Party in

exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy; nor shall Secured Party be required to look first to, enforce or exhaust any other security, collateral or guaranties. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

12.     Marshalling.  Secured Party shall not be required to marshal any present or future collateral security for (including but not limited to this Agreement and the Pledged Collateral), or other assurances of payment of, the Obligations or any of them, or to resort to such collateral security or other assurances of payment in any particular order. To the extent that it lawfully may, Borrower hereby agrees that it will not invoke any law relating to the marshalling of collateral that might cause delay in or impede the enforcement of Secured Party's rights under this Agreement or under any other instrument evidencing any of the Obligations or under which any of the Obligations is outstanding or by which any of the Obligations is secured or payment thereof is otherwise assured, and to the extent that it lawfully may Borrower hereby irrevocably waives the benefits of all such laws.

13.     Waivers, etc.  Other than any notices expressly provided for herein or in the Credit Agreement, Borrower hereby waives presentment, demand, notice, protest and, except as is otherwise provided herein, all other demands and notices in connection with this Agreement or the enforcement of Secured Party's rights hereunder or in connection with any Obligations or any Pledged Collateral; consents to and waives notice of the granting of renewals, extensions of time for payment or other indulgences to Borrower or any of its affiliates, or to any third party, or substitution, release or surrender of any collateral security for any Obligation, the addition or release of Persons primarily or secondarily liable on any Obligation or on any collateral security for any Obligation, the acceptance of partial payments on any Obligation or on any collateral security for any Obligation and/or the settlement or compromise thereof.  Borrower hereby generally waives all suretyship defenses to the extent applicable and waivable under applicable law.  No single or partial waiver by or delay or omission on the part of Secured Party in exercising any right hereunder shall operate as a waiver of any other default, such right or remedy or of any other right hereunder.  Any waiver of any such right on any one occasion shall not be construed as a bar to or waiver of any such right on any future occasion.  Borrower further waives any right it may have under the laws of the State of Connecticut, under the laws of any state or any other jurisdiction in which any of the Pledged Collateral may be located or which may govern the Pledged Collateral, or under the laws of the United States of America, to notice (other than any requirement of notice provided herein or in the Credit Agreement or non-waivable under applicable law) or to a judicial hearing prior to the exercise of any right or remedy provided by this Agreement to Secured Party and waives its rights, if any, to set aside or invalidate any sale duly consummated in accordance with the foregoing provisions hereof on the grounds (if such be the case) that the sale was consummated without a prior judicial hearing.  Borrower's waivers under this Section 13 have been made voluntarily, intelligently, and knowingly and after Borrower has been apprised and counseled by its attorneys as to the nature thereof and its possible alternative rights.

14.     Termination; Waiver; Assignment, etc.  When all the Obligations have been indefeasibly paid in full in cash and have been terminated, (x) this Agreement (including any

power of attorney granted hereunder) and the security interest in the Pledged Collateral created hereby shall terminate, (y) Secured Party shall promptly return the Pledged Collateral to Borrower and notify the Listed Company and any institution maintaining the Cash Collateral Account or any securities account to which any Pledged Collateral has been credited that the Lien of the Secured Party has terminated, and (z) Secured Party shall promptly execute any instruments of termination and release reasonably requested by Borrower at the sole cost and expense of Borrower.  No waiver by Secured Party or any other holder of Obligations of any default shall operate as a waiver of any other default or of the same default on a future occasion. Neither this Agreement nor any term hereof may be changed, waived, discharged, or terminated except by a written instrument expressly referring to this Agreement and to the provisions so modified or limited, and executed by Secured Party and Borrower.  In the event of a sale or assignment by Secured Party of all or any of the Obligations held by it, Secured Party may assign or transfer its rights and interest under this Agreement in whole or in part to the purchaser or purchasers of such Obligations, whereupon such purchaser or purchasers shall become vested with all of the powers and rights of Secured Party hereunder.

15.    <u>Reinstatement</u>.  Notwithstanding the provisions of Section 14, this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any amount received by Secured Party in respect of the Obligations is rescinded or must otherwise be restored or returned by Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of Borrower or upon the appointment of any intervener or conservator of, or trustee or similar official for Borrower or any substantial part of its property or otherwise, all as though such payments had not been made.

16.    <u>Governmental Approvals, etc</u>.  Upon the exercise by Secured Party of any power, right, privilege or remedy pursuant to this Agreement which requires any consent, approval, qualification or authorization of any Governmental Authority or instrumentality, Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certificates, instruments and other documents and papers that Secured Party may be required to obtain for such governmental consent, approval, qualification, or authorization.

17.    <u>Restrictions on Transfer, etc</u>.  To the extent that any restrictions imposed by the Organizational Documents of Borrower or any other document or instrument would in any way affect or impair the pledge of the Pledged Collateral hereunder or the exercise by Secured Party of any right granted hereunder, including, without limitation, the right of Secured Party to dispose of the Pledged Collateral during any Enforcement Period, Borrower hereby waives such restrictions, and Borrower hereby agrees that it will take any further action which Secured Party may reasonably request in order that Secured Party may obtain and enjoy the full rights and benefits granted to Secured Party by this Agreement free of any such restrictions.

18.    <u>Further Assurances</u>.  Borrower will do all such acts, and will furnish to Secured Party all such financing statements, certificates, legal opinions and other documents and will obtain all such governmental consents and corporate approvals and will do or cause to be done all such other things as Secured Party may reasonably request from time to time in order to give full effect to this Agreement and to secure the rights of Secured Party hereunder, all without any cost or expense to Secured Party.  Borrower hereby irrevocably authorizes Secured Party at any time and from time to time to file in any filing office in any UCC jurisdiction any initial

financing statements and amendments thereto that (a) indicate the Pledged Collateral or words of similar effect, or as being of equal or lesser scope or in greater detail, and (b) contain any other information required by Article 9 of the UCC of the jurisdiction of the filing office for the sufficiency or filing office acceptance of any financing statement or amendment, including whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower. Borrower agrees to furnish any such information to Secured Party promptly upon request. Borrower also ratifies its authorization for Secured Party to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof. Borrower shall take such further actions, and execute and/or deliver to Secured Party such additional financing statements, amendments, assignments, agreements, supplements, powers and instruments, as Secured Party may in its judgment deem necessary or appropriate in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted in the Pledged Collateral as provided herein and the rights and interests granted to Secured Party hereunder, and enable Secured Party to exercise and enforce its rights, powers and remedies hereunder with respect to any Pledged Collateral, including the filing of any financing statements, continuation statements and other documents under the UCC (or other similar laws) in effect in any jurisdiction with respect to the security interest created hereby, all in form and substance reasonably satisfactory to Secured Party and in such offices wherever required by law to perfect, continue and maintain the validity, enforceability and priority of the security interest in the Pledged Collateral as provided herein and to preserve the other rights and interests granted to Secured Party hereunder, as against third parties, with respect to the Pledged Collateral. With respect to all Pledged Collateral of Borrower over which Secured Party may obtain "control" within the meaning of section 8-106 of the UCC, Borrower shall take all actions as may be requested from time to time by Secured Party so that control of such Pledged Collateral is obtained and at all times held by the Secured Party. Without limiting the generality of the foregoing, Borrower shall make, execute, endorse, acknowledge, file or refile and/or deliver to Secured Party from time to time upon request by Secured Party such lists, schedules, descriptions and designations of the Pledged Collateral, statements, confirmatory assignments, supplements, additional security agreements, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports and other assurances or instruments as Secured Party shall request. During any Enforcement Period, Secured Party may institute and maintain, in its own name or in the name of Borrower, such suits and proceedings as Secured Party may deem necessary or expedient to prevent any impairment of the security interest in or the perfection thereof in the Pledged Collateral. All of the foregoing shall be at the sole cost and expense of Borrower.

19.    <u>Secured Party's Exoneration</u>.  Subject to Section 9, under no circumstances shall Secured Party be deemed to assume any responsibility for or obligation or duty with respect to any part or all of the Pledged Collateral of any nature or kind or any matter or proceedings arising out of or relating thereto.  Secured Party's prior recourse to any part or all of the Pledged Collateral shall not constitute a condition of any demand, suit or proceeding for payment or collection of any of the Obligations.

20.    <u>Notices</u>.  All notices, requests, consents, demands and other communications required or which any party desires to give hereunder shall be given in accordance with Section 9.9 of the Credit Agreement.

21.    <u>Overdue Amounts</u>.    Until paid, all amounts due and payable by Borrower hereunder shall be a debt secured by the Pledged Collateral and shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto plus 400 basis points from the date of such nonpayment until such amount is paid in full (after as well as before judgment).

22.    <u>Power of Attorney</u>. Borrower hereby appoints Secured Party as its attorney-in-fact, with full power and authority in the place and stead of Borrower and in the name of Borrower, or otherwise, from time to time during any Enforcement Period in Secured Party's discretion to take any action and to execute any instrument or document consistent with the terms hereof which Secured Party may reasonably deem necessary or advisable to accomplish the purposes hereof (but Secured Party shall not be obligated to and shall have no liability to Borrower or any third party for failure to so do or take action). The foregoing grant of authority is a power of attorney coupled with an interest and such appointment shall be irrevocable for the term hereof. Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

23.    <u>No Release</u>. Nothing set forth in this Agreement, nor the exercise by Secured Party of any of the rights or remedies hereunder, shall relieve Borrower from the performance of any term, covenant, condition or agreement on Borrower's part to be performed or observed in respect of any of the Pledged Collateral or from any liability to any Person in respect of any of the Pledged Collateral or shall impose any obligation on Secured Party to perform or observe any such term, covenant, condition or agreement on Borrower's part to be so performed or observed or shall impose any liability on Secured Party for any act or omission on the part of Borrower relating thereto or for any breach of any representation or warranty on the part of Borrower contained in this Agreement or in respect of the Pledged Collateral or made in connection herewith or therewith. Anything herein to the contrary notwithstanding, Secured Party shall not have any obligation or liability under any contracts, agreements and other documents included in the Pledged Collateral by reason of this Agreement, nor shall Secured Party be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce any such contract, agreement or other document included in the Pledged Collateral.

24.    <u>Indemnity and Expenses</u>.

(a)    Borrower hereby agrees to indemnify and hold harmless Secured Party and its respective directors, officers, affiliates and controlling Persons (each such Person being called an "***Indemnitee***") from any losses, damages, liabilities, claims and related expenses (including the fees and expenses of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person other than such Indemnitee arising out of, in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), whether brought by a third party or by Borrower, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (i) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (ii) result from a claim brought by Borrower against an Indemnitee for breach in bad faith of such

- 14 -

Indemnitee's obligations hereunder, if Borrower has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(b)     To the fullest extent permitted by applicable law, Borrower hereby agrees not to assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential, or punitive damages (as opposed to direct and actual damages) arising out of, in connection with, or as a result of this Agreement or any agreement or instrument contemplated hereby, or the transactions contemplated hereby or thereby. No Indemnitee shall be liable for any damages arising from the use of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the transactions contemplated hereby or thereby by unintended recipients.

(c)     Borrower agrees to pay or reimburse Secured Party for all its costs and expenses incurred in enforcing or preserving any rights or remedies under this Agreement (including the fees and other charges of counsel) to Secured Party.

(d)     All amounts due under this Section shall be payable after demand therefor, shall constitute Secured Obligations, and shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto plus 400 basis points from the date of such nonpayment until such amount is paid in full (after as well as before judgment).

25.     Miscellaneous.     The headings of each section of this Agreement are for convenience only and shall not define or limit the provisions thereof. This Agreement shall inure to the benefit of and be binding upon Secured Party and Borrower and their respective successors and assigns.  In case any provision in this Agreement shall be invalid, illegal, or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

26.     Intercreditor Agreement. Notwithstanding anything herein to the contrary, (a) the lien and security interest granted to the Secured Party pursuant to this Agreement and the exercise of any right or remedy by the Secured Party hereunder are subject to the provisions of the Intercreditor Agreement, dated as of September 28, 2021 by, among others, the Secured Party as the Second Lien Agent, Green Finance Authority as the Third Lien Lender and Forbright Bank (formerly Congressional Bank) as the First Lien Agent (as amended, amended and restated, supplemented or otherwise modified from time to time, the "***Intercreditor Agreement***"), (b) in the event of any conflict between the express terms and provisions of the Loan Documents (as defined in the Second Lien Loan Agreement), on the one hand, and of the Intercreditor Agreement, on the other hand, the terms and provisions of the Intercreditor Agreement, shall control, and (c) any Collateral held by (or in the possession or control of) the Secured Party (or its agents or bailees), shall be held as agent and bailee for security, perfection and control purposes in favor of Forbright Bank as the First Lien Agent and Green Finance Authority as the Third Lien Lender in accordance with the terms of the Intercreditor Agreement.

27.     Governing Law.     **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON,**

- 15 -

ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.

28.    Jurisdiction; Venue.

(a)    *Consent to Jurisdiction*.  EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT AND OF ANY CONNECTICUT STATE COURT SITTING IN NEW HAVEN, CONNECTICUT AND ANY APPELLATE COURT FROM ANY THEREOF FOR THE PURPOSES OF ALL ACTIONS, LITIGATIONS OR LEGAL PROCEEDINGS, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  EACH PARTY TO THIS AGREEMENT HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE SECURED PARTY, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING THERETO, IN ANY FORUM OTHER THAN THE COURTS OF THE STATE OF CONNECTICUT SITTING IN NEW HAVEN, CONNECTICUT, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT, AND ANY APPELLATE COURT FROM ANY THEREOF.  EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    *Waiver of Venue*.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN CLAUSE (a) OF THIS SECTION.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY

WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

29.     Waiver of Jury Trial.  **EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR UNDER ANY AGREEMENT, INSTRUMENT OR OTHER DOCUMENT CONTEMPLATED HEREBY OR RELATED HERETO AND IN ANY ACTION DIRECTLY OR INDIRECTLY RELATED TO OR CONNECTED WITH THE TRANSACTIONS PROVIDED FOR HEREIN, OR ANY CONDUCT RELATING TO THE NEGOTIATION, ADMINISTRATION OR ENFORCEMENT OF SUCH TRANSACTIONS OR ARISING FROM THE DEBTOR/CREDITOR RELATIONSHIP OF THE PARTIES HERETO. THE BORROWER ACKNOWLEDGES THAT THIS WAIVER MAY DEPRIVE IT OF AN IMPORTANT RIGHT AND THAT SUCH WAIVER HAS KNOWINGLY BEEN AGREED TO BY THE BORROWER AFTER CONSULTATION WITH ITS LEGAL COUNSEL. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

30.     Prejudgment Remedies.     **THE BORROWER HEREBY REPRESENTS, WARRANTS AND ACKNOWLEDGES THAT THE FINANCING EVIDENCED HEREBY IS A COMMERCIAL TRANSACTION WITHIN THE MEANING OF CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED. THE BORROWER HEREBY WAIVES ITS RIGHT TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER UNDER CONNECTICUT GENERAL STATUTES SECTIONS 52-278a ET. SEQ. AS AMENDED OR UNDER ANY OTHER STATE OR FEDERAL LAW WITH RESPECT TO ANY AND ALL PREJUDGMENT REMEDIES THE AGENT MAY EMPLOY TO ENFORCE THEIR RIGHTS AND REMEDIES HEREUNDER AND UNDER THE OTHER LOAN DOCUMENTS.     MORE SPECIFICALLY, THE BORROWER ACKNOWLEDGES THAT UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT THE AGENT'S ATTORNEY MAY, PURSUANT TO AND IN ACCORDANCE WITH CONN. GEN. STAT. §52-278F, ISSUE A WRIT FOR A PREJUDGMENT REMEDY WITHOUT SECURING A COURT ORDER.  THE BORROWER ACKNOWLEDGES AND RESERVES ITS RIGHT TO NOTICE AND A HEARING SUBSEQUENT TO THE ISSUANCE OF A WRIT FOR PREJUDGMENT REMEDY AS AFORESAID AND THE AGENT ACKNOWLEDGES THE BORROWER'S RIGHT TO SAID HEARING SUBSEQUENT TO THE ISSUANCE OF SAID WRIT.  THE BORROWER FURTHER WAIVES ITS RIGHTS TO REQUEST THAT THE AGENT POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT BORROWER AGAINST DAMAGES THAT MAY**

- 17 -

**BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE AGENT.**

31.     Limitation of Damages.  EXCEPT AS PROHIBITED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS.   THESE WAIVERS CONSTITUTE A MATERIAL INDUCEMENT FOR THE SECURED PARTY TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.  BORROWER REPRESENTS AND ACKNOWLEDGES THAT THESE WAIVERS ARE MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AFTER CONSULTATION WITH LEGAL COUNSEL.

32.     Counterparts; Electronic Signatures. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") shall be effective as delivery of a manually executed counterpart thereof.   Unless otherwise provided in this Agreement, the words "execute", "execution", "signed", and "signature" and words of similar import used in or related to this Agreement, or in any amendment or modification hereof (including waivers and consents), shall be deemed to include electronic signatures (including, without limitation, DocuSign and AdobeSign) and the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Connecticut Uniform Electronic Transactions Act, and other similar state laws based on the Uniform Electronic Transactions Act.

[SIGNATURE PAGE FOLLOWS]

23090\7\4889-9260-3941.v8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

**<u>BORROWER</u>:**

POSIGEN, INC.

By:_____
    Name: Thomas A. Neyhart
    Title: CEO

**<u>SECURED PARTY</u>:**

CONNECTICUT GREEN BANK

By:_____
    Name: Bryan T. Garcia
    Title: President & CEO

*[Signature Page to Security and Pledge Agreement (Term Loan Facility)]*

**EXHIBIT E**

**Form of Borrowing Request**

Dated as of: _____

Connecticut Green Bank
75 Charter Oak Ave.
Hartford, Connecticut 06106
Attention: Bert Hunter, CIO

RE: Connecticut Green Bank/PosiGen, Inc.

Ladies and Gentlemen:

  This irrevocable Borrowing Request is delivered to you pursuant to Section 2.3(b) of the Term Loan Credit Agreement, dated as of October 7, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "***Term Loan Credit Agreement***"), by and between CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut (the "***Lender***") and POSIGEN, INC., a Delaware corporation (the "***Borrower***"). Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Term Loan Credit Agreement.

1. The Borrower hereby requests that the Lender make an advance under the Term Loan to the Borrower in the aggregate principal amount of $_____ (the "***Proposed Advance***").

2. The Borrower hereby requests that such Proposed Advance be made on the following Business Day: _____.

3. The uses of the Proposed Advance are as follows:

4. The proceeds of the Proposed Advance should be transferred by wire to the following account(s):

| Amount Requested | Account Name | Bank Name and Address | Account Number | ABA/Routing Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

5.  The schedule of Customer Agreements attached to this Borrowing Request as **Schedule 1** (the "***Schedule of Customer Agreements with Favorable Pricing***") sets forth, as of the date of this Borrowing Request: (i) the name of each Customer who has executed a Customer Agreement that provides for Favorable Pricing; (ii) the address of the Premises of each such Customer; (iii) the rate of Favorable Pricing applicable to such Customer; and (iv) whether such Customer is an LI Customer or a Customer residing in an Underserved Community.

6.  The aggregate principal amount of all advances under the Term Loan outstanding as of the date hereof (including the Proposed Advance requested herein) does not exceed the maximum amount permitted to be outstanding pursuant to the terms of the Term Loan Credit Agreement.

7.  All of the conditions applicable to the Proposed Advance requested herein as set forth in the Term Loan Credit Agreement have been satisfied as of the date hereof and will remain satisfied to the borrowing date of such Proposed Advance.

8.  After giving effect to the Proposed Advance, the aggregate principal amount of the Term Loan outstanding will not be greater than either: (i) the Term Loan Commitment or (ii) the Available Borrowing Base, as of the borrowing date of such Proposed Advance.

9.  The Borrower hereby affirms that the following representations and warranties to Lender as of the date of this Borrowing Request; and this Borrowing Request shall also be deemed an affirmation of such representations and warranties as of the date of the Proposed Advance requested herein, as follows:

    a.  the representations and warranties contained in the Term Loan Credit Agreement are true and correct and shall be true and correct, both as of the date hereof and after giving effect to the Proposed Advance requested herein and to the application of the proceeds therefrom, as though made on and as of the date of this Borrowing Request and the date of the Proposed Advance requested herein; and

    b.  no event has occurred and is continuing, or would result from the Proposed Advance requested herein or from the application of the proceeds therefrom, which constitutes an Event of Default or which, with the giving of notice or the passage of time or both would constitute an Event of Default.

10. If this Borrowing Request pertains to the first Term Loan Borrowing under the Term Loan Credit Agreement, Borrower hereby represents and warrants that all conditions precedent to such advance set forth in Section 3.1 of the Term Loan Credit Agreement have been fulfilled and documents required for such fulfillment are attached to this Borrowing Request. If this Borrowing Request pertains to any subsequent Term Loan Borrowing, Borrower hereby represents and warrants that all conditions precedent set forth in Section 3.2 of the Term Loan Credit Agreement have been fulfilled and documents required for such fulfillment are attached to this Borrowing Request.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned have executed this Borrowing Request as of the day and year first written above.


POSIGEN, INC.,
a Delaware corporation


By: _____
Name: Benjamin Healey
Title:  Chief Commercial Officer

## SCHEDULE 1 TO FORM OF BORROWING REQUEST

### Schedule of Customer Agreements with Favorable Pricing

| Customer Name | Address of Premises | Favorable Pricing Rate | LI Customer or Underserved Community |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

**EXHIBIT F**

**Form of Term Note**
(*attached*)

*Final Attachment Copy*

## <u>SECURED TERM PROMISSORY NOTE</u>

*2022 Term Loan Facility*

$6,000,000.00                                                              October 7, 2022

FOR VALUE RECEIVED, POSIGEN, INC. a Delaware corporation (the "***Borrower***"), absolutely and unconditionally promises to pay to the order of CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut (the "***Lender***"), at the times provided for in the Credit Agreement (as defined below) in lawful money of the United States of America in immediately available funds, the principal sum of Six Million and 00/100 Dollars ($6,000,000.00) or, if less, the aggregate unpaid principal amount of the Term Loan made by the Lender to the Borrower pursuant to that certain Term Loan Credit Agreement of even date herewith between the Borrower and the Lender (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***").  All capitalized terms used in this Secured Term Promissory Note (as amended, restated, supplemented or otherwise modified from time to time, this "***Term Note***") and not otherwise defined herein shall have the same meanings herein as in that certain Credit Agreement.

This Term Note has been issued pursuant to the Credit Agreement.  Reference is hereby made to the Credit Agreement for a statement of all of the terms and conditions upon which the Term Loan evidenced hereby are made and are to be repaid.  The principal amount of the indebtedness evidenced hereby shall be payable in the amounts and on the dates specified in the Credit Agreement.  Interest thereon shall be paid until such principal amount is paid in full at such interest rates and at such times, and pursuant to such calculations, as are specified in the Credit Agreement.  The terms of the Credit Agreement are hereby incorporated by reference.  The Obligations evidenced by this Term Note are subject to acceleration in accordance with Section 8.3(a)(ii) of the Credit Agreement.

The Lender and any holder hereof is entitled to the benefits and subject to the conditions of the Credit Agreement and may enforce the agreements of the Borrower contained therein, and any holder hereof may exercise the respective remedies provided for thereby or otherwise available in respect thereof, all in accordance with the respective terms thereof.  This Term Note is secured by the Security Agreement described in the Credit Agreement.

The Borrower has the right in certain circumstances, and the obligation under certain other circumstances, to repay or prepay the whole or part of the principal of this Term Note on the terms and conditions specified in the Credit Agreement.

If any Event of Default shall occur, the entire unpaid principal amount of this Term Note and all of the unpaid interest accrued thereon may become or be declared due and payable in the manner and with the effect provided in the Credit Agreement.

The Borrower and every endorser and guarantor of this Term Note, or the obligation represented hereby waive presentment, demand, notice, protest and all other demands and notice in connection with the delivery, acceptance, performance, default or enforcement of this Term Note, assent to any extension or postponement of the time of payment or any other indulgence, to any substitution, exchange or release of collateral and to the addition or release of any other party or Person primarily or secondarily liable.

No delay or omission on the part of the holder of this Term Note in exercising any right hereunder shall operate as a waiver of such right or of any other right under this Term Note, and a waiver, delay or omission on any one occasion shall not be construed as a bar to or waiver of any such right on any future occasion.

The Borrower hereby agrees to pay on demand all costs and expenses, including, without limitation, attorneys' fees and legal expenses, incurred or paid by the holder of this Term Note in enforcing this Term Note on default.

**THIS TERM NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO CONFLICTS OF LAW RULES). THE BORROWER AGREES THAT ANY SUIT FOR THE ENFORCEMENT OF THIS TERM NOTE MAY BE BROUGHT IN THE COURTS OF THE STATE OF CONNECTICUT OR ANY FEDERAL COURT SITTING THEREIN AND THE CONSENT TO THE NONEXCLUSIVE JURISDICTION OF SUCH COURT AND THE SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON THE BORROWER BY MAIL AT THE ADDRESS SPECIFIED IN SECTION 8.2 OF THE CREDIT AGREEMENT.  THE BORROWER HEREBY WAIVES ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE VENUE OF ANY SUCH SUIT OR ANY SUCH COURT OR THAT SUCH SUIT IS BROUGHT IN AN INCONVENIENT COURT.**

Time is of the essence with respect to this Term Note.

*[Signature page follows]*

IN WITNESS WHEREOF, the Borrower has caused this Term Note to be signed by its duly authorized officer as of the day and year first above written.

**BORROWER:**

**POSIGEN, INC.**

_____

By: Thomas A. Neyhart
Its: CEO

**EXHIBIT G**

**Form of Compliance Certificate**

<u>COMPLIANCE CERTIFICATE</u>

THIS CERTIFICATE (this "***Certificate***") is made as of *[_____, 2022__]*, by PosiGen, Inc. a Delaware corporation (the "***Borrower***"), to Connecticut Green Bank, an independent instrumentality of the State of Connecticut (the "***Lender***"), pursuant to Section 6.8(c) of the Term Loan Credit Agreement dated as of October 7, 2022 (as amended, modified, restated, substituted, extended and renewed at any time and from time to time, the "***Term Loan Credit Agreement***"), by and among the Borrower and the Lender. Capitalized terms defined in the Term Loan Credit Agreement and not otherwise defined in this Certificate have shall have the meaning set forth in the Term Loan Credit Agreement.

I, *[_____]*, hereby certify that I am the *[Title of a Responsible Officer]* of Borrower and am a Responsible Officer authorized to certify to the Lender on behalf the Borrower as follows:

This Certificate is given to induce the Lender to make or continue advances to the Borrower under the Term Loan Credit Agreement and the other Loan Documents (defined therein).

This Certificate accompanies the *[audited/internally-prepared]* financial statements for the period ended *[_____, 20___]* (the "***Current Financials***") that the Borrower has furnished to the Lender pursuant to Section 6.8 of the Term Loan Credit Agreement. The Current Financials fairly present in all material respects the financial condition and results of operations of Borrower, in accordance with GAAP consistently applied.

The Borrower continues to be organized solely under the laws of the state, commonwealth or district of organization identified in the Term Loan Credit Agreement and has not changed the state of its organization or organized under the laws of an additional state.

As of the date hereof, there exists no Default or Event of Default, and no change resulting in a Material Adverse Effect has occurred.

As of the most recent fiscal quarter, *[_____]* percent (*[___]*%) of Projects were removed from Customer homes and redeployed to new Customer homes during the preceding twelve (12) months.

The Debt Service Coverage Ratio is *[less/greater]* than the level specified in Section 6.4(a).

The Liquidity of Borrower is [*less/greater*] than the level specified in Section 6.4(b).

The ratio of Borrower's Debt to Borrower's Tangible Net Worth is [*less/greater*] than the level specified in Section 6.4(c).

The Tangible Net Worth of Borrower is [*less/greater*] than the level specified in Section 6.4(d);

The Delinquency Ratio is [*less/greater*] greater than the level specified in Section 6.4(e).

The following is a calculation of Cash Available for Debt Service, including an explanation in sufficient detail of how the cash figures used in such calculation were derived from the financial statements for the relevant financial quarter:

*[_____]*

[*Signature Page Follows*]

Signature Page to
<u>COMPLIANCE CERTIFICATE dated *[_____, 20___]*</u>

WITNESS my signature this *[_____ day of _____, 20__].*

_____

(For itself and as Borrower Representative)



By:_____

   Name:

   Title:  *[Title of a Responsible Officer]*

<u>Schedule 1 to</u>
<u>COMPLIANCE CERTIFICATE dated *[_____, 20__]*</u>
<u>Financial Covenants</u>

<u>Section [_____]</u> (                              ):

    The Borrower *[is/is not]* in compliance with the covenant because the [                ], computed as follows:

<u>Section [_____]</u> (_____):

  The Borrower *[is/is not]* in compliance with the covenant because the amount of the Borrower's

[        ]

**SCHEDULE A**

**Borrower's Foreign Qualifications**

The Borrower is registered to transact business in the following states:

- Delaware

# SCHEDULE B

**State Contracting Standard Terms and Conditions**
(*attached*)

### STATE CONTACTING CERTIFICATIONS, AFFIDAVITS, AND AFFIRMATIONS FOR QUASI-PUBLIC AGENCIES

### COVER SHEET

The following certifications, affidavits and affirmations are provided in connection with an agreement or contact (the "**Contract**") by and between PosiGen, Inc. (the "**Contractor**") and Connecticut Green Bank (the "**Quasi-Public Agency**") dated as of October 7, 2022.  The duly authorized and acting officer of Contractor signing the attached documents is Thomas A. Neyhart, the CEO of Contactor.

The Contract Execution Date is October 7, 2022.

The certifications, affidavits and affirmations are applicable as follows:

I.    **CERTIFICATION OR AFFIDAVIT REGARDING NONDISCRIMINATION AND AFFIRMATIVE ACTION PROVISIONS – Applicable to all contracts. (Conn. Gen. Stat. §§ 4a-60 and 4a-60a)**

II.    **CERTIFICATION REGARDING OCCUPATIONAL SAFETY AND HEALTH ACT COMPLIANCE – Applicable to all Contracts.  (Conn. Gen. Stat. §§ 31-57b)**

III.    **CERTIFICATION REGARDING CAMPAIGN CONTRIBUTIONS – Applicable to certain contracts valued at $50,000 or more, or a combination or series of such contracts valued at $100,000 or more in a calendar year.  (Conn. Gen. Stat. § 9-612)**

The Connecticut General Statutes referenced above are attached below.  These materials are provided solely as a convenience.  It is the obligation of the Contractor to review the statutes and determine the applicability of the same to the Contract, as well as to determine whether statutes not cited above may be applicable to a particular contract.

23090\7\4860-3827-2311.v1

I.    **CERTIFICATION OR AFFIDAVIT REGARDING NONDISCRIMINATION AND AFFIRMATIVE ACTION PROVISIONS (Conn. Gen. Stat. §§ 4a-60 and 4a-60a)**

      a.    For purposes of this Section, "Contractor", "contractor" and "Consultant" shall have the same meaning, "Contract", "contract" and "Agreement" shall have the same meaning and other otherwise undefined terms have the meaning ascribed to them in Connecticut General Statutes § 4a-60g.

      b.    Pursuant to Connecticut General Statutes § 4a-60:

      1.    The Contractor agrees and warrants that in the Performance of this Contract such Contractor will not discriminate or permit discrimination against any person or group of persons on the grounds of race, color, religious creed, age, marital status, national origin, ancestry, sex, gender identity or expression, status of a veteran, intellectual disability, mental disability or physical disability, including, but not limited to, blindness, unless it is shown by such Contractor that such disability prevents Performance of the work involved, in any manner prohibited by the laws of the United States or of the State of Connecticut; and the Contractor further agrees to take affirmative action to ensure that applicants with job-related qualifications are employed and that employees are treated when employed without regard to their race, color, religious creed, age, marital status, national origin, ancestry, sex, gender identity or expression, status of a veteran, intellectual disability, mental disability or physical disability, including, but not limited to, blindness, unless it is shown by the Contractor that such disability prevents performance of the work involved;

      2.    the Contractor agrees, in all solicitations or advertisements for employees placed by or on behalf of the Contractor, to state that it is an "affirmative action equal opportunity employer" in accordance with regulations adopted by the Commission on Human Rights and Opportunities (the "Commission");

      3.    the Contractor agrees to provide each labor union or representative of workers with which the Contractor has a collective bargaining agreement or other contract or understanding and each vendor with which the Contractor has a contract or understanding, a notice to be provided by the Commission, advising the labor union or workers' representative of the Contractor's commitments under this Section and to post copies of the notice in conspicuous places available to employees and applicants for employment;

4.    the Contractor agrees to comply with each provision of this Section and Connecticut General Statutes §§ 46a-68e and 46a- 68f and with each regulation or relevant order issued by said Commission pursuant to Connecticut General Statutes §§ 46a-56, 46a-68e and 46a-68f; and

5.    the Contractor agrees to provide the Commission with such information requested by the Commission, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Contractor as relate to the provisions of this Section and Connecticut General Statutes § 46a-56.

6.    If the contract is a public works contract, municipal public works contract or contract for a quasi-public agency project, the contractor agrees and warrants that he or she will make good faith efforts to employ minority business enterprises as subcontractors and suppliers of materials on such public works or quasi-public agency project.

c.    The Contractor shall include the provisions of subsection (b) of this Section in every subcontract or purchase order entered into in order to fulfill any obligation of a contract with the state, and in every subcontract entered into in order to fulfill any obligation of a municipal public works contract or contract for a quasi-public agency project, and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the Commission. The Contractor shall take such action with respect to any such subcontract or purchase order as the Commission may direct as a means of enforcing such provisions including sanctions for noncompliance in accordance with Connecticut General Statutes §46a-56; provided if such Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Commission, the Contractor may request the state of Connecticut to enter into any such litigation or negotiation prior thereto to protect the interests of the state and the state may so enter.

d.    Pursuant to Connecticut General Statutes § 4a-60a:

1.    The Contractor agrees and warrants that in the performance of this Contract such Contractor will not discriminate or permit discrimination against any person or group of persons on the grounds of sexual orientation, in any manner prohibited by the laws of the United States or the State of Connecticut, and that employees are treated when employed without regard to their sexual orientation;

2.    the Contractor agrees to provide each labor union or representative of workers with which such Contractor has a collective bargaining Contract or other contract or understanding and each vendor with which such

Contractor has a contract or understanding, a notice to be provided by the Commission advising the labor union or workers' representative of the Contractor's commitments under this Section, and to post copies of the notice in conspicuous places available to employees and applicants for employment;

3.      the Contractor agrees to comply with each provision of this Section and with each regulation or relevant order issued by said commission pursuant to Connecticut General Statutes §46a-56; and

4.      the Contractor agrees to provide the Commission with such information requested by the Commission, and permit access to pertinent books, records and accounts, concerning the employment practices and procedures of the Contractor which relate to the provisions of this Section and Connecticut General Statutes §46a-56.

e.      The Contractor shall include the provisions of subsection (d) of this Section in every subcontract or purchase order entered into in order to fulfill any obligation of a contract with the state, and in every subcontract entered into in order to fulfill any obligation of a municipal public works contractor contract for a quasi-public agency project, and such provisions shall be binding on a subcontractor, vendor or manufacturer unless exempted by regulations or orders of the Commission. The Contractor shall take such action with respect to any such subcontract or purchase order as the Commission may direct as a means of enforcing such provisions including sanctions for noncompliance in accordance with Connecticut General Statutes § 46a-56; provided, if such Contractor becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of such direction by the Commission, the Contractor may request the State of Connecticut to enter into any such litigation or negotiation prior thereto to protect the interests of the state and the state may so enter.

f.      Pursuant to subsection (c) of section 4a-60 and subsection (b) of section 4a-60a of the Connecticut General Statutes, the Contractor, for itself and its authorized signatory of this Contract, affirms that it understands the obligations of this section and that it will maintain a policy for the duration of the Contract to assure that the Contract will be performed in compliance with the nondiscrimination requirements of such sections. The Contractor and its authorized signatory of this Contract demonstrate their understanding of this obligation by either (A) having provided an affirmative response in the required online bid or response to a proposal question which asks if the contractor understands its obligations under such sections, or (B) initialing this nondiscrimination affirmation in the following box:



-4-

## II.    CERTIFICATION REGARDING OCCUPATIONAL SAFETY AND HEALTH ACT COMPLIANCE (CONN. GEN. STAT. §§ 31-57B)

I hereby certify that Contractor (1) has not been cited for three or more willful or serious violations of any occupational safety and health act or of any standard, order or regulation promulgated pursuant to such act, during the three-year period preceding the date of the Agreement, provided such violations were cited in accordance with the provisions of any state occupational safety and health act or the Occupational Safety and Health Act of 1970, and not abated within the time fixed by the citation and such citation has not been set aside following appeal to the appropriate agency or court having jurisdiction or (2) has not received one or more criminal convictions related to the injury or death of any employee in the three-year period preceding the date of the Agreement.

Signed: _____          Date: October 7, 2022

23090\7\4860-3827-2311.v1

**III.**    **CERTIFICATION REGARDING CAMPAIGN CONTRIBUTIONS** (CONN. GEN. STAT. § 9-612)

For all state contracts, defined in Section 9-612 of the Connecticut General Statutes as having a value in a calendar year of $50,000 or more, or a combination or series of such agreements or contracts having a value of $100,000 or more, the authorized signatory to this Agreement represents that they have received the State Elections Enforcement Commission's notice advising state contractors of state campaign contribution and solicitation prohibitions, and will inform its principals of the contents of the notice. *See* https://seec.ct.gov/Portal/data/forms/ContrForms/seec_form_10_final.pdf. The Consultant makes the representations set forth in the Campaign Contribution Certification (OPM Form 1) attached hereto.

Signed: _____    Date: October 7, 2022

23090\7\4860-3827-2311.v1

**SEEC FORM 10**
CONNECTICUT STATE ELECTIONS ENFORCEMENT COMMISSION
Rev. 07/18
Page 1 of 3



# Notice to Executive Branch State Contractors and Prospective State Contractors of Campaign Contribution and Solicitation Limitations

### *Acknowledgement of Receipt of Explanation of Prohibitions for Incorporation in Contracting and Bidding Documents*

This notice is provided under the authority of Connecticut General Statutes § 9-612 (f) (2) and is for the purpose of informing state contractors and prospective state contractors of the following law (italicized words are defined on the reverse side of this page).

## CAMPAIGN CONTRIBUTION AND SOLICITATION LIMITATIONS

No *state contractor, prospective state contractor, principal of a state contractor or principal of a prospective state contractor*, with regard to a *state contract* or *state contract solicitation* with or from a state agency in the executive branch or a quasi-public agency or a holder, or principal of a holder, of a valid prequalification certificate, shall make a contribution to (i) an exploratory committee or candidate committee established by a candidate for nomination or election to the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, Secretary of the State or State Treasurer, (ii) a political committee authorized to make contributions or expenditures to or for the benefit of such candidates, or (iii) a party committee (which includes town committees).

In addition, no holder or principal of a holder of a valid prequalification certificate shall make a contribution to (i) an exploratory committee or candidate committee established by a candidate for nomination or election to the office of state senator or state representative, (ii) a political committee authorized to make contributions or expenditures to or for the benefit of such candidates, or (iii) a party committee.

On and after January 1, 2011, no state contractor, prospective state contractor, principal of a state contractor or principal of a prospective state contractor, with regard to a state contract or state contract solicitation with or from a state agency in the executive branch or a quasi-public agency or a holder, or principal of a holder of a valid prequalification certificate, shall **knowingly** *solicit* contributions from the state contractor's or prospective state contractor's employees or from a *subcontractor* or *principals of the subcontractor* on behalf of (i) an exploratory committee or candidate committee established by a candidate for nomination or election to the office of Governor, Lieutenant Governor, Attorney General, State Comptroller, Secretary of the State or State Treasurer, (ii) a political committee authorized to make contributions or expenditures to or for the benefit of such candidates, or (iii) a party committee.

## DUTY TO INFORM

State contractors and prospective state contractors are required to inform their principals of the above prohibitions, as applicable, and the possible penalties and other consequences of any violation thereof.

## PENALTIES FOR VIOLATIONS

Contributions or solicitations of contributions made in violation of the above prohibitions may result in the following civil and criminal penalties:

**Civil penalties**—Up to $2,000 or twice the amount of the prohibited contribution, whichever is greater, against a principal or a contractor. Any state contractor or prospective state contractor which fails to make reasonable efforts to comply with the provisions requiring notice to its principals of these prohibitions and the possible consequences of their violations may also be subject to civil penalties of up to $2,000 or twice the amount of the prohibited contributions made by their principals.

**Criminal penalties**—Any knowing and willful violation of the prohibition is a Class D felony, which may subject the violator to imprisonment of not more than 5 years, or not more than $5,000 in fines, or both.

## CONTRACT CONSEQUENCES

In the case of a state contractor, contributions made or solicited in violation of the above prohibitions may result in the contract being voided.

In the case of a prospective state contractor, contributions made or solicited in violation of the above prohibitions shall result in the contract described in the state contract solicitation not being awarded to the prospective state contractor, unless the State Elections Enforcement Commission determines that mitigating circumstances exist concerning such violation.

The State shall not award any other state contract to anyone found in violation of the above prohibitions for a period of one year after the election for which such contribution is made or solicited, unless the State Elections Enforcement Commission determines that mitigating circumstances exist concerning such violation.

**SEEC FORM 10**
CONNECTICUT STATE ELECTIONS ENFORCEMENT COMMISSION
Rev. 07/18
Page 2 of 3



## DEFINITIONS

"State contractor" means a person, business entity or nonprofit organization that enters into a state contract. Such person, business entity or nonprofit organization shall be deemed to be a state contractor until December thirty-first of the year in which such contract terminates. "State contractor" does not include a municipality or any other political subdivision of the state, including any entities or associations duly created by the municipality or political subdivision exclusively amongst themselves to further any purpose authorized by statute or charter, or an employee in the executive or legislative branch of state government or a quasi-public agency, whether in the classified or unclassified service and full or part-time, and only in such person's capacity as a state or quasi-public agency employee.

"Prospective state contractor" means a person, business entity or nonprofit organization that (i) submits a response to a state contract solicitation by the state, a state agency or a quasi-public agency, or a proposal in response to a request for proposals by the state, a state agency or a quasi-public agency, until the contract has been entered into, or (ii) holds a valid prequalification certificate issued by the Commissioner of Administrative Services under section 4a-100. "Prospective state contractor" does not include a municipality or any other political subdivision of the state, including any entities or associations duly created by the municipality or political subdivision exclusively amongst themselves to further any purpose authorized by statute or charter, or an employee in the executive or legislative branch of state government or a quasi-public agency, whether in the classified or unclassified service and full or part-time, and only in such person's capacity as a state or quasi-public agency employee.

"Principal of a state contractor or prospective state contractor" means (i) any individual who is a member of the board of directors of, or has an ownership interest of five per cent or more in, a state contractor or prospective state contractor, which is a business entity, except for an individual who is a member of the board of directors of a nonprofit organization, (ii) an individual who is employed by a state contractor or prospective state contractor, which is a business entity, as president, treasurer or executive vice president, (iii) an individual who is the chief executive officer of a state contractor or prospective state contractor, which is not a business entity, or if a state contractor or prospective state contractor has no such officer, then the officer who duly possesses comparable powers and duties, (iv) an officer or an employee of any state contractor or prospective state contractor who has managerial or discretionary responsibilities with respect to a state contract, (v) the spouse or a dependent child who is eighteen years of age or older of an individual described in this subparagraph, or (vi) a political committee established or controlled by an individual described in this subparagraph or the business entity or nonprofit organization that is the state contractor or prospective state contractor.

"State contract" means an agreement or contract with the state or any state agency or any quasi-public agency, let through a procurement process or otherwise, having a value of fifty thousand dollars or more, or a combination or series of such agreements or contracts having a value of one hundred thousand dollars or more in a calendar year, for (i) the rendition of services, (ii) the furnishing of any goods, material, supplies, equipment or any items of any kind, (iii) the construction, alteration or repair of any public building or public work, (iv) the acquisition, sale or lease of any land or building, (v) a licensing arrangement, or (vi) a grant, loan or loan guarantee. "State contract" does not include any agreement or contract with the state, any state agency or any quasi-public agency that is exclusively federally funded, an education loan, a loan to an individual for other than commercial purposes or any agreement or contract between the state or any state agency and the United States Department of the Navy or the United States Department of Defense.

"State contract solicitation" means a request by a state agency or quasi-public agency, in whatever form issued, including, but not limited to, an invitation to bid, request for proposals, request for information or request for quotes, inviting bids, quotes or other types of submittals, through a competitive procurement process or another process authorized by law waiving competitive procurement.

"Managerial or discretionary responsibilities with respect to a state contract" means having direct, extensive and substantive responsibilities with respect to the negotiation of the state contract and not peripheral, clerical or ministerial responsibilities.

"Dependent child" means a child residing in an individual's household who may legally be claimed as a dependent on the federal income tax return of such individual.

"Solicit" means (A) requesting that a contribution be made, (B) participating in any fundraising activities for a candidate committee, exploratory committee, political committee or party committee, including, but not limited to, forwarding tickets to potential contributors, receiving contributions for transmission to any such committee, serving on the committee that is hosting a fundraising event, introducing the candidate or making other public remarks at a fundraising event, being honored or otherwise recognized at a fundraising event, or bundling contributions, (C) serving as chairperson, treasurer or deputy treasurer of any such committee, or (D) establishing a political committee for the sole purpose of soliciting or receiving contributions for any committee. "Solicit" does not include (i) making a contribution that is otherwise permitted under this chapter, (ii) informing any person of a position taken by a candidate for public office or a public official, (iii) notifying the person of any activities of, or contact information for, any candidate for public office, (iv) serving as a member in any party committee or as an officer of such committee that is not otherwise prohibited in this subdivision, or (v) mere attendance at a fundraiser.

"Subcontractor" means any person, business entity or nonprofit organization that contracts to perform part or all of the obligations of a state contractor's state contract. Such person, business entity or nonprofit organization shall be deemed to be a subcontractor until December thirty-first of the year in which the subcontract terminates. "Subcontractor" does not include (i) a municipality or any other political subdivision of the state, including any entities or associations duly created by the municipality or political subdivision exclusively amongst themselves to further any purpose authorized by statute or charter, or (ii) an employee in the executive or legislative branch of state government or a quasi-public agency, whether in the classified or unclassified service and full or part-time, and only in such person's capacity as a state or quasi-public agency employee.

"Principal of a subcontractor" means (i) any individual who is a member of the board of directors of, or has an ownership interest of five per cent or more in, a subcontractor, which is a business entity, except for an individual who is a member of the board of directors of a nonprofit organization, (ii) an individual who is employed by a subcontractor, which is a business entity, as president, treasurer or executive vice president, (iii) an individual who is the chief executive officer of a subcontractor, which is not a business entity, or if a subcontractor has no such officer, then the officer who duly possesses comparable powers and duties, (iv) an officer or an employee of any subcontractor who has managerial or discretionary responsibilities with respect to a subcontract with a state contractor, (v) the spouse or a dependent child who is eighteen years of age or older of an individual described in this subparagraph, or (vi) a political committee established or controlled by an individual described in this subparagraph or the business entity or nonprofit organization that is the subcontractor.

# SEEC FORM 10
**CONNECTICUT STATE ELECTIONS ENFORCEMENT COMMISSION**
Rev. 07/18
Page 3 of 3

| ACKNOWLEDGEMENT OF RECEIPT |
|---|

SIGNATURE

10/7/2022

DATE (mm/dd/yyyy)

## NAME OF SIGNER

| First Name | MI | Last Name | Suffix |
|---|---|---|---|
| Thomas | A. | Neyhart | |

## TITLE

CEO

## COMPANY NAME

PosiGen, Inc.

Additional information may be found on the website of the State Elections Enforcement Commission,
www.ct.gov/seec
Click on the link to "Lobbyist/Contractor Limitations"

**SCHEDULE C**

**Disclosure Schedule**

**SCHEDULE 4.23**
**OF THE DISCLOSURE SCHEDULES**

**Capitalization**
(*attached*)

**SCHEDULE 7.1(C)**
**OF THE DISCLOSURE SCHEDULES**

**Subordinating Lender Indebtedness**

1.  Secured Promissory Note dated April 29, 2022 by Borrower in favor of Mizzen Capital, LP in the amount of $7,500,000

2.  Secured Promissory Note dated April 29, 2022 by Borrower in favor of Stonehenge Community Impact Fund, LP in the amount of $7,500,000

3.  Secured Promissory Note dated June 24, 2022 by Borrower in favor of The Libra Foundation in the amount of $1,000,000

4.  Secured Promissory Note dated July 18, 2022 by Borrower in favor of Petunia, LLC in the amount of $750,000

5.  Secured Promissory Note dated July 18, 2022 by Borrower in favor of Amy Brakeman Investment Trust in the amount of $750,000

6.  Amended and Restated Secured Promissory Note dated September 13, 2022 by Borrower in favor of Ceniarth Wales Interest, LP in the amount of $2,000,000

7.  Secured Promissory Note dated September 13, 2022 by Borrower in favor of Bianca Passarelli in the amount of $500,000

# PBC Term Loan Credit Agreement
# First Amendment

# Dated April 21, 2023

*Execution Version*

## FIRST AMENDMENT TO TERM LOAN CREDIT AGREEMENT

This First Amendment to Term Loan Credit Agreement (this "Amendment"), dated as of April 21, 2023 (the "First Amendment Effective Date"), is entered into among PosiGen, Inc., a Delaware Corporation ("PosiGen") and Connecticut Green Bank, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, as the Lender (in such capacity, together with its successors and assigns in such capacity, the "Lender". Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement (defined below).

## BACKGROUND

A.      PosiGen and the Lender are party to that certain Term Loan Credit Agreement dated as of October 7, 2022 (as may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

B.      PosiGen has requested that Lender amend the Credit Agreement.

C.      Subject to the terms and conditions set forth in this Amendment, the Lender has agreed to amend the Credit Agreement as more fully set forth herein.

NOW THEREFORE, in consideration of the matters set forth in the recitals and the covenants and provisions herein set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

Section 1.      Amendments to the Credit Agreement. Effective upon satisfaction of the conditions precedent set forth in Section 3 below, the Credit Agreement is hereby amended as set forth in Annex I attached hereto (the "Amended Credit Agreement"). In Annex I hereto, deletions of text in the Amended Credit Agreement are indicated by stricken text, and insertions of text are indicated by double-underlined text. As so amended, the Credit Agreement shall continue in full force and effect.

Section 2.      Representations and Warranties. To induce the Agents and Lenders to execute this Amendment, PosiGen hereby represents and warrants to the Agents and the Lenders as follows:

(a)      the execution, delivery and performance of this Amendment and the other documents entered into in connection herewith (the "Amendment Documents") have been duly authorized by all requisite action of PosiGen, and this Amendment and the other Amendment Documents constitute the legal, valid and binding obligation of PosiGen, enforceable against PosiGen in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity and will not (i) contravene the terms of any of the organization documents of PosiGen, (ii) violate any law in any material respect, or (iii) conflict with or result in any material breach or contravention of any order, injunction, writ or decree of any Governmental Authority to which PosiGen or its property is subject;

(b)      The representations and warranties made by PosiGen, the PosiGen Backleverage and the Project Companies contained in the Credit Agreement are true and correct in all material respects as of the date hereof (except to the extent such representations and warranties expressly

refer to an earlier date, in which case they were true and correct in all material respects as of such earlier date). Any default by PosiGen in its warranties and representations made in this Amendment shall constitute an additional Event of Default under the Loan Documents as applicable; and

(c)     no Event of Default or Default has occurred and is continuing after giving effect to this Amendment and the other Amendment Documents.

Section 3.     <u>Conditions Precedent</u>.  This Amendment shall be effective as of the date first set forth above, subject to the receipt by Agents and Lenders of duly executed counterparts (where applicable) of the following, each in form and substance reasonably satisfactory to the Lenders, each duly executed by the parties thereto and dated as of the date hereof unless otherwise specified:

(a)  this Amendment, duly executed by PosiGen, the Agents, and the Lenders;

(b)  the Eleventh Amendment to Second Lien Credit Agreement, duly executed by PosiGen Backleverage, the Agents, and the Lenders;

(c)  PosiGen shall pay all reasonable and documented fees and expenses of Lenders in connection with the preparation, negotiation, execution, and delivery of this Amendment and any related documents, including, without limitation, the amendment fee, the reasonable and documented fees and expenses of its counsel and reasonable and documented out-of-pocket expenses, including reasonable due diligence expenses, incurred on or prior to the date hereof; and

(d)  such other assurances, certificates, documents, consents or opinions as the Agents reasonably may request.

Section 4.     <u>Miscellaneous</u>.

(a)     <u>Effect of Amendment</u>.   The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of any Lender under the Credit Agreement or any other Loan Document, or constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein.  Except as expressly set forth herein, the Credit Agreement and the other Loan Documents, and all terms and conditions of the Credit Agreement and the other Loan Documents, shall remain in full force and effect and all Obligations are hereby ratified and confirmed.  This Amendment shall constitute a "Loan Document" under the Credit Agreement.

(b)     <u>Affirmation</u>.  PosiGen hereby acknowledges, agrees and affirms its obligations under the Credit Agreement and the other Loan Documents (as modified and supplements in connection with the Amendment) and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects and hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party (after giving effect hereto) and (ii) ratifies and reaffirms the validity, enforceability and perfection of the grant of security interests and Liens provided for under the Loan Documents and confirms and agrees that such security interests and Liens secure all of the Obligations under the Loan Documents as amended by this Amendment.

(c)     <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts and by the different parties on separate counterparts, and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

2

Delivery of the executed counterpart of this Amendment by telecopy or electronic mail shall constitute effective delivery of such signature page.

(d)     <u>Successors and Assigns</u>.  This Amendment shall inure to the benefit of and be binding upon the successors and permitted assigns of the Lenders and shall be binding upon the successors and assigns of PosiGen.

(e)     <u>Severability</u>.     The illegality or unenforceability of any provision of this Amendment or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Amendment or any instrument or agreement required hereunder.

(f)     <u>Captions</u>.  Section captions used in this Amendment are for convenience only and shall not affect the construction of this Amendment.

(g)     <u>Entire Agreement</u>.     This Amendment together with the other Amendment Documents embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof.

(h)     <u>References</u>.     Any reference to the Credit Agreement contained in any notice, request, certificate, or other document executed concurrently with or after the execution and delivery of this Amendment shall be deemed to include this Amendment unless the context shall otherwise require.  Reference in any of this Amendment, the Credit Agreement or any other Loan Document to the Credit Agreement shall be a reference to the Credit Agreement as amended hereby and as further amended, modified, restated, supplemented or extended from time to time. References in the Credit Agreement (including references to the Credit Agreement as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Credit Agreement as amended hereby.

Section 5.     <u>Governing Law</u>.  This Amendment shall be governed in all respects by the laws of the State of New York without regard to conflicts of laws.

[signature page follows]

23090\7\4860-0729-7630.v3

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**POSIGEN**:

POSIGEN, INC.

By _____

Name: Thomas A. Neyhart
Title:   CEO

*[Signature Page to First Amendment to Term Loan Credit Agreement]*

**LENDER:**

CONNECTICUT GREEN BANK

By: _____

Name: Bryan Garcia

Title: CEO & President

## **ANNEX I**

**Amended Credit Agreement**
(*attached*)

*Execution Version*
*Conformed Through First Amendment*

## TERM LOAN CREDIT AGREEMENT

THIS TERM LOAN CREDIT AGREEMENT ~~("*Agreement*")~~ dated October 7, 2022 (the "*Closing Date*") (as amended by First Amendment dated April 21, 2023, and as may be further amended from time to time, this "*Agreement*"), is made and entered into by and between CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, having its mailing address at 75 Charter Oak Avenue, Hartford, Connecticut, 06106 (the "*Lender*") and POSIGEN, INC., a Delaware corporation, having its principal place of business at 819 Central Ave., Ste. 210, New Orleans, Louisiana, 70121 (the "*Borrower*"). The Lender, together with the Borrower, are each referred to herein as a "*Party*" and, collectively, the "*Parties*".

RECITALS

A.      In accordance with the Decision dated July 28, 2021, Docket No. 17-12-03RE03, *PURA Investigation into Distribution System Planning of the Electric Distribution Companies – Electronic Storage*, the State of Connecticut Public Utilities Regulatory Authority ("*PURA*") established Energy Storage Solutions ("*ESS*"), a program designed to expand the development of battery storage systems across the State of Connecticut, with enhanced incentives for deployment of said devices to Low Income (as defined below) households and households located in Underserved Communities (as defined below).

B.      The Borrower and its subsidiaries plan to participate in the ESS and to provide eighteen kilowatt hour (18kWh) batteries to the Borrower's new and existing customers in the State of Connecticut, with a focus on installing Batteries (as defined below) for Low Income customers and customers in Underserved Communities, in accordance with the terms and subject to the conditions of ESS.

C.      The Borrower and Generac (as defined below) are parties to that certain Guaranteed Incentive Program Agreement, dated as of August 30, 2022, attached hereto as **Exhibit A** (as amended from time to time, and including, as applicable, all amendments, exhibits, schedules, quotes, change notes, appendices, statements of work, work orders, purchase orders and/ or other similar ordering documents, or other similar documents related thereto, collectively, the "*Generac Agreement*"), pursuant to which the Borrower will purchase *PWRcell®* ~~battery storage systems~~batteries as the initial product offering to the Borrower's customers (each a "*Project*" and, collectively, the "*Projects*") for installation and connection to rooftop solar photovoltaic systems ~~(each a "*Project*" and, collectively, the "*Projects*")~~, as more particularly set forth in the Generac Agreement.

D.      The Projects are to be constructed by the Borrower and the Affiliates of Borrower at ESS-qualifying residential real property located in State of Connecticut (the location of the Projects, as such locations may change from time to time, being the "*Premises*").

E.      The Borrower desires to finance certain development costs of the Projects, including the battery purchases from Generac.

F.      The Borrower has, subject to the terms and conditions set forth in this Agreement, requested that the Lender make loans and other financial accommodations to the Borrower in an aggregate amount not to exceed the Term Loan Commitment (as defined below) to finance the purchase of the Projects.

G.      The Lender is willing to make such loans upon the terms and subject to the conditions of this Agreement.

NOW THEREFORE, in consideration of the premises and the respective representations, warranties, covenants, agreements, and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

## 1.      INCORPORATION OF PREAMBLE AND RECITALS; DEFINITIONS.

1.1     <u>Incorporation of Preamble and Recitals</u>.     The preamble and recitals set forth above are an integral part of this Agreement and set forth the intentions of the Parties and the premises on which the Parties have decided to enter into this Agreement.  Accordingly, the preamble and recitals set forth above, and all defined terms set forth in such preamble and in such recitals, are fully incorporated into this Agreement by this reference as if fully set forth herein.

1.2     <u>Definitions</u>.  Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement (including in the Recitals hereto):

"*Actual Loan Balance*" means, as of the time of calculation, the then-outstanding principal, accrued and unpaid interest, and other fees due hereunder.

"*Affiliate of Borrower*" means (a) any Person (i) in which Borrower holds any direct or indirect Equity Interest, (ii) who holds a direct or indirect Equity Interest in Borrower, (iii) Controls, is Controlled by, or is under common Control with Borrower.

"*Agreement*" has the meaning set forth in the Preamble to this Agreement.

"*Anti-Terrorism Law*" means the USA Patriot Act or any other law pertaining to the prevention of future acts of terrorism, in each case as such law may be amended from time to time.

"*Applicable Law*" means, as to any Person, all applicable constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules and regulations of any Governmental Authority binding upon such Person or to which such a Person is subject.

"*Authorized Officer*" means, with respect to any Person, any of the following officers: the President, the Chief Executive Officer, the Chief Financial Officer, the Treasurer, the Assistant Treasurer, the Controller or the Assistant Controller, the Manager, or such other Person

as is authorized in writing to act on behalf of such Person and is acceptable to the Lender. Unless otherwise qualified, all references herein to an Authorized Officer shall refer to an Authorized Officer of Borrower.

"***Available Borrowing Base***" means, as of any date of determination, the net present value of the Generac Guaranteed Payments and any customer payments, relating to the installation of the Pledged Collateral discounted by the weighted average of the Interest Rate of the Term Loan as of the date of determination.

"***Available Borrowing Base Certificate***" means a certificate from an authorized officer of the Borrower, in the form attached hereto as **Exhibit B**, containing the calculation of the Available Borrowing Base as of each Available Borrowing Base Determination Date determined in accordance with the Base Case Model updated as of such date.

"***Available Borrowing Base Determination Date***" means each date as of which the Available Borrowing Base is required to be calculated pursuant to Section 3.2.

"***Base Case Model***" means the comprehensive long-term financial model of the Term Loan as agreed between Borrower and Lender.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code, as amended from time to time, and all rules and regulations promulgated thereunder.

"***Battery***" means a Generac *PWRcell*® battery storage system(or batteries) connected or to be connected to a rooftop solar photovoltaic system.

"***Borrower***" has the meaning set forth in the Preamble to this Agreement.

"***Borrowing Request***" has the meaning set forth in Section 2.3(b).

"***Business Day***" means any day other than a Saturday, a Sunday or any other day on which commercial banks in the State of Connecticut or in the State of Louisiana are required or permitted by law to close.

"***Capitalized Lease Obligations***" means, with respect to any Person, all obligations under Capital Leases of such Person, without duplication, in each case taken at the amount thereof accounted for as liabilities identified as "capital lease obligations" (or any similar words) on a consolidated balance sheet of such Person prepared in accordance with GAAP.

"***Cash Available for Debt Service***" shall mean all cash available to Borrower for Debt Service including, but not limited to, the Customer Payments.

"***CERCLA***" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 *et seq.*

"***Change of Control***" means an event or series of events by which:

      (a)    a "person" or "group" within the meaning of Section 13(d) of the Exchange Act other than the Borrower, a direct or indirect Subsidiary of the Borrower, or any employee or executive benefit plan of the Borrower and/or its Subsidiaries, has become the "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of the Borrower's Common Stock representing more than fifty percent (50%) of the total voting power of all Common Stock of the Borrower then outstanding and constituting Voting Stock;

      (b)    the consummation of (i) any consolidation or merger of the Borrower pursuant to which the Borrower's Common Stock will be converted into the right to obtain cash, securities of a Person other than the Borrower, or other property or (ii) any sale, lease or other transfer in one transaction or a series of related transactions of all or substantially all of the consolidated assets of the Borrower and its Subsidiaries, taken as a whole, to any other Borrower other than a direct or indirect Subsidiary of the Borrower; *provided*, *however*, that a transaction described in clause (i) or (ii) in which the holders of the Borrower's Common Stock immediately prior to such transaction own or hold, directly or indirectly, more than fifty percent (50%) of the voting power of all Common Stock of the continuing or surviving corporation or the transferee, or the parent thereof, outstanding immediately after such transaction and constituting Voting Stock shall not constitute a Change of Control; or

      (c)    during any period of twelve (12) consecutive months, a majority of the members of the board of directors (or other governing body) of the Borrower cease to be composed of individuals (i) who were members of the board of directors (or other governing body) of the Borrower on the first day of such period, (ii) whose election or nomination to the board of directors (or other governing body) of the Borrower was approved by individuals referred to in the immediately preceding clause (i) constituting at the time of such election or nomination at least a majority of the board of directors (or other governing body) of the Borrower, or (iii) whose election or nomination to the board of directors (or other governing body) of the Borrower was approved by individuals referred to in the immediately preceding clauses (i) and (ii) constituting at the time of such election or nomination at least a majority of the board of directors (or other governing body) of the Borrower.

"***Charged-Off Project***" shall mean a Project the subject of a continuing event described in clauses (a), (b), (c) or (d) of the definition of "Customer Prepayment Event".

"***Claims***" has the meaning set forth in the definition of "Environmental Claims".

"***Closing Date***" has the meaning set forth in the Preamble to this Agreement.

"***Collateral***" means any collateral (whether real property or personal property) covered by any Collateral Document or Loan Document.

"***Collateral Accounts***" shall mean collectively the Generac Guaranteed Payments Account and the Customer Payments Account.

"***Collateral Documents***" means the Security Agreement, the Control Agreements, the Lien Subordination Agreement, any other document or agreement pursuant to which any Lien is granted or perfected by the Borrower to the Lender as security for any of the Obligations, and all UCC or other financing statements, instruments or perfection and other filings, recordings and registrations required to be filed or made in respect of any of the foregoing.

"***Common Stock***" means the Borrower's common stock, par value $0.001 per share.

"***Control***" shall mean, with respect to any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise (the terms "***Controlling***" and "***Controlled***" shall have meanings correlative to the foregoing).

"***Control Agreement***" shall mean a deposit account, securities account or commodities account agreement by and among the Borrower, the Lender, and First Horizon Bank as Depositary Institution (or any other applicable Depositary Institution) thereunder, each in form and substance reasonably satisfactory to the Lender and in any event providing the Lender with full dominion and exclusive "control" of such deposit account, securities or commodities account within the meaning of Articles 8 and 9 of the UCC.

"***Customer***" means a Connecticut homeowner who leases a Battery and Project Equipment from Borrower or an Affiliate of Borrower.

"***Customer Agreement***" means those certain lease agreements between a Customer and Borrower or an Affiliate of Borrower (together with all ancillary agreements and documents related thereto, including any assignment agreement to a replacement Customer), entered into from time to time, for the use of a Battery or the Project Equipment.

"***Customer Payment***" means a monthly payment paid by a Connecticut homeowner to Borrower or an Affiliate of Borrower pursuant to a Customer Agreement.

"***Customer Payments Account***" means the deposit, securities or commodities account in the name of the Borrower receiving the revenues from the Customer Payments from any Customer and subject to a Control Agreement.

"***Customer Prepayment Event***" shall mean the occurrence of any of the following:

        (a)     any Project Equipment experiences an Event of Loss and is not repaired, restored, replaced or rebuilt to substantially the same condition as existed

immediately prior to the Event of Loss within one hundred eighty (180) days of such Event of Loss;

(b)    the early termination of any Customer Agreement (including, but not limited to, as a result of the occurrence of a default thereunder or otherwise removed from the Customer's home and is in the process of being redeployed);

(c)    in respect of any Project Equipment, the applicable Customer is more than one hundred twenty (120) days past due on any amount due under the related Customer Agreement;

(d)    the sale or disposition of any Project Equipment attributable to court order, litigation or Debtor Relief Law;

(e)    the elective prepayment by the Customer of any future amounts due under a Customer Agreement;

(f)    the purchase of any Project Equipment by a Customer in accordance with the terms of the applicable Customer Agreement; or

(g)    the sale or disposition of any Project Equipment other than as identified above.

"**DC Green Finance Authority**" means the Green Finance Authority, an independent instrumentality of the District of Columbia Government.

"**Debt**" means, with respect to any Person, (i) Indebtedness of such Person for borrowed money, (ii) obligations of such Person evidenced by bonds, debentures, notes or other similar instruments related to transactions that are classified as financings under GAAP, (iii) obligations of such Person to pay the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business that are unsecured and not overdue by more than six (6) months), (iv) obligations of such Person as lessee under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, (v) obligations secured by an adverse claim upon property or assets owned (under GAAP) by such Person, even though such Person may not have assumed or become liable for the payment of such obligations and (vi) obligations of such Person under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor, against loss in respect of, Indebtedness or obligations of others of the kinds referred to in clauses (i) through (v) above.

"**Debt Service**" shall mean, for any period, the aggregate amount of all principal, interest, fees payable to lenders, agency fees, margin and payments in the nature of interest under this Agreement and, to the extent collateralized by the same Collateral as under the Collateral Documents, the Subordinating Lender Facilities.

"**Debt Service Coverage Ratio**" shall mean, for any calculation period, the ratio of: (i) the Cash Available for Debt Service for such period; to (ii) the Debt Service for such period.

"**_Debtor Relief Laws_**" shall mean the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"**_Default_**" means any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"**_Default Rate_**" means, for any day, with respect to the Term Loan, a rate per annum equal to the lesser of: (i) eight percent (8.0%); or (ii) the maximum rate of interested which may be collected from Borrower under Applicable Law.

"**_Delinquent Project_**" shall mean a Project that is not a Charged-Off Project and (a) for which all or a portion of any Customer Payment is more than thirty (30) days delinquent or (b) with respect to which Lender shall have determined in good faith that the related Customer will not resume making Customer Payments.

"**_Delinquency Ratio_**" shall mean, as of the last day of each calendar month, the percentage equivalent of a fraction: (i) the numerator of which is the aggregate outstanding Customer Agreement balance of all Delinquent Projects included in the Collateral as of the last day of the immediately preceding calendar month; and (ii) the denominator of which is the aggregate outstanding Customer Agreement balance of all Projects which have achieved Project Completion and that are included in the Collateral as of the last day of the immediately preceding calendar month.

"**_Depository Institution_**" shall mean IberiaBank, and its successors and assigns in such capacity in accordance with the Depositary Agreement.

"**_Designated Jurisdiction_**" means any country or territory to the extent that such country or territory is the subject of any Sanction.

"**_Disclosure Schedule_**" means the Disclosure Schedule attached hereto as **<u>Schedule C</u>**.

"**_Dollars_**", "**_U.S. Dollars_**", and the sign "$" each means lawful money of the United States.

"**_Environmental Claims_**" means any and all global, regulatory or judicial actions, suits, demands, demand letters, claims, Liens, notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law or any Permit issued under any such law (hereafter "**_Claims_**"), including, without limitation, (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the storage, treatment or Release (as defined in CERCLA) of any

Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"***Environmental Laws***" means any federal, state, territorial, provincial or local law, common law doctrine, rule, order, decree, judgment, injunction, license, Permit or regulation relating to environmental matters, including those pertaining to land use, air, soil, service water, ground water, public or employee health or safety or any other environmental matter, together with any other laws relating to emissions, discharges, releases or threatened releases of any Hazardous Materials, toxic or hazardous substance, pollutant or contaminant, including, without limitation, medical, chemical, biological, biohazardous or radioactive waste and materials or otherwise relating to the manufacture, processing, distribution, use, achievement, storage, disposal, transportation, discharge or handling of any Hazardous Materials, toxic or hazardous substance, pollutant or contaminant.

"***Environmental Liabilities and Costs***" means all liabilities, monetary obligations, remedial actions, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any Environmental Claim which relate to any environmental condition or a release, use, handling, storage or treatment of Hazardous Materials by Borrower or a predecessor in interest from or onto the Borrower's Real Property.

"***Equity Interest***" means, with respect to a Person, any and all shares, rights to purchase, options, warrants, general, limited or limited liability partnership interests, member interests, participation or other equivalents of or interest in (regardless of how designated) equity of such Person, whether voting or nonvoting, including common stock, preferred stock, convertible securities or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the SEC under the Exchange Act).

"***ERISA***" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the Closing Date and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"***ERISA Affiliate***" means each Person (as defined in Section 3(9) of ERISA), which together with Borrower or a Subsidiary of Borrower, would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or 4001(b)(i) of ERISA or (ii) as a result of Borrower or a Subsidiary of Borrower being or having been a general partner of such Person.

"***ERISA Event***" means: (i) that a Reportable Event has occurred with respect to any Plan; (ii) the institution of any steps by Borrower or any Subsidiary, any ERISA Affiliate, the PBGC or any other Person to terminate any Plan or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan; (iii) the institution of any steps by Borrower or any Subsidiary or any ERISA Affiliate to withdraw from any Multi-Employer Plan or Multiple Employer Plan, if

23090\7\4864-3945-2453.v14
23090\7\4887-6256-2398.v4

such withdrawal could result in withdrawal liability (as described in Part 1 of Subtitle E of Title IV of ERISA or in Section 4063 of ERISA) in excess of $2,000,000; (iv) a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA in connection with any Plan; (v) that a Plan has Unfunded Benefit Liabilities exceeding $2,000,000; (vi) the cessation of operations at a facility of Borrower or any Subsidiary or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (vii) the conditions for imposition of a Lien under Section 303(k) of ERISA shall have been met with respect to a Plan; (viii) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 206(g) of ERISA; (ix) the insolvency of or commencement of reorganization proceedings with respect to a Multi-Employer Plan; (x) any material increase in the contingent liability of Borrower or any Subsidiary with respect to any post-retirement welfare liability; or (xi) the taking of any action by, or the threatening of the taking of any action by, the Internal Revenue Service, the Department of Labor or the PBGC with respect to any of the foregoing.

"**ESS Active Dispatch Incentives**" means the payments administered under the ESS at a rate of: (i) Two Hundred AND No/100 Dollars ($200.00) per dispatched Battery kilowatt capacity for the period beginning June 1st and ending on September 30th during each year for the first five (5) years following Project Completion, and One Hundred Fifteen AND No/100 Dollars ($115.00) per dispatched Battery kilowatt capacity during each year for years six (6) through ten (10) following Project Completion; and (ii) Twenty-Five AND No/100 Dollars ($25.00) per dispatched Battery kilowatt capacity for the period beginning on November 1st and ending on March 1st during each year for the first five (5) years following Project Completion, and Fifteen AND No/100 Dollars ($15.00) per dispatched Battery kilowatt capacity during each year for years six (6) through ten (10) following Project Completion.

"**ESS Incentive Payments**" means, collectively, the ESS Active Dispatch Incentives and the ESS Passive Dispatch Incentives.

"**ESS Passive Dispatch Incentives**" means the payments administered under the ESS, through December 31, 2024, at a rate of: (i) Three Hundred AND No/100 Dollars ($300.00) per Battery kilowatt hour for Customers located in Underserved Communities, (ii) Four Hundred AND No/100 Dollars ($400.00) per Battery kilowatt hour for LMI Customers, and (iii) Two Hundred AND No/100 Dollars ($200.00) per Battery kilowatt hour for all other Customers.

"**Event of Default**" has the meaning set forth in Section 8.1 hereof.

"**Event of Loss**" shall mean (a) an event which causes all or a major portion of any Collateral be damaged, destroyed or rendered unfit for normal use for any reason whatsoever (including any covered loss under a casualty insurance policy) and (b) any compulsory transfer or taking, or transfer under threat of compulsory transfer, of any Collateral pursuant to the power of eminent domain, condemnation or otherwise.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended.

"**Favorable Pricing**" means the monthly charges to LI Customers and Customers residing in Underserved Communities, as provided in the applicable Customer Agreements, and

as provided to Lender in each Borrowing Request, enabled by elevated tax incentives contained in the Inflation Reduction Act of 2022.

"*FERC*" shall mean the Federal Energy Regulatory Commission, and any successor authority.

"*First Amendment Effective Date*" means April 21, 2023.

"*First Lien Backleverage ~~Lender~~Agent*" means ~~Forbright Bank, a Maryland chartered bank~~, BID Administrator LLC, a Delaware limited liability company, in its capacity as administrative and collateral agent for the First Lien Backleverage Lenders.

"*First Lien Backleverage Lenders*" means, collectively, the "lenders" from time to time party to the First Lien Backleverage Credit Agreement.

"*First Lien Backleverage Credit Agreement*" means that certain Credit Agreement dated ~~September 28~~April 21, ~~2021~~2023 by and between PosiGen Backleverage, as borrower, ~~and Forbright Bank, a Maryland chartered bank, as lender~~the lenders from time to time party thereto, and the First Lien Backleverage Agent, administrative agent, ~~and~~ collateral agent, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

"First Lien Backleverage Facility" means that certain credit facility created under the First Lien Back Leverage Credit Agreement and the Loan Documents, as defined in the First Lien Backleverage Credit Agreement.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time.

"*Generac*" means Generac Grid Services LLC, a Delaware limited liability company and its affiliates, a U.S. manufacturer of backup power generation products for residential, light commercial and industrial markets.

"*Generac Guaranteed Payments*" means the "Payments" (as such term is defined in the Generac Agreement) made by Generac to Borrower pursuant to the Generac Agreement, which payments are, among other things, underwritten by Generac's receipt of the ESSP Incentive Payments.

"*Generac Guaranteed Payments Account*" means the deposit, securities or commodities account in the name of Borrower receiving the Generac Guaranteed Payments from Generac and subject to a Control Agreement.

"*Generac Agreement*" has the meaning set forth in the Preamble to this Agreement.

"**_Governmental Authority_**" means, with respect to any Person, any federal or state or local government or other political subdivision thereof or any entity, including any regulatory or administrative authority (including FERC) or court, exercising executive, legislative, judicial, regulatory or administrative or quasi-administrative functions of or pertaining to government and shall include any supra-national bodies (such as the European Union or the European Central Bank).

"**_Hazardous Materials_**" means (i) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; and (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous wastes," "restrictive hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar meaning and regulatory effect, under any applicable Environmental Law.

"**_HMT_**" has the meaning specified in the definition of "Sanctions".

"**_Indebtedness_**" of any Person means without duplication:

> (i)    all indebtedness of such Person for borrowed money;

> (ii)    all bonds, notes, debentures and similar debt securities of such Person;

> (iii)    the deferred purchase price of capital assets or services that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person;

> (iv)    the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder;

> (v)    all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

> (vi)    all indebtedness of a second Person secured by any Lien on any property owned by such first Person, whether or not such indebtedness has been assumed;

> (vii)    all Capitalized Lease Obligations of such Person;

> (viii)    the present value, determined on the basis of the implicit interest rate, of all Synthetic Lease Obligations of such Person;

> (ix)    all obligations of such Person with respect to asset securitization financing;

(x)    all obligations of such Person to pay a specified purchase price for goods or services whether or not delivered or accepted, *i.e.*, take-or-pay and similar obligations, in each case that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person;

(xi)    the full outstanding balance of trade receivables, notes or other instruments sold with full recourse (and the portion thereof subject to potential recourse, if sold with limited recourse), other than in any such case any thereof sold solely for purposes of collection of delinquent accounts; and

(xii)    all guaranty obligations of such Person;

*provided*, *however*, that (x) neither trade payables, deferred revenue, taxes nor other similar accrued expenses, in each case arising in the ordinary course of business, shall constitute Indebtedness; and (y) the Indebtedness of any Person shall in any event include (without duplication) the Indebtedness of any other entity (including any general partnership in which such Person is a general partner) to the extent such Person is liable thereon as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide expressly that such Person is not liable thereon.

"***Inflation Reduction Act of 2022***" means the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022).

"***Insolvency Event***" means, with respect to any Person:

(i)    the commencement of a voluntary case by such Person under the Bankruptcy Code or the seeking of relief by such Person under any bankruptcy or insolvency or analogous law in any jurisdiction outside of the United States;

(ii)    the commencement of an involuntary case against such Person under the Bankruptcy Code or any bankruptcy or insolvency or analogous law in any jurisdiction outside of the United States and the petition or application is not controverted within thirty (30) days, or is not dismissed within sixty (60) days, after commencement of the case;

(iii)    a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of such Person;

(iv)    such Person commences (including by way of applying for or consenting to the appointment of, or the taking of possession by, a rehabilitator, receiver, custodian, trustee, conservator or liquidator (collectively, a "conservator") of such Person or all or any substantial portion of its property) any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation, rehabilitation, conservatorship or similar law of any jurisdiction whether now or hereafter in effect relating to such Person;

(v)    any such proceeding of the type set forth in clause (iv) above is commenced against such Person to the extent such proceeding is consented to by such Person or remains undismissed for a period of sixty (60) days;

(vi)    such Person is adjudicated insolvent or bankrupt;

(vii)    any order of relief or other order approving any such case or proceeding is entered;

(viii)    such Person suffers any appointment of any conservator or the like for it or any substantial part of its property that continues undischarged or unstayed for a period of sixty (60) days;

(ix)    such Person makes a general assignment for the benefit of creditors or generally does not pay its debts as such debts become due; or

(x)    any corporate (or similar organizational) action is taken by such Person for the purpose of effecting any of the foregoing.

"*Intercreditor Agreement*" means that certain Amended and Restated Intercreditor Agreement, dated as of September 28, 2021the First Amendment Effective Date, by and between the Lender, First Lien Backleverage LenderAgent, DC Green Finance Authority, Borrower, PosiGen Backleverage, and PosiGen Backleverage Holdco, LLC, a Delaware limited liability company, and PosiGen, LLC, a Louisiana limited liability company (as the same may be amended, restated, supplemented or otherwise modified from time to time).

"*Interest Rate*" has the meaning set forth in Section 2.6 hereof.

"*Internet*" means the collection of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the "transmission control protocol/internet protocol", or any predecessor or successor protocols to such protocol, and includes the world wide web.

"*Laws*" shall mean, collectively, all international, foreign, federal, state and local statutes, common law, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and Permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"*Leaseholds*" of any Person means all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"*Lender*" has the meaning set forth in the Preamble to this Agreement.

"***Lien***" means, with respect to any property or assets, any lien, hypothecation, encumbrance, assignment for security, charge, mortgage, pledge, security interest or other preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement) or similar lien.

"***LI***" means low-income, defined as households with annual income below sixty percent (60%) of Connecticut area median income.

"***LI Customer***" means a Customer: (i) whose Battery qualifies for enhanced ESS Incentive Payments for LI households; (ii) who has been qualified for a low to moderate income performance based incentive under Lender's Residential Solar Investment Program; or (iii) who resides in an Underserved Community.

"***LI Portion***" means the portion of the Term Facility Exposure used to provide Batteries to LI Customers.

"***Lien Subordination Agreement***" means that certain Lien Subordination Agreement, dated as of the date hereof, by and among Lender, Borrower, Mizzen Capital, LP, a Delaware limited partnership, and Stonehenge Community Impact Fund, LP, a Delaware limited partnership, substantially in the form attached hereto as **Exhibit C**.

"***Liquidity***" shall mean, as of any date of determination, an amount equal to unrestricted cash reserves on hand.

"***Loan Documents***" means this Agreement, the Term Note(s), the Collateral Documents, the Generac Agreement and such other documents, instruments and certificates delivered in connection with the Obligations.

"***Low Income***" means households with income below sixty percent (60%) of Connecticut area median income.

"***Margin Stock***" has the meaning provided in Regulation U.

"***Material Adverse Effect***" means any or all of the following: (i) any material adverse effect on the business, operations, property, assets, liabilities, or condition (financial or otherwise) of Borrower or its Subsidiaries, taken as a whole; (ii) any material adverse effect on the ability of Borrower to perform its obligations under any of the Loan Documents to which it is a party; (iii) any material adverse effect on the validity, effectiveness or enforceability, as against the Borrower, of any of the Loan Documents to which it is a party; (iv) any material adverse effect on the rights and remedies of the Lender under any Loan Document; or (v) any material adverse effect on the validity, perfection or priority of any Lien in favor of the Lender on any material portion of the Collateral.

"***Maturity Date***" means the earlier to occur of: (i) the date that is the ten (10) year anniversary of the Closing Date; and (ii) the date that the Term Loan is accelerated pursuant to Section 8.3 hereof.

"***Minimum Borrowing Amount***" means One Hundred Thousand AND No/100 Dollars ($100,000), with minimum increments thereafter of One Thousand AND No/100 Dollars ($100,000).

"***Multi-Employer Plan***" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding five (5) plan years made or accrued an obligation to make contributions.

"***Multiple Employer Plan***" means an employee benefit plan, other than a Multi-Employer Plan, to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate, and one or more employers other than Borrower or a Subsidiary of Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which Borrower or a Subsidiary of Borrower or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five (5) plan years preceding the date of termination of such plan.

"***Non-LI Portion***" has the meaning set forth in Section 2.6(a)(2) hereof.

"***Notice Office***" means the office of the Lender at 75 Charter Oak Ave., Hartford, Connecticut 06106 Attention: Bert Hunter (CIO), or such other office as the Lender may designate in writing to Borrower from time to time.

"***Obligations***" means any and all obligations, liabilities, covenants and agreements of Borrower under the Loan Documents, and any and all costs and expenses of, or incurred by, Lender in collecting any of the foregoing and in enforcing the provisions of this Agreement, including all court costs and/or reasonable attorneys' fees and expenses in any action between Lender and Borrower and/or Lender and any third party based on the Loan Documents, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest that would accrue on any of the foregoing during the pendency of any bankruptcy or related proceeding with respect to the Borrower, regardless of whether such interest and fees are allowed claims in such proceeding. .

"***OFAC***" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"***Organizational Documents***" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or

organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"*Party*" or "*Parties*" each has the meaning set forth in the Preamble to this Agreement.

"*Payment Due Date*" means, with respect to each advance under the Term Loan, the date that is the first day of each calendar Quarter beginning with the Principal Repayment Start Date and on the first day of each calendar quarter thereafter; *provided*, *however*, if any applicable day identified above is not a Business Day, the Payment Due Date shall be extended to the next succeeding Business Day.

"*Payment Office*" means the office of the Lender at 75 Charter Oak Ave., Hartford, Connecticut 06106 Attention: Head of Finance and Administration, or such other office as the Lender may designate in writing to Borrower from time to time.

"*PBGC*" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"*Permits*" shall mean any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required to be obtained from a Governmental Authority under any Law, rule or regulation.

"*Permitted Backleverage Refinancing*" means, with respect to any Indebtedness owing by PosiGen Backleverage, any extensions, renewals and replacements of such Indebtedness; provided that such extension, renewal or replacement (a) shall not increase the outstanding principal amount of such Indebtedness beyond amounts permitted under the Intercreditor Agreement, and (b) contains terms relating to outstanding principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole no less favorable in any material respect to PosiGen Backleverage and its Subsidiaries than the terms of any agreement or instrument governing such existing indebtedness

"*Permitted Encumbrances*" means: (a) Liens securing taxes, assessments and/or governmental charges and/or levies or the claims of materialmen, mechanics, carriers, warehousemen, landlords and other similar Persons, the payment of which is not currently due and payable; (b) Liens in favor of Lender; (c) Liens in favor of other lenders existing prior to the Closing Date as disclosed to and approved by Lender, including liens in favor of Subordinating Lenders; and (d) Liens on the Pledged Collateral in favor of First Lien Backleverage ~~Lender~~Agent, but only to the extent that such First Lien Backleverage ~~Lender~~Agent's Liens on the Pledged Collateral are subordinate to the Lender's Liens on such Pledged Collateral.

"*Permitted Indebtedness*" shall have the meaning given to it in Section 7.1 hereof.

"**_Person_**" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, institution, entity, party, corporation, limited liability company, or government agency (whether national, federal, state, county, city, municipal, or otherwise), including any instrumentality, division, agency, body or department thereof.

"**_Plan_**" means any Multi-Employer Plan, Multiple Employer Plan or Single-Employer Plan.

"**_Pledged Collateral_**" has the meaning ascribed to such term in the Security Agreement.

"**_PosiGen Backleverage_**" means PosiGen Backleverage, LLC, a Delaware limited liability company.

"**_Premises_**" has the meaning set forth in the Recitals to this Agreement.

"**_Principal Repayment Start Date_**" means, with respect to each Term Loan Borrowing, the date that is the first day of the calendar Quarter immediately following the six (6) month anniversary of the Working Capital Loan Conversion Date.

"**_Proceeds_**" means any and all consideration received from the sale, exchange, collection or other disposition of any asset or property that constitutes Pledged Collateral, any value received as a consequence of the possession of any Pledged Collateral, any payment received from any insurer or other person or entity as a result of the destruction, loss, theft, damage or other involuntary conversion of whatever nature of any asset or property which constitutes Pledged Collateral, and shall include all cash and negotiable instruments received or held on behalf of Lender relating to the payment of accounts and any and all property of whatever nature received and/or held by Borrower or on behalf of Lender.

"**_Project_**" or "**_Projects_**" each has the meaning set forth in the Recitals to this Agreement.

"**_Project Completion_**" means, with respect to any Project, the point at which a Battery and related Project Equipment: (i) is fully installed at the Premises; (ii) is connected to a rooftop solar photovoltaic system, (iii) is capable of storing measurable amounts of energy; and (iv) for which a PTO Letter has been received, if required.

"**_Project Equipment_**" means all of the Generac battery storage systems, component parts, wiring, replacement parts, and hardware necessary to construct the Projects, whether now owned or acquired after the date of this Agreement.

"**_PTO Letter_**" shall mean, with respect to a Project, a permission to operate letter or its functional equivalent as issued by the connecting utility authorizing the operation of such Project.

"**_Real Property_**" of any Person shall mean all of the right, title and interest of such Person in and to land, improvements and fixtures, including, but not limited to, any Leaseholds.

"*Regulation U*" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"*Reportable Event*" means an event described in Section 4043 of ERISA or the regulations thereunder with respect to a Plan, other than those events as to which the notice requirement is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, .35, .62, .63, .64, .65 or .67 of PBGC Regulation Section 4043.

"*Requirements of Law*" as to any Person, the articles or certificate of incorporation, declaration of trust, partnership agreement and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its material property or to which such Person or any of its material property is subject.

"*Quarter*" means a quarterly period measured based on a calendar year.

"*Sanction*" means any trade, economic or financial sanction, embargo or restrictive measures administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("*HMT*"), the Government of Canada (including Global Affairs Canada and Public Safety Canada) or other relevant sanctions authority.

"*Second Lien Backleverage Credit Agreement*" means that certain Credit Agreement, dated December 12, 2018, by and between PosiGen Backleverage, as borrower, and Lender, as lender, administrative agent, and collateral agent, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

"*Secured Parties*" means the Lender and each other financial institution party hereto as a Lender from time to time, with each individually a "*Secured Party*".

"*Security Agreement*" means that certain Security and Pledge Agreement, dated as of the date hereof, by and among Borrower, as pledgor, and Lender, as pledgee, substantially in the form attached hereto as **Exhibit D**, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

"*Single Employer Plan*" means a single-employer plan, as defined in Section 4001(a)(15) of ERISA, to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which Borrower or any Subsidiary of Borrower or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five (5) plan years preceding the date of termination of such plan.

"*Subordinating Lender Documents*" means, collectively, the documents evidencing the Subordinating Lender Facilities.

"***Subordinating Lender Facilities***" means, collectively, the credit facilities provided by the Subordinating Lenders.

"***Subordinating Lender Indebtedness***" has the meaning set forth in Section 7.1(c) hereof.

"***Subordinating Lenders***" means, collectively, Mizzen Capital, LP, a Delaware limited partnership, Stonehenge Community Impact Fund, LP, a Delaware limited partnership, and Reinvestment Fund, Inc., a Pennsylvania not-for-profit corporation.

"***Subsidiary***" of a Person shall mean a corporation, partnership, limited liability company or other business entity of which the shares of the securities is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"***Synthetic Lease Obligations***" means, as to any person, an amount equal to the capitalized amount of the remaining lease payments under any synthetic lease that would appear on a balance sheet of such person in accordance with GAAP if such obligations were accounted for as Capitalized Lease Obligations.

"***Tangible Net Worth***" shall mean, for any Person, such Person's: (i) assets; <u>minus</u> (ii) liabilities; <u>minus</u> (iii) any intangible assets of such person, including goodwill, trademarks, tradenames, copyrights, patents, patent allocations, licenses and rights in any of the foregoing and other items treated as intangibles, in each case as determined in accordance with GAAP, <u>minus</u> (iv) amounts due to such Person from any of its Affiliates in each case as determined in accordance with GAAP.

"***Term Loan***" has the meaning set forth in Section 2.1 hereof.

"***Term Loan Borrowing***" means all Term Loan advances made on the same day.

"***Term Loan Commitment***" means the obligation of the Lender to make the Term Loan to the Borrower pursuant to Section 2.1, in an aggregate principal amount, as of the Closing Date, not to exceed Six Million AND No/100 Dollars ($6,000,000.00) at any one time outstanding, as such amount may be adjusted from time to time in accordance with this Agreement.

"***Term Facility Exposure***" means, for the Lender at any time, the aggregate principal amount of Term Loan made by the Lender and outstanding at such time.

"***Term Note***" has the meaning set forth in Section 2.5(b) hereof.

"***UCC***" shall mean the Uniform Commercial Code as in effect from time to time in the State of Connecticut.

"***Underserved Communities***" means (i) "distressed municipalities", as such term is defined in the State Commerce Act, Connecticut General Statutes §§ 32-1a, *et. seq.*, as amended from time to time; and (ii) multifamily affordable housing.

"***Unfunded Benefit Liabilities***" of any Plan means the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"***USA Patriot Act***" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"***Voting Stock***" means securities entitled to vote generally in the election of directors (or similar governing bodies).

"***Withdrawn Collateral***" has the meaning set forth in Section 2.7(b) hereof.

"***Waiver and Consent Under Intercreditor Agreement***" means that certain Waiver and Consent Under Intercreditor Agreement, dated ~~on or about the date hereof~~October 7, 2022, by and between the Lender, ~~First Lien Backleverage Lender~~Forbright Bank, a Maryland Chartered Bank, the Second Lien Agent (as defined therein), and DC Green Finance Authority.

"***Working Capital Loan***" means that certain revolving loan in an amount not to exceed Two Million AND No/100 Dollars ($2,000,000.00) advanced by Lender to Borrower pursuant to that certain Revolving Credit Agreement dated as of the date hereof.

"***Working Capital Assets***" means the Project Equipment securing Borrower's obligations to repay the Working Capital Loan.

"***Working Capital Loan Conversion Date***" means the date on which the Working Capital Assets become Pledged Collateral hereunder.

## 2.   TERM LOAN COMMITMENT; GENERAL TERMS.

2.1   <u>Term Loan Commitment</u>.  Subject to the terms and conditions hereof, the Lender agrees to make one or more advances of a term loan in the aggregate principal amount not to exceed the Term Loan Commitment of the Lender (the "***Term Loan***") by submitting a Borrowing Request to the Lender in accordance with Section 3.2 of this Agreement.

2.2   <u>Repayment of Term Loan</u>.  The Borrower shall repay to the Lender, the then-unpaid principal amount (together with accrued and unpaid interest and other amounts) of the Term Loan of the Lender on the Maturity Date.

2.3   <u>Borrowing Request; Minimum Borrowing Amount</u>.

(a)   *Time of Notice*.  Each Term Loan Borrowing of the Term Loan shall be made upon notice in the form provided for below which shall be provided by the

Borrower to the Lender not later than 1:00 P.M. (Lender's local time) at least five (5) Business Days prior to the date of such Term Loan Borrowing, in each case, in accordance with the notice provisions set forth in Section 9.9 hereof.

(b)     *Borrowing Request*.  Each request for a Term Loan Borrowing shall be made by an Authorized Officer of the Borrower no more than once per calendar month by delivering written notice of such request, substantially in the form attached hereto as **Exhibit E** (each such request, a "***Borrowing Request***"), and each such request shall be irrevocable and shall specify, among other things, (i) the principal amount of the advance under the Term Loan to be made pursuant to such Term Loan Borrowing and (ii) the date of the Term Loan Borrowing (which shall be a Business Day).

(c)     *Minimum Borrowing Amount*.  The aggregate principal amount of each Term Loan Borrowing by the Borrower shall not be less than the Minimum Borrowing Amount.

2.4     Funding Obligations; Disbursement of Funds.  Subject to the terms and conditions set forth in this Agreement (including the prior satisfaction or waiver of the applicable conditions precedent under Section 3), no later than 4:00 P.M. (local time at the Payment Office) on the date specified in each Borrowing Request, the Lender will cause to be deposited to the Borrower's account specified in the Borrowing Request an amount equal to the amount of the Term Loan Borrowing requested to be made on such date, or such lesser amount as may be required by the terms and conditions hereof.

2.5     Evidence of Obligations.

(a)     *Loan Accounts of Lender*.  The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Obligations of the Borrower to the Lender resulting from advance under the Term Loan made by the Lender, including the amounts of principal and interest payable and paid to the Lender from time to time under this Agreement.  The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of advances under the Term Loan made by the Lender to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

(b)     *Term Note*.  Upon request of the Lender, Borrower will execute and deliver to one or more Term Notes, substantially in the form attached hereto as **Exhibit F**, with blanks appropriately completed in conformity herewith to evidence Borrower's obligation to pay the principal of, and interest on, the advances under the Term Loan made to it by the Lender (each a "***Term Note***" and, collectively, the "***Term Notes***"); *provided*, *however*, that the decision of the Lender to not request a Term Note shall in no way detract from the

Borrower's obligation to repay the Term Loan and other amounts owing by the Borrower to the Lender.

2.6     <u>Interest Rates and Payment Dates; Default Rate</u>.

(a)     *Interest on Term Loan*.  Subject to paragraph (b) of this Section 2.6, the Term Loan shall bear interest at a rate equal to (as applicable, the "***Interest Rate***"):

(1)   a fixed rate of two percent (2.0%) per annum for all portions of the Term Facility Exposure used to fund the LI Portion, such LI Portion not to exceed an amount equal to the difference of the (A) Term Facility Exposure, <u>minus</u> (B) the Non-LI Portion (as defined below), provided that Borrower provides Lender with proof of Favorable Pricing; and

(2)   a fixed rate of five percent (5.0%) per annum for all portions of the Term Facility Exposure used to fund Battery deployment to Customers who are not LI Customers (such portions, the "***Non-LI Portion***"), such Non-LI Portion not to exceed an amount equal to the difference of the (A) Term Facility Exposure, <u>minus</u> (B) the LI Portion.

(b)     *Default Interest*.  If: (i) any amount payable by the Borrower under any Loan Document is not paid when due, whether at stated maturity, by acceleration or otherwise; or (ii) an Event of Default occurs and so long as it is continuing, all outstanding Obligations shall thereafter bear interest (including post-petition interest in any proceeding under any Debtor Relief Law), payable on demand, at a interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by Applicable Law.  Payment or acceptance of the increased rates of interest provided for in this Section 2.6(b) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Lender.

(c)     *Payments of Principal and Interest*.

(1)     Interest on the outstanding principal amount of the Term Loan shall be payable on each applicable Payment Due Date (beginning on the Principal Repayment Start Date), and on the date on which all or any part of the Term Loan is repaid or prepaid, including, without limitation, at maturity (whether by acceleration or otherwise); *provided*, *however*, that interest accrued pursuant to the preceding paragraph (b) of this Section 2.6 shall be payable from time to time on demand.

(2)     Additionally, the Borrower shall repay the outstanding principal amount of the Term Loan, due and payable, on each Payment Due Date, in an amount equal to outstanding principal under the Term Loan fully amortized over ten (10) years and adjusting such repayment of principal so

as to evenly amortize such payments giving consideration to (a) any interest only option pursuant to Section 2.6(c)(3) hereof, (b) the expected cash receipts by Borrower of amounts due with respect to ESS Active Dispatch Incentives, ESS Incentive Payments, ESS Passive Dispatch Incentives, any amounts pursuant to the Generac Agreement and any and all other anticipated cash receipts of Borrower so that, together with any Interest due and payable results in a nearly level ratio of such expected cash receipts to expected payments of principal and interest and (ii) a final installment of the unpaid principal amount of the Term Loan, and all accrued and unpaid interest outstanding under the Term Loan, and other fees due to Lender under this Agreement which shall be due and payable on the Maturity Date.

(3)    *Interest Only Option*. At Lender's sole and absolute discretion, the Borrower may be afforded the option to pay interest only on the Actual Loan Balance for a period not to exceed twelve (12) months from the Closing Date, during which period the Term Loan shall re-amortize such that there is no balloon payment at the Maturity Date.

(4)    *Computations of Interest*.  All computations of interest on the Term Loan and other amounts hereunder shall be made on the actual number of days elapsed over a year of 360 days.

(5)    *Payments*.  All payments of principal and/or interest hereon shall be payable in lawful money of the United States and in immediately available fund. All payments received hereon shall be applied, at the Lender's option, first to late charges, if any, then to costs and expenses (including reasonable attorneys' fees) of collection and other sums due under the Loan Documents (as hereinafter defined), if any, then to accrued interest, if any, then to principal as billed, if any, then and then to outstanding principal. All payments hereunder shall be made without offset, demand, counterclaim, deduction, abatement, defense, or recoupment, each of which Borrower hereby waives.  Acceptance by Lender of any payment in an amount less than the amount then due on any Indebtedness shall be deemed an acceptance on account only, notwithstanding any notation on or accompanying such partial payment to the contrary, and shall not in any way (a) waive or excuse the existence of an Event of Default (as hereinafter defined), (b) waive, impair or extinguish any right or remedy available to Lender hereunder or under the other Loan Documents, or (c) waive the requirement of punctual payment and performance or constitute a novation in any respect.

2.7    Voluntary and Mandatory Prepayments of the Term Loan.

(a)    *Voluntary Prepayments*.  The Borrower shall have the right to prepay any of the Term Loan owing by it in whole or in part, without premium or penalty.  The Borrower shall give the Lender at the Notice Office written notice of its intent to prepay the Term Loan, which written notice shall be received by

the Lender by 12:00 noon (local time at the Notice Office) on the date of such prepayment.

(b)    *Mandatory Prepayments*.

(1)    If on any date, after giving effect to any other payments on such date, the Term Facility Exposure of the Lender exceeds the Term Loan Commitment, then, in the case of the foregoing, the Borrower shall, on such day, prepay on such date the principal amount of the Term Loan in an aggregate amount sufficient to eliminate such excess.

(2)    If Pledged Collateral is withdrawn from either the Generac Agreement or any Customer Agreement (such collateral, "***Withdrawn Collateral***"), the Borrower shall, on the day such Pledged Collateral becomes Withdrawn Collateral, prepay on such date the principal amount of the Term Loan an amount equal to the difference of: (i) that portion of the Term Loan Borrowing of the Borrowing Request associated with such Withdrawn Collateral, in each case, as determined in the sole discretion of Lender; <u>minus</u> (ii) any payments by the Borrower to the Lender that have been made against such Term Loan Borrowing.

2.8    <u>No Reborrowing</u>.  Any principal amount of the Term Loan that is repaid or prepaid may not be reborrowed.

2.9    <u>Method and Place of Payment</u>.

(a)    *Generally*.  All payments made by the Borrower hereunder or under any Term Note or any other Loan Document shall be made without setoff, counterclaim or other defense.

(b)    *Payment of Obligations*.  Except as specifically set forth elsewhere in this Agreement, all payments under this Agreement with respect to any of the Obligations shall be made to the Lender on the date when due and shall be made at the Payment Office by wire transfer of immediately available funds and shall be made in Dollars.

(c)    *Timing of Payments*.    Any payments under this Agreement that are made later than 3:00 P.M.  (local time at the Payment Office) shall be deemed to have been made on the next succeeding Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

3.    **CONDITIONS PRECEDENT.**

3.1     Conditions Precedent at Closing Date.  The obligation of the Lender to make a Term Loan on the Closing Date is subject to the satisfaction of each of the following conditions on or prior to the Closing Date:

(a)     *Term Loan Credit Agreement*.   This Agreement shall have been executed by both the Borrower and the Lender.

(b)     *Term Note*.  The Borrower shall have executed and delivered to the Lender a Term Note in favor of the Lender evidencing the Term Loan made by the Lender on the Closing Date.

(c)     *Loan Documents*.  The Borrower shall have duly executed and delivered the Security Agreement, in form and substance satisfactory to the Lender, Borrower and any other party thereto shall deliver fully executed Collateral Documents by all parties thereto that are required by this Agreement and/or the Collateral Documents, and the Borrower shall have duly executed and delivered each other Loan Document to which it is a party; *provided*, *however*, that Borrower shall not be required to deliver any Control Agreement until the date that is forty-five (45) days after the Closing Date.

(d)     *Corporate Resolutions and Approvals*.  The Lender shall have received certified copies of the resolutions of the board of directors (or similar governing body) of Borrower approving the Loan Documents to which Borrower is or may become a party, and of all documents evidencing other necessary corporate or other organizational action, as the case may be, and governmental and other material third party approvals, if any, with respect to the execution, delivery and performance by Borrower of the Loan Documents to which it is or may become a party and the continuing operations of the Borrower, all of which documents to be in form and substance satisfactory to the Lender.

(e)     *Incumbency Certificate*.  The Lender shall have received a certificate of the Secretary or an Assistant Secretary or manager of Borrower certifying the names and true signatures of the officers of Borrower authorized to sign the Loan Documents to which Borrower is a party and any other documents to which Borrower is a party that may be executed and delivered in connection herewith.

(f)     *Opinion of General Counsel*. The Lender shall have received an opinion of counsel from the General Counsel to the Borrower, which opinion shall be addressed to the Lender and dated the Closing Date and in form and substance satisfactory to the Lender.

(g)     *Recordation of Collateral Documents, Delivery of Collateral, Taxes, Etc*.  The Collateral Documents (and/or proper notices or UCC financing statements in respect thereof) shall have been duly recorded, published and filed in such manner and in such places as is required by law to establish, perfect, preserve and protect the rights, Liens and security interests of the parties thereto

and their respective successors and assigns, all Collateral items required to be physically delivered to the Lender thereunder shall have been so delivered, accompanied by any appropriate instruments of transfer, and all taxes, fees and other charges then due and payable in connection with the execution, delivery, recording, publishing and filing of such instruments and the incurrence of the Obligations and the delivery of the Term Note shall have been paid in full.

(h)    *Evidence of Insurance*.  The Lender shall have received, thirty (30) days of the Closing Date, (A) certificates of insurance and other evidence satisfactory to it of compliance with the insurance requirements of this Agreement and the Collateral Documents and (B) endorsements and/or declarations pages to insurance policies naming the Lender as an additional insured on the liability insurance policies of the Borrower and as a loss payee on the property insurance policies of the Borrower.

(i)    *Search Reports*.  The Lender shall have received the results of UCC, financing statement, judgment, tax lien, and other search reports requested by Lender, from one or more commercial search firms acceptable to the Lender and in all jurisdictions (state and county) as Lender may deem appropriate, listing all of the effective financing statements, judgments, tax liens and other Liens on file with respect to Borrower in such jurisdictions, together with copies of such financing statements judgments, tax liens and other Liens.  Such search results must show that no Person, other than Lender and any other holders of Permitted Encumbrances, has any Lien on any of the Pledged Collateral, except as provided in the Lien Subordination Agreement.

(j)    *Corporate Documents and Good Standing Certificates*.  The Lender shall have received:  (A) an original certified copy of the Articles of Incorporation, Bylaws or equivalent formation document of Borrower and any and all amendments and restatements thereof, certified as of a recent date by the relevant Secretary of State; (B) an original "long-form" good standing certificate or certificate of existence from the relevant Secretary of State of the state of organization, dated as of a recent date, listing all charter documents affecting Borrower and certifying as to the good standing (or equivalent) of Borrower; and (C) original certificates of good standing (or equivalent) or foreign qualification for Borrower from the Secretary of State of the State of Delaware and each jurisdiction in which the Borrower is authorized or qualified to do business and where the failure to maintain such good standing (or equivalent) or foreign qualification could reasonably be expected to have a Material Adverse Effect, such jurisdictions being set forth with respect to Borrower on **Schedule A** hereto.

(k)    *Proceedings and Documents*.  All corporate and other proceedings and all documents incidental to the transactions contemplated hereby shall be satisfactory in substance and form to the Lender and its counsel shall have received all such counterpart originals or certified or other copies of such documents as the Lender or its counsel may reasonably request.

(l)    *Litigation*.  There shall not exist any pending or threatened litigation that could reasonably be expected to cause a Material Adverse Effect, in the judgment of the Lender, in or affecting the business, operations, property or condition (financial or otherwise) of the Borrower or any Affiliate of Borrower.

(m)    *No Material Adverse Effect*.  No event shall have occurred that has had or would reasonably be expected to have any Material Adverse Effect on the Borrower or any Affiliate of Borrower.

(n)    *Waiver and Consent Under Intercreditor Agreement*.  The Lender shall have received a fully executed copy of the Waiver and Consent Under Intercreditor Agreement, in form and substance reasonably satisfactory to the Lender.

(o)    *Lien Subordination Agreement*.  The Lender shall have received a fully executed copy of the Lien Subordination Agreement, in form and substance reasonably satisfactory to the Lender.

(p)    *Generac Agreement*.  The Lender shall have received a fully executed copy of the Generac Agreement, in form and substance reasonably satisfactory to the Lender.

(q)    *Structure and Equity*. The capital and organizational structure of Borrower shall be reasonably satisfactory to the Lender.

(r)    *Payment of Lender's Fees/Expenses*.  All of Lender's fees and expenses (including attorneys' fees and disbursements) incurred by Lender in connection with the transactions contemplated by the Loan Documents shall have been paid or shall be, contemporaneously with the Closing, paid.

(s)    *Miscellaneous*.  The Borrower shall have provided to the Lender such other items and shall have satisfied such other conditions as may be reasonably required by the Lender, including, without limitation, Lender's requests and conditions with respect to the Pledged Collateral

3.2    <u>Conditions Precedent to all Term Loan Borrowings</u>.  The obligations of the Lender to make any advance under the Term Loan, including the initial advance under the Term Loan is subject, at the time thereof, to the satisfaction of the following conditions:

(a)    *Borrowing Request and Available Borrowing Base Certificate*.  The Lender shall have received each of: (i) a Borrowing Request meeting the requirements of Section 2.3(b), and (ii) an Available Borrowing Base Certificate, each in form and substance satisfactory to the Lender, with respect to any Term Loan Borrowing.  Following receipt and approval of a Borrowing Request, Available Borrowing Base Certificate, and all supporting documentation and

information, Lender will determine, in its sole discretion, the amount of the Term Loan that Lender will advance in accordance with this Agreement and the Loan Documents. Notwithstanding any other provision of this Agreement to the contrary, the proceeds of any Term Loan advance made after the initial Term Loan advance shall solely be used in accordance with the terms and conditions set forth in Section 4.7 hereof.

(b)      *Due Diligence; Formal Credit Approval*.  At the time of each Term Loan Borrowing, Lender will have completed its due diligence and issued formal credit approval.

(c)      *No Default; Representations and Warranties*.  At the time of each Term Loan Borrowing and also after giving effect thereto, (i) there shall exist no Default or Event of Default and (ii) all representations and warranties of the Borrower contained herein or in the other Loan Documents shall be true and correct in all material respects (or in the case of any representation and warranty already subject to a materiality qualifier, true and correct in all respects) with the same effect as though such representations and warranties had been made on and as of the date of such Term Loan Borrowing, except to the extent that such representations and warranties expressly relate to an earlier specified date, in which case such representations and warranties shall have been true and correct in all material respects as of the date when made.

(d)      *Term Loan Facility Exposure*.  After giving effect to the Term Loan Borrowing, the aggregate outstanding Term Loan Facility Exposure shall not exceed the less of: (i) Term Loan Commitment or (ii) the Available Borrowing Base, as provided in the Available Borrowing Base Certificate applicable to such Term Loan Borrowing, after giving effect to such Term Loan Borrowing.  If the balance of the aggregate outstanding Term Loan Exposure against the pledged assets per the Credit Agreement is greater than the Term Loan disbursement, then the Borrower shall pay the lender the difference upon disbursement.  If the balance of the loan outstanding against the pledged assets per the Credit Agreement is less than the Term Loan disbursement, then the lender will disburse the net amount.

(e)      *Copies of Generac Purchase Orders*.  The Lender has received copies of the purchase orders submitted to Generac or an Affiliate of Generac, which have been accepted by Generac.

(f)      *Compliance with the ESS*.  The Lender has received any and all documentation related to Borrower's and its Subsidiaries' participation in and compliance with the ESS required by PURA, or the administrator of the ESS, as the case may be.

(g)      *Compliance with Loan Documents*.  Any and all other documents and legal matters in connection with the transactions contemplated by the Agreement

shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Lender.

(h)     *Licenses and Approvals*.  Borrower and each of its Affiliates shall have received all licenses, approvals, or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Borrower and each of its Affiliates of the Loan Documents or with the consummation of the transactions contemplated thereby.

(i)     *Insurance*.  At the time of each Term Loan Borrowing, the Lender shall have received, certificates of insurance and other evidence satisfactory to it of compliance with the insurance requirements of this Agreement and the Collateral Documents.

(j)     *No Material Adverse Effect*.  At the time of each Term Loan Borrowing, no event shall have occurred that has had or would reasonably be expected to have any Material Adverse Effect on the Borrower or any Affiliate of Borrower.

(k)     *Bring-Down of Conditions Precedent*.  The acceptance of the benefits of: (i) the initial Term Loan Borrowing shall constitute a representation and warranty by the Borrower to the Lender that all of the applicable conditions specified in Section 3.1 of this Agreement have been satisfied as of the times referred to in such Section; and (ii) each Term Loan Borrowing thereafter shall constitute a representation and warranty by the Borrower to the Lender that all of the applicable conditions specified in Section 3.1 of this Agreement have been satisfied as of the times referred to in such Section.

## 4.    <u>**REPRESENTATIONS AND WARRANTIES OF BORROWER.**</u>

In order to induce the Lender to enter into this Agreement and to make the Term Loan provided for herein, the Borrower makes the following representations and warranties to, and agreements with, the Lender, all of which shall survive the execution and delivery of this Agreement and each Term Loan Borrowing:

4.1     <u>Organizational Status</u>. Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage.  Borrower is duly qualified and is authorized to do business in each and every jurisdiction where it is required to be so qualified or where the failure of Borrower to so qualify would have a Material Adverse Effect under this Agreement or any of the other Loan Documents.

4.2     <u>Corporate Power and Authority</u>.  Borrower has all requisite corporate power and authority to own, lease and operate its properties, to carry on its business as now being conducted, and to execute, deliver and perform under this Agreement and any of the other

Term Loan Credit Agreement                                                                         29

Loan Documents and all writings relating hereto and thereto.   Borrower has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents to which it is party.

4.3     Tax Returns and Payments.   All of Borrower's federal, state, local and foreign income, profits, franchise, sales, use, occupation, property, excise and other tax returns and tax reports, if any, required to be filed with respect to the business and assets of Borrower have been filed, as of, at a minimum, the date hereof with the appropriate governmental agencies, and all taxes, governmental charges and assessments due and payable with respect to such returns and reports have been paid.  Borrower has established on its books such charges, accruals and reserves in respect of taxes, assessments, fees and other governmental charges for all fiscal periods as are required by GAAP.   Borrower does not know of any proposed assessment for additional federal, foreign or state taxes for any period, or of any basis therefor, which, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as Borrower and its Subsidiaries have made, could reasonably be expected to have a Material Adverse Effect.

4.4     Authorization of Borrower. The execution, delivery and performance by Borrower of this Agreement, all other Loan Documents to which it is a party, and all other writings relating hereto and thereto have been duly and validly authorized by Borrower. No consent or approval of or notification to any party, other than any consent or approval that has been obtained, is required in connection with the execution, delivery and performance by Borrower of this Agreement, the other Loan Documents, and/or any writing relating hereto and thereto or the consummation of the transactions contemplated hereby or thereby.  Borrower has duly executed and delivered each Loan Document to which it is party and each Loan Document to which it is party constitutes the legal, valid and binding agreement and obligation of Borrower, enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

4.5     Indebtedness.   The Borrower and its Subsidiaries have no outstanding Indebtedness other than the Obligations and other Permitted Indebtedness.  As of the Closing Date, no other Indebtedness of the Borrower rank senior prior to the Obligations other than the Permitted Indebtedness.

4.6     Litigation Claims and Proceedings. No litigation, suits, claims, or judicial or administrative proceedings of any nature are pending or, to the best knowledge of Borrower, threatened against Borrower, Borrower's property or any Project, that: (i) have had, or could reasonably be expected to have, a Material Adverse Effect, or (ii) question the validity or enforceability of any of the Loan Documents, or of any action to be taken by Borrower pursuant to any of the Loan Documents.

4.7     Use of Proceeds; Margin Regulations.

(a)     The proceeds of the initial advance and all subsequent advances under the Term Loan shall solely be used to: (i) acquire from Generac the Project Equipment for the Projects; and (ii) pay down the amount due by Borrower to the Lender under the Working Capital Loan.

(b)     No part of the proceeds of the Term Loan will be used directly or indirectly to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, in violation of any of the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System.  The Borrower is not and will not be engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

4.8     <u>Title to Pledged Collateral; Liens or Encumbrances on Pledged Collateral</u>. Borrower has good and marketable title to the Pledged Collateral, free and clear of all Liens other than as provided in the Lien Subordination Agreement.

4.9     <u>Laws and Regulations</u>.

(a)     No order, consent, approval, license, Permit, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to authorize or is required as a condition to (i) the execution, delivery and performance by Borrower of any Loan Document to which it is a party or any of its obligations thereunder, or (ii) the legality, validity, binding effect or enforceability of any Loan Document to which the Borrower is a party, except the filing and recording of financing statements and other documents necessary in order to perfect the Liens created by the Collateral Documents.

(b)     The current or anticipated use of Project Equipment complies with applicable state ordinances, regulations and restrictive covenants affecting the Project Equipment and all use requirements of any governmental authority having jurisdiction have been satisfied.

4.10     <u>No Violation</u>. Neither the execution, delivery and performance by the Borrower of the Loan Documents to which it is party nor compliance with the terms and provisions thereof will:

(a)     contravene any provision of any law, statute, rule, regulation, order, writ, injunction or decree of any Governmental Authority applicable to Borrower or its properties and assets;

(b)     conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created pursuant to the Collateral Documents) upon any of the property or assets of Borrower pursuant to the terms of (i) any material contractual

obligation or (ii) any other promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement, or any other agreement or other instrument, to which Borrower is a party or by which it or any of its property or assets are bound or to which it may be subject; or

(c)    violate any provision of the Organizational Documents of Borrower.

4.11    <u>Environmental Matters</u>.

(a)    Borrower and each of its Subsidiaries is in compliance with all applicable Environmental Laws, except to the extent noncompliance would not reasonably be expected to, in the aggregate, cause or result in a Material Adverse Effect.  All licenses, Permits, registrations or approvals required for the conduct of the business of Borrower and any of its Subsidiaries under any Environmental Law have been secured and Borrower and each of its Subsidiaries is in compliance therewith, except for licenses, Permits, registrations or approvals the failure to secure or to comply therewith is not material to Borrower or its business.  Neither Borrower nor any of its Subsidiaries has received written notice, or otherwise knows, that it is in any respect in noncompliance with, breach of or default under any applicable writ, order, judgment, injunction, or decree with respect to any Environmental Law to which Borrower or any of its Subsidiaries is a party or that would affect the ability of Borrower or any of its Subsidiaries to operate its business or any Real Property and no event has occurred and is continuing that, with the passage of time or the giving of notice or both, would constitute noncompliance, breach of or default thereunder, except in each such case, such noncompliance, breaches or defaults as would not reasonably be expected to, in the aggregate, be material to Borrower or its business.  There are no Environmental Claims pending or, to the best knowledge of Borrower, threatened wherein an unfavorable decision, ruling or finding would reasonably be expected to be material to Borrower or its business.  There are no facts, circumstances, conditions or occurrences on any Real Property now or at any time owned, leased or operated by Borrower or any of its Subsidiaries or, to Borrower's knowledge, on any property adjacent to any such Real Property, that are known by Borrower or as to which Borrower or any such Subsidiary has received written notice, that could reasonably be expected:  (i) to form the basis of an Environmental Claim against Borrower or any of its Subsidiaries or any Real Property of Borrower or any of its Subsidiaries; or (ii) to cause such Real Property to be subject to any restrictions on the ownership, occupancy, use or transferability of such Real Property under any Environmental Law, except in each such case, such Environmental Claims or restrictions that individually or in the aggregate could not reasonably be expected to cause or result in a Material Adverse Effect.

(b)    Except as disclosed to Lender, to the best of Borrower's knowledge, Hazardous Materials have not at any time been (i) generated, used, treated or stored on, or transported to or from, any Real Property of Borrower or any of its

Subsidiaries or (ii) released on or about any such Real Property, in each case where such occurrence or event is not in compliance with Environmental Laws and such noncompliance could reasonably be expected to, in the aggregate, cause or result in a Material Adverse Effect.

4.12    Compliance with ERISA.  Compliance by Borrower with the provisions of this Agreement or the other Loan Documents will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code.  Borrower, and each ERISA Affiliate: (i) has fulfilled all obligations under the minimum funding standards of ERISA and the Code with respect to each Plan that is not a Multi-Employer Plan or a Multiple Employer Plan, (ii) has satisfied all contribution obligations in respect of each Multi-Employer Plan and each Multiple Employer Plan, (iii) is in compliance in all material respects with all other applicable provisions of ERISA and the Code with respect to each Plan, each Multi-Employer Plan and each Multiple Employer Plan, and (iv) has not incurred any liability under Title IV of ERISA to the PBGC with respect to any Plan, any Multi-Employer Plan, any Multiple Employer Plan, or any trust established thereunder. No Plan or trust created thereunder has been terminated, and there have been no Reportable Events, with respect to any Plan or trust created thereunder or with respect to any Multi-Employer Plan or Multiple Employer Plan, which termination or Reportable Event will or could give rise to a material liability of Borrower or any ERISA Affiliate in respect thereof.  Neither Borrower nor any Subsidiary of Borrower nor any ERISA Affiliate is at the date hereof, or has been at any time within the five (5) years preceding the date hereof, an employer required to contribute to any Multi-Employer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in Section 4001(a)(13) of ERISA) in any Multi-Employer Plan or Multiple Employer Plan.  Neither Borrower nor any Subsidiary of Borrower nor any ERISA Affiliate has any contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as has been disclosed to the Lender in writing.

4.13    Intellectual Property, etc.  Borrower and each of its Subsidiaries has obtained or has the right to use all patents, trademarks, service marks, trade names, copyrights, licenses and other rights with respect to the foregoing necessary for and material to the present and planned future conduct of its business, without any known conflict with the rights of others, except for such patents, trademarks, service marks, trade names, copyrights, licenses and rights, the loss of which, and such conflicts that, in any such case individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

4.14    Insurance.  Borrower and each of its Subsidiaries maintains insurance coverage by such insurers and in such forms and amounts and against such risks as are carried generally in accordance with sound business practices by companies in similar businesses similarly situated and located, and in each case in compliance with the terms of Section 6.16.

4.15    Contracts; Labor Relations.  Neither Borrower nor any Subsidiary of Borrower: (a) is subject to any contract, agreement, corporate restriction, judgment, decree or order, (b) is a party to any labor dispute affecting any bargaining unit or other group of employees generally, (c) is subject to any strike, slowdown, workout or other concerted interruptions of operations by employees of Borrower or any of its Subsidiaries, whether or not

relating to any labor contracts, (d) is subject to any pending or, to the knowledge of Borrower, threatened, unfair labor practice complaint, before the National Labor Relations Board, (e) is subject to any pending or, to the knowledge of Borrower, threatened grievance or arbitration proceeding arising out of or under any collective bargaining agreement, (f) is subject to any pending or, to the knowledge of Borrower, threatened significant strike, labor dispute, slowdown or stoppage, or (g) is, to the knowledge of Borrower, involved or subject to any union representation organizing or certification matter with respect to the employees of Borrower or any of its Subsidiaries, except (with respect to any matter specified in any of the above clauses) for such matters as, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Neither Borrower nor any of its Subsidiaries has suffered any strikes, walkouts or work stoppages in the five (5) years preceding the Closing Date.

4.16    <u>Disclosures</u>.

(a)    The factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of Borrower to the Lender for purposes of or in connection with this Agreement or any transaction contemplated herein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such Person in writing to the Lender is true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not materially misleading at such time in light of the circumstances under which such information was provided, except that all information consisting of financial projections prepared by Borrower is only represented herein as being based on good faith estimates and assumptions believed by such persons to be reasonable at the time made.

(b)    No representation or warranty by Borrower contained in this Agreement, and no statement contained in any certificate, schedule, exhibit, list or other writing furnished to Lender in connection with this transaction and/or in connection with the Project contains any material untrue statement of fact or omits to state any material fact necessary in order to make the statements contained herein or therein not materially misleading. All copies of all writings furnished to Lender in connection with this Agreement or the transactions contemplated in the Loan Documents, are true and complete in all material respects. All schedules and exhibits to this Agreement, if any, are true and complete in all material respects. Borrower has disclosed all material risk to all Projects of which Borrower has knowledge, including, without limitation, environmental risks.

4.17    <u>Security Interest</u>.    Once executed and delivered, each of the Collateral Documents creates, as security for the Obligations, a valid and enforceable, and upon making the required filings and recordings, perfected and continuing security interest in and Lien on all of the Pledged Collateral in favor of the Lender, superior to and prior to the rights of all third persons and subject to no other Liens, other than provided as set forth in the Lien Subordination

Agreement. All recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable legal requirements or other laws applicable to the property encumbered by the Collateral Documents in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement thereof have been paid.

4.18    <u>Taxes</u>. Borrower has filed or has caused to have been filed all federal, state and local tax returns which, to the knowledge of Borrower, are required to be filed, and has paid or caused to have been paid all taxes as shown on such returns or on any assessment received by it, to the extent that such taxes have become due unless and to the extent only that such taxes, assessments and governmental charges are currently contested in good faith and by appropriate proceedings by Borrower and adequate reserves therefor have been established as required under generally accepted accounting principles. To the extent Borrower believes it advisable to do so, Borrower has set up reserves which are believed by Borrower to be adequate for the payment of additional taxes for years which have not been audited by the respective tax authorities.

4.19    <u>Building Permits; Other Permits</u>. No work associated with any Project Equipment will be commenced unless and until all building, construction and other Permits necessary or required in connection with the commencement of the installation of the Project Equipment has been validly issued and all fees and bonds required in connection therewith have been paid or posted, as the circumstances may require.

4.20    <u>Solvency</u>. Both before and after giving effect to the transactions contemplated by the Loan Documents, the sum of the "fair value" of the assets of Borrower and its Subsidiaries on a consolidated basis will, as of the date hereof, exceed the sum of all debts (including contingent, subordinated, absolute, fixed, matured or unmatured and liquidated or unliquidated liabilities) of Borrower and its Subsidiaries, taken as a whole, as of the date hereof. The present fair salable value of the assets of Borrower and its Subsidiaries, on a consolidated basis, is greater than the (i) total amount of present debts and liabilities (including subordinated and contingent liabilities) of Borrower and its Subsidiaries, on a consolidated basis, and (ii) amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities (including subordinated and contingent liabilities) as such debts and liabilities become absolute and matured. Borrower and its Subsidiaries, on a consolidated basis, do not have unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the date hereof. Neither Borrower nor any of its Subsidiaries intends to incur, nor does Borrower or its Subsidiaries believe that they will incur, debts beyond their ability to pay such debts as they mature in the ordinary course of business. Neither Borrower nor any of its Subsidiaries intends to hinder, delay or defraud either present or future creditors or any other person to which Borrower or any of its Subsidiaries is or, on or after the date hereof, will become indebted.

4.21    <u>No Material Adverse Effect</u>. There has been no change in the business, operations, property, assets, liabilities, or condition (financial or otherwise) of Borrower or any of its Subsidiaries, taken as a whole since the date of formation, except for changes none of which, individually or in the aggregate, has had or could reasonably be expected to have, a Material Adverse Effect.

4.22     No Defaults or Events of Default.  No Default or Event of Default exists as of the Closing Date under this Agreement, nor will any Default or Event of Default begin to exist immediately after the execution and delivery of this Agreement.

4.23     Capitalization.  A true, complete and accurate description of the equity capital structure of Borrower, as of the Closing Date, is attached hereto as **Schedule 4.23 of the Disclosure Schedules**. The Equity Interests of Borrower described on **Schedule 4.23 of the Disclosure Schedules**: (i) are validly issued and fully paid and non-assessable (to the extent such concepts are applicable to the respective Equity Interests) and (ii) are owned of record and beneficially as set forth on **Schedule 4.23 of the Disclosure Schedules**, free and clear of all Liens (other than Liens created under the Collateral Documents or Permitted Liens).

4.24     Sanctions Concerns; Anti-Terrorism Laws and Anti-Corruption Laws.

(a)     *Sanctions Concerns*.  Neither Borrower, Borrower's Subsidiaries, nor, to the knowledge of the Borrower and Borrower's Subsidiaries, any respective director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

(b)     *Anti-Corruption Laws*.  The Borrower and Borrower's Subsidiaries have conducted their business in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions, and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.  No part of the proceeds of the Term Loan will be used, directly or indirectly, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, or any other applicable anti-corruption laws.

(c)     *USA Patriot Act and Anti-Terrorism Laws*.  To the extent applicable, each of the Borrower and Borrower's Subsidiaries is in compliance with: (i) the Trading with the Enemy Act, as amended, the International Emergency Economic Powers Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto and (ii) the USA Patriot Act and any other applicable Anti-Terrorism Law or anti-money laundering law or statute.  Neither the making available of the Term Loan nor the use of any part of the proceeds thereof will violate the: (i) Trading with the Enemy Act, as amended, the International Emergency Economic Powers Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR Subtitle B, Chapter V, as amended) and any other enabling

legislation or executive order relating thereto or any other applicable economic sanctions law, or (ii) the USA Patriot Act and any other applicable anti-money laundering law or statute.

4.25    Fiscal Year.  Borrower's fiscal year is January 1st thru December 31st.

## 5.    REPRESENTATIONS AND WARRANTIES OF LENDER.

5.1    As of the date hereof, Lender represents and warrants that Lender is a public instrumentality and political subdivision of the State of Connecticut duly organized, validly existing and in good standing under the laws of the State of Connecticut and has all requisite corporate power and authority to enter into this Agreement and to carry out the transactions contemplated hereby.

## 6.    AFFIRMATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the Closing Date and thereafter so long as this Agreement is in effect and until such time as the Term Loan Commitment has been terminated, no Term Note remains outstanding and the Term Loan, together with interest, Fees and all other Obligations incurred hereunder and under the other Loan Documents, have been indefeasibly paid in full, it shall, as applicable:

6.1    Corporate Existence and Maintenance of Properties.  Do or cause to be done all things necessary to preserve and keep in full force and effect its existence as a corporation and its rights and franchises and comply, in all material respects, with all laws applicable to it; at all times maintain, preserve and protect all franchises, approvals, trade names licenses, patents, trademarks and copyrights and preserve all material property used or useful in the conduct of its business and keep the same in good repair, working order and condition, reasonable wear and tear excluded, and from time to time make, or cause to be made, all needful and proper repairs, renewals, replacements, betterments and improvements thereto so that the business carried on in connection therewith may be properly conducted at all times.

6.2    Payment of Indebtedness, Taxes, etc.  (a) Pay all Indebtedness and obligations as and when due and payable and (b) pay and discharge or cause to be paid and discharged promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income and profits, or upon any of its property, real, personal or mixed, or upon any part thereof, before the same shall become in default, as well as all lawful claims for labor, materials and supplies or otherwise which, if unpaid, might become a Lien or charge upon such properties or any part thereof; *provided*, *however*, that Borrower shall not be required to pay and discharge or cause to be paid and discharged any such Indebtedness, tax, assessment, charge, levy or claim so long as the validity thereof shall be contested in good faith by appropriate proceedings; and *provided further*, that subject to the foregoing proviso, Borrower will pay or cause to be paid all such Indebtedness, taxes, assessments, charges, levies or claims upon the commencement of proceedings to foreclose any Lien which has attached as security therefor.

6.3    Notice of Adverse Change.    Borrower shall furnish to the Lender, promptly after any manager or authorized representative of Borrower becomes aware or could reasonably be expected to become aware, written notice of:

(a)    immediately in writing of any proposed or actual change of Borrower's name, identity and/or corporate structure;

(b)    the occurrence of any event or circumstance that constitutes, or with the passage of time will come to constitute, a breach, Default, or Event of Default under any of the Loan Documents, or in any way impair the validity or enforcement of the Obligations, or tend to reduce the amount payable, under any of the Loan Documents;

(c)    the commencement of any action or proceeding involving or affecting Borrower or any of its Subsidiaries thereof or any properties or assets of Borrower or any of its Subsidiaries an adverse determination of which could reasonably be expected to have a Material Adverse Effect;

(d)    (i) any default or event of default under any material contractual obligation of Borrower or any of its Subsidiaries which could reasonably be expected to have a Material Adverse Effect, (ii) the termination or nonrenewal of a license issued by a Governmental Authority, or (iii) the termination or nonrenewal of any other licensing or other agreement of Borrower or any of its Subsidiaries, which could reasonably be expected to have a Material Adverse Effect;

(e)    any litigation, investigation or proceeding which may exist at any time between Borrower and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

(f)    the occurrence of an event, occurrence or circumstance which would reasonably be expected to have a Material Adverse Effect on the Borrower or on any Project; and

(g)    (i) any release or discharge by Borrower or any of its Subsidiaries of any Hazardous Materials required to be reported under any Environmental Law to any Governmental Authority; (ii) any condition, circumstance, occurrence or event that could result in material Environmental Liabilities and Costs or could result in the imposition of any Lien or other restriction on the title, ownership or transferability of any of Borrower's Real Property; and (iii) any proposed action to be taken by Borrower or that could subject Borrower to any material additional or different requirements or liabilities under any Environmental Law.

6.4    Financial Covenants.

(a)     *Debt Service Covenant Ratio*.  The Debt Service Coverage Ratio shall not be less than 1.10x.

(b)     *Minimum Liquidity (Borrower)*.  As of any date of determination, the Liquidity of Borrower shall be equal to or greater than $5,000,000. For the avoidance of doubt, amounts on deposit in the Debt Service Reserve Account (as defined in the Credit Agreement) shall be considered as part of Borrower's Liquidity for purposes of this Section 6.4(b).

(c)     *Maximum Borrower Leverage*.  As of the end of each calendar month, the ratio of Borrower's Debt to Borrower's Tangible Net Worth shall not be greater than 1.00.

(d)     *Minimum Tangible Net Worth (Borrower)*.  As of the end of each calendar month, the Tangible Net Worth of Borrower shall not be less than $10,000,000.

(e)     *Delinquency Ratio*.  As of the end of each calendar month, the Delinquency Ratio shall not be greater than ten percent (10%).

6.5     <u>Notice of Default</u>.  Promptly, in the event Borrower knows of any default or Event of Default, or knows of an event of default under any other agreement, furnish to the Lender a written statement as to such occurrence, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto

6.6     <u>Litigation Notice</u>.  Give the Lender prompt written notice of any action, suit or proceeding at law or in equity or by or before any governmental instrumentality or other agency against Borrower: (i) which, if adversely determined against Borrower on the basis of the allegations and information set forth in the complaint or other notice of such action, suit or proceedings would be reasonably likely to have a Material Adverse Effect, (ii) in which the amount involved is $50,000 or more and is not covered by insurance, (iii) in which injunctive or similar relief is sought in respect of the transactions contemplated hereby, or (iv) in which any material alterations in the nature of Borrower's business and/or any material change in the management of Borrower are sought.

6.7     <u>Access to Records</u>.  Maintain, and shall cause each of its Subsidiaries to maintain, proper books and records with respect to the operation of its business in accordance with GAAP consistently applied.   Borrower shall, permit, and shall cause each of its Subsidiaries to permit in accordance with all applicable laws relating to the confidentiality thereof, authorized representatives of the Lender to visit and inspect from time to time upon reasonable notice during business hours (or at any time after the occurrence and during the continuance of an Event of Default hereunder) any of the offices, inventory locations and other facilities of Borrower or any of its Subsidiaries, to examine the books and records of Borrower or any of its Subsidiaries and make copies or extracts therefrom, to examine the inventory of Borrower or any of its Subsidiaries, to conduct field examinations with respect to the assets of Borrower or any of its Subsidiaries, and to discuss the affairs, inventory and accounts of

Borrower or any of its Subsidiaries with such Person's officers and accountants. Borrower or any of its Subsidiaries shall permit, and shall cause each of their Subsidiaries to permit, Lender to conduct field examinations and collateral audits as the Lender may reasonably require, at the sole cost and expense of Borrower; *provided*, *however*, that if no Event of Default exists, Borrower shall be responsible for only one field examination and collateral audit in any twelve (12) month period.

   6.8 <u>Financial Statements, Reports, etc</u>. Deliver or cause to be delivered to the Lender:

    (a) as soon as available, but in any event no later than one hundred eighty (180) days after the close of each fiscal year of Borrower, the consolidated and consolidating balance sheets of Borrower as of the close of such fiscal year, the related consolidated and consolidating profit and loss statements and consolidated and consolidating statements of cash flows for such fiscal year, and a summary operating report in form and substance reasonably satisfactory to the Lender with respect to the Borrower, and any other material items reasonably requested by the Lender, such financial statements to be reviewed by, and accompanied by a report of, a firm of independent certified public accountants reasonably acceptable to the Lender, to the effect that such financial statements have been prepared in conformity with GAAP.

    (b) as soon as available, but in any event no later than sixty (60) days after the close of each fiscal quarter of Borrower commencing with December 31, 2022, management-prepared or independently-prepared interim financial statements of Borrower for the most-recent fiscal quarter, all in reasonable detail satisfactory to the Lender and prepared in accordance with GAAP consistently applied for such interim period (subject to year-end audit adjustments), and a summary operating report in form and substance reasonably satisfactory to the Lender with respect to the Borrower, and any other material items reasonably requested by the Lender;

    (c) together with each delivery of financial statements of Borrower pursuant to clauses (a) and (b) above, Borrower shall deliver to Lender a Compliance Certificate, substantially in the form attached hereto as **Exhibit G** (the "***Compliance Certificate***"), demonstrating Borrower's compliance with, among other things, all of the financial covenants set forth herein.

    (d) promptly after the same become available, but in any event within ten (10) Business Days of filing or receipt thereof, copies of all licensure and state and federal inspection reports (including, if applicable, an attached plan of correction) and any other periodic reports, that may be required to be filed by or with respect to Borrower in order to maintain its licenses in good standing. Borrower shall correct any deficiency on any report delivered pursuant to this clause (e) or otherwise received by Borrower within the date required by the applicable Governmental Authority.

(e)      promptly upon receipt thereof, but in any event no later than three (3) Business Days after Borrower's receipt thereof, copies of:

(1)    all notices given or received with respect to a default or any event of default under any term or condition of or related to any Permitted Indebtedness;

(2)    all material notices, requests, correspondence and other communications relating to the Project Equipment;

(3)    any and all notices of a material default, material breach or termination by any party under any Customer Agreement or the Generac Agreement;

(4)    any notice of the occurrence of any event or circumstance that has, or could reasonably be expected to have, a Material Adverse Effect;

(5)    all notices of any (i) fact, circumstance, condition or occurrence at, on, or arising from, any Project, that results or could reasonably be expected to result in material noncompliance with or a material liability or material obligation under any Environmental Law or Permit issued under Environmental Law, (ii) release of Hazardous Materials from or related to any Project that has resulted in or could reasonably be expected to result in personal injury, material property damage or material liability, or (iii) pending or, to the Borrower's knowledge, threatened action, charge, claim, demand, suit, proceeding, petition, governmental investigation or arbitration in respect of any Environmental Laws against it or arising in connection with occupying or conducting operations on or at any Project therefor;

(6)    any notice that any insurance required to be maintained pursuant to the Loan Documents has been, or is threatened to be, cancelled;

(7)    each recall notice issued in respect of, or any other material communications related to an actual or potential serial defect from any manufacturer of any Project Equipment included in a Project; and

(8)    any amendment, modification or waiver to any Subordinating Lender Loan Documents.

(f)      promptly upon the occurrence thereof, but in any event no later than three (3) Business Days after the occurrence thereof, written notice of notice of any event which would require a mandatory prepayment under Section 2.7(b);

(g)     promptly upon the occurrence thereof, but in any event no later than ten (10) Business Days after the occurrence thereof, written notice of the occurrence of any Customer Prepayment Event;

(h)     as soon as available, but in any event within ten (10) days of Borrower's receipt of Lender's written request or as required as a condition of Loan approval, Borrower's most recent internally or independently prepared interim financial statements on a quarterly or semiannual basis, as Lender may require;

(i)     promptly, but in any event within five (5) Business Days after receipt by Borrower, copies of any material communications to or from any regulatory agency or Governmental Authority; and

(j)     with reasonable promptness, such other information regarding Borrower or any of their respective Subsidiaries as the Lender may reasonably request.

6.9     <u>Compliance with Contractual Obligations and Requirements of Law</u>. Comply, in all material respects, with all contractual obligations and Requirements of Law, the breach of which, or failure to comply with, would be reasonably likely to have a Material Adverse Effect.

6.10     <u>Licenses</u>.  Borrower shall (i) maintain, all licenses, certifications and material Permits necessary to continue its operations; and (ii) promptly provide the Lender with copies of any final third party audit reports, or other material regulatory communications. Borrower shall within thirty (30) days of receipt, deliver to Lender a copy of any required license, Permit, registration or evidence of any other requirement of any Governmental Authority having jurisdiction over Borrower or the conduct of its business.

6.11     <u>Conduct of Business and Maintenance of Existence</u>.  Borrower shall preserve in full force and effect its corporate existence and solvency, and materially comply with all laws applicable to it.  Borrower shall maintain and protect all Permits, licenses, franchises and trade names and preserve all of its assets used or usable in the conduct of its business and keep the same in good repair and working order and shall within thirty (30) days of receipt, deliver to Lender a copy of any required license, Permit, registration or evidence of any other requirement of any Governmental Authority having jurisdiction over Borrower or the conduct of its business.

6.12     <u>Organizational Documents</u>.  Borrower shall not permit or suffer (i) without the prior written consent of the Administrative Agent (not to be unreasonably withheld, conditioned or delayed), a material amendment or modification of its Organizational Documents or (ii) any dissolution or termination of its existence.

6.13     <u>Maintenance of Security</u>.

(a)     Borrower shall, at its sole cost and expense: (i) take any and all actions necessary to defend its respective title, rights and interests in and to the Pledged

Collateral against all Persons and, further, to defend the security interest of the Lender in the Pledged Collateral and the priority thereof against any Lien other than as provided in the Lien Subordination Agreement; and (ii) advise Lender promptly, in reasonable detail, of any Lien made or asserted against any of the Pledged Collateral and of the occurrence of any event that may have a material, adverse effect on the aggregate value of the Pledged Collateral and/or on the security interest in the Pledged Collateral granted to Lender.

(b)     Notwithstanding the foregoing, the Lender, at its sole discretion and at the Borrower's expense, may take all necessary action to maintain and preserve the Liens and security interests created by the Loan Documents in accordance with the terms thereof.

6.14    <u>Furnishing Reports</u>.  Upon the Lender's request, Borrower shall provide the Lender with copies of all inspections, reports, test results and other information received by Borrower which in any material way relate to Borrower or such Person's property.

6.15    <u>Insurance</u>.  Borrower shall:

(a)     maintain to maintain the following minimum insurance coverages on itself, the Projects, and the Pledged Collateral:

(1)     Commercial General Liability insurance, for bodily injury and property damage, with limits of not less than: Two Million AND No/100 Dollars ($2,000,000.00) per occurrence and Two Million AND No/100 Dollars ($2,000,000.00) annual aggregate, and naming Lender as an additional insured under such policy;

(2)     All Risk property insurance covering the replacement cost of the Project and naming Lender as an additional insured and loss payee with respect thereto with a maximum deductible of $25,000;

(3)     Fidelity/Crime Insurance for limits of at least One Million and No/100 Dollars ($1,000,000.00) per claim; and

(4)     such other insurance in such coverage types and in such coverage amounts as Lender may reasonably require.

(b)     Each insurance policy required by this Agreement shall be issued by a nationally-known insurance underwriter having an A.M. Best's rating of "A-/VII" or better, or, for underwriters not rated by A.M. Best, a quality equivalent to that of an A.M. Best rating of "A-/VII" or better, as determined by Lender in its reasonable discretion.

(c)     Each insurance policy shall provide that each insurer will provide Lender with written notice at least thirty (30) days prior to any termination or

material modification thereof.  If Borrower fails to pay any insurance premium, Lender shall have the right (but shall be under no duty) to pay such premiums, and Borrower shall promptly reimburse Lender all costs and expenses reasonably incurred by Lender, together with interest thereon at the Interest Rate.  In the event of an insurable loss with respect to any Project, Borrower shall deliver to Lender the full replacement cost of the Equipment from the insurance Proceeds to Lender. Borrower hereby on behalf of it-self authorizes and directs Lender, and Lender shall have the sole discretion, to apply or pay all such Proceeds to: (i) the payment of the Obligations, (ii) the restoration or replacement of the property destroyed or damaged, or (iii) Borrower.

(d)     Each such insurance policy set forth above shall include: (i) provisions or endorsements naming Lender as an additional insured; (ii) provisions that such insurance is primary insurance with respect to the interest of Lender and that any insurance maintained by Lender is excess and not contributory insurance with the insurance required hereunder; (iii) a cross-liability or severability of insurance interest clause; and (iv) provisions by which the insurer waives all rights of subrogation against Lender.

(e)     Borrower shall provide Lender with Certificates of Insurance, in form and substance acceptable to Lender, evidencing the policies, provisions and endorsements listed above as a condition of closing of each advance under the Term Loan and, during the term of the Term Loan, promptly upon the request of Lender.

6.16     Inspections.  Upon written notice to Borrower, Borrower shall allow Lender (or its designee) to inspect the Projects to confirm that Borrower is constructing, operating and maintaining the Projects in accordance with this Agreement, and Borrower shall use best efforts to facilitate such inspections.  Borrower shall not rely on Lender's inspection for any purpose and shall be solely responsible for ensuring that the Projects are installed, constructed, operated and maintained in accordance with prudent industry standard. Lender's inspection of the Projects or the disbursement of an advance under the Term Loan shall not be deemed to constitute Lender's approval or warranty of the Projects, the Project Equipment, or any contractor or vendor and/or its continued operation.

6.17     Material Agreements.  Borrower shall comply in all respects with all material existing and future agreements, indentures, mortgages, or documents which are binding on it or affecting any of its properties or business.

6.18     Taxes.  Borrower shall file and caused to be filed when and as due all federal, state, local and foreign income, profits, franchise, sales, use, occupation, property, excise and other tax returns and tax reports required to be filed with respect to the business and assets of Borrower, including without limitation the Pledged Collateral, with the appropriate Governmental Authority, and pay, when and as due, all such taxes to all such appropriate Governmental Authority.

6.19    Payment of Lender's Fees, Costs and Expenses.  Borrower shall pay to Lender, or as Lender directs, all reasonable fees, charges, costs and expenses of the Lender including any third-party fees, legal fees, accounting fees, inspection fees and other fees related to the Term Loan and required to satisfy the conditions of the Loan Documents. Borrower will hold Lender harmless and indemnify Lender from all claims of brokers and "finders" arising by reason of the execution and delivery hereof or the consummation of the transaction contemplated hereby that claim to have been introduced to the transaction by Borrower.

6.20    Correction of Project Defects.  Borrower will correct or cause the correction of any defects in any Project and any material departures or deviations from any Project not approved in advance and in writing by Lender.

6.21    Management of Project Equipment.  Borrower shall cause the Project Equipment to be managed, operated and maintained in compliance with the ESS, manufacturer's specifications, the Generac Agreement, and with all applicable federal, state and local laws, ordinances and regulations.  Additionally, at all times applicable hereto, Borrower shall cause any and all Project Equipment to be connected to the Internet and shall afford Generac at least such Internet and other access to the Project Equipment as required by the terms of the Generac Agreement.

6.22    Maintenance of Project Equipment.  Borrower shall cause the Project Equipment to be maintained in good operating condition, reasonable wear and tear excepted.

6.23    Maintenance of Pledged Collateral. Borrower will properly protect and maintain the Pledged Collateral and defend the Pledged Collateral against any claims and/or demands against it.   Borrower shall use reasonable means to use reasonable means to ensure that the Project Equipment is not affixed to real estate in a manner so as to be deemed a "fixture" as defined under the Uniform Commercial Code.

6.24    Change of Place of Business.  Borrower shall notify Lender in writing at least thirty (30) days prior to any change in Borrower's place of business, or, if Borrower has or acquires more than one place of business, at least thirty (30) days prior to any change in either Borrower's chief executive office and/or the office or offices where Borrower's books and records are kept.

6.25    Further Assurances. Borrower shall, upon Lender's request at any time, take all actions reasonably required to assure to the Lender a perfected security interest in the Pledged Collateral.

6.26    Cooperation. Borrower shall cooperate and use all reasonable efforts to cooperate and use all reasonable efforts, in good faith, to make all registrations, filings and applications and to give all notices and obtain all governmental and regulatory consents, authorizations, approvals, licenses, Permits, orders, qualifications and waivers necessary or desirable for the consummation of the transactions contemplated in this Agreement.

6.27    <u>Collateral Accounts; Collections</u>.

(a)    The Borrower shall maintain, and shall cause its Affiliates to maintain, in full force and effect each of the Collateral Accounts in accordance with the terms of the Loan Documents.

(b)    The Borrower shall, and shall cause each of its Affiliates to, remit all Generac Guaranteed Payments received from Generac to the Generac Guaranteed Payments Account for deposit in accordance with the terms of the Loan Agreements.

(c)    The Borrower shall, and shall cause each of its Affiliates to, remit all Customer Payments received from Customers to the Customer Payments Account for deposit in accordance with the terms of the Loan Agreements.

(d)    The Borrower shall, and shall cause each of its Affiliates to, direct any proceeds of any Generac Guaranteed Payments received from Generac to the Generac Guaranteed Payments Account.

6.28    <u>Non-Discrimination</u>.  The Borrower shall comply with all federal and state laws regarding non-discrimination. The Borrower shall provide, and shall include in all contracts and subcontracts entered into in connection with the Project Equipment after the date hereof, a requirement that all contractors and subcontractors engaged in the installation of the Project Equipment shall provide equal opportunity for housing or employment without discrimination in accordance with applicable state and federal laws. The Borrower shall use its best efforts to assure compliance with this requirement, including prosecution of an action to enforce contract compliance, if necessary.

6.29    <u>State Contracting Terms</u>. Lender is a quasi-public agency of the state of Connecticut and the state of Connecticut requires certain certifications for certain parties contracting with quasi-public agencies.  Attached hereto as **Schedule B** are the State Contracting Standard Terms and Conditions applicable to the execution and performance of this Agreement (the "***State Contracting Standard Terms and Conditions***").  References to the "Contract" or "contract" shall mean this Agreement and references to "Contractor" or "contractor" shall mean the Borrower.

## 7.    **NEGATIVE COVENANTS.**

The Borrower hereby covenants and agrees that on the Closing Date and thereafter so long as this Agreement is in effect and until such time as the Term Loan Commitment has been terminated, no Term Note remains outstanding and the Term Loan, together with interest, Fees and all other Obligations incurred hereunder and under the other Loan Documents, have been indefeasibly paid in full, it shall not, as applicable:

7.1    <u>Additional Indebtedness</u>.  The Borrower shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness at any time, except the following (collectively, the "***Permitted Indebtedness***"):

(a)    the Obligations and all other Indebtedness owing to Lender under the Loan Documents and as set forth in the Lien Subordination Agreement;

(b)    taxes, assessments and governmental charges that are not yet due and payable;

(c)    Indebtedness owing to the Subordinating Lenders as of the date hereof that is: (i) specified in the financial statements referred to in the Disclosure Schedule; (ii) set forth in, and subject to, the Lien Subordination Agreement; and (iii) is set forth in **Schedule 7.1(c) of the Disclosure Schedules**, and any extensions, renewals and refinancings thereof, so long as such extensions, renewals or refinancings do not increase the amount of the original Indebtedness (the "***Subordinating Lender Indebtedness***"); ~~and~~

(d)    Indebtedness under the First Lien Backleverage Facility, and any Permitted Backleverage Refinancing of such Indebtedness; and

(e)    ~~(d)~~ unsecured trade accounts payable incurred in the ordinary course of business; *provided*, *however*, (1) such trade payables are payable not later than ninety (90) days after the original invoice date and are not overdue by more than thirty (30) days, and (2) the aggregate amount of such trade payables outstanding does not, at any time, exceed Five Hundred Thousand AND No/100 Dollars ($500,000.00) in the aggregate for the Borrower and the Subsidiaries.

In no event shall any Indebtedness, other than the Obligations, be secured, in whole or in part, by the Pledged Collateral or any portion thereof or interest therein and any proceeds of any of the foregoing unless such security was created without the consent of the Borrower, in which case Borrower shall have not less than thirty (30) days to fully bond over, or reserve against, any such involuntary interest.

7.2    <u>Accounting Policies and Procedures</u>.  The Borrower shall not change its fiscal year or any of its fiscal quarters from those in effect on the date hereof, change any of its accounting or auditing policies, practices or procedures in effect on the date hereof, unless it has given the Lender not less than ninety (90) days' prior written notice of its intention to do so and has amended the financial covenants set forth herein to the extent necessary, in the opinion of the Lender, to preserve the usefulness to the Lender of such financial covenants as a means of ascertaining the financial condition of Borrower.

7.3    <u>Liens</u>.  The Borrower shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien of any kind upon, or any

security interest in, any of the Project Equipment or the Pledged Collateral, whether now owned or hereafter acquired.

7.4     Merger, Consolidation, Dissolution or Liquidation.  The Borrower shall not enter into any merger, consolidation, liquidation, or voluntary dissolution, or lease or acquire all or substantially all of the assets of any Person or of any division or business unit of any Person, or sell, lease, license or otherwise dispose of all or a significant portion of its assets.

7.5     Change of Name.  The Borrower shall not change the name or the legal form of Borrower's business.

7.6     Change of Address.  The Borrower shall not change the address of its principal offices without first giving Lender thirty (30) days' prior written notice.

7.7     Change of Control.  The Borrower shall not enter into, allow, or suffer to exist a Change of Control to which Lender has not provided its prior written consent, which consent may be withheld, delayed or conditioned in Lender's sole and absolute discretion.

7.8     Insurance Policies.  The Borrower shall not cancel or change any material existing insurance policy required under this Agreement, unless replaced by an insurance policy providing substantially the same coverage, and such replacement insurance policy or policies are in compliance with the terms hereof.

7.9     Sale or Relocation of Project Equipment.  The Borrower shall not sell or relocate the Project Equipment outside of the State of Connecticut.

7.10     Use of Proceeds of the Term Loan.  The Borrower shall not allow the proceeds of the Term Loan to be used for any purpose, except (i) as set forth in Section 4.7 of this Agreement; or (ii) a purpose for which the Borrower receives the Lender's prior written consent.

7.11     Pledged Collateral.  The Borrower shall not take any action that will, or is reasonably likely to, impair: (i) the value of the Pledged Collateral in any manner; or (ii) (A) the legality, validity, or enforceability of the Security Agreement, or (B) the legality, validity, enforceability, or priority of the Lender's security interest in the Collateral identified and described in such Security Agreement.

7.12     No Assignments.  Borrower shall not to transfer, assign, pledge or hypothecate any right or interest in any payment or advance due pursuant to this Agreement, or any of the other benefits of this Agreement, without the prior written consent of Lender.  Any assignment made or attempted by Borrower without the prior written consent of Lender shall be void.  No consent by Lender to an assignment by Borrower shall release Borrower as the party primarily obligated and liable under the terms of this Agreement unless Borrower shall be released specifically by Lender in writing.  No consent by Lender to an assignment shall be deemed to be a waiver of the requirement of prior written consent by Lender with respect to

each and every further assignment and as a condition precedent to the effectiveness of such assignment.

## 8.    **EVENTS OF DEFAULT.**

8.1    <u>Events of Default</u>.  Any of the following specified events which are continuing after expiration of all applicable cure periods shall constitute an Event of Default (each an "***Event of Default***"):

(a)    *Payments*.  Borrower shall fail to make a payment when due under the Term Loan, this Agreement, or any other Loan Document, or if Borrower shall fail to timely fund a reserve or escrow under the Loan Documents; or

(b)    *Representations, etc*.  any representation, warranty or statement made by Borrower herein or in any other Loan Document or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect (without duplication as to any materiality modifiers, qualifications, or limitations applicable thereto) on the date as of which made, deemed made, or confirmed; or

(c)    *Certain Covenants*. Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in Sections 6.1, 6.3, 6.7, 6.11, 6.12, 6.14, 6.25, 6.26 or 6.27 or Section 7 of this Agreement; or

(d)    *Other Covenants*.  Borrower shall default in the due performance or observance by it of any term, covenant or agreement contained in this Agreement or any other Loan Document (other than those referred to in Section 8.1(a) or (b) or (c) above); or

(e)    *Cross-Default Under Other Agreements*.  Borrower shall (i) default in any payment with respect to any Indebtedness and such default shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness; or (ii) default in the observance or performance of any agreement, covenant or condition relating to any Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto (and all grace periods applicable to such observance or performance shall have expired), or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause any such Indebtedness to become due prior to its stated maturity; or (iii) any such Indebtedness of Borrower shall be declared to be due and payable, or shall be required to be prepaid (other than by a regularly scheduled required prepayment or redemption, prior to the stated maturity thereof; or

(f)      *Invalidity of Loan Documents*.  any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or under such Loan Document or satisfaction in full of all the Obligations, ceases to be in full force and effect, and the Borrower shall fail to provide a replacement for such Loan Document(s) that is acceptable to Lender, in its reasonable discretion, within thirty (30) days from written request from Lender; or Borrower or any of its Subsidiaries contests in any manner the validity or enforceability of any provision of any Loan Document; or the Borrower or any of its Subsidiaries denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(g)      *Invalidity of Liens*.  any security interest and Lien purported to be created by any Collateral Document shall cease to be in full force and effect with respect to any portion of the Collateral (other than in accordance with the terms hereof and thereof), or shall cease to give the Lender, the Liens, rights, powers and privileges purported to be created and granted under such Collateral Documents (including a perfected first priority security interest in and Lien on, the Collateral thereunder (except as otherwise expressly provided in such Collateral Document)) or shall be asserted by Borrower or any of its Subsidiaries not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Collateral Document) security interest in or Lien on a material portion of the Collateral covered thereby, and the Borrower or any of its Subsidiaries shall fail to provide a replacement for such Collateral Document, Lien and/or Collateral that is acceptable to Lender, in its reasonable discretion; or

(h)      *Judgments*.  (i) one or more judgments, orders or decrees shall be entered against Borrower involving a liability (other than a liability covered by insurance as to which the carrier has not effectively disclaimed coverage) that is likely to constitute a Material Adverse Effect for Borrower or to impair the Pledged Collateral, and any such judgments, orders or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within twenty (20) days (or such longer period, not in excess of sixty (60) days, during which enforcement thereof, and the filing of any judgment Lien, is effectively stayed or prohibited) from the entry thereof; or (ii) one or more judgments, orders or decrees shall be entered against Borrower and/or any of its Subsidiaries involving a required divestiture of any material properties, assets or business that is likely to constitute a Material Adverse Effect for Borrower or to impair the Pledged Collateral, and any such judgments, orders or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within twenty (20) days (or such longer period, not in excess of sixty (60) days, during which enforcement thereof, and the filing of any judgment Lien, is effectively stayed or prohibited) from the entry thereof; or

(i)     *Insolvency Event*.  any Insolvency Event shall occur with respect to Borrower; or

(j)     *Illegal Activity*.  Borrower shall participate in any illegal activity, whether or not related to the business of Borrower, that may subject the assets in excess of $100,000 of Borrower to: (i) a restraining order or any form of injunction issued by any federal or state court, or (ii) seizure, forfeiture or confiscation by any federal or state governmental instrumentality; or

(k)     *ERISA*.  any ERISA Event shall have occurred and either (i) such event or events could reasonably be expected to have a Material Adverse Effect or (ii) there shall result from any such event or events the imposition of a Lien; or

(l)     *Cessation of Business*.  any cessation of a substantial part of the business of Borrower for a period that could reasonably be expected to have a Material Adverse Effect, such period being a minimum of sixty (60) days; or

(m)     *Environmental*.  Borrower or any of its Subsidiaries shall have any Environmental Liabilities and Costs (other than Environmental Liabilities and Costs covered by insurance, as to which the carrier has not effectively disclaimed coverage), the payment of which is reasonably probable and which could reasonably be expected to have a Material Adverse Effect (after taking into consideration available claims or rights of recovery that Borrower or any of its Subsidiaries may have against any third- party, to the extent reasonably expected to be realized); or

(n)     *Material Adverse Effect*.  any other event shall occur, which could reasonably be expected to have a Material Adverse Effect; or

(o)     *Change of Control*.  the occurrence of a Change of Control, without the Lender's prior written consent; or

(p)     *Security Agreement*.  Borrower commits an Event of Default under the Security Agreement or any of the other Loan Documents; or

(q)     *First Lien Backleverage Credit Agreement; Second Lien Backleverage Credit Agreement*.  an Event of Default, as such term is defined in the First Lien Backleverage Credit Agreement or the Second Lien Backleverage Credit Agreement, has occurred; or

(r)     *Breach of Agreement Between Borrower and Lender*.  Borrower breaches and/or defaults under any agreement between Borrower and Lender; or

(s)     *Subordinating Lenders*.  Borrower defaults under any of its obligations to Subordinating Lenders with respect to the Pledged Collateral; or

(t)     *Liens on Pledged Collateral*.  any lien or encumbrance of any kind or character, other than any Permitted Encumbrances, shall attach to the Pledged Collateral, or any portion thereof, or any levy, seizure or attachment thereof or thereon; or

(u)     *Lender's Lien on Pledged Collateral*.  Lender's Lien on or security interest in any of the Pledged Collateral becomes unenforceable.

8.2     <u>Cure Rights</u>.  If any default, other than a default under Sections 8.1(a), 8.1(b), 8.1(c), 8.1(f), 8.1(h), 8.1(i), 8.1(k), 8.1(l), 8.1(o) or 8.1(t), is curable and if Borrower has not been given a notice of a similar default within the preceding three (3) months, it may be cured (and no Event of Default will have occurred) if Borrower, after receiving written notice from Lender demanding cure of such default:

(a)     cures the default, if such default requires the payment of money to Lender, within ten (10) days, or thirty (30) days, if such default does not require the payment of money to Lender, or

(b)     if the cure requires more than thirty (30) days, promptly initiates steps to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

Nothing in this Section 8.2 shall require Lender to provide Borrower with an additional ten (10) days to cure any event of default occurring under any of the other Loan Documents, which event of default was not cured within any applicable grace period provided therein.  Any notice and cure period shall not be made available to Borrower if Lender determines, in its sole discretion, that Lender's rights with respect to Borrower and/or the Pledged Collateral could be materially adversely affected.

8.3     <u>Remedies</u>.

(a)     Subject to any applicable notice and cure periods, upon the occurrence of any Event of Default, and at any time thereafter, if any Event of Default shall then be continuing, the Lender may, as the true and lawful agent of Borrower, with power of substitution for Borrower and in either Borrower's name, Lender's name or otherwise, for the use and benefit of Lender, take any or all of the following actions, without prejudice to the rights of the Lender to enforce its claims against the Borrower in any manner permitted under Applicable Law:

i.     declare the Term Loan Commitment terminated, whereupon the Term Loan Commitment of Lender shall forthwith terminate immediately without any other notice of any kind;

ii.     declare the principal of and any accrued interest in respect of the Term Loan and all other Obligations owing hereunder and thereunder to be,

whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower;

iii.  to offset any amounts owed by Borrower to Lender, which are not paid when due, against any amounts due and owing by Lender to Borrower from any source whatsoever;

iv.  to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Pledged Collateral or any part of it;

v.  to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any part of the Pledged Collateral;

vi.  to commence and prosecute any and all suits, actions or proceedings at law or in equity or otherwise in any court of competent jurisdiction to collect on any of the Pledged Collateral or to enforce any rights in respect of any Pledged Collateral;

vii.  to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating or pertaining to all or any portion of the Pledged Collateral;

viii.  to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Pledged Collateral and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though Lender were the absolute owner of the Pledged Collateral for all purposes; and/or

ix.  exercise any other right or remedy available under any of the Loan Documents or Applicable Law.

(b)    *Lender's Costs and Expenses*.  Lender shall be entitled to recover its costs and expenses including reasonable attorneys' fees in any legal or equitable action resulting from an Event of Default hereunder.  Borrower shall promptly reimburse Lender promptly for all reasonable attorneys' fees, costs and expenses Lender incurs in exercising any and all of its remedies, including the costs and expenses incurred by Lender in inspecting Borrower's books and records, plus interest on the amount of such costs and expenses from the date incurred by Lender to the date reimbursed by Borrower, calculated in accordance with Section 2.6, and Lender shall be entitled to offset such amounts against payment of any amounts owed to Borrower from any source whatsoever.

(c)      *No Requirement to First Foreclose on or Liquidate Pledged Collateral*. Upon the occurrence of an Event of Default, Lender may institute a suit directly against Borrower without first foreclosing on or liquidating the Pledged Collateral, and Borrower waives any requirement that Lender first foreclose on or liquidate the Pledged Collateral.

(d)      *Default Rate*.  Upon the occurrence of an Event of Default, Lender, in its sole discretion may increase the rate of interest accruing and payable on the Term Loan to a rate equal to the Default Rate, for as long as any portion of the Term Loan remains outstanding.

(e)      *Execution of Additional Documents*.  Upon the written demand of the Lender, the Borrower shall execute and deliver to the Lender an assignment or assignments of any or all of the Pledged Collateral and such other documents and take such other actions as are necessary or appropriate to carry out the intent and purposes hereof.

(f)      *Possession of Pledged Collateral*.  After the occurrence of an Event of Default and in the event of a failure of the foregoing remedies, Lender may, after reasonable notice to Borrower, with ten (10) days constituting reasonable notice, and in accordance with Applicable Law, enter onto the Premises, and take possession of the Pledged Collateral.

(g)      *Lender's Right to Dispose of Pledged Collateral*. Consistent with Applicable Law, Borrower agrees that Lender shall have the right to sell or otherwise dispose of all or any part of the Pledged Collateral, at public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as Lender shall deem appropriate. Lender shall be authorized at any such sale, if it deems it advisable to do so, to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment and not with a view to the distribution or sale of it, and upon consummation of any such sale Lender shall have the right to assign, transfer and deliver to the purchaser or purchasers the Pledged Collateral so sold. Each such purchaser at any such sale shall hold the property sold absolutely free from any claim or right on the part of Borrower, and Borrower hereby waives to the fullest extent permitted by law, all rights of redemption, stay and appraisal which Borrower now has, or may have at any time in the future, under any rule of law or statute now existing or hereafter enacted.

(h)      *Lender Appointed Attorney-in-Fact*.  Upon Borrower's receipt of written notice of an Event of Default pursuant to Section 8, Lender is automatically appointed without any further action by Borrower to act as attorney-in-fact on behalf of Borrower for the purposes of carrying out the provisions of this Agreement and taking any action and executing any instrument or other writing

which Lender may deem reasonably necessary or advisable to accomplish the purposes hereof, which appointment is irrevocable and coupled with an interest.

8.4 <u>Application of Certain Payments and Proceeds</u>. All payments and other amounts received by the Lender through the exercise of remedies hereunder or under the other Loan Documents shall, unless otherwise required by the terms of the other Loan Documents or by applicable law, be applied as follows:

(a) FIRST, to the payment of that portion of the Obligations constituting fees, costs, indemnities, and expenses payable Lender in connection with such collection or sale, or otherwise in connection with this Agreement or any other agreement in connection with the Term Loan, including, without limitation, all court costs and reasonable attorneys' fees, costs, disbursements and other charges of its agents and legal counsel, whether incurred in any action or proceeding either between the Parties or between Lender and any third party;

(b) SECOND, to the payment of that portion of the Obligations constituting any and all accrued and unpaid interest on the Term Loan;

(c) THIRD, to the payment of that portion of the Obligations constituting unpaid principal of the Term Loan;

(d) FOURTH, to the payment of all other Obligations of the Borrower owing under or in respect of the Loan Documents that are then due and payable to the Lender; and

(e) FINALLY, any remaining surplus after all of the Obligations have been paid in full, to the Borrower or to whomsoever shall be lawfully entitled thereto.

Lender shall have absolute discretion as to the time of application of any such Proceeds, moneys or balances in accordance with this Agreement. Upon any sale of the Pledged Collateral by Lender, including pursuant to a power of sale granted by statute or under a judicial proceeding, the receipt of the consideration by Lender or of the officer making the sale shall be a sufficient discharge to the purchaser of the Pledged Collateral so sold and such purchaser shall not be obligated to see to the application of any part of the purchase money paid over to Lender or such officer or be answerable in any way for the misapplication thereof.

9. **MISCELLANEOUS.**

9.1 <u>Amendments; Waivers</u>.

(a) *No Deemed Waivers; Remedies Cumulative*. No failure or delay by the Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power,

preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of an advance under the Term Loan shall not be construed as a waiver of any Default, regardless of whether the Lender may have had notice or knowledge of such Default at the time.

(b)     *Amendments*.  Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof, may be amended, changed, waived or otherwise modified unless such amendment, change, waiver or other modification is in writing and signed by Borrower and the Lender. The representations, warranties, covenants and conditions set forth in this Agreement may be waived only by a written instrument executed by the Party so waiving.  The failure of any Party at any time or times to require performance of any provision of this Agreement shall in no manner affect the right of such Party at a later time to enforce the same. No waiver by any Party of any condition, or breach of any term, covenant, agreement, representation or warranty contained in this Agreement shall be deemed to be or construed as a waiver of any other condition or of the breach of any other term, covenant, agreement, representation or warranty contained in this Agreement.

9.2     <u>Survival of Representations, Warranties and Covenants</u>.        All representations, warranties and covenants of the Parties contained in or made pursuant to this Agreement, and in any document, certificate or statement delivered pursuant hereto or in connection herewith, shall survive until this Agreement expires or is sooner terminated or, in the case of a third-party claim against Lender with respect to the Loan Documents, the indemnity obligations set forth in the Loan Documents.

9.3     <u>Payment of Expenses</u>.    Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Lender and its affiliates (including the reasonable fees, charges and disbursements of outside counsel for the Lender), in connection with the preparation, negotiation, execution, and delivery of this Agreement and the other Loan Documents and the Closing; and (ii) all out-of-pocket expenses incurred by the Lender (including the fees, charges and disbursements of any outside counsel for the Lender), in connection with (x) any amendments, modifications or waivers of the provisions hereof or thereof, and (y) the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of this Agreement and the Loan Documents.

9.4     <u>Indemnification</u>.      In consideration of the Lender's execution and delivery of this Agreement and the consummation of the transactions contemplated hereunder

and in addition to all of the Borrower's other obligations under this Agreement and the Loan Documents, Borrower shall defend, protect, indemnify and hold harmless the Lender and all of its affiliates, officers, directors, managers, members, employees and agents (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "***Indemnitees***") from and against each of the following (the "***Indemnified Liabilities***"):

(a)    subject to the limitations in clause (i) of Section 9.3 governing the costs and expenses arising in connection with the preparation, negotiation, execution, and delivery of this Agreement and the other Loan Documents and the Closing, any and all expenses, costs, actions, causes of action, liabilities, suits, claims, losses, penalties, fees, liabilities, and damages (including among others reasonable attorney's fees and disbursements) arising out of or incurred in connection with this Agreement, the Loan Documents and/or the transactions contemplated herein or therein (including without limitation costs related to the Closing, costs of collection, and costs related to waivers, consents, and enforcement of rights) except for any such liabilities arising on account of the particular Indemnitee's gross negligence or willful misconduct; and

(b)    any and all actions, causes of action, liabilities, suits, claims, losses, costs, penalties, fees, liabilities, damages, and expenses including, but not limited to, all costs of investigation, monitoring, legal representation, remedial response, removal, restoration or Permit acquisition of any kind whatsoever, which may now or in the future be undertaken, suffered, paid, awarded, assessed, or otherwise incurred by the Indemnitees (or any other Person with a claim on the Lender or to whom the Lender has or have liability or responsibility of any sort) related to, resulting from or arising out of (i) the presence of any hazardous substance or a release or the threat of a release of any hazardous substance on, at or from Borrower's or any of its Subsidiary's Real Property, (ii) the failure to promptly undertake and diligently pursue to completion all necessary, appropriate and legally authorized investigative, containment, removal, restoration and other remedial actions with respect to any release or the threat of a release of any hazardous substance on, at or from Borrower's or any of its Subsidiary's Real Property, (iii) human exposure to any hazardous substance, noises, vibrations or nuisances of whatever kind to the extent the same arise from the condition of any Borrower's or any of its Subsidiary's Real Property or the ownership, use, operation, sale, transfer or conveyance thereof, (iv) a violation of any Environmental Law or any other Applicable Law related to the environment, and (v) non-compliance with any environmental Permit, incurred by the Indemnitees or any of them as a result of, or arising out of, or relating to the transactions contemplated by this Agreement and the Loan Documents. To the extent that the foregoing undertaking by Borrower may be unenforceable for any reason, Borrower shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. Notwithstanding anything to the contrary contained herein, Borrower's liability

and obligations under this Section 9.4 shall survive the discharge, satisfaction or assignment of this Agreement by the Lender and the payment in full of all of the Obligations.

(c)    The Indemnified Liabilities shall be deemed to include, without limitation, any sums which the Lender reasonably deems it necessary or desirable to expend to protect its security interests and liens under this Agreement and/or any Loan Document.

9.5    Usury.  This Agreement and the Loan Documents are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or maturity of the Indebtedness evidenced hereby or thereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the Indebtedness evidenced hereby or thereby exceed the maximum permissible under applicable law.  As used herein, the term "applicable law" shall mean the law in effect as of the date hereof, *provided*, *however* that in the event there is a change in the law which results in a higher permissible rate of interest, then the Loan Documents shall be governed by such new law as of its effective date. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from any circumstances whatsoever the Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of this Agreement and all Loan Documents.

9.6    Payment Set Aside.  To the extent that Borrower makes a payment or payments to the Lender hereunder or under the Loan Documents or the Lender enforces or exercises its rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, or are required to be refunded, repaid or otherwise restored to Borrower, a trustee, receiver or any other Person under any law, then to the extent of any such set off, recovery, refund, repayment or restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or such set off, recovery, refund, repayment or restoration had not occurred.

9.7    Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Lender and each of its affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or its affiliates, irrespective of whether or not such Lender or affiliate shall have made any demand under this Agreement or any other Loan Document and

although such obligations of the Borrower may be contingent or unmatured or are owed to a branch, office or affiliate of such Lender different from the branch, office or affiliate holding such deposit or obligated on such Indebtedness.  The rights of the Lender and its affiliates under this Section 9.7 are in addition to other rights and remedies (including other rights of setoff) that such Lender or its affiliates may have.  The Lender agrees to notify the Borrower promptly after any such setoff and application; *provided*, *however*, that the failure to give such notice shall not affect the validity of such setoff and application.

       9.8      <u>Successors and Assigns</u>.  Except as otherwise expressly provided herein, all covenants and agreements contained in this Agreement by or on behalf of any of the Parties hereto shall bind and inure to the benefit of the respective successors and assigns of the Parties hereto.  In addition, and whether or not any express assignment has been made, the provisions of this Agreement which are for the Lender's benefit holder of the Term Note(s) are also for the benefit of, and enforceable by, any subsequent holder of the same.  The Borrower may not assign any of its obligations, duties or rights under this Agreement, or under the Term Note(s) issued hereunder, except with the Lender's consent.

       9.9      <u>Notices</u>.  Any and all notices or other communications required or permitted under this Agreement shall be in written communication given: (i) by delivery to a commercially recognized ground or air courier service which provides a receipt for delivery, (ii) by certified mail, postage prepaid, return receipt requested, or (iii) by hand delivery with delivery receipt, addressed to the person to whom such communication is to be given, at the following addresses, addressed as follows:

              If to Lender:    Connecticut Green Bank
                            75 Charter Oak Ave.
                            Hartford, Connecticut 06106
                            Attn: General Counsel

              With a copies to (which shall not constitute notice):

                    Wiggin and Dana LLP
                    One Century Tower
                    265 Church Street, 17th Floor
                    New Haven, Connecticut 06510
                    Attn: Paul A. Hughes, Esq.

                    and

                    Wiggin and Dana LLP
                    One Century Tower
                    265 Church Street, 17th Floor
                    New Haven, Connecticut 06510
                    Attn: Jonathan F. Tross, Esq.

              If to Borrower:

PosiGen, Inc.
819 Central Ave., Ste. 210,
New Orleans, Louisiana 70121
Attn: Benjamin Healey

Any Party may change the address to which notices or other communications are to be sent to it by giving written notice of such change in the manner provided above for all notices.

A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or two (2) Business Days after mailing; or (c) in the case of overnight courier service, on the Business Day after the same was sent. A Party receiving a notice which does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given.

9.10    Liability of Lender. Lender shall in no event be responsible or liable to any Person other than Borrower for the disbursement of or failure to disburse the proceeds of the Term Loan or any part thereof and no subcontractor, laborer or material supplier shall have any right or claim against Lender under this Agreement or the administration thereof.

9.11    Assignment. This Agreement may not be assigned by the Borrower without the prior written consent of the Lender. Borrower shall not transfer, assign, pledge or hypothecate any of its rights to Loan advances, or any of its rights or obligations under this Agreement, without the prior written consent of Lender. Any assignment made or attempted by Borrower without the prior written consent of Lender shall be void. No consent by Lender to an assignment by Borrower shall either (a) release Borrower as the party primarily obligated and liable under the terms of this Agreement unless Borrower shall be released specifically by Lender in writing, or (b) be deemed to be a waiver of the requirement of prior written consent by Lender with respect to each and every further assignment. The Lender shall be entitled to recover its reasonable costs and expenses including administration and attorneys' fees in connection with any such assignment. Lender may assign its rights and delegate its obligations under this Agreement to one or more Subsidiaries or affiliates of Lender.

9.12    Entire Agreement. This Agreement, together with the Term Note(s) and the Loan Documents, sets forth the entire agreement and understanding of the Parties in respect of the transactions contemplated by this Agreement, and supersedes all prior agreement, arrangements and understandings relating to the subject matter of this Agreement.

9.13    No Third Party Beneficiary. Nothing in this Agreement is intended or shall be construed to give any Person any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein, other than the Parties.

9.14    Incorporation of Preamble and Recitals. The preamble and recitals set forth above are an integral part of this Agreement and set forth the intentions of the Parties and

the premises on which the Parties have decided to enter into this Agreement. Accordingly, the preamble and recitals set forth above, and all defined terms set forth in such preamble and in such recitals, are fully incorporated into this Agreement by this reference as if fully set forth herein.

9.15    <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") shall be effective as delivery of a manually executed counterpart thereof.  Unless otherwise provided in this Agreement, the words "execute", "execution", "signed", and "signature" and words of similar import used in or related to this Agreement, or in any amendment or modification hereof (including waivers and consents), shall be deemed to include electronic signatures (including, without limitation, DocuSign and AdobeSign) and the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Connecticut Uniform Electronic Transactions Act, and other similar state laws based on the Uniform Electronic Transactions Act.

9.16    <u>Titles, Headings, and Captions</u>. The titles, headings, and captions used in this Agreement are inserted only as a matter of convenience and in no way affect the terms or intent of any provisions of this Agreement.  Unless otherwise specifically stated, all references herein to "sections" and "exhibits" will mean "sections" and "exhibits" to this Agreement.

9.17    <u>Interpretation</u>.  Each of the Parties expressly acknowledges and agrees that the Parties have participated jointly in the negotiation and drafting of this Agreement.   In recognition of the fact that each of the Parties had an equal opportunity to negotiate the language of, and draft, this Agreement, the Parties acknowledge and agree that there is no single drafter of this Agreement and, therefore, the general rule that ambiguities are to be construed against the drafter is, and shall be, inapplicable to this Agreement.  If any language in this Agreement is found or claimed to be ambiguous, each Party shall have the same opportunity to present evidence as to the actual intent of the Parties with respect to any such ambiguous language without any inference or presumption being drawn against any Party hereto.

9.18    <u>Construction</u>. In this Agreement the singular includes the plural and the plural the singular; words importing any gender include the other genders; the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to agreements and other contractual instruments shall be deemed to include all subsequent amendments and other modifications, without prejudice to any provisions of this Agreement prohibiting such amendments and other modifications; and references to persons include their respective permitted successors and assigns.

9.19    <u>Severability</u>. If any provision of this Agreement is determined by any court or other tribunal of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the Parties hereto.  If such clause or provision cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.  Notwithstanding the foregoing, upon such determination that any term or other provision is invalid, illegal, or unenforceable, the court or other tribunal of competent jurisdiction making such determination is authorized and instructed to modify this Agreement so as to effect the original intent of the Parties as closely as possible so that the transactions and agreements contemplated herein are consummated as originally contemplated to the maximum extent permitted under Applicable Law.

9.20    <u>Governing Law</u>. **THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF CONNECTICUT, WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANY OTHER JURISDICTION.**

9.21    <u>Jurisdiction; Venue</u>.

(a)    *Consent to Jurisdiction*.  **EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT AND OF ANY CONNECTICUT STATE COURT SITTING IN NEW HAVEN, CONNECTICUT AND ANY APPELLATE COURT FROM ANY THEREOF FOR THE PURPOSES OF ALL ACTIONS, LITIGATIONS OR LEGAL PROCEEDINGS, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING THERETO, IN ANY FORUM OTHER**

**THAN THE COURTS OF THE STATE OF CONNECTICUT SITTING IN NEW HAVEN, CONNECTICUT, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT, AND ANY APPELLATE COURT FROM ANY THEREOF. EACH PARTY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR IN THE FUTURE HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.**

(b)      *Waiver of Venue*. EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN CLAUSE (a) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

9.22      <u>Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

9.23      <u>Prejudgment Remedy Waiver</u>. BORROWER ACKNOWLEDGES THAT THE TERM LOAN EVIDENCED BY THE TERM NOTE(S) IS A COMMERCIAL

TRANSACTION AS DEFINED IN CHAPTER 903a OF THE CONNECTICUT GENERAL STATUTES, AS AMENDED, AND WAIVES ITS RIGHTS TO NOTICE AND HEARING UNDER SAID CHAPTER 903a, OR AS OTHERWISE REQUIRED BY ANY STATE OR FEDERAL LAW, WITH RESPECT TO ANY PREJUDGMENT REMEDY WHICH THE LENDER MAY SEEK AND WAIVES ITS RIGHTS TO REQUEST THAT THE LENDER POST A BOND IN CONNECTION WITH ANY SUCH PREJUDGMENT REMEDY.

9.24    Limitation of Damages.    EXCEPT AS PROHIBITED BY APPLICABLE LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE, OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS. THESE WAIVERS CONSTITUTE A MATERIAL INDUCEMENT FOR THE LENDER TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. BORROWER REPRESENTS AND ACKNOWLEDGES THAT THESE WAIVERS ARE MADE KNOWINGLY, VOLUNTARILY AND INTENTIONALLY AFTER CONSULTATION WITH LEGAL COUNSEL.

9.25    Miscellaneous. Nothing in this Agreement shall be construed to create any duty to, any standard of care with reference to, or any liability to any Person not a party to this Agreement. No undertaking by one Party to the other under any provision of this Agreement shall constitute the dedication of Lender's system or any portion thereof to Borrower or to the public, nor affect the status of Lender as an independent instrumentality of the State of Connecticut, or Borrower as an independent entity. Lender's review or acceptance of the Project and its operation shall not be construed as confirming or endorsing the design or as any warranty of safety, durability, reliability and/or performance. Lender shall not by reason of such review or failure to review be responsible for the strength, safety, details of design, adequacy, capacity, reliability and/or operation of any Project, nor shall Lender's extension of the Term Loan to Borrower be deemed to be an endorsement of the Project, in whole or in part.

9.26    Relationship of the Parties. For purposes of this Agreement, Lender and Borrower expressly agree that the relationship of Lender to Borrower is that of a lender only. The intent of this provision is to clarify and stipulate that Lender is not a partner, fiduciary and/or coventurer of Borrower and that Lender's sole interest in the Pledged Collateral is for the purpose of security for repayment of the obligations of Borrower to Lender and of Grantor to Lender under the Security Agreement.

9.27    Participation and Loan Servicing. In its sole discretion, at any time Lender shall have the right to participate out all or a portion of any Term Loan or to engage a loan servicer for any Term Loan. Borrower shall execute such documents any take such actions as may be required in connection with such participation or servicing provided that

such documents or actions shall not increase the monetary liability of Borrower under the Loan Documents.

9.28    <u>Time is of the Essence</u>.  Time is of the essence for the Loan Documents.

9.29    <u>Freedom of Information Act</u>.    The Lender is a "public agency" for purposes of the Connecticut Freedom of Information Act ("**FOIA**").  This Agreement and information received pursuant to this Agreement will be considered public records and will be subject to disclosure under the FOIA, except for information falling within one of the exemptions in Conn. Gen. Stat. Sections § 1-210(b) and § 16-245n(d).    Because only the particular information falling within one of these exemptions can be withheld by the Lender pursuant to an FOIA request, Borrower should specifically and in writing identify to Lender the information that Borrower claims to be exempt.  Borrower should further provide a statement stating the basis for each claim of exemption.  It will not be sufficient to state generally that the information is proprietary or confidential in nature and not, therefore, subject to release to third parties. A convincing explanation and rationale sufficient to justify each exemption consistent with General Statutes §1-210(b) and § 16-245n(d) must be provided. Borrower acknowledges that (1) Lender has no obligation to notify Borrower of any FOIA request it receives, (2) Lender may disclose materials claimed by Borrower to be exempt if in its judgment such materials do not appear to fall within a statutory exemption, (3) Lender may in its discretion notify Borrower of FOIA requests and/or of complaints made to the Freedom of Information Commission concerning items for which an exemption has been claimed, but Lender has no obligation to initiate, prosecute, or defend any legal proceeding, or to seek to secure any protective order or other relief to prevent disclosure of any information pursuant to an FOIA request, (4) Borrower will have the burden of establishing the availability of any FOIA exemption in any such legal proceeding, and (5) in no event shall Lender or any of its officers, directors, or employees have any liability for the disclosure of documents or information in Lender's possession where Lender, or such officer, director, or employee, in good faith believes the disclosure to be required under the FOIA or other law.

(Signatures appear on the following pages)

IN WITNESS WHEREOF, each Party has caused its duly authorized representative to sign and deliver this Agreement as of the date first above written.

**BORROWER**:

**POSIGEN, INC.**

By: _____
Name: Thomas A. Neyhart
Title: CEO

[*Lender's signature appears on the following page*])

**LENDER**:

**CONNECTICUT GREEN BANK**


By:_____
Name: Bryan T. Garcia
Title: President & CEO

**EXHIBIT A**

**Generac Agreement**
(*attached*)

**EXHIBIT B**

**Available Borrowing Base Certificate**

AVAILABLE BORROWING BASE CERTIFICATE

Dated as of: _____

Connecticut Green Bank
75 Charter Oak Ave.
Hartford, Connecticut 06106
Attention: Bert Hunter, CIO

RE: Connecticut Green Bank/PosiGen, Inc.

Ladies and Gentlemen:

This certificate (this "***Certificate***") is delivered to you pursuant to Section 3.2 of that certain Term Loan Credit Agreement, dated as of October 7, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Term Loan Credit Agreement***"), by and between CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut (the "***Lender***") and POSIGEN, INC., a Delaware corporation (the "***Borrower***"). Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Term Loan Credit Agreement.

The Borrower hereby certifies to the Lender that, as of the date hereof:

Attached hereto as <u>Appendix A</u> are calculations showing the Available Borrowing Base, as of the Available Borrowing Base Determination Date, which were calculated in good faith and a manner consistent in all material respects with and supported by the Base Case Model.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Borrower has caused this Certificate to be duly executed and delivered as of the date first written above.

POSIGEN, INC.,
a Delaware corporation

By: _____
Name: Benjamin Healey
Title:  Chief Commercial Officer

**APPENDIX A TO AVAILABLE BORROWING BASE CERTIFICATE**

**Available Borrowing Base Calculations**
(*attached*)

**EXHIBIT C**

**Lien Subordination Agreement**
(*attached*)

**EXHIBIT D**

**Form of Security Agreement**
(*attached*)

**EXHIBIT E**

**Form of Borrowing Request**

Dated as of: _____

Connecticut Green Bank
75 Charter Oak Ave.
Hartford, Connecticut 06106
Attention: Bert Hunter, CIO

RE: Connecticut Green Bank/PosiGen, Inc.

Ladies and Gentlemen:

      This irrevocable Borrowing Request is delivered to you pursuant to Section 2.3(b) of the Term Loan Credit Agreement, dated as of October 7, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "***Term Loan Credit Agreement***"), by and between CONNECTICUT GREEN BANK, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut (the "***Lender***") and POSIGEN, INC., a Delaware corporation (the "***Borrower***"). Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Term Loan Credit Agreement.

1. The Borrower hereby requests that the Lender make an advance under the Term Loan to the Borrower in the aggregate principal amount of $_____ (the "***Proposed Advance***").

2. The Borrower hereby requests that such Proposed Advance be made on the following Business Day: _____.

3. The uses of the Proposed Advance are as follows:

4. The proceeds of the Proposed Advance should be transferred by wire to the following account(s):

| Amount Requested | Account Name | Bank Name and Address | Account Number | ABA/Routing Number |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

5.  The schedule of Customer Agreements attached to this Borrowing Request as **<u>Schedule 1</u>** (the "***Schedule of Customer Agreements with Favorable Pricing***") sets forth, as of the date of this Borrowing Request: (i) the name of each Customer who has executed a Customer Agreement that provides for Favorable Pricing; (ii) the address of the Premises of each such Customer; (iii) the rate of Favorable Pricing applicable to such Customer; and (iv) whether such Customer is an LI Customer or a Customer residing in an Underserved Community.

6.  The aggregate principal amount of all advances under the Term Loan outstanding as of the date hereof (including the Proposed Advance requested herein) does not exceed the maximum amount permitted to be outstanding pursuant to the terms of the Term Loan Credit Agreement.

7.  All of the conditions applicable to the Proposed Advance requested herein as set forth in the Term Loan Credit Agreement have been satisfied as of the date hereof and will remain satisfied to the borrowing date of such Proposed Advance.

8.  After giving effect to the Proposed Advance, the aggregate principal amount of the Term Loan outstanding will not be greater than either: (i) the Term Loan Commitment or (ii) the Available Borrowing Base, as of the borrowing date of such Proposed Advance.

9.  The Borrower hereby affirms that the following representations and warranties to Lender as of the date of this Borrowing Request; and this Borrowing Request shall also be deemed an affirmation of such representations and warranties as of the date of the Proposed Advance requested herein, as follows:

    a.  the representations and warranties contained in the Term Loan Credit Agreement are true and correct and shall be true and correct, both as of the date hereof and after giving effect to the Proposed Advance requested herein and to the application of the proceeds therefrom, as though made on and as of the date of this Borrowing Request and the date of the Proposed Advance requested herein; and

    b.  no event has occurred and is continuing, or would result from the Proposed Advance requested herein or from the application of the proceeds therefrom, which constitutes an Event of Default or which, with the giving of notice or the passage of time or both would constitute an Event of Default.

10. If this Borrowing Request pertains to the first Term Loan Borrowing under the Term Loan Credit Agreement, Borrower hereby represents and warrants that all conditions precedent to such advance set forth in Section 3.1 of the Term Loan Credit Agreement have been fulfilled and documents required for such fulfillment are attached to this Borrowing Request. If this Borrowing Request pertains to any subsequent Term Loan Borrowing, Borrower hereby represents and warrants that all conditions precedent set forth in Section 3.2 of the Term Loan Credit Agreement have been fulfilled and documents required for such fulfillment are attached to this Borrowing Request.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the undersigned have executed this Borrowing Request as of the day and year first written above.


POSIGEN, INC.,
a Delaware corporation


By: _____
Name: Benjamin Healey
Title:   Chief Commercial Officer

## SCHEDULE 1 TO FORM OF BORROWING REQUEST

### Schedule of Customer Agreements with Favorable Pricing

| Customer Name | Address of Premises | Favorable Pricing Rate | LI Customer or Underserved Community |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**EXHIBIT F**

**Form of Term Note**
(*attached*)

## EXHIBIT G

### Form of Compliance Certificate

<u>COMPLIANCE CERTIFICATE</u>

THIS CERTIFICATE (this "***Certificate***") is made as of *[_____, 2022__]*, by PosiGen, Inc. a Delaware corporation (the "***Borrower***"), to Connecticut Green Bank, an independent instrumentality of the State of Connecticut (the "***Lender***"), pursuant to Section 6.8(c) of the Term Loan Credit Agreement dated as of October 7, 2022 (as amended, modified, restated, substituted, extended and renewed at any time and from time to time, the "***Term Loan Credit Agreement***"), by and among the Borrower and the Lender.  Capitalized terms defined in the Term Loan Credit Agreement and not otherwise defined in this Certificate have shall have the meaning set forth in the Term Loan Credit Agreement.

I, *[_____]*, hereby certify that I am the *[Title of a Responsible Officer]* of Borrower and am a Responsible Officer authorized to certify to the Lender on behalf the Borrower as follows:

This Certificate is given to induce the Lender to make or continue advances to the Borrower under the Term Loan Credit Agreement and the other Loan Documents (defined therein).

This Certificate accompanies the *[audited/internally-prepared]* financial statements for the period ended *[_____, 20___]* (the "***Current Financials***") that the Borrower has furnished to the Lender pursuant to Section 6.8 of the Term Loan Credit Agreement.  The Current Financials fairly present in all material respects the financial condition and results of operations of Borrower, in accordance with GAAP consistently applied.

The Borrower continues to be organized solely under the laws of the state, commonwealth or district of organization identified in the Term Loan Credit Agreement and has not changed the state of its organization or organized under the laws of an additional state.

As of the date hereof, there exists no Default or Event of Default, and no change resulting in a Material Adverse Effect has occurred.

As of the most recent fiscal quarter, *[_____]* percent (*[___]%*) of Projects were removed from Customer homes and redeployed to new Customer homes during the preceding twelve (12) months.

The Debt Service Coverage Ratio is *[less/greater]* than the level specified in Section 6.4(a).

The Liquidity of Borrower is [*less/greater*] than the level specified in Section 6.4(b).

The ratio of Borrower's Debt to Borrower's Tangible Net Worth is [*less/greater*] than the level specified in Section 6.4(c).

The Tangible Net Worth of Borrower is [*less/greater*] than the level specified in Section 6.4(d);

The Delinquency Ratio is [*less/greater*] greater than the level specified in Section 6.4(e).

The following is a calculation of Cash Available for Debt Service, including an explanation in sufficient detail of how the cash figures used in such calculation were derived from the financial statements for the relevant financial quarter:

*[_____]*

[*Signature Page Follows*]

Signature Page to
<u>COMPLIANCE CERTIFICATE dated *[_____, 20___]*</u>

WITNESS my signature this *[_____ day of _____, 20___]*.

_____
(For itself and as Borrower Representative)




By:_____
    Name:
    Title:  *[Title of a Responsible Officer]*

<u>Schedule 1 to</u>
<u>COMPLIANCE CERTIFICATE dated *[_____, 20__]*</u>
<u>Financial Covenants</u>

<u>Section [_____]</u> (                              ):

    The Borrower *[is/is not]* in compliance with the covenant because the [                  ], computed as follows:

<u>Section [_____]</u> (_____):

   The Borrower *[is/is not]* in compliance with the covenant because the amount of the Borrower's

[         ]

23090\7\4864-3945-2453.v14
23090\7\4887-6256-2398.v4

**SCHEDULE A**

**Borrower's Foreign Qualifications**

The Borrower is registered to transact business in the following states:

- Delaware

## SCHEDULE B

### State Contracting Standard Terms and Conditions
*(attached)*

**SCHEDULE C**

**Disclosure Schedule**

**SCHEDULE 4.23**
**OF THE DISCLOSURE SCHEDULES**

**Capitalization**
(*attached*)

**SCHEDULE 7.1(C)**
**OF THE DISCLOSURE SCHEDULES**

**Subordinating Lender Indebtedness**

1. Secured Promissory Note dated April 29, 2022 by Borrower in favor of Mizzen Capital, LP in the amount of $7,500,000

2. Secured Promissory Note dated April 29, 2022 by Borrower in favor of Stonehenge Community Impact Fund, LP in the amount of $7,500,000

3. Secured Promissory Note dated June 24, 2022 by Borrower in favor of The Libra Foundation in the amount of $1,000,000

4. Secured Promissory Note dated July 18, 2022 by Borrower in favor of Petunia, LLC in the amount of $750,000

5. Secured Promissory Note dated July 18, 2022 by Borrower in favor of Amy Brakeman Investment Trust in the amount of $750,000

6. Amended and Restated Secured Promissory Note dated September 13, 2022 by Borrower in favor of Ceniarth Wales Interest, LP in the amount of $2,000,000

7. Secured Promissory Note dated September 13, 2022 by Borrower in favor of Bianca Passarelli in the amount of $500,000

Document comparison by Workshare 10.0 on Friday, April 21, 2023 11:22:02 AM

| Input: | |
|---|---|
| Document 1 ID | netdocuments://4887-6256-2398/1 |
| Description | Connecticut Green Bank - PosiGen, Inc. - Term Loan Credit Agreement ($6MM Term Loan) (Conformed through First Amendment) |
| Document 2 ID | netdocuments://4887-6256-2398/4 |
| Description | Connecticut Green Bank - PosiGen, Inc. - Term Loan Credit Agreement ($6MM Term Loan) (Conformed through First Amendment) |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 51 |
| Deletions | 34 |
| Moved from | 1 |
| Moved to | 1 |
| Style changes | 0 |
| Format changes | 0 |

| Total changes | 87 |
|---|---|

# PBC Term Loan Credit Agreement
# Second Amendment and Waiver

# Dated June 12, 2023

*Execution Version*

## SECOND AMENDMENT AND WAIVER NO. 1 TO TERM LOAN CREDIT AGREEMENT

This Second Amendment and Waiver No. 1 to Term Loan Credit Agreement (this "Amendment"), dated as of June 12, 2023 (the "Second Amendment Effective Date"), is entered into among PosiGen, Inc., a Delaware Corporation ("PosiGen") and Connecticut Green Bank, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, as the Lender (in such capacity, together with its successors and assigns in such capacity, the "Lender". Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement (defined below).

### BACKGROUND

A.       PosiGen and the Lender are party to that certain Term Loan Credit Agreement dated as of October 7, 2022 (as amended by that certain First Amendment to Term Loan Credit Agreement dated as of April 21, 2023 and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

B.       PosiGen has requested that Lender waive certain Events of Default that have occurred and are continuing under the Credit Agreement and make certain amendments to the Credit Agreement, all as more specifically set forth herein.

C.       Subject to the terms and conditions set forth in this Amendment, the Lender has agreed to waive certain Events of Default and amend the Credit Agreement as more fully set forth herein.

NOW THEREFORE, in consideration of the matters set forth in the recitals and the covenants and provisions herein set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### AGREEMENT

Section 1.        Amendments to the Credit Agreement.

(a)  Section 1.2 is hereby amended to add the following definition:

"*Third Lien Backleverage Credit Agreement*" means that certain Solar Loan Agreement, dated as of May 18, 2022, by and between PosiGen Backleverage, as borrower, and DC Green Finance Authority, as lender, as such agreement may be amended, restated, supplemented, revised or otherwise modified from time to time.

(b)  The definition of Permitted Encumbrances is amended in its entirety and replaced with the following:

"*Permitted Encumbrances*" means: (a) Liens securing taxes, assessments and/or governmental charges and/or levies or the claims of materialmen, mechanics, carriers, warehousemen, landlords and other similar Persons, the payment of which is not currently due and payable; (b) Liens in favor of Lender; (c) Liens in favor of other lenders existing prior to the Closing Date as disclosed to and approved by Lender, including liens in favor of Subordinating Lenders, (d) Liens on the Pledged Collateral in favor of First Lien Backleverage Lender, but only to the extent that such First Lien Backleverage Lender's Liens on the Pledged

Collateral are subordinate to the Lender's Liens on such Pledged Collateral, and (e) Liens in connection with the Indebtedness pursuant to Section 7.1(f)(ii) provided that such Indebtedness shall be subject to a lien subordination agreement in form and substance satisfactory to the Lender, in its sole discretion, and on terms reasonably equivalent to the Lien Subordination Agreement."

(c) Section 7.1 is amended by adding the following as Section 7.1(f):

"(f)    Indebtedness in connection with (i) that certain Note Purchase Agreement, dated February 2, 2023, as amended, by and among PosiGen and the persons and entities listed on Schedule I attached thereto and (ii) that certain Note Purchase Agreement, dated on or about June 12, 2023, as amended, by and among PosiGen and the persons and entities listed on Schedule I attached thereto."

(d) The final paragraph of Section 7.1 is amended in its entirety and replaced with the following:

"In no event shall any Indebtedness (other than the Obligations, the subordinated Indebtedness referred to in the Lien Subordination Agreement, and the Indebtedness permitted pursuant to Section 7.1(f)(ii), *provided, however,* that solely with respect to the Indebtedness permitted pursuant to Section 7.1(f)(ii), such Indebtedness shall be subject to a lien subordination agreement in form and substance satisfactory to the Lender, in its sole discretion, and on terms reasonably equivalent to the Lien Subordination Agreement), be secured, in whole or in part, by the Pledged Collateral or any portion thereof or interest therein and any proceeds of any of the foregoing unless such security was created without the consent of the Borrower, in which case Borrower shall have not less than thirty (30) days to fully bond over, or reserve against, any such involuntary interest."

(e) Section 7.3 is amended in its entirety and replaced with the following:

"7.3    Liens. The Borrower shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien of any kind upon, or any security interest in, any of the Project Equipment or the Pledged Collateral, whether now owned or hereafter acquired, other than in connection with Indebtedness permitted pursuant to Sections 7.1(c) and 7.1(f)."

(f) Section 8.1(q) is amended in its entirety and replaced with the following:

(q)    *First Lien Backleverage Credit Agreement; Second Lien Backleverage Credit Agreement; Third Lien Backleverage Credit Agreement.* An Event of Default, as such term is defined in the First Lien Backleverage Credit Agreement, the Second Lien Backleverage Credit Agreement, or the Third Lien Backleverage Credit Agreement, has occurred; or"

Section 2.    Representations and Warranties. To induce the Agents and Lenders to execute this Amendment, PosiGen hereby represents and warrants to the Agents and the Lenders as follows:

(a)    the execution, delivery and performance of this Amendment and the other documents entered into in connection herewith (the "Amendment Documents") have been duly authorized by all requisite action of PosiGen, and this Amendment and the other Amendment

2

Documents constitute the legal, valid and binding obligation of PosiGen, enforceable against PosiGen in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity and will not (i) contravene the terms of any of the organization documents of PosiGen, (ii) violate any law in any material respect, or (iii) conflict with or result in any material breach or contravention of any order, injunction, writ or decree of any Governmental Authority to which PosiGen or its property is subject;

(b)      The representations and warranties made by PosiGen, PosiGen Backleverage and the Project Companies contained in the Credit Agreement are true and correct in all material respects as of the date hereof (except to the extent such representations and warranties expressly refer to an earlier date, in which case they were true and correct in all material respects as of such earlier date, and except with respect to the matters that are the subject of this Amendment). Any default by PosiGen in its warranties and representations made in this Amendment shall constitute an additional Event of Default under the Loan Documents as applicable; and

(c)      no Event of Default or Default (other than the Existing Defaults) has occurred and is continuing immediately prior to and after giving effect to this Amendment and the other Amendment Documents.

Section 3.      Waiver. PosiGen has advised the Lender that Events of Default have occurred and are continuing under the Credit Agreement as follows: (a) Events of Default have occurred under Section 8.1(c) of the Credit agreement due to PosiGen's failure to comply with Sections 7.1 and 7.3 of the Credit Agreement in connection with the issuance of convertible promissory notes (the "Existing Notes") pursuant to that certain Note Purchase Agreement, dated February 2, 2023, as amended, by and among PosiGen and the persons and entities listed on Schedule I attached thereto and (b) Events of Default have occurred under Section 8.1(b) of the Credit agreement due to PosiGen's making of material misstatements and misrepresentations from and after February 2, 2023 regarding the absence of any Events of Default under the Loan Documents (collectively, the "Existing Defaults"). Effective as of the date of this Amendment, and subject to the terms and conditions set forth herein, the Lender hereby waives the Existing Defaults. This waiver shall not be deemed or otherwise construed to constitute a waiver of any Default or Event of Default now existing or hereafter arising (other than the Existing Defaults) or any other provision or to prejudice any right, power or remedy which the Lender may now have or may have in the future under or in connection with the Loan Documents (after giving effect to this Amendment).

Section 4.      Conditions Precedent. This Amendment shall be effective as of the date first set forth above, subject to the receipt by the Lender of duly executed counterparts (where applicable) of the following, each in form and substance reasonably satisfactory to the Lender and duly executed by the parties thereto and dated as of the date hereof unless otherwise specified:

(a)  this Amendment, duly executed by PosiGen and the Lender;

(b)  a Second Amendment and Waiver No. 1 to Revolving Credit Agreement, duly executed by PosiGen and the Lender;

(c)  a Thirteenth Amendment and Waiver No. 1 to Second Lien Credit Agreement, duly executed by PosiGen Backleverage LLC, Connecticut Green Bank, as Administrative Agent, Collateral Agent and a Lender, and the other Lenders;

3

(d) a Waiver to Credit Agreement, duly executed by PosiGen Backleverage LLC, BID Administrator LLC, as administrative agent and collateral agent, and the other Required Lenders;

(e) a Waiver to Solar Loan Agreement, duly executed by PosiGen Backleverage LLC and Green Finance Authority;

(f) a Waiver to Credit Agreement, duly executed by PosiGen, Inc., Mizzen Capital, LP, as lead arranger, sole administrative agent and collateral agent, and the Requisite Lenders (as defined therein), which amends that certain Credit Agreement dated as of April 29, 2022, as amended; and

(g) a Waiver to Credit Agreement, duly executed by PosiGen, LLC, PosiGen, Inc., as guarantor, Mizzen Capital, LP, as lead arranger, sole administrative agent and collateral agent, and the Requisite Lenders (as defined therein), which amends that certain Credit Agreement dated as of March 30, 2021, as amended.

Section 5.      Miscellaneous.

(a)     Effect of Amendment.   The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of any Lender under the Credit Agreement or any other Loan Document, or constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein. Except as expressly set forth herein, the Credit Agreement and the other Loan Documents, and all terms and conditions of the Credit Agreement and the other Loan Documents, shall remain in full force and effect and all Obligations are hereby ratified and confirmed. This Amendment shall constitute a "Loan Document" under the Credit Agreement.

(b)     Affirmation.   PosiGen hereby acknowledges, agrees and affirms its obligations under the Credit Agreement and the other Loan Documents (as modified and supplements in connection with the Amendment) and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects and hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party (after giving effect hereto) and (ii) ratifies and reaffirms the validity, enforceability and perfection of the grant of security interests and Liens provided for under the Loan Documents and confirms and agrees that such security interests and Liens secure all of the Obligations under the Loan Documents as amended by this Amendment.

(c)     Counterparts.   This Amendment may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Amendment by telecopier, facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") shall be effective as delivery of a manually executed counterpart thereof. Unless otherwise provided in this Amendment, the words "execute", "execution", "signed", and "signature" and words of similar import used in or related to this Amendment, or in any amendment or modification hereof (including waivers and consents), shall be deemed to include electronic signatures (including, without limitation, DocuSign and AdobeSign) and the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Connecticut Uniform

Electronic Transactions Act, and other similar state laws based on the Uniform Electronic Transactions Act.

(d)    Successors and Assigns.  This Amendment shall inure to the benefit of and be binding upon the successors and permitted assigns of the Lender and shall be binding upon the successors and assigns of PosiGen.

(e)    Severability.    The illegality or unenforceability of any provision of this Amendment or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Amendment or any instrument or agreement required hereunder.

(f)    Captions.  Section captions used in this Amendment are for convenience only and shall not affect the construction of this Amendment.

(g)    Entire Agreement.    This Amendment together with the other Amendment Documents embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof.

(h)    References.  Any reference to the Credit Agreement contained in any notice, request, certificate, or other document executed concurrently with or after the execution and delivery of this Amendment shall be deemed to include this Amendment unless the context shall otherwise require.  Reference in any of this Amendment, the Credit Agreement or any other Loan Document to the Credit Agreement shall be a reference to the Credit Agreement as amended hereby and as further amended, modified, restated, supplemented or extended from time to time. References in the Credit Agreement (including references to the Credit Agreement as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Credit Agreement as amended hereby.

Section 6.    Governing Law.  This Amendment shall be governed in all respects by the laws of the State of New York without regard to conflicts of laws.

[signature page follows]

5

DocuSign Envelope ID: C34959C5-88E2-499D-ADE8-64040A351D68

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**POSIGEN:**

POSIGEN, INC.

By _Thomas A. Neyhart_
Name: Thomas A. Neyhart
Title: CEO

*[Signature Page to Second Amendment to Term Loan Credit Agreement]*

**LENDER:**

CONNECTICUT GREEN BANK

By: _____
Name: Bryan T. Garcia
Title: President and CEO

23090\7\4868-0902-8713.v4

*[Signature Page to Second Amendment to Term Loan Credit Agreement]*

# PBC Term Loan Credit Agreement
# Third Amendment


# Dated September 30, 2024

## THIRD AMENDMENT TO TERM LOAN CREDIT AGREEMENT

This Third Amendment to Term Loan Credit Agreement (this "Amendment"), dated as of September 30, 2024 (the "Third Amendment Effective Date"), is entered into among PosiGen, PBC, a Delaware public benefit corporation (f/k/a PosiGen, Inc.) ("PosiGen") and Connecticut Green Bank, a body politic and corporate, constituting a public instrumentality and political subdivision of the State of Connecticut, as the Lender (in such capacity, together with its successors and assigns in such capacity, the "Lender"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement (defined below).

## BACKGROUND

A.    PosiGen and the Lender are party to that certain Term Loan Credit Agreement dated as of October 7, 2022 (as amended by that certain First Amendment to Term Loan Credit Agreement dated as of April 21, 2023, that certain Second Amendment and Waiver No. 1 to Term Loan Credit Agreement dated as of June 12, 2023, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

B.    The Lender is entitled to the benefits of that certain Lien Subordination Agreement dated as of July 17, 2023, by and among the Lender, PosiGen and Wilmington Trust, National Association, as Subordinating Lienholder (as heretofore amended, and as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Subordination Agreement").

C.    PosiGen has requested that Lender make certain amendments to the Credit Agreement, all as more specifically set forth herein.

D.    Subject to the terms and conditions set forth in this Amendment, the Lender has agreed to amend the Credit Agreement as more fully set forth herein.

NOW THEREFORE, in consideration of the matters set forth in the recitals and the covenants and provisions herein set forth, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

Section 1.    Amendments to the Credit Agreement.

(a)  Section 1.2 of the Credit Agreement is hereby amended to add the following definitions:

"*Availability Period*" means period commencing on the Closing Date and concluding on the date that is twenty-four (24) month anniversary of the Closing Date, subject to extension in Lender's sole and absolute discretion, during which period Term Loan proceeds shall be disbursed to Borrower pursuant to Borrowing Requests in accordance with the terms and subject to the conditions of Section 3.2 hereof.

"*Revolving Credit Agreement*" means that certain Revolving Credit Agreement dated as of September 30, 2022 between Borrower and Lender, as amended by that certain First Amendment to Revolving Credit Agreement dated as of April 21, 2023, that certain Second Amendment and Waiver No. 1 to Revolving Credit

Agreement dated as of June 12, 2023, and as may be further amended, restated, supplemented or otherwise modified from time to time.

(b) The definition of "Principal Repayment Start Date" is amended in its entirety and replaced with the following:

"***Principal Repayment Start Date***" means, with respect to each Term Loan Borrowing, the date that is the first day of the calendar Quarter immediately following the six (6) month anniversary of the Maturity Date (as defined in the Revolving Credit Agreement).

(c) Section 2.1 of the Credit Agreement is amended in its entirety and replaced with the following:

"2.1    Term Loan Commitment.  Subject to the terms and conditions hereof, from time to time during the Availability Period, the Borrower may request one or more advances of a term loan in the aggregate principal amount not to exceed the Term Loan Commitment of the Lender (the "***Term Loan***") by submitting a Borrowing Request to the Lender in accordance with Section 3.2 of this Agreement."

Section 2.    Representations and Warranties.    To induce the Lender to execute this Amendment, PosiGen hereby represents and warrants to the Lender as follows:

(a)    the execution, delivery and performance of this Amendment and the other documents entered into in connection herewith (the "Amendment Documents") have been duly authorized by all requisite action of PosiGen, and this Amendment and the other Amendment Documents constitute the legal, valid and binding obligation of PosiGen, enforceable against PosiGen in accordance with their terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity and will not (i) contravene the terms of any of the organization documents of PosiGen, (ii) violate any law in any material respect, or (iii) conflict with or result in any material breach or contravention of any order, injunction, writ or decree of any Governmental Authority to which PosiGen or its property is subject;

(b)    The representations and warranties made by PosiGen and PosiGen Backleverage contained in the Credit Agreement are true and correct in all material respects as of the date hereof (except to the extent such representations and warranties expressly refer to an earlier date, in which case they were true and correct in all material respects as of such earlier date, and except with respect to the matters that are the subject of this Amendment). Any default by PosiGen in its warranties and representations made in this Amendment shall constitute an additional Event of Default under the Loan Documents as applicable; and

(c)    no Event of Default or Default has occurred and is continuing immediately prior to and after giving effect to this Amendment and the other Amendment Documents.

Section 3.    Conditions Precedent.  This Amendment shall be effective as of the date first set forth above, subject to the receipt by the Lender of duly executed counterparts (where applicable) of the following, each in form and substance reasonably satisfactory to the Lender and duly executed by the parties thereto and dated as of the date hereof unless otherwise specified:

23090\7\4889-2790-6005.v7

(a) this Amendment, duly executed by PosiGen, the Subordinating Lienholder and the Lender;

(b) a Third Amendment to Revolving Credit Agreement, duly executed by PosiGen, the Subordinating Lienholder and the Lender;

(c) a copy of the certificate of formation, limited liability company agreement, operating agreement or other organizational documents of PosiGen, together with such amendments to the organizational documents of PosiGen as required by the Lender, certified by the secretary of such Person as being true, correct and complete copy of such document (and includes all schedules, exhibits, attachments, supplements and amendments thereto and any related protocols or side letters);

(d) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Authorized Officers of PosiGen as the Lender may require authorizing, as applicable, the amendments and the execution delivery and performance of this Amendment and the other Loan Documents and evidencing the identity, authority and capacity of each Authorized Officer thereof authorized to act as an Authorized Officer in connection with this Amendment and the other Loan Documents to which PosiGen is a party or is to be a party, in each case, certified by the secretary of such Person;

(e) such documents and certifications as the Lender may reasonably require to evidence that PosiGen is duly formed, validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect;

(f) a certificate of an Authorized Officer of PosiGen, either (A) attaching copies of all internal approvals required in connection with the amendments and the execution delivery and performance of this Amendment and the other Loan Documents and the validity against PosiGen of the Loan Documents to which it is a party, and such approvals shall be in full force and effect and not subject to appeal, or (B) certifying that no such approvals are so required;

(g) PosiGen shall pay all accrued, but unpaid interest under the Revolving Credit Agreement and the Revolving Note(s) (as such term is defined in the Revolving Credit Agreement), which is equal to $61,074.05;

(h) PosiGen shall pay all reasonable and documented fees and expenses of the Lender in connection with the preparation, negotiation, execution, and delivery of this Amendment and any related documents, including, without limitation, the reasonable and documented fees and expenses of its counsel and reasonable and documented out-of-pocket expenses, including reasonable due diligence expenses, incurred on or prior to the date hereof; and

(i) such other assurances, certificates, documents, consents or opinions as the Lender reasonably may request.

Section 4.        <u>Miscellaneous</u>.

23090\7\4889-2790-6005.v7

(a)  Effect of Amendment.  The execution, delivery and effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy of any Lender under the Credit Agreement or any other Loan Document, or constitute a waiver of any provision of the Credit Agreement or any other Loan Document, except as specifically set forth herein.  Except as expressly set forth herein, the Credit Agreement and the other Loan Documents, and all terms and conditions of the Credit Agreement and the other Loan Documents, shall remain in full force and effect and all Obligations are hereby ratified and confirmed.  This Amendment shall constitute a "Loan Document" under the Credit Agreement.

(b)  Affirmation.  PosiGen hereby acknowledges, agrees and affirms its obligations under the Credit Agreement and the other Loan Documents (as modified and supplements in connection with the Amendment) and shall continue to be, in full force and effect and is hereby ratified and confirmed in all respects and hereby (i) ratifies and reaffirms all of its payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which it is a party (after giving effect hereto) and (ii) ratifies and reaffirms the validity, enforceability and perfection of the grant of security interests and Liens provided for under the Loan Documents and confirms and agrees that such security interests and Liens secure all of the Obligations under the Loan Documents as amended by this Amendment.

(c)  Counterparts.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Amendment by telecopier, facsimile or other electronic format (including, without limitation, "pdf", "tif", or "jpg") shall be effective as delivery of a manually executed counterpart thereof.  Unless otherwise provided in this Amendment, the words "execute", "execution", "signed", and "signature" and words of similar import used in or related to this Amendment, or in any amendment or modification hereof (including waivers and consents), shall be deemed to include electronic signatures (including, without limitation, DocuSign and AdobeSign) and the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature in ink or the use of a paper-based recordkeeping system, as applicable, to the fullest extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the Connecticut Uniform Electronic Transactions Act, and other similar state laws based on the Uniform Electronic Transactions Act.

(d)  Successors and Assigns.  This Amendment shall inure to the benefit of and be binding upon the successors and permitted assigns of the Lender and shall be binding upon the successors and assigns of PosiGen.

(e)  Severability.  The illegality or unenforceability of any provision of this Amendment or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Amendment or any instrument or agreement required hereunder.

(f)  Captions.  Section captions used in this Amendment are for convenience only and shall not affect the construction of this Amendment.

(g)  Entire Agreement.  This Amendment together with the other Amendment Documents embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof.

(h)    <u>References</u>.  Any reference to the Credit Agreement contained in any notice, request, certificate, or other document executed concurrently with or after the execution and delivery of this Amendment shall be deemed to include this Amendment unless the context shall otherwise require.  Reference in any of this Amendment, the Credit Agreement or any other Loan Document to the Credit Agreement shall be a reference to the Credit Agreement as amended hereby and as further amended, modified, restated, supplemented or extended from time to time. References in the Credit Agreement (including references to the Credit Agreement as amended hereby) to "this Agreement" (and indirect references such as "hereunder", "hereby", "herein" and "hereof") shall be deemed to be references to the Credit Agreement as amended hereby.

Section 5.    <u>Governing Law</u>.  This Amendment shall be governed in all respects by the laws of the State of Connecticut without regard to conflicts of laws.

[signature page follows]

23090\7\4889-2790-6005.v7

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed by their respective authorized officers as of the day and year first above written.

**POSIGEN:**

POSIGEN, PBC

By _____

Name: Benjamin Healey

Title:   President, Capital Markets & Strategy

[*Signature Page to Third Amendment to Term Loan Credit Agreement*]

**LENDER**:

CONNECTICUT GREEN BANK

By: _____
Name: Bryan T. Garcia
Title:   President and CEO

*[Signature Page to Third Amendment to Term Loan Credit Agreement]*

**CONSENTED TO BY:**


**SUBORDINATING LIENHOLDER**:

WILMINGTON TRUST, NATIONAL
ASSOCIATION

By: _____
Name:  Andrew Lennon
Title:    Assistant Vice President